CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Bardis Vakili (Cal. Bar No. 247783)
bardis@centerforhumanrights.org
Sarah E. Kahn (Cal. Bar No. 341901)
sarah@centerforhumanrights.org
Erika Cervantes (Cal. Bar No. 344432)
erika@centerforhumanrights.org
1505 E 17th St. Ste. 117
Santa Ana, CA 92705
Tel: (909) 274-9057

Attorneys for Plaintiffs

Additional counsel listed on following page

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

Immigration Center for Women and
Children; Lupe A.; Camila B.; Paulo C.;
Kenia J. Merlos; Luna E.; Carmen F.;
Yessenia Ruano; Daniel H.; Coalition
for Humane Immigrant Rights; La Raza
Centro Legal, California Collaborative
for Immigrant Justice,

                    Plaintiffs,

          v.

Kristi Noem, Secretary of Homeland
Security, in her official capacity; U.S.
Immigration and Customs Enforcement,
United States Citizenship and
Immigration Services,
                    Defendants.

Case No.:

**COMPLAINT FOR INJUNCTIVE,
DECLARATORY, AND APA RELIEF**

**ACTION SEEKING NATIONWIDE RELIEF**

**[CLASS ACTION]**

1  *Additional Counsel for Plaintiffs:*

2  LA RAZA CENTRO LEGAL
   Stephen A. Rosenbaum (Cal. Bar No. 98634)

3  rosenbaum@law.berkeley.edu
   Jordan Weiner (Cal. Bar No. 356297)

4  jordan@lrcl.org

5  474 Valencia Street, Suite 295
   San Francisco, CA 94103

6  Tel: (415) 575-3500

7

8  PUBLIC COUNSEL
   Rebecca Brown (Cal. Bar No. 345805)

9  rbrown@publiccounsel.org
   Kathleen Rivas (Cal. Bar No. 333600)

10  krivas@publiccounsel.org

11  610 South Ardmore Ave.
   Los Angeles, CA 90005

12  Tel: (213) 385-2977

13

14  COALITION FOR HUMANE IMMIGRANT RIGHTS
   Carl Bergquist* (DC Bar 1720816)

15  cbergquist@chirla.org

16  2351 Hempstead Road
   Ottawa Hills, OH 43606

17  Tel: (310) 279-6025

18
   Adam Reese (Cal. Bar No. 362898)
19  areese@chirla.org

20  2533 W 3rd Street, #101
   Los Angeles, CA 90057

21  Tel: (213) 353-1333

22

23  *\* Pro Hac Vice Application Forthcoming*

24

25

26

27

28

2

COMPLAINT (CLASS ACTION)

I.    **INTRODUCTION**

1.    This is an action under the Administrative Procedures Act ("APA"), Immigration Nationality Act ("INA"), and the United States Constitution on behalf of noncitizen survivors of domestic violence, human trafficking, and other serious crimes, who are in or pursuing lawful immigration status, as well as several legal organizations that represent them.

2.    Plaintiffs challenge aberrant U.S. Immigration and Customs Enforcement ("ICE") policy guidance issued in early 2025, which has allowed, for the first time in decades, the detention and removal of survivors of these violent crimes as a routine matter, without regard for the many protections Congress put in place for them. *See* ICE Policy Number 11005.4, *Interim Guidance on Civil Immigration Enforcement Actions Involving Current or Potential Beneficiaries of Victim-Based Immigration Benefits* (Jan. 30, 2025) ("2025 Guidance") (attached as Exhibit A), available at https://www.ice.gov/doclib/foia/policy/11005.4.pdf.

3.    Plaintiffs also challenge two unlawful policies ICE has implemented pursuant to the 2025 Guidance. First, ICE now regularly imprisons and deports noncitizen survivors of human trafficking and crime who are lawfully in the United States pursuant to a grant of "deferred action" – formal authorization to remain lawfully in the United States for a set period of time – treating its enforcement actions as a de facto revocation of deferred action status without prior notice or opportunity to be heard (the "De Facto Revocation Policy"). Second, ICE now routinely deports survivors of trafficking and crime who have pending applications for visas that Congress created specifically to protect them from deportation, without first conducting a statutorily mandated inquiry into whether they are prima facie eligible for those visas (the "Blind Removal Policy").

4.    The individual Plaintiffs in this action have been imprisoned or deported by ICE pursuant to these unlawful policies, despite lawfully residing in the United States or having approvable pending petitions for lawful status. They

COMPLAINT (CLASS ACTION)

1   seek to represent classes of similarly situated survivors of domestic violence,
2   human trafficking, and serious crime.

3       5.      Over the last thirty years, Congress has created a carefully balanced
4   framework for the application of immigration laws to noncitizens survivors of
5   domestic violence, human trafficking, and other serious crimes, in an effort to
6   address an endemic public safety issue: undocumented people are often reluctant
7   to report violent crime to police or cooperate with investigations, out of fear of the
8   consequences they might face from their abusers and from the specter of
9   deportation. Congress's express goal in addressing this problem was to improve
10  public safety for all by creating protections against deportation and exploitation
11  that might encourage noncitizen crime victims to come forward.

12      6.      Central to this public safety goal are three critical avenues Congress
13  created for survivors to obtain permanent residence in the United States: (1) relief
14  under the Violence against Women Act ("VAWA"), under which survivors of
15  domestic abuse by U.S. citizens ("USCs") or Lawful Permanent Residents
16  ("LPRs") may "self-petition" for immigrant visas, rather than relying on their
17  abusive family members to request such visas on their behalf; (2) the "U visa,"
18  which affords a path to lawful status for noncitizens harmed by certain serious
19  crimes and who help law enforcement investigate or prosecute those crimes; and
20  (3) the "T visa," which affords lawful status to survivors of labor or sex trafficking
21  (collectively referred to herein as "Survivor-based Benefits"). Furthermore,
22  because the adjudication process for these forms of lawful status can take years,
23  Congress also took steps to protect eligible applicants from removal while their
24  petitions are pending, including by authorizing deferred action and employment
25  for those whose petitions are deemed bona fide after an initial review.

26      7.      Until recently, United States Citizenship and Immigration Services
27  ("USCIS") and ICE followed Congress's lead. For decades, ICE's policy and
28  practice was generally not to pursue civil immigration enforcement against

4

COMPLAINT (CLASS ACTION)

individuals with pending petitions for Survivor-based Benefits, absent serious adverse factors such as public safety concerns. Additionally, USCIS created formal processes to expedite applications for Survivor-based Benefits and to provide deferred action and work authorization for those deemed to have bona fide petitions for these forms of relief until such petitions could be adjudicated.

8.    The 2025 Guidance reverses these decades of agency practice and capsizes the careful balance that Congress created. The 2025 Guidance abruptly rescinded prior ICE directives that, consistent with Congressional intent, generally protected noncitizens with pending Survivor-based Benefit petitions from immigration enforcement, replacing them with a directive that greenlights their detention and removal as a routine matter.

9.    The only stated justification for this abrupt reversal is a single sentence from one of President Trump's first-day executive orders calling for "total" enforcement of immigration laws against "all" nominally removable individuals to address a fictional "invasion." *Id.* at 2. This scant explanation is insufficient under the APA to upend decades of prior policy and ignore voluminous Congressional and agency findings regarding the benefits of protecting noncitizen crime survivors.

10.    The 2025 Guidance and challenged policies flout the legislative scheme, replacing the long-standing and judiciously crafted "victim-centered" approach with an unforgiving, arbitrary, and unlawful "deportation-centered" system that ignores crime victims' eligibility for relief and railroads them into detention and removal without due process. As a result, Defendants have caused public safety to take a back seat to an arbitrary, xenophobic, and militarized mass deportation campaign that has terrorized immigrant communities and further victimized survivors of domestic violence, human trafficking, and other serious crimes who Congress sought to protect.

COMPLAINT (CLASS ACTION)

11.     Plaintiffs seek to end this harm, to restore Defendants' policy and practice regarding noncitizen survivors into compliance with the law and consistency with common sense, and to prevent a resurgence of unreported crime against vulnerable populations that the federal government had worked to combat until this year. Accordingly, Plaintiffs respectfully request that this Court set aside and enjoin the 2025 Guidance, De Facto Revocation Policy, and Blind Removal Policy, declare such policies and practices unlawful, and issue remedial orders to return the individual Plaintiffs to the position they would be in but for Defendants' applying these policies and practices against them.

## II.    JURISDICTION AND VENUE

12.     This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States. This Court may grant relief pursuant to 5 U.S.C. §§ 702-706 (APA), 28 U.S.C. §§ 1361 (mandamus), 1651 (All Writs Act), 2241-43 (habeas corpus), and 2201-02 (Declaratory Judgment Act), as well as Federal Rule of Civil Procedure 65.

13.     The federal government has waived its sovereign immunity and permitted judicial review of agency action. 5 U.S.C. § 702. In addition, sovereign immunity does not bar claims against federal officials that seek to prevent violations of federal law, rather than monetary relief.

14.     Venue is proper in this district under 28 U.S.C. § 1391(c) and (e)(1) because at least one Plaintiff resides and/or has its principal place of business in this district and each Defendant is an agency of the United States or an officer of the United States sued in his or her official capacity.

## III.    PARTIES

15.     Plaintiff Lupe A. [1] is a 64-year-old national of Mexico, with four adult children and three U.S. citizen grandchildren. She lived in the United States

---

[1] Several individual Plaintiffs are referred to in this Complaint by pseudonym. A

COMPLAINT (CLASS ACTION)

for nearly thirty years, including the last twenty years in Los Angeles, California, until Defendants removed her to Mexico in April 2025 despite her being lawfully in the United States pursuant to a grant of deferred action. She is a survivor of domestic violence. In one particularly violent episode, when Lupe tried to stop her ex-partner from hitting one of their children, he beat her to the ground and kicked her repeatedly all over her body. She reported the crime and cooperated with police in his successful prosecution. She applied for a U visa in 2017. In 2022, USCIS granted her deferred action status and work authorization, valid until October 2026, based on her prima facie eligibility for relief. Nevertheless, on or about April 28, 2025, ICE officers arrested her outside her home in Los Angeles, to enforce a 1998 removal order she did not recall receiving. Although her attorney alerted ICE to her deferred action status and pending U visa petition and sought to reopen her removal case and obtain a stay of removal, an ICE officer deported her one day later.

16.     Plaintiff Camila B. is a 46-year-old national of Mexico in lawful deferred action status. She resides in Los Angeles, California, where she has lived for the last twenty-three years. She has three U.S. citizen children: one is a college graduate, one is starting college this year, and the youngest is fourteen. In 2021, Camila was knocked unconscious and hospitalized after an assault. She cooperated with police in apprehending the suspect. In 2023, she applied for a U visa. In May 2025, USCIS determined that her petition was bona fide and conferred deferred action status on her. On July 1, 2025, while Camila was working at her tamales business, unidentified agents apprehended her during DHS's indiscriminate immigration raids across Los Angeles and held her in custody at the B-18 ICE facility in downtown Los Angeles and then the Adelanto ICE Processing Center in Adelanto, California. Although an immigration judge

_____

motion to proceed under pseudonym will promptly follow the filing of this Complaint.

COMPLAINT (CLASS ACTION)

released her on bond, ICE did not stipulate to her release and required her to wear an ankle monitor upon leaving custody. ICE now requires her to confirm her location every week by providing a picture. Camila is terrified of being detained by ICE again.

17.    Plaintiff Paulo C. is a 43-year-old national of Mexico who has lived in and around Austin, Texas for the last fifteen years. Although he is in deferred action status based on a pending U visa petition, ICE is currently imprisoning him at the South Texas ICE Processing Center in Pearsall, Texas. Paulo is married with four U.S. citizen children ages three to twenty-one, the oldest being his U.S. citizen step-daughter, who he has raised since age three. She was raped when she was 13 years old, and Paulo and his wife cooperated with police and prosecutors in the successful felony prosecution of the perpetrator. His wife petitioned for a U visa based on the incident and included Paulo as a derivative beneficiary. In April 2023, USCIS determined their application was bona fide and, as a result, granted him deferred action status and work authorization. In July 2025, after a traffic stop, ICE took him into custody without probable cause to believe he had violated the terms of his deferred action status. ICE has since refused to release him or afford him notice and an opportunity to be heard regarding the reasons for its de facto revocation of his deferred action status.

18.    Plaintiff Kenia Jackeline Merlos is a 43-year-old national of Honduras, who has lived in the United States for 22 years and resides in Portland, Oregon with her husband and four U.S. citizen children: triplets age nine and a seven-year-old. Despite her authorized presence in the United States pursuant to deferred action status, ICE is currently imprisoning her in its Northwest ICE Processing Center in Tacoma, Washington. In June 2023, Mrs. Merlos and her husband saw a man suspiciously approaching a truck by their house. When they confronted him, he pulled a gun on them and threatened to kill them. They were able to retreat to their house, and they promptly reported the matter to police and

COMPLAINT (CLASS ACTION)

cooperated with their investigation. In March 2024, Mrs. Merlos applied for a U visa. In December 2024, USCIS determined her petition was bona fide and granted her deferred action. In June 2025, while Mrs. Merlos's parents were visiting from Honduras on a valid tourist visa, her sister's family came down from Canada, where they are lawful permanent residents or citizens, to spend time together. CBP officials approached the family in a park near the Canadian border and arrested them all, including Mrs. Merlos's four U.S. citizen children and 71-year-old mother. CBP separated them from her elderly mother, and then held Mrs. Merlos and her children captive and incommunicado for the next two weeks. CBP then transferred Mrs. Merlos to ICE custody in Tacoma. ICE has since refused to release her or afford her notice and an opportunity to be heard regarding the reasons for its de facto revocation of her deferred action status.

19.     Plaintiff Luna E. is a 47-year-old national of Mexico whom ICE is currently imprisoning her at the ICE California City Detention Facility in California City, California, despite her being in approved deferred action status. She endured physical and sexual abuse from her father beginning at age twelve, and from another older man who impregnated her at age fifteen and who is the biological father of her oldest daughter. This man eventually moved to the United States, and Luna and her children, fleeing her father, joined him at his behest in 2005. However, he forced her to work several jobs and hand over all of her earnings, effectively holding her captive for years. He continued to be physically abusive. Eventually she was able to escape him. In 2023, ICE took her into custody in Washington State after she served a sentence for possession of a controlled substance for sale. She thereafter petitioned for a T visa based on the trafficking she endured, disclosing her criminal history in her petition, and providing significant evidence of her rehabilitation at USCIS's subsequent request. In February 2025, USCIS determined that her petition was bona fide and informed her that any removal order against her is automatically stayed, meaning

1   she cannot lawfully be deported. Despite this stay of removal, ICE continues to

2   detain Luna, though it does not allege that any new facts justify her detention

3   since being granted a stay.

4       20.     Plaintiff Carmen F. is a 42-year-old national of a South American

5   country, who lived in the United States for three years until Defendants removed

6   her to her home country with her eight-year-old son on or about July 31, 2025.

7   She has had a U visa petition pending since early 2025. While in the United

8   States, she endured increasingly abusive behavior from her husband. After a

9   particularly violent incident, she called police and obtained a restraining order,

10  which he soon violated. He was ultimately deported, and she was able to be free of

11  him for a time. It was short lived. In June 2025, ICE detained her at her ICE

12  check-in, took custody of her son, and then held them in ICE's family detention

13  center in Dilley, Texas, for nearly two months. Her lawyer informed ICE of her

14  pending U visa petition and requested her release and a stay of removal. ICE

15  removed her to her home country without requesting or obtaining a determination

16  from USCIS regarding her prima facie eligibility for a U visa. Her abusive

17  husband found her upon her return to their country, has forced her to live with

18  him, and has resumed his physical abuse. She is terrified every moment of every

19  day.

20      21.     Plaintiff Yessenia Ruano is a 38-year-old national of El Salvador who

21  lived in the United States for fourteen years and worked as a teacher's aide in

22  Milwaukee, Wisconsin until June 2025, but who currently resides in El Salvador

23  after being forced by Defendants to "self-deport." She is a survivor of human

24  trafficking and has had a pending T visa petition since February 2025. Her

25  immigration lawyer filed an application for a stay of her removal. ICE denied the

26  stay on March 6, 2025, and informed her immigration attorney that if she did not

27  leave the country promptly, the agency would detain her at an upcoming June

28  2025 ICE check-in. ICE agents threatened to forcibly deport her without her ten-

COMPLAINT (CLASS ACTION)

year-old twin U.S. citizen daughters. ICE did not request or obtain a determination from USCIS regarding Ms. Ruano's prima facie eligibility for a T visa. To avoid being separated from her children, Ms. Ruano succumbed to the duress and left for El Salvador with them.

22.     Plaintiff Daniel H. is a 35-year-old national of Guatemala who has lived in United States for 18 years and resides in Oklahoma City, Oklahoma. ICE is currently imprisoning him at the Rio Grande ICE Detention Center in Laredo, Texas. ICE has imprisoned him since August 2025. He has two U.S. citizen daughters, ages thirteen and fourteen. In 2009, Daniel and his father approached some individuals who appeared to be planning to break into their car. They brutally attacked Daniel and his father with a knife and car jack, stabbing Daniel in his neck and shoulder and breaking his teeth, and EMTs had to rush him to the hospital. He cooperated with the police, and as a result, his perpetrator pled guilty. In August 2025, ICE took custody of Daniel near his home after a *notario* – an unlicensed individual holding herself out as a legal professional and who Daniel believed was a lawyer – filed an incomplete U visa petition for him. Although a lawyer has since filed a corrected and complete U visa petition for him, ICE has not released him or sought expedited determination of his prima facie eligibility for relief.

23.     Plaintiff Immigration Center for Women and Children ("ICWC") is a nonprofit legal organization providing free and affordable immigration services to underrepresented immigrants, with its principal place of business is Los Angeles, California. ICWC has offices in San Francisco, Los Angeles, San Diego, and Las Vegas. ICWC strives to provide security and stability for immigrants who are survivors of domestic violence, sexual assault and other violent crimes. *See* https://www.icwclaw.org/. ICWC currently represents 6,245 clients with pending U visa petitions, including 2,279 principal petitioners with deferred action. ICWC also represents 15 clients with T visa petitions and 343 clients with pending or

COMPLAINT (CLASS ACTION)

approved VAWA self-petitions. Because its core business activities have been impacted by Defendants' policies and practices challenged herein, ICWC sues on its own behalf.

24. Plaintiff Coalition for Humane Immigrant Rights ("CHIRLA") is a Los Angeles based nonprofit organization that engages in advocacy, organizing, and legal representation on behalf of immigrants. CHIRLA's principal place of business is Los Angeles, California. CHIRLA's mission is to achieve a just society fully inclusive of immigrants. CHIRLA represents many U Visa petitioners in their affirmative petitions, as well as in removal proceedings if placed into such proceedings or detained by ICE. Its core business activities have been impacted by Defendants' policies and practices challenged herein. CHIRLA is also a membership-based organization with 52,142 members, including many in Los Angeles County. At least three of their members are U visa petitioners with pending U visa petitions who are being irreparably harmed by Defendants' policies and practices, including one for whom ICE previously agreed to "administrative closure" of her immigration court case based on her pending U visa, but which ICE is now seeking to recalendar and pursue based on the 2025 Guidance. CHIRLA sues on behalf of itself and its members.

25. Plaintiff La Raza Centro Legal ("LRCL") is a community-based nonprofit legal services organization dedicated to providing high quality, free legal representation to the Latino community and low-income immigrant families. It maintains its principal place of business in the San Francisco Bay Area. One of LRCL's core programs is its Affirmative Immigration Program, through which LRCL attorneys provide legal assistance to victims of domestic violence, crime, and human trafficking. LRCL also operates an Immigration Removal Defense Program, which includes representing U, T, and VAWA petitioners who have been detained or placed into removal proceedings. Because its core business

COMPLAINT (CLASS ACTION)

1  activities have been impacted by Defendants' policies and practices challenged

2  herein, LRCL sues on its own behalf.

3      26.    Plaintiff California Collaborative for Immigrant Justice ("CCIJ") is a

4  nonprofit legal and advocacy organization whose mission is to utilize

5  coordination, advocacy, and legal services to fight for the liberation of immigrants

6  in detention in California. CCIJ's principal place of business is in Oakland,

7  California. CCIJ operates legal clinics at immigration detention centers and other

8  carceral facilities across California, participates in rapid response networks across

9  the Bay Area to respond to urgent needs in immigrant communities, and pursues

10 impact litigation regarding conditions and abuse in carceral facilities, including

11 immigration detention centers. Through these activities, CCIJ provides direct

12 representation, consultations, and legal support to victims of crime and human

13 trafficking. As one example of CCIJ's work, the organization has assisted dozens

14 of immigrant women formerly incarcerated at the now-shuttered FCI Dublin

15 prison, helping to empower them to come forward and expose a years-long pattern

16 of sexual abuse that has resulted in numerous prosecutions. Many of these

17 survivors are eligible and have applied for U or T visas with CCIJ's assistance.

18 CCIJ sues on its own behalf.

19     27.    Defendant Kristi Noem is the Secretary of Homeland Security. As the

20 highest-ranking official in the U.S. Department of Homeland Security ("DHS"),

21 Defendant Noem directs and oversees the agency and each of its component

22 agencies, including USCIS, ICE, and U.S. Customs and Border Protection

23 ("CBP"). DHS is an agency within the meaning of 5 U.S.C § 551(f)(1). Defendant

24 Noem is responsible for implementing and enforcing immigration laws and

25 creating and implementing immigration policies, including laws and policies

26 regarding petitions for Survivor-based Benefits and other interim benefits

27 attendant to such petitions. She is sued in her official capacity.

28

COMPLAINT (CLASS ACTION)

28.     Defendant ICE is a component agency of DHS. ICE is headquartered in Washington, D.C. and has field offices throughout the country, including in Los Angeles. ICE is responsible for, among other things, enforcement of civil immigration laws, including for the detention and removal of removable noncitizens, as well as setting policies for such enforcement. ICE is an agency within the meaning of 5 U.S.C § 551(f)(1).

29.     Defendant USCIS is a component agency of DHS. USCIS is headquartered in Washington, D.C. and has offices and service centers throughout the country, including in Los Angeles. USCIS adjudicates petitions for Survivor-based Benefits. USCIS also administers immigration benefits, including those related to petitions for Survivor-based Benefits such as deferred action and employment authorization. USCIS is an agency within the meaning of 5 U.S.C § 551(f)(1).

## IV.     LEGAL BACKGROUND REGARDING PROTECTIONS FOR NONCITIZEN SURVIVORS OF SERIOUS CRIME

30.     For the last three decades, Congress has repeatedly and consistently acted to protect noncitizen victims of crime. By creating paths to legal status and citizenship through the VAWA, U visa, and T visa programs, and by authorizing and approving eligibility for deferred action and employment for petitioners while their petitions are pending, Congress's clear intent is to encourage noncitizen victims to help with exposing and prosecuting crime and to protect them from removal and further exploitation if they do.

### A.     VAWA Self-Petitions

#### *VAWA History and Purpose*

31.     Congress enacted VAWA in 1994 to address the widespread problem that many noncitizens stayed in abusive relationships because an abusive family member held the key to their permanent immigration status in the United States.

14

COMPLAINT (CLASS ACTION)

1    *See* VAWA, Title IV, Pub. L. 103-322, 108 Stat. 1796, 1902 (September 13,

2    1994). "[T]he goal of the bill is to 'permit[ ] battered immigrant women to leave

3    their batterers without fearing deportation.'" *Hernandez v. Ashcroft*, 345 F.3d 824,

4    841 (9th Cir. 2003) (quoting H.R. Rep. No. 103–395, at 25).

5            32.    As noted in the USCIS Policy Manual ("PM") – the agency's

6    centralized online repository for USCIS' immigration policies – VAWA

7    "provided certain [noncitizen] family members of abusive U.S. citizens and lawful

8    permanent residents (LPRs) the ability to self-petition for immigrant classification

9    without the abuser's knowledge, consent, or participation in the immigration

10   process." PM, vol. 3, pt. D, ch. 1, available at https://www.uscis.gov/policy-

11   manual. "This allowed victims to seek both safety and independence from their

12   abuser." *Id*.

13          33.    In 1997, the Immigration and Naturalization Service ("INS") – the

14   precursor agency to USCIS, ICE, and CBP – created a "centralized" and specially

15   trained VAWA Unit at its Vermont Service Center to adjudicate VAWA self-

16   petitions, with "the intent. . . to ensure sensitive and expeditious processing of the

17   petitions filed by this class of at-risk applicants" and to "engender[] uniformity in

18   the adjudication of all applications of this type." *Direct Mail Program; Form I-

19   360*, 62 Fed. Reg. 16607-08 (April 7, 1997).

20          34.    In 2000, Congress passed the Victims of Trafficking and Violence

21   Protection Act of 2000, which included the Violence against Women Act of 2000

22   ("VAWA 2000"). Title V, Pub. L. No. 106-386, 114 Stat. 1464, 1518. Passed with

23   overwhelming bipartisan support, VAWA 2000 expanded VAWA's protections,

24   including by creating exemptions and waivers for certain grounds of removability,

25   including crimes of moral turpitude, fraud, public charge, and unlawful presence

26   in the United States. *See, e.g.,* 8 U.S.C. §§ 1182(a)(4)(E)(i), (a)(6)(A)(ii),

27   (a)(9)(B)(iii)(IV), (a)(9)(C)(iii), (h)(1)(C), (i). In doing so, Congress expressly

28   found that "the goal of the immigration protections for battered immigrants

COMPLAINT (CLASS ACTION)

included in [VAWA] was to remove immigration laws as a barrier that kept battered immigrant women and children locked in abusive relationships" and to provide them "with protection against deportation." VAWA 2000 § 1502(a)(1)-(2).

35.     Congress expanded protections for domestic violence survivors again in 2005, with the Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162 (2006) ("VAWA 2005"). The bill's cosponsor Rep. Conyers provided the following remarks in the Congressional Record Extension:

> [Survivors] with deferred action status should not be removed or deported. Prima facie determinations and deferred action grants should not be revoked by immigration enforcement agents. The specially trained [USCIS] unit should review such cases to determine whether or not to revoke a deferred action grant. *Immigration enforcement officials at the Bureau of Immigration and Customs Enforcement do not have authority to overrule a [US]CIS grant of deferred action* to a [survivor]. Immigration enforcement officers should refer [individuals] they encounter who may qualify for relief under this Act to immigration benefits adjudicators handling VAWA cases at [US]CIS.[2]

### ***VAWA Eligibility, Adjudication, and Benefits***

36.     VAWA's main immigration provisions permit certain noncitizens whose qualifying family member was abusive to "self-petition" for a family-based immigrant visa for themselves and/or their children without their abuser's knowledge, consent or participation, instead of requiring them to petition through the sponsorship of their abusive family member. 8 U.S.C. §§ 1101(a)(51), 1154(a)(1)(A)(iii), (B)(iii).

37.     While waiting for their petitions to be adjudicated, VAWA self-

---

[2] 151 Cong. Rec. E2605-04, E2607, 2005 WL 3453763 (Dec. 17, 2005) (Statement of Rep. Conyers) (emphasis added).

COMPLAINT (CLASS ACTION)

petitioners who establish a "prima facie case" may receive federal public benefits, including federally funded "retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit." 8 U.S.C. §§ 1611, 1641(c). Thus, "[u]pon receipt of a self-petition," USCIS must promptly determine if it sets out "a 'prima facie case.'" 8 C.F.R. §§ 204.2(c)(6)(i), (e)(6)(i).

38.     Those with approved self-petitions may then apply to become LPRs. Because that process can also be lengthy, Congress ensured their protection while they wait by authorizing that anyone with an approved VAWA self-petition "is eligible for work authorization." 8 U.S.C. § 1154(a)(1)(K). In addition, "[a]pproved self-petitioners and their derivative beneficiaries may be considered for deferred action on a case-by-case basis." PM vol. 3, pt. D, ch. 5.C.2.

**B.     U Visas**

***U-Visa History and Purpose***

39.     Recognizing that VAWA protected some survivors of spousal abuse but left many survivors of violent crime without protection and unlikely to report such crime, Congress expanded protections to survivors of other serious crimes when it reauthorized VAWA in 2000. Specifically, VAWA 2000 created U Nonimmigrant Status, commonly referred to as the U visa, which provides a path to citizenship for non-citizen survivors of qualifying crimes who assist law enforcement in investigating or prosecuting those crimes. *See* VAWA 2000, § 1513(a)(2)(B), (b); 8 U.S.C. § 1101(a)(15)(U).

40.     Among Congress's stated purposes in creating the U visa were (1) "to strengthen the ability of law enforcement agencies to detect, investigate, and prosecute cases of domestic violence, sexual assault, trafficking of aliens, and other crimes. . . committed against [noncitizens], while offering protection to victims of such offenses in keeping with the humanitarian interests of the United States," and (2) to "facilitate the reporting of crimes to law enforcement officials

17

COMPLAINT (CLASS ACTION)

by trafficked, exploited, victimized, and abused [noncitizens] who are not in lawful immigration status." *Id.* § 1513(a)(2).

41.    As DHS has acknowledged, Congress—

created the U [visa] program out of recognition that victims without legal status may otherwise be reluctant to help in the investigation or prosecution of criminal activity. Immigrants, especially women and children, can be particularly vulnerable to criminal activity like human trafficking, domestic violence, sexual assault, stalking, and other crimes due to a variety of factors, including but not limited to: language barriers, separation from family and friends, lack of understanding of U.S. laws, fear of deportation, and cultural differences.[3]

42.    Underscoring the importance of encouraging noncitizen victims of crime to feel comfortable reporting crime and working with law enforcement authorities, Congress authorized DHS to waive virtually any ground of inadmissibility to U visa petitioners in the public interest. VAWA 2000 § 1513(e); 8 U.S.C. § 1182(d)(14). Even a noncitizen "who is the subject of a final order of removal, deportation, or exclusion is not precluded" from eligibility. 8 C.F.R. § 214.14(c)(1)(ii).

43.    In the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No.110-457, 122 Stat. 5044, 5053 ("TVPRA"), Congress expanded the protections for noncitizens who had come forward to report crime. Most relevant to this action, the TVPRA added § 237(d) to the INA, which authorizes DHS to issue a stay of any removal order against a U or T visa petitioner if the petition "sets forth a prima facie case for approval." 8 U.S.C. § 1227(d)(1). Any such stay remains in effect until the U or T visa is

---

[3] DHS, *U and T Visa Law Enforcement Resource Guide for Federal, State, Local, Tribal and Territorial Law Enforcement, Prosecutors, Judges, and Other Government Agencies*, at 4, available at https://niwaplibrary.wcl.american.edu/wp-content/uploads/DHS-U-and-T-Visa-Law-Enforcement-Resource-Guide-11.30.15.pdf.

COMPLAINT (CLASS ACTION)

approved or denied, during which time the applicant "shall not be removed." 8
U.S.C. §§ 1227(d)(1)-(3).

44.    The TVPRA also authorized employment for U visa petitioners who
had "a pending, bona fide application" awaiting full adjudication. TVPRA §
201(c) (codified at 8 U.S.C. § 1184(p)(6)). As stated by USCIS, the Bona Fide
Determination ("BFD") process "provides an opportunity for certain petitioners to
receive BFD [work permits] and deferred action while their petitions are pending,
consistent with the [TVPRA]." PM vol. 3, pt. C, ch. 5.

45.    Congress created BFD protections in recognition that the full
adjudication of a U visa necessary for placement on the waiting list involves a
lengthy process, and Congress intended that petitioners with valid petitions
promptly receive protection. Indeed, the bipartisan bill's co-sponsors envisioned
that USCIS would determine whether a petition was "bona fide" through a
streamlined process lasting no longer than two months, stating—

> [i]mmigrant victims of domestic violence, sexual assault and other violent
> crimes should not have to wait for up to a year before they can support
> themselves and their families. The [USCIS] Vermont Service Center should
> therefore strive to issue work authorization and deferred action in most
> instances within 60 days of filing, consistent with the need for safe and
> competent adjudication.[4]

46.    Another co-sponsor added, "By protecting the victims and not
sending them back to their home country where they are often exploited in a
vicious cycle of exploitation, we say to the victims we will make every effort to
make you safe and secure."[5]

---

[4] 154 Cong. Rec. H10888-01, H10905, 2008 WL 5169865 (Dec.10, 2008)
(statement of Reps. Berman and Conyers).
[5] 154 Cong. Rec. H10888-01, H10902, 2008 WL 5169865 (Statement of Rep.
Smith).

COMPLAINT (CLASS ACTION)

1    47.    In the TVPRA, Congress also recognized the importance of the

2    "specially-trained Violence Against Women Act Unit" at USCIS, recognizing the

3    specialized training required to understand the experience and needs of survivors.

4    The purpose of creating the unit was twofold. First, the bill's author,

5    Representative Conyers "emphasize[d] the importance of the fact that the law

6    assures that adjudication of all forms of immigration relief related to domestic

7    violence, sexual assault, trafficking or victims of violent crime continue to be

8    adjudicated by the specially trained VAWA unit." [6] He explained that "[t]his

9    specially trained VAWA unit assures consistency of VAWA adjudications, and

10   can effectively identify eligible cases and deny fraudulent cases. Maintaining a

11   specially trained unit with consistent and stable staffing and management is

12   critically important to the effective adjudication of these applications."[7]

13    48.    Second, Congress intended the unit to guide DHS policy and

14   mandated a report describing, inter alia, measures taken "to ensure the retention of

15   specially trained staff within" that unit and "to ensure routine consultation" with

16   the VAWA Unit "during the development of any [DHS] regulations or policies

17   that impact" non-citizen survivors of domestic violence and crime. TVPRA §

18   238(b)(3), (5).

19    ***U-Visa Eligibility, Adjudication, and Benefits***

20    49.    A noncitizen is eligible for a U visa if (1) the applicant "suffered

21   substantial physical or mental abuse as a result of having been a victim of" certain

22   explicitly identified types of crimes; (2) the applicant "possesses information

23   concerning [the] criminal activity"; (3) the applicant "has been helpful, is being

24   helpful or is likely to be helpful" to government officials regarding the criminal

25   activity; and (4) the criminal activity "occurred in the United States" or violated

26   United States law. 8 U.S.C. §§ 1101(a)(15)(U)(i)(I-IV). Children and spouses and,

27   _____

28   [6] Rep. Conyers, 151 Cong. Rec. E 2605, 2606, 2005 WL 3453763 (Dec. 17, 2005).
     [7] *Id.*

COMPLAINT (CLASS ACTION)

for petitioners under the age of 21, siblings and parents, may also receive U visas as derivative beneficiaries. 8 C.F.R. § 214.14(a)(10).

50.     Congress capped the number of principal U visas that may be granted annually at 10,000. 8 U.S.C. § 1184(p)(2). In 2007, DHS created implementing regulations setting forth the process for adjudicating U visa petitions. *See* Interim Rule, 72 Fed. Reg. 53014 (Sept. 17, 2007). To address backlogs caused by the annual cap, these regulations required that crime victims who are not granted U visas "due solely to the cap… must be placed on a waiting list." 8 C.F.R. § 214.14(d)(2). USCIS must also "grant deferred action" to individuals placed on the waiting list until a U visa becomes available. *Id*. Wait-listed individuals are also eligible for work authorization. *Id*.

51.     After the TVPRA authorized employment for U visa petitioners with "bona fide" petitions, 8 U.S.C. § 1184(p)(6), USCIS created a formal and streamlined BFD process in 2021 for making such bona fide determinations.

52.     Thus, as it exists today, the U visa adjudication process "involves three distinct adjudicative processes:" (1) the streamlined BFD process, (2) for petitions in which the BFD process did not result in deferred action and work authorization, full adjudication for potential placement on the U visa waiting list, and then (3) granting of a U visa once available. PM, vol. 3, pt. C, ch. 4.

53.     *First*, in the BFD process, USCIS conducts a streamlined initial review to determine whether an application is "bona fide." *Id.* The determination is "based on the petitioner's compliance with initial evidence requirements and successful completion of background checks," after which USCIS "considers any national security and public safety risks, as well as any other relevant considerations," in deciding whether to issue an employment authorization document ("EAD") and deferred action. PM, vol. 3, pt. C, ch. 5. "If USCIS determines a principal petitioner and any other qualifying family members have a

COMPLAINT (CLASS ACTION)

1    bona fide petition and warrant a favorable exercise of discretion, USCIS issues

2    them BFD EADs and grants deferred action." PM, vol. 3, pt. C, ch. 5.C.

3        54.    Under USCIS's BFD policy, petitioners granted a BFD EAD and

4    deferred action skip the second step of waiting list adjudication and are instead

5    placed directly in the queue to wait for a U visa to come available. If USCIS

6    declines to issue a BFD EAD and deferred action, it then proceeds to the second

7    step of a full adjudication for purposes of the waiting list, in which the agency

8    provides an opportunity to address "any deficiencies or concerns" regarding

9    approval. *Id.* ch. 5.C.5.

10       55.    A BFD EAD and deferred action are valid for four years and

11   renewable. PM vol. 3, pt. C, ch. 5.

12       56.    USCIS identifies four circumstances when early revocation of

13   deferred action is appropriate: (1) "if USCIS determines a national security or

14   public safety concern is present," (2) "if USCIS determines the BFD EAD and

15   deferred action is no longer warranted," (3) if "the Form I-918 Supplement B law

16   enforcement certification is withdrawn" by the certifying agency, or (4) USCIS

17   determines the prior BFD EAD was issued in error." *Id*. If changed circumstances

18   appear to warrant such revocation, USCIS "initiates a waiting list adjudication to

19   gather additional information and evidence." *Id*. ch. 5.C.1.

20       57.    *Second*, for those deemed ineligible for a BFD EAD and deferred

21   action, USCIS proceeds to a full adjudication of the petition, including any

22   waivers of grounds of removability that might have prevented the BFD. If the

23   petition is approvable and a U visa is not available due solely to the annual cap,

24   USCIS then places petitioners on the U visa waiting list and must confer deferred

25   action until a U visa becomes available or a change in circumstances causes

26   USCIS to remove the petitioner from the waiting list. PM, vol. 3, pt. C, ch. 4.

27

28

COMPLAINT (CLASS ACTION)

58.     Because deferred action for those on the waiting list is mandatory by regulation, it can only be revoked due to a material change in eligibility for the U visa. *See* 8 C.F.R. § 214.14(d)(2)-(3).

59.     *Third*, once a U visa becomes available to someone with a BFD EAD or someone on the waiting list, USCIS will conduct another background check to screen for any new material facts affecting eligibility, and if none, approve the visa. PM, vol. 3, pt. C, ch. 7.A-B. The visa recipient is authorized to work incident to status and may apply for lawful permanent residence three years later. 8 C.F.R. § 274a.12(19)-(20); 8 C.F.R § 245.24(b).

**C.     T Visa**

***T Visa History and Purpose***

60.     In the same legislation as VAWA 2000, Congress expanded protections for survivors in yet another way – it passed the Trafficking Victims Protection Act of 2000 ("TVPA"), creating the T visa to provide an avenue to lawful permanent residence and U.S. citizenship for survivors of a "severe form of trafficking in persons," as well as their family members. Pub. L. No. 106–386, 114 Stat. 1464, 1475; 8 U.S.C. §§ 1101(a)(15)(T), 1255(l). "Severe form of trafficking in persons" means either sex trafficking or labor trafficking involving the use of "force, fraud, or coercion." 8 C.F.R. § 214.201.

61.     In passing the TVPA, Congress made several express findings. It found that "trafficking in persons… is the largest manifestation of slavery today" and that "[a]pproximately 50,000 women and children are trafficked into the United States each year." 22 U.S.C. § 7101(b)(1). "Victims are often forced through physical violence to engage in sex acts or perform slavery-like labor." 22 U.S.C. § 7101(b)(6). Because "[e]xisting laws often fail to protect victims of trafficking, and because victims are often illegal immigrants in the destination country, they are repeatedly punished more harshly than the traffickers themselves." 22 U.S.C. § 7101(b)(17). "Victims of severe forms of trafficking

should not be inappropriately incarcerated, fined, or otherwise penalized solely for unlawful acts committed as a direct result of being trafficked." 22 U.S.C. § 7101(b)(19). The TVPA was passed to remedy these ills.

62.     As the INS acknowledged shortly thereafter, "Congress's intentions in passing the TVPA were to further the humanitarian interests of the United States and to strengthen the ability of government officials to investigate and prosecute trafficking in persons crimes by providing temporary immigration benefits to victims." *New Classification for Victims of Severe Forms of Trafficking in Persons; Eligibility for "T" Nonimmigrant Status*, 67 Fed. Reg. 4784-01 (Jan. 31, 2002). USCIS maintains this interpretation, stating the TVPA "was enacted to strengthen the ability of law enforcement agencies to investigate and prosecute trafficking in persons, while offering protections to victims of such trafficking, including temporary protections from removal, access to certain federal and state public benefits and services, and the ability to apply for T nonimmigrant status." PM vol. 3, pt B, ch. 1.A.

63.     USCIS "centralized the adjudication process" for T visas with the VAWA Unit "at its Vermont Service Center." 67 Fed. Reg. 4784-01, 4790. USCIS's stated policy is to "apply a victim-centered approach to all victim-based filings" by "applying a trauma-informed, survivor-informed, and culturally competent approach to all policies regarding victims." PM vol. 3, pt. B, ch. 7.

64.     Congress capped the number of T visas for principal applicants that can be granted each year to 5,000. 8 U.S.C. § 1184(o)(2)-(3). Though the cap has never been reached, the number of applicants has grown over the years. As a result, USCIS created processes for bona fide determinations and placement on a wait-list to protect T visa petitioners from removal if the annual cap is reached. 89 Fed. Reg.  34864 (Apr. 30, 2024); 8 C.F.R. §§ 214.205, 214.210.

COMPLAINT (CLASS ACTION)

1      ***T Visa Eligibility, Adjudication, and Benefits***

2      65.      To be eligible for a T visa, a petitioner must (1) be a survivor of a

3 "severe form of trafficking in persons," (2) be "physically present in the United

4 States" or territories, (3) have "complied with any reasonable request for

5 assistance" by law enforcement, with some exceptions for age and the impact of

6 trauma, (4) be someone who would "suffer extreme hardship" if removed, and (5)

7 be admissible or qualify for a waiver of the relevant grounds of inadmissibility. 8

8 U.S.C. § 1101(a)(15)(T); 8 C.F.R. § 214.202.

9      66.      Upon receipt of a T visa petition, USCIS will conduct an initial

10 review and deem it bona fide if (1) "[t]he applicant has submitted a properly filed

11 and complete [a]pplication," (2) "[t]he applicant has submitted a signed personal

12 statement," and (3), "initial background checks are complete, have been reviewed,

13 and do not present national security concerns." 8 C.F.R. § 214.205.

14      67.      T visa petitioners deemed to have bona fide petitions are eligible for

15 deferred action and work authorization. 8 C.F.R. § 214.205(c), (e). Additionally, a

16 determination that a T visa petition is bona fide "automatically stays the execution

17 of any final order of removal, deportation, or exclusion… until any adverse

18 decision" on the T visa "becomes final." 8 C.F.R. § 214.205(g); *see also* 8 C.F.R.

19 § 214.204(b)(2)(iii). T visa petitioners with bona fide petitions are also eligible for

20 federal and state public benefits and support services to the same extent as

21 refugees. 22 U.S.C. § 7105(b)(1).

22      68.      If, before final adjudication, USCIS "receives information that an

23 applicant is no longer eligible for T nonimmigrant status, USCIS may remove an

24 applicant from the waiting list and terminate any grant of deferred action or parole

25 at its discretion." 8 C.F.R. § 214.210(d). "USCIS will provide notice to the

26 applicant of that decision." *Id*.

27      69.      However, "USCIS generally will not refer" a T visa applicant "for

28 removal proceedings while the application is pending or following denial of the

COMPLAINT (CLASS ACTION)

application, absent serious aggravating circumstances, such as the existence of an egregious criminal history, a threat to national security, or where the applicant is complicit in committing an act of trafficking." 8 C.F.R. § 214.204(b)(3).

## V.    DECADES OF CONSISTENT DHS POLICIES PROTECTED APPLICANTS FOR SURVIVOR-BASED BENEFITS

70.    Since the creation of these benefits, DHS policy has consistently implemented Congress's intent to encourage noncitizen victims of domestic violence, severe trafficking, and other serious crime to report crime and cooperate with law enforcement without fear of immigration consequences.

### *2005: Howard Memo*

71.    In 2005, ICE's Office of the Principal Legal Advisor ("OPLA") – the office responsible for pursuing removal proceedings in immigration court – issued a memorandum to guide ICE attorneys in exercising "sound principles of prosecutorial discretion, uniformly throughout our offices and in all of our cases." Memorandum from William J. Howard, Principal Legal Advisor, to All OPLA Chief Counsel, *Prosecutorial Discretion*, at 3 (Oct. 24, 2005) ("Howard Memo"), available at https://www.aila.org/library/ice-prosecutorial-discretion-memo. As one example of a circumstance "where the reasonable and rational decision is not to prosecute the case," the Howard Memo states that "[w]here a 'U' or 'T' visa application has been submitted, it may be appropriate not to" initiate removal proceedings "until a decision is made on such an application" and to pursue removal proceedings only if "the application is denied." *Id.* at 5.

### *2007 Guidance*

72.    In 2007, ICE issued a memo summarizing and providing "practice considerations" for ICE attorneys after VAWA 2005 was enacted. Memorandum from William Howard, Principal Legal Advisor, to All OPLA Chief Counsel, *VAWA 2005 Amendments to Immigration and Nationality Act and 8 U.S.C. § 1367*

COMPLAINT (CLASS ACTION)

(Feb. 1, 2007), available at

https://www.ice.gov/doclib/foia/policy/memoVAWA_2005_INA_Amendments_0

2.01.2007.pdf. The guidance informed ICE attorneys that they "may agree to

exercise appropriate prosecutorial discretion" by not actively pursuing removal

proceedings against noncitizens "who establishes *prima facie* eligibility for

VAWA, T, or U self-petitioner status" so that they can pursue their applications

"before USCIS." *Id.* at 13.

### *2009 U Visa Guidance*

73.     In 2009, ICE issued guidance directing agents to generally "favorably

view" requests for stays of removal from U visa petitioners who "USCIS has

determined" to have "prima facie eligibility for a U-visa," except in exceptional

cases presenting "serious adverse factors" such as "significant public safety

concerns." Memorandum of David J. Venturella, Acting Director, Detention and

Removal Operations, to Field Office Directors, *Guidance: Adjudicating Stay

Requests Filed by U Nonimmigrant Status (U-visa) Applicants*, (Sept. 24, 2009)

("Directive 11005.1"), available at

https://www.ice.gov/doclib/foia/dro_policy_memos/11005_1-hd-

stay_requests_filed_by_u_visa_applicants.pdf. Consistent with the plain language

of 8 U.S.C. § 1227(d)(1), if the individual requests a stay, ICE "must… request a

prima facie determination from USCIS's [VAWA Unit]." *Id.* For those in custody,

ICE "shall inform USCIS" and "request that USCIS expedite" adjudication. *Id.*

74.     The next day, ICE's Principal Legal Advisor issued "field guidance

to ensure compliance with the [TVPRA] regarding [noncitizens] with pending U

visa petitions." Memorandum from Peter S. Vincent, Principal Legal Advisor, to

OPLA Attorneys, *Guidance Regarding U Nonimmigrant Status (U visa)

Applicants in Removal Proceedings or with Final Orders of Deportation or

Removal* (Sept. 25, 2009) ("2009 Vincent Memo"), *available at*

https://www.ice.gov/doclib/foia/dro_policy_memos/vincent_memo.pdf. The 2009

COMPLAINT (CLASS ACTION)

Vincent Memo reiterated the requirements of Directive 11005.1, and it added that ICE "should allow USCIS a minimum of five (5) business days to make a *prima facie* determination." *Id.* For individuals in removal proceedings, ICE attorneys were "to request a continuance to allow USCIS to make a *prima facie* determination." *Id.* If USCIS decides the petitioner "has made a *prima facie* case," ICE attorneys were to consider seeking termination or administrative closure of the removal proceedings "pending final adjudication of the [U visa] petition." *Id.*

### **2011 Policy**

75.     In 2011, ICE issued additional guidance establishing "agency policy regarding the exercise of prosecutorial discretion" in "the handling of cases involving T and U visas," with the express purpose to "minimize any effect that immigration enforcement may have on the willingness and ability of victims, witnesses, and plaintiffs to call police and pursue justice." John Morton, ICE Policy Statement 10076.1, *Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs* (Jun. 17, 2011) ("2011 Policy" or "Morton Memo") at 1, available at https://www.ice.gov/doclib/foia/prosecutorial-discretion/certain-victims-witnesses-plaintiffs.pdf. In guiding this discretion, the 2011 Policy reminds agents that, through the TVPA, "its subsequent reauthorization" in the TVPRA, "and the Violence Against Women Act," Congress created "protections for the victims of crime," including "victims of domestic violence, victims of certain other crimes" delineated in the U visa statute, "and victims of human trafficking." *Id.*

76.     Accordingly, the 2011 Policy reiterates that it is generally against ICE policy "to initiate removal proceedings against an individual known to be the immediate victim or witness to a crime," unless there are "special circumstances or aggravating factors" or other "serious adverse factors" that warrant an exception to the general rule. *Id.* at 1-2.

77.     Further, the 2011 Policy noted "that a flag now exists in the Central Index system (CIS) to identify those victims of domestic violence, trafficking, or

other crimes who already have filed for, or have been granted, victim-based immigration relief," and it encourages ICE officers "to contact the local ICE Office of Chief Counsel" when they "see this flag." *Id*. at 3.

### *2019 Directive*

78.    In 2019, ICE under the first Trump Administration issued Directive 11005.2, which superseded Directive 11005.1 and the 2009 Vincent Memo. ICE Directive 11005.2, *Stay of Removal Requests and Removal Proceedings Involving U Nonimmigrant Status (U Visa) Petitioners*, (Aug. 2. 2019) ("2019 Directive"), available at https://www.ice.gov/doclib/foia/policy/11005.2_StayRemovalReqRemProcUVisa Petitioners.pdf.

79.    Although the 2019 Directive was less protective than previous policy in several ways, it expressly preserved ICE longstanding practices of (1) providing stay application forms to individuals with final removal orders claiming to have a pending U visa petition and allowing "five business days" for them to file a stay request, (2) viewing law enforcement cooperation as a "significant favorable factor," (3) considering convictions "related to a petitioner's victimization" generally to not be an "adverse factor," (4) reconsidering "whether continued detention is appropriate" for people with pending petitions, (5) adhering to grants of "deferred action" from USCIS based on the pending U visa petition, and (6) considering whether to "join a motion to terminate proceedings… while the [petition] is being adjudicated." *Id.* at 2-6.

### *2021 Directive: Victim-Centered Approach*

80.    In 2021, ICE, under the Biden Administration, issued Directive 11005.3, encouraging a "Victim-Centered" enforcement approach and superseding the 2019 Directive. ICE Directive 11005.3, *Using a Victim-Centered Approach with Noncitizen Crime Victims* (Dec. 2, 2021) ("2021 Directive"), available at https://www.ice.gov/doclib/foia/policy/11005.3_UsingVictimCenteredApproachN

oncitizenVictims.pdf. Noting that "Congress created victim-based immigration benefits to encourage noncitizen victims to seek assistance and report crimes committed against them despite their undocumented status," the 2021 Directive states that "[w]hen victims have access to humanitarian protections, regardless of their immigration status, and can feel safe in coming forward, it strengthens the ability of local, state, and federal law enforcement agencies, including ICE, to detect, investigate, and prosecute crimes." *Id.* Accordingly, the 2021 Directive seeks to "minimize[] any chilling effect that civil immigration enforcement actions may have on the willingness and ability of noncitizen crime victims to contact law enforcement, participate in investigations and prosecutions, pursue justice, and seek benefits" and to "bolster[] faith in the entire criminal justice and civil immigration systems." *Id.*

81. Thus, the 2021 Directive continued ICE's longstanding policy to "refrain from taking civil enforcement action against" individuals "known to have a pending application" for "victim-based immigration benefits" unless there are "exceptional circumstances" such as national security concerns or a "risk of death, violence, or physical harm to any person." *Id.* at 1-2. If an application is pending, ICE will "defer decisions" on enforcement until final determinations are made on pending petitions or a negative determination is made on an interim adjudication like a BFD or wait-list determination. *Id.* at 2. The 2021 Directive also reinstated a policy of requesting expedited adjudications for people in ICE custody. *Id.* at 9. "The fact that someone is a victim of crime and… may be eligible for victim-based benefits" is to be considered a "positive discretionary factor." *Id.*

## VI.    DEFENDANTS' CURRENT POLICIES REJECT PRIOR PRACTICE AND INTENTIONALLY EXPOSE SURVIVORS TO ENFORCEMENT

82. Shortly after President Trump took office for his second term, ICE Acting Director Caleb Vitello issued the 2025 Guidance challenged in this case.

COMPLAINT (CLASS ACTION)

The sparse 2025 Guidance explicitly "rescinded and superseded" the 2021 Policy and 2011 Policy, replacing them with requirements that, when conducting civil immigration enforcement actions against applicant for Survivor-based Benefits, ICE officers —

(1) need only "coordinate and deconflict" with law enforcement agencies "to ensure criminal investigative and other enforcement actions will not be compromised";

(2) "should consult with" local ICE attorneys only "to ensure any such action is consistent with applicable legal limitations";

(3) need not consider the fact that a noncitizen "is a victim of a crime" as "a positive discretionary factor"; and

(4) "will no longer routinely request expedited adjudications from USCIS," but may do so only when "it is in *ICE's* best interests."

2025 Guidance at 2-3 (emphasis added).

83. Thus, the 2025 Guidance reverses course from decades of agency practice under which immigration agencies generally refrained from enforcement against survivors of serious crime, unless warranted by adverse factors. Instead, the 2025 Guidance requires enforcement against survivors of crime to the maximum extent that ICE attorneys say it is legal to do so, with the only exception being when enforcement will interfere with active law enforcement investigations.

84. As detailed below, the unprecedented result is that noncitizen victims of crime and severe human trafficking who have cooperated with police, applied for the benefits Congress afforded them for doing so, and are simply awaiting adjudication of their applications, including even those with valid grants of deferred action or who are prima facie eligible for relief, are now routinely being detained and deported.

85. The 2025 Guidance devotes a *single* sentence to justifying this about-face, identifying the sole reason language from one of President Trump's first-day

COMPLAINT (CLASS ACTION)

Executive Orders calling for "the 'total and efficient enforcement of [immigration] laws' against all inadmissible and removable" people. *Id.* at 2. It does not reference any of the factual findings or purposes of Congress's enactments or prior immigration policies, much less make any of its own.

86.   The stated purpose of the Executive Order relied upon was to address a supposed "flood of illegal immigration" that had occurred "[o]ver the past 4 years," and to "ensure[] that the Federal Government protects the American people by faithfully executing the immigration laws of the United States." Exec. Order No. 14159, *Protecting the American People Against Invasion,* § 1 (Jan. 20, 2025) ("Invasion EO"), available at https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-american-people-against-invasion/. Accordingly, the Invasion EO states the Trump Administration's policy "to faithfully execute the immigration laws against all inadmissible and removable aliens" and "to achieve the total and efficient enforcement of those laws." *Id.* § 2.

87.   The 2025 Guidance has directly resulted in two additional unlawful policies and practices by Defendants that Plaintiffs challenge here.

88.   Under the De Facto Revocation Policy, ICE now routinely detains and deports people who have valid grants of deferred action from USCIS in connection with pending U or T visa petitions. Neither ICE nor USCIS provides any notice or opportunity to be heard regarding whether such deferred action should be revoked prior to doing so. Instead, ICE treats its enforcement action as a de facto revocation of deferred action. This policy unlawfully renders the protection of deferred action meaningless.

89.   Under the Blind Removal Policy, ICE now engages in a pattern and practice of refusing to request prima facie determinations from USCIS when people with pending U or T visa petitions request stays of their removal orders. By doing so, ICE renders itself willfully blind to an individual's eligibility for protection when seeking to remove the person. This policy is inconsistent with the

COMPLAINT (CLASS ACTION)

requirements of 8 U.S.C. §1227(d)(1) and Congress's intent that individuals with prima facie eligibility for relief should generally be protected from removal.

90.    The 2025 Guidance's harm to applicants for Survivor-based Benefits is further compounded by other policies and practices the Trump Administration has aimed at them to minimize the effectiveness of these immigration programs and further chill eligible applicants from their use.

91.    For instance, the Administration has created staffing shortages and adjudication policies in USCIS that result in several months of delay before a receipt notice is even issued to U and T visa applicants, when such notices used to be provided in a few weeks.[8] This deprives applicants of proof of their filing for months, leaving them more vulnerable to enforcement.

92.    In addition to these delays at the front end of the application process, the BFD process for U visa has long been plagued by delays, with these *prima facie* adjudications often taking more than a year, instead of the few months envisioned by Congress. Because a favorable outcome in the BFD process leads to work authorization and deferred action, these delays render applicants more vulnerable to detention and deportation.

93.    Processing times for T visa petitions have also increased, from a reported average of 5.9 months in 2014 to a reported average of 19.9 months in fiscal year 2025.[9]

94.    This prolonged vulnerability of applicants is occurring in conjunction with unprecedented levels of immigration enforcement. Defendants have deputized every federal law enforcement agency and the military into their

---

[8] Mel Leonor Barclay, *The protective visas that may never come,* The 19th (Sep. 3, 2025) https://19thnews.org/2025/09/u-t-visas-victims-violence-immigrants-women/
[9] Phi Do, *More human-trafficking survivors are seeking visas but face longer waits and risk deportation,* L.A. Times (Aug. 3, 2025), https://www.latimes.com/world-nation/story/2025-08-23/more-human-trafficking-survivors-are-seeking-visas-but-face-longer-waits-and-risk-deportation.

COMPLAINT (CLASS ACTION)

onslaught of immigration enforcement.[10] Immigration agents have reportedly been given arrest and removal quotas, placing pressure on them to arrest more and more people in increasingly sensitive situations and locations.[11] Masked, often unidentified immigration agents and their new "deputies" routinely arrest people for civil immigration enforcement on the street, at their homes, at work, while dropping their kids off at school, and even at places where they have complied with DHS orders to appear, such as ICE check-ins, fingerprint appointments, and immigration court hearings.[12] Many of the people caught up in this arbitrary blitz are individuals with pending petitions for Survivor-based Benefits, including the individual Plaintiffs here and the organizational Plaintiffs' members and clients.

95.    Policies that explicitly protect crime survivors are necessary to effect Congress's repeated intent and public safety goal of encouraging noncitizen survivors of domestic violence, human trafficking, and other serious crime to come forward, report crime, and cooperate with law enforcement. Instead, Defendants have created a climate of fear and implemented the 2025 Guidance to strip the protections of prior policies, giving immigration agents the green light to arrest and deport vulnerable individuals who bravely confronted their perpetrators and who relied on the government's long-standing promise of protection.

---

[10] *See, e.g.*, Press Release, DHS, *ICYMI:Secretary Noem Deputized State Department Officials as Immigration Officers* (Feb. 20, 2025). https://www.dhs.gov/news/2025/02/20/secretary-noem-deputized-state-department-officials-immigration-officers

[11] Josh Gerstein & Kyle Cheney, *Judges press Trump administration on deportation quotas,* Politico (July 28, 2025) https://www.politico.com/news/2025/07/28/judges-trump-administration-deportation-quotas-00480899 (quoting an ICE official as saying, "Under President Trump's leadership, we are looking to set a goal of a minimum of 3,000 arrests for ICE every day").

[12] *See, e.g.,* Ted Hesson & Kristina Cooke,  *ICE's tactics draw criticism as it triples daily arrest targets*, Reuters (June 10, 2025) https://www.reuters.com/world/us/ices-tactics-draw-criticism-it-triples-daily-arrest-targets-2025-06-10/

COMPLAINT (CLASS ACTION)

## VII. THE 2025 GUIDANCE IS CAUSING IRREPARABLE HARM

96.     The 2025 Guidance, the De Facto Revocation Policy, and the Blind Removal Policy have predictably resulted in a reduction of crime reporting and applications for Survivor-based Benefits.

97.     "Data from January through March published by [USCIS] shows a sharp drop off in U visa applications," which "fell by almost half from the previous three months."[13] "A spring 2025 survey of 170 advocates and lawyers for immigrant victims of domestic and sexual violence and human trafficking… found that more than three-quarters said their clients had concerns about contacting the police."[14] After one advocate "watched a human trafficking victim with no criminal record be detained" by ICE, the advocate now "question[s] whether it is advisable to tell victims that it's safe to seek help from law enforcement."[15]

98.     Prosecutors have reported that victims of crimes have expressed fear of coming to court to testify, out of fear of being "snatched by ICE" at the courthouse.[16] As one prosecutor stated in responding to the fact that the 2025 Guidance "explicitly talk[s] about witnesses and victims that ICE is no longer going to" refrain from detaining, "[t]his is not something that we've ever seen before."[17]

99.     In sum, "[s]ince Trump's second inauguration, the administration's close cooperation with local police to help with immigration enforcement, layoffs at the agency that handles" U and T "visa applications and the stripping away of policies that protected applicants from deportation have all had a chilling effect on

---

[13] Barclay, *supra* n. 8.

[14] *Id.*

[15] *Id.*

[16] Sahan Journal, "*It makes us … less safe": How federal immigration actions are affecting local prosecutions in Hennepin County*, Eden Prairie Local News (Aug. 23, 2025) https://www.eplocalnews.org/2025/08/23/it-makes-us-less-safe-how-federal-immigration-actions-are-affecting-local-prosecutions-in-hennepin-county/

[17] *Id.*

COMPLAINT (CLASS ACTION)

new applications and could be exacerbating processing delays for new applications."[18]

100.   The challenged policies have also had their intended effect of causing a greater number of arrests and removals of noncitizens who applied for Survivor-based Benefits, including many in authorized deferred action status.[19] For T visa petitioners, such unlawful removals impact their ability to establish physical presence in the United States, which is a requirement for approval. 8 U.S.C. § 1101(a)(15)(T)(i)(II).

**A. The Challenged Policies Irreparably Harm Individual Plaintiffs.**

101.   Plaintiffs Lupe A., Camila B., Paulo C., Mrs. Merlos, Luna E., Carmen F., Ms. Ruano, and Daniel H. (collectively, "Individual Plaintiffs") have suffered and continue to suffer irreparable harm as a result of the 2025 Guidance and the De Facto Revocation Policy and Blind Removal Policy that it unleashed.

***Lupe A.:***

102.   Plaintiff Lupe A. received deferred action and work authorization pursuant to her U visa petition in 2022, which is valid until October 2026. She is 64 years old, lived in the U.S. for nearly three decades, and has four adult U.S. citizen children, three of whom live in the United States, and three grandchildren.

_____

[18] Barclay, *supra*, n.8

[19] *See, e.g.* Cate Cauguiran, *Family says wrong turn led to ICE detaining Chicago business owner, demand release:'Heartbroken'*, ABC 7 Chicago (Aug. 20, 2025) https://abc7chicago.com/post/chicago-area-family-says-wrong-turn-michigan-led-ice-detaining-business-owner-sergio-serna-ramirez-demands-release/17600733/ (describing Chicago area man still in ICE custody three months after being detained, despite pending U visa and marriage to U.S. citizen); *Oregon Firefighter Arrested by Border Agents While on Track for U Visa Status*, Visa Verge (Aug. 31, 2025) https://www.visaverge.com/news/oregon-firefighter-arrested-by-border-agents-while-on-track-for-u-visa-status/ (describing arrest of fireman at wildfire worksite during an active fire and his continued ICE detention despite having a U visa petition pending for 7 years); *Madrid Leiva v. Welsh*, Case No. 5:25-cv-03075-TC (D. Kan. 2025) (ongoing detention of U visa petitioner with BFD).

COMPLAINT (CLASS ACTION)

She was deeply involved in her church in Los Angeles, where she often volunteered. She also started a small clothing business, paid her taxes, and took English classes.

103.   Lupe's U visa petition stems from her former partner's severe physical abuse. One day in 1997, when he was hitting one of their children, she intervened to stop him. He beat her badly, slapping her on the face, throwing her to the ground, and kicking her all over her body. She reported the attack and found the courage to testify against him, resulting in his conviction. He frequently told her that while he could not hurt her in the United States anymore, if she ever went back to Mexico, he would find her and hurt her.

104.   She applied for a U visa in 2017, and USCIS granted her work authorization and deferred action status in November 2022. At the time she applied, she believed it would protect her from immigration enforcement, so long as she obeyed the law. She was correct, for a time. But then the 2025 Guidance was issued, leading to ICE's De Facto Revocation and Blind Removal Policies.

105.   As a result, on April 28, 2025, ICE arrived at Lupe's house to arrest her based on an old removal order about which she was unaware. Lupe did not understand why they came for her, as she had not done anything since being granted deferred action to place that status at risk. In conducting the arrest, ICE agents shackled her by her arms and legs and handled her roughly, injuring her arm and bruising her leg. This was an especially traumatic experience for her as a survivor of domestic abuse. Lupe informed the agents she had arthritis, but they ignored her pleas.

106.   The ICE agents took Lupe to a facility in Los Angeles, where she was forced to spend the night on the floor. Based on the stark description of the conditions, this appears to have been the notorious B-18 ICE facility in downtown Los Angeles. ICE agents pressured her to sign a document, seemingly an order of removal. She told them she had a pending U visa petition, but they did not care.

Her immigration attorney – a staff member with Plaintiff ICWC – also contacted ICE, informed the agent that she had deferred action, and inquired what he was asking her to sign. The officer refused to provide any information to the attorney about the forms, saying something to the effect of "she has no option" or "we don't do options here." Meanwhile, an ICE officer told Lupe that if she did not sign, they would "get rid" of her anyway.

107.   ICE did not provide her with any notice that her deferred action was being revoked early or an opportunity to be heard why it should not be. A prior removal order is not a bar to a U visa.

108.   Although her attorney attempted to file a motion to reopen with the immigration court to address the old removal order, which included a request for a stay of removal that was served on ICE, ICE removed Lupe the very next day, before the immigration court had an opportunity to address the motion. Although 8 U.S.C. § 1227(d)(1) requires ICE to consider whether an individual is prima facie eligible for a U visa when determining whether to stay a removal order, under its Blind Removal Policy, ICE does not follow this requirement. Thus, ICE did not request or obtain a prima facie determination from USCIS prior to removing her.

109.   Lupe is now in Mexico, separated by national borders from her children, grandchildren, dogs, and church, and she is vulnerable to persecution by her past abuser.

### *Camila B.*:

110.   Plaintiff Camila B. received deferred action status related to her U visa petition in May 2025. She has lived in Los Angeles for the last 23 years. She is married and has three U.S. citizen children, ages 22, 18, and 14. The oldest just graduated university, and the middle child just entered university. The youngest is a talented soccer player whose games the family often goes to watch together.

COMPLAINT (CLASS ACTION)

111.   In 2021, an assailant attacked Camila at a bus stop, punching her twice in the face and knocking her unconscious, after which she was hospitalized. She cooperated with police, who arrested the attacker. Camila believes he is currently in jail.

112.   In 2023, she applied for a U visa, including her husband as a derivative. In May 2025, USCIS determined that her petition was bona fide and informed her that she has been approved for employment authorization and deferred action status.

113.   In summer 2025, DHS began a widespread, militarized, indiscriminate campaign of immigration raids in and around Los Angeles. On July 1, 2025, as part of those immigration sweeps, armed men surrounded Camila at her tamales stand, handcuffed her, and forced her into a vehicle that did not have any discernible government markings. She did not know if they were ICE agents. They pulled into an alley, and she could hear them discussing that they did not know the directions to the ICE facility they were trying to get to. She was terrified as she came to realize she had been kidnapped.

114.   The men who arrested her did not have a warrant or any individualized suspicion that Camila was violating immigration laws or her deferred action status.

115.   The armed men took her belongings and brought her to ICE's B-18 facility in Los Angeles. ICE then transferred her to ICE's Adelanto detention facility, where the conditions are substantially similar to or worse than jail: although it is nominally "civil" detention, immigration detainees are forced into color-coded jumpsuits, guarded by armed guards, forbidden from leaving or moving about the facility, separated from work and family, restricted in visitation, deprived of private personal phone calls, stripped of their liberty to decide when to turn the lights off or what to eat, provided limited time outdoors, subjected to routine searches, and otherwise treated like prisoners in a criminal facility.

COMPLAINT (CLASS ACTION)

116.   ICE refused to release Camila despite her deferred action, and an attorney filed a habeas petition on her behalf. Although the Department of Justice attorney on the case agreed to have the immigration court conduct a bond hearing, the ICE attorney in the bond hearing did not stipulate to Camila's release. The immigration judge ordered release on bond on July 30, 2025, but ICE forced her to wear an ankle monitor when releasing her, even though her deferred action status necessarily meant that DHS had conducted background checks and deemed her not to be a flight risk or dangerous.

117.   ICE removed the ankle monitor only after Camila's doctor submitted a letter requesting it to alleviate health risks it caused based on her diabetes and high blood pressure. However, ICE still requires her to check in every week with a photograph and/or phone call, as well as additional check-ins every four weeks, including home visits.

118.   While ICE unjustifiably imprisoned her at Adelanto, Camila's family also suffered tremendously. Her daughter cried herself to sleep every night.

### ***Paulo C.*:***

119.   Plaintiff Paulo C. has been in authorized deferred action status based on his pending U visa petition since around April 2023. Yet, he is currently detained at an ICE detention center in Pearsall, Texas, where ICE has imprisoned him since his arrest in July 2025. Paulo has lived in the United States since 2010. He lives with his wife and their four U.S. citizen children, ages 21, twelve, six, and three. He has a small construction company, which he has operated for nearly ten years, and he timely pays his taxes and his subcontractors. His family recently bought their first home.

120.   In 2016, Paulo's then-thirteen-year-old step-daughter was raped. He and his wife reported the attack to the police and worked with a detective until the perpetrator was arrested. Due in large part to their cooperation, the perpetrator pled guilty to felony injury to a child.

COMPLAINT (CLASS ACTION)

121.   The family suffered alongside their daughter, who was traumatized by the incident. Paulo and his wife applied for U visas, with Paulo's wife as the principal and Paulo as a derivative to her application. In 2023, USCIS granted Paulo and his wife a BFD, deferred action status, and employment authorization.

122.   When he applied for his U visa, Paulo believed the process would protect him from immigration enforcement. Indeed, his grant of deferred action status is meant to do just that. However, under ICE's 2025 Guidelines and De Facto Revocation policy, it does not. On July 25, 2025, a Texas Department of Public Safety officer pulled Paulo over because of a broken taillight. Even though Paulo showed a valid driver's license and employment authorization card, the arresting officer texted an ICE agent, who instructed the officer that he would issue a detainer to take custody of Paulo.

123.   Paulo has not committed any act since his deferred action was granted to put that status in jeopardy, and ICE had no probable cause to believe that he did. Nevertheless, the police held Paulo until July 27, when they transferred him to ICE custody. Prior to taking custody, ICE did not provide him any notice that his deferred action was being revoked or provide an opportunity to be heard regarding its potential revocation.

124.   Paulo's wife was able to hire a lawyer to represent Paulo solely in a bond hearing, but the immigration judge deemed him ineligible to receive a bond hearing based on recent BIA precedent holding that individuals who entered the United States without admission or inspection are not entitled to such a hearing, even if they had been residing in the United States for years or were granted temporary lawful status after entry. *See Matter of Yajure Hurtado*, 29 I&N Dec. 216, 220 (BIA 2025). On August 12, 2025, an immigration judge ordered Paulo, who appeared pro se at that hearing, removed. Although the ICE attorneys knew that Paulo had been granted deferred action based on a BFD, they did not present that information to the immigration court or exercise discretion not to pursue

proceedings. Subsequently, Paulo's family hired another attorney who was able to reopen the proceedings, but the immigration judge has thus far refused to order Paulo released despite his authorized deferred action status, and ICE has opposed his requests and refused to release him.

125.   As with most nominally "civil" immigration detention centers, conditions at the South Texas ICE Processing Center are substantially similar to jail. Guards are aggressive and discriminatory, treating detainees like criminals.

126.   Paulo's children and wife rely heavily on him for financial and emotional support. Furthermore, without the income from Paulo's work, his wife, who has health problems, must support the family with her part-time job, and the family is at risk of losing their newly purchased home.

127.   ICE continues to seek Paulo's removal, as directed by the 2025 Guidance, and to keep him imprisoned in an immigration jail pursuant to its De Facto Revocation policy.

***Mrs. Merlos***:

128.   Plaintiff Kenia Jackeline Merlos has been in authorized deferred action status since December 2024. She is married with four U.S. citizen children: nine-year-old triplets and a seven-year-old son. The family operates a construction business in their hometown of Portland, Oregon.

129.   In June 2023, Mrs. Merlos and her husband confronted a man who they believed was going to steal from a parked truck near their home. The man pulled a gun on them and threatened to kill them. They retreated to their home and then reported the crime to police and cooperated with their investigation. Although she was physically unharmed, Mrs. Merlos was traumatized by the incident, which triggered difficult memories of the violence she endured in Honduras.

130.   In March 2024, Mrs. Merlos petitioned for a U visa based on the incident. In or around December 2024, USCIS conferred deferred action status on her after it found her petition bona fide and that she passed her background

COMPLAINT (CLASS ACTION)

checks. Deferred action status is intended to protect her from immigration enforcement. Under the 2025 Guidelines and De Facto Revocation Policy, it does not.

131.   In June 2025, Mrs. Merlos' elderly parents were visiting on a valid tourist visa. Other than a previous visit earlier in the year, she hadn't seen them in 22 years. The family went to a park near the United States-Canada border in Washington, where they had a reunion with Mrs. Merlos's sister, a LPR in Canada, and her family. CBP agents approached the family at the end of their get-together, and arrested them all: Mrs. Merlos, her U.S. citizen children, Canadian LPR sister and her children, and their elderly mother with a valid visa. CBP permitted Mrs. Merlos's sister to return to Canada the next day. CBP separated Mrs. Merlos's mother and detained her separately. CBP kept Mrs. Merlos and her children in prison-like custody for two weeks, during which time they denied the family permission to use the phone, prevented the children from going outside, called the family criminals, interrogated the children without their mother, and threatened to send them to social services.

132.   After attorneys filed a habeas petition on their behalf to address the denial of her access to counsel and conditions of confinement, CBP transferred Mrs. Merlos to ICE custody. Notwithstanding her deferred action status, ICE took custody of her in July 2025, without providing any notice that her deferred action was being revoked or an opportunity to be heard regarding why it should not be. She had done nothing since it was issued to put her status in jeopardy.

133.   Mrs. Merlos's immigration lawyer requested her release, specifically informing ICE of her deferred action status. Yet ICE continues to imprison Mrs. Merlos in its Northwest ICE Processing Center, where, despite its nominally "civil" nature, the conditions are substantially similar to or worse than a jail.

134.   Mrs. Merlos's case has been widely publicized and calls for her release have been widespread. ICE has refused to release her. She recently learned

COMPLAINT (CLASS ACTION)

that ICE showed up at her home to arrest and deport her husband. She believes ICE deported him during the past week, depriving her small children of both of their parents. The children do not eat or sleep well. They had to change schools to one closer to the family friend with whom they are staying. They are petrified of being forced to return to Honduras, where they know they have had family members killed by the rampant violence.

### ***Luna E.*:**

135.   Plaintiff Luna E. has a pending T visa petition that USCIS determined in February 2025 was bona fide. This determination automatically stays any removal against her until a final adjudication on the T visa. *See* 8 C.F.R. § 214.205(g). Nevertheless, she remains in ICE custody. She has two grown children in the United States.

136.   Luna is a quintessential survivor. She has endured a lifetime of physical and sexual abuse since her childhood. Her father was physically abusive and began sexually abusing her when she was twelve. At age fifteen, she was sexually abused by an older man and became pregnant with her first daughter. When this man came to the United States and summoned her to join him years later, she did so out of a desire to protect her children from her father, who was abusive to them as well.

137.   For the next five years after they joined him, he kept her captive, forcing her to work for him and to take jobs and then seizing all of her paychecks. One night in 2010, after he physically abused her in public, she finally found the courage to escape this prolonged period of labor trafficking, jumping from the window with her daughter to get away.

138.   Unfortunately, years later, financial difficulties and pressure from her dying father caused her to make a mistake she regrets to this day. In 2018, she was arrested and convicted for possession for sale of a controlled substance. This is her only conviction in her life. The conviction is a deportable offense, and under

COMPLAINT (CLASS ACTION)

Washington law, she accepted her deportation rather than serve her sentence. However, in 2021, she attempted to return to reunite with her daughters, was apprehended by CBP, and served the remainder of her sentence. In prison, she worked hard to rehabilitate herself, took every class she could, and worked hard to earn a second chance.

139.   In 2023, she applied for a T visa from ICE custody based on her years as a labor trafficking victim and disclosed her criminal history in her petition. USCIS vetted the application carefully and requested more evidence of her rehabilitation, which she provided. In 2023, ICE also took Luna into custody after she served her sentence. She has been in ICE custody ever since.

140.   In February 2025, USCIS ultimately deemed her petition bona fide, which means she cannot be removed until the T visa is adjudicated. Under prior policy, she likely would have been released from her years of ICE custody. Unfortunately, by the time she received her BFD, the 2025 Guidelines were in place. As a result, she remains in ICE custody, now in the ICE facility in California City. ICE refuses to release her.

141.   Luna is eager to access the services Congress has made available to T visa survivors, including mental health support. She would like to begin healing from a lifetime of trauma and be reunited with her daughters. Pursuant to the 2025 Guidelines, ICE refuses to allow this.

**_Carmen F.:_**

142.   Plaintiff Carmen F. is currently in her home country in South America, where she and her 8-year-old son were deported on or about July 31, 2025, despite having a pending U visa petition. Her abusive husband, from whom she had escaped in the United States, has now found her, forced her and their son to live with him, and resumed his abuse. She is living a nightmare, daily.[20]

---

[20] In addition to proceeding under pseudonym, Plaintiffs are taking the additional

COMPLAINT (CLASS ACTION)

143.    Carmen arrived in the United States in 2022 with her family. They were taken into CBP custody and promptly requested asylum. CBP released Carmen, her son, and her husband into the United States with an immigration court date. They were eventually denied asylum in February 2024. They appealed, but the appeal was denied in July 2024. ICE gave Carmen a wrist monitor, did frequent home and video visits to monitor her, and required her to regularly appear for check-ins, all of which she complied with consistently.

144.    Carmen's husband became increasingly abusive. One night, after he came home drunk and tried to attack her, she called the police to protect her and her son, who was hysterical with fear. She filed a police report and obtained a restraining order, but he came to the place she was renting in December 2024 and beat her again. She called the police again. In March 2025, her husband was deported to their home country.

145.    In November 2024, under the then-current 2021 Directive, ICE granted Carmen and her son a six-month stay of removal based on the physical and sexual abuse she had been enduring. She hired an immigration attorney, who submitted a U visa petition on her behalf in or around March 2025.

146.    On or about June 5, 2025, Carmen appeared for her ICE check-in and was detained. A friend brought her son, who had just finished second grade, to where she was being held, and ICE transferred them both to ICE's Dilley Immigration Processing Center, its immigration jail for families with children. While there, his teammates wrote the family asking when he would come back.

---

precaution to not identify Carmen's home country or the state in which she lived in the United States, out of fear that, if this case is reported in the news, her live-in abuser will be able to identify her through the details of her story combined with her nationality. Plaintiffs will provide this information to Defendants confidentially, and plan to submit a request for a protective order to keep the information sealed throughout this case.

COMPLAINT (CLASS ACTION)

147.   ICE incarcerated Carmen and her child at Dilley for nearly two months. He had also recently recovered from a serious medical condition, and Carmen was overwhelmed with worry for his well-being at the facility. The family's attorney requested a stay of removal from both the Board of Immigration Appeals ("BIA"), where he had filed a motion to reopen her removal proceedings, and served it on ICE. ICE opposed the stay request, and it never sought a prima facie determination on Carmen's pending U visa petition as required by 8 U.S.C. § 1227(d)(1). Instead, pursuant to its Blind Removal Policy, ICE deported Carmen and her son on or about July 31, 2025, before her U visa could be adjudicated.

148.   When Carmen arrived in her home country, her abusive ex-husband was waiting in the airport. He forced her to return home with him. He has resumed his abuse. She and her son are currently trapped with him as she desperately searches for a way to escape him again. Under prior policy, she would not have been put into this impossible and dangerous situation.

### *Yessenia Ruano*

149.   Plaintiff Yessenia Ruano was, until a few weeks ago, a public school teacher's aide in Wisconsin who has lived in the United States for fourteen years. She has ten-year-old, U.S. citizen twin daughters.

150.   Ms. Ruano fled violence in El Salvador in 2011. During her journey, she endured severe human trafficking, the details of which she intends to provide in a declaration that she will request to be filed under seal.

151.   After arriving in the United States and being freed from the dangerous situation she was in, Border Patrol found and detained her. She had previously received an expedited removal order, but this time, after being apprehended, she was given a fear interview, which she passed, indicating she had a legitimate fear of being persecuted or tortured if returned to El Salvador. She was released and placed into immigration court proceedings on a non-detained immigration court docket, which moves extremely slowly.

COMPLAINT (CLASS ACTION)

152.   Over the next fourteen years, Ms. Ruano attended all immigration court hearings and ICE check-ins. She also became a teacher's aide, gave birth to her twin daughters, and built a life in the United States.

153.   However, in or around 2023, her prior immigration lawyer withdrew her claim for relief in immigration court and advised her to instead apply for a T visa. Ms. Ruano retained new counsel to help her with the T visa petition. While they were preparing her petition, the 2025 Guidance was implemented. Ms. Ruano's attorney submitted her T visa petition on or around February 11, 2025.

154.   At an ICE check-in on February 14, 2025, an officer issued a warning for failure to depart the United States and ordered her to return for a check-in in April, with an itinerary demonstrating she would depart the United States by June 4.  That same day, her attorney requested a stay of her removal. Applying its Blind Removal Policy, ICE denied it in March without requesting a prima facie determination from USCIS on her pending petition, violating 8 U.S.C. § 1227(d)(1).

155.   After receiving the receipt notice for her pending petition in May, her immigration attorney requested a stay of removal on or about June 2, 2025. Again, applying its Blind Removal Policy, ICE denied it without requesting a prima facie determination from USCIS. If the petition was deemed bona fide, an automatic stay of removal would have been mandatory. 8 C.F.R. §§ 214.204(b)(2)(iii), 214.205(g).

156.   ICE had again ordered Yessenia to appear for a check-in. This time, ICE informed her attorney that they would detain her at the check-in and deport her. Yessenia, her family, and her community were devastated. She faced an impossible decision: fighting her case meant subjecting herself to imprisonment, separation from her daughters, and forced removal alone; but agreeing to leave the country with them meant tearing them from the only home they had known, their school, their friends, and their lives and bringing them to a situation she knew to

COMPLAINT (CLASS ACTION)

be unsafe. Ultimately, Yessenia decided to self-deport with her daughters rather than put them through the trauma of seeing her arrested and imprisoned. For weeks, they cried constantly. They remain in El Salvador at significant risk of harm.

### *Daniel H.:*

157.   Plaintiff Daniel H. has been in ICE custody since approximately August 22, 2025. ICE is currently imprisoning him at Rio Grande ICE Detention Center in Laredo, Texas. Daniel has two daughters with his ex-wife, with whom he shares custody, and lives with his wife. Through his construction work, he provides for his wife and supports his daughters. He is deeply involved in his church and community, and he often leads fundraisers to support community members in need.

158.   In 2009, Daniel and his father approached individuals who appeared to be planning to break into his car. They attacked Daniel and his father with a knife and car jack, breaking Daniel's teeth and stabbing him repeatedly. Daniel was bleeding profusely from the neck and had to be transported by ambulance to the hospital.

159.   Daniel was able to identify one of the attackers, cooperated with the police, and was ready to testify against his assailants. As a result, the perpetrator pled guilty.

160.   In or around April 2025, Daniel hired someone he thought was an attorney, but unbeknownst to him, was actually a *notario* who is under criminal investigation for a *notario* fraud scheme. The *notario* filed an incomplete U visa petition on Daniel's behalf without supporting documentation or the required law enforcement certification.

161.   On or about August 23, 2025, Daniel was detained outside his house by unknown officers, who brought him to an ICE facility. ICE subsequently transferred him to its Rio Grande facility, where he remains. Daniel's attorney

1   believes the incomplete U visa application triggered ICE, unencumbered by ICE
2   policy prior to the 2025 Guidance, to seek him out and arrest him for removal
3   proceedings.

4   162.   After his arrest, Daniel hired his current immigration attorney, who
5   promptly filed a corrected, complete U visa petition for him, including the law
6   enforcement certification. His attorney requested an expedited prima facie
7   determination on his pending petition, but USCIS will only consider such requests
8   if they come from ICE. And pursuant to its Blind Removal Policy, ICE will not.

9   163.   Daniel attempted to seek release on bond, but the immigration court
10  said it had no jurisdiction to release him, likely based on the BIA's recent *Hurtado*
11  decision.

12  164.   Daniel is devastated by the separation from his wife and daughters he
13  is currently enduring, and he and his wife often cry together during his calls from
14  detention.

15  **B. The Challenged Policies Irreparably Harm Organizational Plaintiffs.**

16  165.   ICWC is also suffering irreparable harm as a result of the challenged
17  policies. As an organization that represents thousands of survivors of domestic
18  violence, serious crime, and human trafficking, ICWC has unique insight into the
19  impact of these policies on the communities they serve. ICWC has observed a
20  chilling effect among immigrant survivors of crime and trafficking, an increasing
21  number of whom are unwilling to come forward to report crime out of fear of
22  immigration detention and removal. Increased client anxiety has made it more
23  difficult to maintain consistent communication with some clients and increased
24  phone calls from others inquiring about their risk of removal, all of which requires
25  additional staff time and resources to maintain client trust and effective
26  representation. Attorneys now spend significantly more time counseling clients
27  about risks and responding to urgent client inquiries, which comes at the expense
28  of representing additional clients and expanding the organization's reach. ICWC

COMPLAINT (CLASS ACTION)

has also noticed a decline in the number of individuals seeking its services due to Defendants' policies, which has a tangible effect on ICWC's core activities, because the organization receives funding based on the volume of clients served.

166. Due to the increased likelihood of immigration enforcement of its clientele, ICWC hired 2.5 temporary employees to check their thousands of clients' A-numbers against the immigration court database, to ensure that those clients do not have outstanding orders of removal, and to identify clients with cases that were administratively closed due to their eligibility for Survivor-based Benefit. Pursuant to the 2025 Guidance, ICE is now routinely seeking to recalendar such administratively closed cases, so ICWC had to use resources that otherwise would have been used to reach new clients to instead prepare for the reopening of those cases.

167. The 2025 Guidance has also impacted Plaintiff CHIRLA's core business activities. One of the many resources CHIRLA provides is community education presentations regarding paths to lawful immigration status, including Survivor-based Benefits. Since the 2025 Guidance, CHIRLA has greatly increased the resources it devotes to providing these presentations. CHIRLA also has at least three members who are U visa petitioners who have been harmed by the 2025 Guidance. One member has curtailed some of her activities, including work in occupations that ICE equates with being an immigrant, because she understands she no longer has the protections from removal that she had under ICE's prior policies. Another has an immigration court hearing in November that he is fearful of attending, because he is aware of heightened immigration arrests and that he no longer has as much protection as he once had due to his pending U visa.

168. Plaintiff LRCL is also experiencing irreparable harm caused by the 2025 Guidance and ICE's resulting policies and practices. LRCL has clients with pending U visas, T visas, and VAWA self-petitions, and its attorneys regularly conduct intakes of potential additional petitioners in its community clinics. Since

COMPLAINT (CLASS ACTION)

the 2025 Guidance was implemented, LRCL has noted a decrease in people seeking advice for Survivor-based Benefits, resulting in fewer clients for the organization. LRCL is also aware that several potential clients are fearful to come to the organization's offices out of fear of being in public more than necessary, and this also has resulted in a decrease in new clients. Additionally, LRCL has had to expend more resources to represent its current Survivor-based Benefit clients who are in removal proceedings. Under prior policy, ICE would routinely join motions to terminate or close such proceedings if the client demonstrated prima facie eligibility. Under the 2025 Guidance, ICE will no longer do so. This requires significantly more resources to litigate an entire removal defense case, in addition to pursuing the Survivor-based Benefit. Like ICWC, LRCL also must expend additional resources counseling anxious clients concerned about detention and removal. All these necessary additional resources come at the expense of LRCL representing additional clients and expanding its reach to help more people in need.

169.   Plaintiff CCIJ is also being irreparably harmed by the 2025 Guidance and resulting policies and practices. CCIJ staff works closely with many survivors of sex trafficking, including women who were incarcerated at FCI Dublin during the period when sexual abuse at the facility was rampant. Since the 2025 Guidance was implemented, an increasing number of CCIJ's clientele have been detained and removed compared to before. For instance, from August 2021 to August 2024, at least 34 survivors of crime and trafficking who were formerly detained at FCI Dublin were afforded prosecutorial discretion and released into the community after serving their sentences, instead of being detained or deported by ICE. Since February 2025, CCIJ is not aware of a single such case. Indeed, CCIJ has one client who ICE detained and deported after denying her request for prosecutorial discretion in the summer of 2025, who was similarly situated to another client for whom ICE afforded such relief in mid-January 2025, before the 2025 Guidance

COMPLAINT (CLASS ACTION)

was in place. CCIJ then had to expend additional resources representing the individual ICE took into custody and is now unable to represent her as she has been deported. CCIJ has also expended significant resources in 2025 assisting and accompanying U and T visa clients who have ICE check-ins, when such check-ins were usually routine prior to the 2025 Guidance. Without the 2025 Guidance, these significant resources could instead have been used to pursue and expand CCIJ's reach to other clients.

## CLASS ACTION ALLEGATIONS

170.   The individual Plaintiffs bring this action on behalf of themselves and, pursuant to Federal Rule of Civil Procedure 23, all others similarly situated. They seek to certify the following three classes:

- **Pending Petition Class**: All individuals with pending principal or derivative U visa petitions, T Visa petitions, or VAWA self-petitions who ICE detains or seeks to detain for civil immigration enforcement;

- **Deferred Action Class**: All individuals to whom USCIS has granted deferred action based on a pending U or T visa petition and who, during the authorized period of deferred action, ICE detains, seeks to detain, or removes without providing notice and an opportunity to be heard regarding potential revocation of their deferred action status; and

- **Stay of Removal Class**: All individuals with a pending U or T visa petition who, since January 30, 2025, have been, are, or will be detained by ICE and who request or requested a stay of a final removal order prior to enforcement of that removal order.

171.   The proposed classes and Class meet the requirements of Fed. R. Civ. P. 23(a) and (b)(2).

### A.    Numerosity (Fed. R. Civ. P. 23(a)(1))

172.   The proposed classes are so numerous and transitory that joinder of all members is impracticable. There are at least tens of thousands of individuals

COMPLAINT (CLASS ACTION)

who have submitted petitions for a Survivor-based Benefit who have not yet received a final decision on their petition. Thousands of them have deferred action. A great many have final orders of removal, which Congress has made clear is not a per se bar to eligibility for a U or T visa, and they will seek stays of their removal orders if ICE tries to remove them before they receive a prima facie determination. Indeed, Plaintiffs have already identified several individuals who have been detained or removed and who satisfy each class definition. Due to the 2025 Guidance's removal of constraints on Defendants' enforcement activities, its focus on "total" enforcement against "all" removable noncitizens, and Defendants' aggressive mass deportation campaign, it is a near-certainty that there will be far too many people in each transitory class and Class to make joinder practicable.

**B.     Commonality (Fed. R. Civ. P. 23(a)(2))**

173.   The Pending Petition Class challenges the legality of the 2025 Guidance. All members of the Pending Petition Class are equally subject to the 2025 Guidance and are in custody because of it. Common question of law or fact exist as to all class members, including but not limited to the following:

a.  Whether ICE considered the unique vulnerabilities of class members prior to issuing the 2025 Guidance;

b.  Whether ICE considered prior findings made by their predecessors in ICE, colleagues in USCIS, and/or Congress prior to issuing the 2025 Guidance;

c.  Whether ICE considered class members' reliance interests prior to issuing the 2025 Guidance;

d.  Whether ICE engaged in reasoned decision-making or adequately justified its reversal of decades of consistent practice when issuing the 2025 Guidance; and

e.  Whether the 2025 Guidance is arbitrary, capricious, or contrary to law under the APA.

54

174.   The Deferred Action Class challenges Defendants' De Facto Revocation policy. Common question of law or fact exist as to all class members, including but not limited to the following:

a.   Whether Defendants have a policy and practice of detaining people in deferred action status that was granted by USCIS in connection with a U or T visa petition without first providing notice and an opportunity to be heard regarding the revocation of that status;

b.   Whether the De Facto Revocation Policy is arbitrary, capricious, or contrary to law under the APA;

c.   Whether the De Facto Revocation Policy is inconsistent with Defendants' existing policies in violation of the *Accardi* doctrine; and

d.   Whether the De Facto Revocation Policy violates class members' due process rights to a process before revocation of deferred action and to be free from detention until a constitutionally adequate revocation process is complete.

175.   The Stay of Removal Class challenges Defendants' Blind Removal Policy. Common question of law or fact exist as to all class members, including but not limited to the following:

a.   Whether Defendants have a policy and practice of removing people with pending U or T visa petitions who have requested a stay of removal without first obtaining a prima facie determination regarding their pending petitions; and

b.   Whether the Blind Removal Policy violates 8 U.S.C. § 1227(d)(1) and the APA.

**C.    Typicality (Fed. R. Civ. P. 23(a)(3))**

176.   The claims of the Individual Plaintiffs are typical of the claims of the class members each seeks to represent, because they and the class members they

COMPLAINT (CLASS ACTION)

1    seek to represent are similarly subject to the policies they challenge on behalf of

2    that class.

3        **D.    Adequacy (Fed. R. Civ. P. 23(a)(4))**

4        177.    All Individual Plaintiffs seeking to represent a class will fairly and

5    adequately represent the interests of the class they seek to represent. Any relief

6    they seek for themselves is consistent with the relief they seek for the classes they

7    seek to represent.

8        178.    Counsel for Plaintiffs are experienced in complex class action, civil

9    rights, and immigrants' rights litigation.

10        **E.    Defendants have acted or refused to act against the class generally**

11    **(Fed. R. Civ. P. 23(b)(2).**

12        179.    Regarding the putative classes, Defendants have acted or refused to

13    act on grounds generally applicable to each class. Regardless of the outcome of

14    any individual case or determination, they generally impose (1) the 2025 Guidance

15    on all Pending Petition Class members equally, (2) the De Facto Revocation

16    Policy against all Deferred Action Class members equally, and (3) the Blind

17    Removal Policy against all Stay of Removal Class members equally. Thus, final

18    injunctive or declaratory relief is appropriate regarding each class and Class as a

19    whole.

20                        **<u>CLAIMS FOR RELIEF</u>**
                            **First Claim for Relief**
21        ***5 U.S.C. § 706(2)(A) – The 2025 Guidance is Arbitrary and Capricious***
22                    **(All Plaintiffs and Proposed Classes)**

23        180.    Plaintiffs reallege and incorporate, as though fully set forth herein,

24    each and every allegation contained in the above paragraphs.

25        181.    Under the APA, courts "shall… hold unlawful and set aside agency

26    action" that is, among other things, "arbitrary, capricious, [or] an abuse of

27    discretion…." 5 U.S.C § 706(2)(A).

28

                                    56

182.    The 2025 Guidance is reviewable under the APA because it constitutes "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. This is because it marks the consummation of Defendants' decision-making process and is an action "from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 156 (1997) (citation omitted).

183.    Section 706(2)(A) of the APA "requires agencies to engage in reasoned decisionmaking." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020) ("*Regents*") (citations and quotations omitted). "[A]gency action must be based on non-arbitrary, relevant factors, which," in the immigration context, "means that the [agency's] approach must be tied, even if loosely, to the purposes of the immigration laws or the appropriate operation of the immigration system. A method for disfavoring deportable [noncitizens] that bears no relation to these matters—that neither focuses on nor relates to an [noncitizen's] fitness to remain in the country—is arbitrary and capricious." *Judulang v. Holder*, 565 U.S. 42, 55 (2011) (internal quotations and citations omitted).

184.    The 2025 Guidance reversed decades of consistent DHS policy that created a presumption against detention and removal of noncitizen survivors of domestic violence, human trafficking, and other serious crime, in favor of a policy of detention and deportation whenever possible, so long as it does not disrupt a criminal prosecution. The only explanation provided for this change is the statement in the Invasion EO regarding "'total and efficient enforcement of the [immigration] laws' against all inadmissible and removable" individuals. 2025 Guidance at 2.

185.    Defendants' scant reasoning fails the APA's "requirement that [the agency] provide a reasoned explanation for its action" and is therefore arbitrary and capricious. *Regents*, 591 U.S. at 35.

COMPLAINT (CLASS ACTION)

186.   Here, ICE "entirely failed to consider [] important aspect[s] of the problem." *State Farm Mut. Auto. Ins. Co. v. Motor Vehicle Mfrs.' Ass'n*, 463 U.S. 29, 43 (1983). If a policy-maker fails to consider even one "important aspect of the problem" when announcing a significant change in policy, "[t]hat omission alone renders [the] decision arbitrary and capricious." *Regents*, 591 U.S. at 30.

187.   The number of important aspects of the problem that the 2025 Guidance fails to consider are legion. They include, but are not limited to:

a.   Congress's express intent that bona fide applicants for Survivor-based Benefits be generally protected from civil immigration enforcement;

b.   the public safety issues that Congress sought to address regarding the willingness of noncitizens to report crime;

c.   how the interests of applicants for Survivor-based Benefits compare to "ICE's best interests";

d.   the near-consensus view that a focus solely on whether *active* investigations will be compromised – i.e., on prosecution – without also focusing on prevention of crime or protection of victims, is ineffective in addressing trafficking and serious crime; and

e.   the views of the specially trained VAWA Unit within USCIS, which the author of the TVPRA intended to be "not only an adjudication team but a policy resource" in matters related to Survivor-based Benefits.[21]

188.   In addition, the 2025 Guidance fails to address the reliance interests of noncitizens who were courageous enough to report the crime they endured and applied for the protections that Congress and Defendants promised in return. "When an agency changes course, as DHS did here, it must be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Regents*, 591 U.S. at 30 (citation omitted). Here, the 2025

---

[21] 154 Cong. Rec. H10888-01, H10905, 2008 WL 5169865 (Dec. 10, 2008) (statement of Rep. Berman).

COMPLAINT (CLASS ACTION)

Guidance fails "to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* at 33.

189.   The reliance interests of applicants for Survivor-based Benefits that the 2025 Guidance ignores are significant. Tens of thousands of noncitizen victims of crime and trafficking have reported to and cooperated with police, with the U visa, T visa, and VAWA relief representing a promise from Congress of eligibility for protection from deportation for their courage. Indeed, Congress counted on such reliance and created these benefits as an enticement to report crime. VAWA 2000 § 1513(a)(2).

190.   The public safety risks imposed by the 2025 Guidance's removal of protections from enforcement are also weighty, especially because maintaining those protections could be achieved consistently with the supposedly competing policy concerns of the Invasion EO. For instance, if the agency's true goal was to "enforce[e]" immigration laws "against all inadmissible and removable" noncitizens, it could do so by having USCIS adjudicate U and T visas and VAWA petitions more quickly and initiating removal proceedings only against individuals denied a visa. Such an alternative would prevent re-traumatization of vulnerable individuals through arrest and detention and ensure that their unique vulnerabilities are considered, while still enforcing immigration laws against all removable noncitizens. *See Regents,* 591 U.S. at 30 ("[W]hen an agency rescinds a prior policy[,] its reasoned analysis must consider the alternatives that are within the ambit of the [current] policy.").

191.   Furthermore, the Invasion EO is not a sufficiently "reasoned explanation" for ICE's "disregarding facts and circumstances that underlay or were engendered by the prior policy" of protecting applicants for Survivor-based Benefits.  *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009). When "new policy rests upon factual findings that contradict those which underlay its

COMPLAINT (CLASS ACTION)

1    prior policy," then "a more detailed justification" is needed. *Id.* at 515.

2    192.   Here, the rescinded 2021 Policy expressly found that: ICE's "duty to

3    protect and assist noncitizen crime victims" was "enshrined in" VAWA and the

4    TVPA; "[w]hen victims have access to humanitarian protections, regardless of

5    their immigration status, and can feel safe in coming forward, it strengthens the

6    ability of local, state, and federal law enforcement agencies, including ICE, to

7    detect, investigate, and prosecute crimes'"; there is a "chilling effect that civil

8    immigration enforcement actions may have on the willingness and ability of

9    noncitizen crime victims to contact law enforcement, participate in investigations

10   and prosecutions, pursue justice, and seek benefits"; and "[a] victim-centered

11   approach encourages victim cooperation with law enforcement, engenders trust in

12   ICE agents and officers, and bolsters faith in the entire criminal justice and civil

13   immigration systems." 2021 Policy at 1.

14   193.   By contrast, the 2025 Guidance relies only on the Invasion EO and

15   fails to offer any contrary factual findings or explain why Congress and the

16   immigration agencies' prior findings were incorrect. "An agency cannot simply

17   disregard contrary or inconvenient factual determinations that it made in the

18   past[.]" *F.C.C.*, 556 U.S. at 537. In fact, neither the 2025 Guidance nor the

19   Invasion EO offer *any* factual findings: no statistics, no studies – no actual

20   evidence at all. "[C]onclusory statements do not suffice to explain" a change in

21   policy "that is inconsistent with the Department's longstanding earlier position"

22   and any such unsupported policy "cannot carry the force of law." *Encino*

23   *Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016).

24   194.   Also, there is no "invasion." The entire foundation on which the 2025

25   Guidance rests is a fiction of political convenience, designed to justify a harsh and

26   unprecedented immigration crackdown, even against longtime residents.

27   Reversing longstanding policy based on claims that are unsupported by any actual

28   facts is necessarily arbitrary and capricious.

60

COMPLAINT (CLASS ACTION)

1

### Second Claim for Relief
2
*5 U.S.C. § 706(2)(A), (C) – The 2025 Guidance is Not in Accordance with Law and in Excess of Statutory Authority*
3
**(All Plaintiffs and Proposed Classes)**

4     195.   Plaintiffs reallege and incorporate, as though fully set forth herein,

5 each and every allegation contained in the above paragraphs.

6     196.   Under the APA, courts "shall… hold unlawful and set aside agency

7 action" that is, among other things, "not in accordance with law" or "in excess of

8 statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C

9 § 706(2)(A), (C).

10     197.   The statutory scheme, established by Congress and implemented

11 through binding regulations, requires that applicants for Survivor-based Benefits

12 generally be protected from detention and removal unless serious adverse factors

13 warrant otherwise. The numerous protections against removal contained in the

14 INA and regulations for members of the putative Pending Petition Class include:

15 mandatory deferred action for waitlisted U visa petitioners and eligibility for

16 deferred action for other U and T petitioners with bona fide petitions and approved

17 VAWA self-petitioners; employment authorization—which obviously

18 contemplates the recipient remaining in the United States—for applicants with

19 bona fide petitions and approved VAWA self-petitioners; waivers and exemptions

20 from grounds of removability unavailable to other noncitizens; eligibility for stays

21 of removal based on prima facie eligibility for a U or T visa; automatic stays of

22 removal based on bona fide determinations of pending T visa petitions; and a

23 general prohibition on referring pending or denied T visa petitioners for removal

24 proceedings.

25     198.   In imposing a policy of "total" enforcement against "all" removable

26 noncitizens, the 2025 Guidance not only authorizes the removal of Pending

27 Petition Class members without observing any of these protections, but it

28

COMPLAINT (CLASS ACTION)

encourages rapid removals that willfully avoid them. For instance, its requirement that ICE will no longer pursue expedited prima facie adjudications unless it is in "ICE's best interests" to do so, permits the removal of class members who are eligible to remain in the United States and who Congress authorized to remain in the United States, without any consideration for the equities involved.

199.   Any policy that does not require Defendants to consider an applicant's prima facie eligibility for Survivor-based Benefits as a positive factor in favor of permitting the applicant to remain in the United States is not in accordance with the law and in excess of statutory authority. The 2025 Guidance is such a policy.

## Third Claim for Relief
### *APA 706(2)(A) – The De Facto Revocation Policy is Arbitrary and Capricious*
**(Lupe A., Camila B., Paulo C., Mrs. Merlos, Deferred Action Class, and all Organizational Plaintiffs)**

200.   Plaintiffs reallege and incorporate, as though fully set forth herein, each and every allegation contained in the above paragraphs.

201.   The APA requires courts to "set aside" agency action that is "arbitrary, capricious" or "an abuse of discretion." 5 U.S.C. § 706(2)(A).

202.   ICE maintains a policy and practice of treating its enforcement decisions against U visa petitioners to whom USCIS has conferred deferred action status as a de facto revocation of that status. This De Facto Revocation policy constitutes "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. The 2025 Guidance expressly asserts that ICE has the discretion to cause "the termination of the victim-based benefit," including deferred action. 2025 Guidance at 1 n.1. Under the De Facto Revocation policy, ICE asserts this purported authority to detain and remove people without first revoking deferred action, thereby ignoring and de facto terminating deferred

COMPLAINT (CLASS ACTION)

1  action status. These positions mark the consummation of the Defendants'
2  decision-making process on the issue and is one "from which 'legal consequences
3  will flow.'" *Bennett*, 520 U.S. at 177-78 (citation omitted).

4      203.  If an agency "announces and follows—by rule or by settled course of
5  adjudication—a general policy by which its exercise of discretion will be
6  governed, an irrational departure from that policy . . . could constitute action that
7  must be overturned as 'arbitrary, capricious, [or] an abuse of discretion' within the
8  meaning of" § 706(2)(A). *INS v. Yang*, 519 U.S. 26, 32 (1996).

9      204.  "As long as there is a 'meaningful standard against which to judge
10  the agency's exercise of discretion,' judicial review is available" under the APA
11  because there is "law to apply." *Perez Perez v. Wolf*, 943 F.3d 853, 862 (9th Cir.
12  2019). This can be so where a statute, regulation, or agency policy "establishes the
13  goal of the program" or "agency duties… including the duty to consider certain
14  criteria." *Jajati v. U.S. Customs & Border Prot.*, 102 F.4th 1011, 1018 (9th Cir.
15  2024)*.*

16      205.  An immigration policy is arbitrary and capricious when it has "no
17  connection to the goals of the deportation process or the rational operation of the
18  immigration laws." *Judulang*, 565 U.S. at 53, 58.

19      206.  Here, USCIS regulations and policies provide meaningful standards
20  by which a noncitizen's fitness for deferred action will be determined. *See* 8
21  C.F.R. § 214.14(d)(2); *see also* PM vol. 3, pt. C, ch. 5.C.6; PM vol. 3, pt. B, ch. 6.

22      207.  A grant of deferred action necessarily means USCIS determined that
23  the recipient "merit[s] a favorable exercise of discretion, considering any risk to
24  national security or public safety, as well as other relevant discretionary factors."
25  PM vol. 3, pt. C, ch., 5.B.

26      208.  Nevertheless, ICE has engaged in a practice of terminating such
27  deferred action by fiat, ignoring deferred action status and detaining deferred
28  action recipients without regard for whether the individual has done anything to

COMPLAINT (CLASS ACTION)

change USCIS's prior determination that they were fit to remain in the United States for the duration of that deferred action grant.

209.   Agency action that gives controlling weight to the "immigration official's charging decision" is necessarily arbitrary and capricious. *Judulang*, 565 U.S. at 57. That is precisely what the De Facto Revocation policy does. Immigration courts have no authority over the granting or revocation of deferred action or eligibility for a U or T visa. *Lee v. Holder*, 599 F.3d 973, 975-76 (9th Cir. 2010). Thus, ICE's determination to unilaterally revoke deferred action through its enforcement practices is controlling. Thus, the De Facto Revocation policy is unlawful under the APA.

### Fourth Claim for Relief
*Accardi Doctrine– The De Facto Revocation Policy Violates the PM, Regulations, and Longstanding Practice*
**(Lupe A., Camila B., Paulo C., Mrs. Merlos, Deferred Action Class, and all Organizational Plaintiffs)**

210.   Plaintiffs reallege and incorporate, as though fully set forth herein, each and every allegation contained in the above paragraphs.

211.   The Supreme Court has long recognized that government agencies are required to follow their own procedures. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954). The Ninth Circuit has applied this principle to the immigration agencies. *See, e.g., Alcaraz v. INS*, 384 F.3d 1150, 1162 (9th Cir. 2004). The *Accardi* doctrine extends beyond formal "regulations" to include, e.g., "internal operating procedures," "handbook[s]," "policy statements," and other materials that document an agency's "usual practice." *Id.* at 1162.

212.   Here, ICE engages in a policy and practice of detaining and deporting Deferred Action Class members without a formal revocation of their deferred

COMPLAINT (CLASS ACTION)

action status by USCIS. Instead, ICE treats its enforcement actions as a de facto revocation of deferred action, overriding USCIS's determination.

213.    However, Defendants' longstanding policies and operating procedures require that USCIS, not ICE, has exclusive authority over deferred action determinations in the U and T visa contexts, whether through placement on the waiting list or issuance of a BFD. *See, e.g.*, 8 C.F.R. § 214.14(d)(3) (U-visa waiting list "deferred action or parole may be terminated *at the discretion of USCIS*") (emphasis added); PM vol. 3, pt. B, ch. 6.D.3. n.18 ("[D]eferred action is by its nature an exercise of prosecutorial discretion," and "[t]he decision not to exercise [such] favorable prosecutorial discretion is appropriately an action *within USCIS' sole and unreviewable discretion*.") (emphasis added); 8 C.F.R. § 214.205 (discussing the obligations that follow after "USCIS determines that deferred action is warranted" for a T-visa petitioner).

214.    Because the De Facto Revocation Policy is contrary to DHS's long-standing practice not to allow ICE to unilaterally revoke benefits like deferred action granted by USCIS, it is unlawful under the *Accardi* doctrine.

**Fifth Claim for Relief**
*Fifth Amendment – ICE's De Facto Revocation Policy Violates Procedural Due Process by Failing to Provide any Process for Revoking Deferred Action*
**(Lupe A., Camila B., Paulo C., Mrs. Merlos, Deferred Action Class, and all Organizational Plaintiffs)**

215.    Plaintiffs reallege and incorporate, as though fully set forth herein, each and every allegation contained in the above paragraphs.

216.    "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). "The essence of due process is the requirement that a person in jeopardy of serious loss (be given) notice of the

case against him and opportunity to meet it." *Id.* at 348 (internal quotation marks omitted). Thus, some form of "hearing is required at some time before a person is finally deprived of his property interests." *Wolff v. McDonnell*, 418 U.S. 539, 557-558 (1974).

217.    Members of the putative Deferred Action Class possess a protected property interest in their deferred action status and the numerous benefits that come with it. These benefits include, among other things, the ability to remain and legally work in the United States and eligibility for important state and federal benefits. If the government issues benefits whose "continued possession [has] become essential in the pursuit of a livelihood," revocation of those benefits "involves state action that adjudicates important interests" such that they "are not to be taken away without [] procedural due process." *Bell v. Burson*, 402 U.S. 535, 539 (1971).

218.    Here, in granting deferred action pursuant to a U or T visa petition, "USCIS solicited applications from eligible [noncitizens], instituted a standardized review process, and sent formal notices indicating whether the [petitioner] would receive the [four]-year forbearance." *Regents,* 591 U.S. at 18. "These proceedings are effectively adjudications." *Id*. (cleaned up). "[T]he result of these adjudications—DHS's decision to grant deferred action…—is an affirmative act of approval" that "confer[s] affirmative immigration relief." *Id.* "[D]eferred action recipients are considered 'lawfully present' for purposes of, and therefore eligible to receive, [federal] benefits." *Id.* at 1902 (citations omitted). Thus, a "grant of [deferred action] constitutes a conferred benefit that requires procedural safeguards before it can be terminated." *Inland Empire - Immigrant Youth Collective v. Nielsen*, No. EDCV 17-2048 PSGSHKX, 2018 WL 4998230, at *19–20 (C.D. Cal. Apr. 19, 2018) ("*Inland Empire*").

219.    In determining whether process is sufficient, courts apply the familiar *Mathews* test, considering (1) "the private interest that will be affected by the

COMPLAINT (CLASS ACTION)

official action," (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," and (3) "the Government's interest… that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. Here, *Mathews* balancing comes out strongly in favor of Plaintiffs.

220.   First, Deferred Action Class members have a profound interest in maintaining their deferred action status and attendant benefits. Because a person cannot be detained for removal if he cannot be removed, maintaining deferred action should be tantamount to maintaining one's freedom. "[A]n individual's private interest in freedom from prolonged detention is unquestionably substantial." *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1207 (9th Cir. 2022) (cleaned up). Deferred action status also confers the ability to obtain employment authorization and public benefits, which can lead to financial stability and less vulnerability to exploitation and abuse, which are also substantial interests.

221.   Second, "the practice of automatic termination [of deferred action]" without any opportunity to be heard "creates an unacceptably high risk of erroneous deprivation." *Inland Empire,* 2018 WL 4998230, at *19. Defendants provide no process at all, and certainly no pre-deprivation process, to Class members. Immigration judges do not have authority to grant or take away deferred action, and immigration courts have now taken the position that Class members are ineligible for release from custody. *See Matter of Yajure Hurtado*, 29 I&N Dec. 216 (BIA 2025). The risk of error is compounded because Defendants' stated goal is to accomplish "total" enforcement of immigration laws against "all" inadmissible and removable noncitizens, and their efforts to do so demonstrate little regard for a particular subject's fitness to remain in the United States. The value of providing some pre-deprivation process is high.

222.   Third, the government's interests in providing no process at all when revoking deferred action are insubstantial. "The fact that DHS' rules already

COMPLAINT (CLASS ACTION)

provide for [ ] basic pre-deprivation protections in most circumstances" regarding revocation of deferred action for childhood arrivals "reinforces both that the value of such safeguards is high, and that providing such limited process would not place undue fiscal or administrative burdens on the government." *Inland Empire*, 2018 WL 4998230, at *19 n.8. Although it may impose "some costs in time, effort, and expense" to provide a notice and an opportunity to be heard regarding the revocation of deferred action, "these rather ordinary costs cannot outweigh the constitutional right" to due process. *Fuentes v. Shevin,* 407 U.S. 67, 92 n.22 (1972).

### Sixth Claim for Relief
***Fifth Amendment – Policy of Detaining Individuals with Deferred Action without a Pre-Detention Hearing Violates Due Process***
**((Lupe A., Camila B., Paulo C., Mrs. Merlos, Deferred Action Class, and all Organizational Plaintiffs)**

223.   Plaintiffs reallege and incorporate, as though fully set forth herein, each and every allegation contained in the above paragraphs.

224.   Under the De Facto Revocation policy, ICE imprisons people with unrevoked deferred action status in jail-like conditions until it removes them.

225.   Because Defendants have not engaged in any effort to formally revoke Deferred Action Class members' deferred action status, members maintain authorized presence in the United States that prohibits their removal. Because civil immigration detention is only lawful if it is reasonably related to effecting a removal order, a policy of detaining people with deferred action for anything longer than the cursory period it takes to confirm such status violates their due process rights.

226.   Due Process "protections apply to all 'persons' within the United States, including [non-citizens], whether their presence here is lawful, unlawful,

1  temporary, or permanent, and to immigration detention as well as criminal

2  detention." *Hernandez v. Sessions*, 872 F.3d 976, 990 (9th Cir. 2017) (cleaned up).

3  227.  Because "[a]rbitrary civil detention is not a feature of our American

4  government," *Rodriguez v. Marin*, 909 F.3d 252, 256 (9th Cir. 2018), civil

5  confinement is only permissible "in certain special and narrow non-punitive

6  circumstances," where a "special justification" asserted by the government

7  "outweighs the individual's constitutionally protected interest in avoiding physical

8  restraint." *Zadvydas*, 533 U.S. at 690 (cleaned up).

9  228.  The two traditionally accepted justifications for keeping someone in

10  civil immigration custody do not warrant the imprisonment of Deferred Action

11  Class. "The first justification—preventing flight—is weak or nonexistent where

12  removal seems a remote possibility." *Id.* at 679. By definition, the removal of

13  someone with deferred action is necessarily "a remote possibility" until it is

14  formally revoked. *Id*.

15  229.  "Preventive detention based on the second justification—protecting

16  the community—has been upheld only when limited to specially dangerous

17  individuals and subject to strong procedural protections." *Id.* Here, any such

18  justification would be specious. By definition, all members of the Deferred Action

19  Class have passed background checks and been vetted for national security and

20  public safety risks as a necessary prerequisite to receiving deferred action. *See,*

21  *e.g.*, PM, vol. 3, pt. C, ch. 5. Furthermore, prior to being detained by Defendants,

22  all were necessarily living free in the United States with Defendants' knowledge

23  and approval. When DHS seeks to detain a noncitizen it has previously subjected

24  to robust vetting and determined presents no security or flight risks, it must

25  provide the person with a pre-detention hearing to prove changed circumstances

26  that warrant civil incarceration.

27  230.  Deferred Action Class members do not receive sufficiently "strong

28  procedural protections" to render their detention lawful. Many Class members will

69

never see an immigration judge because they have final orders of removal already. Even for those who are placed into proceedings before an immigration judge, such procedures are inadequate because they are already in ICE custody enduring the unlawful deprivation. *See, e.g., Maldonado v. Noem*, No. 4:25-CV-2541, 2025 WL 1593133, at *2 (S.D. Tex. June 5, 2025).

231.    "[T]he government has no legitimate interest in detaining individuals who have been determined not to be a danger to the community and whose appearance at future immigration proceedings can be reasonably ensured by a lesser bond or alternative conditions." *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017).

232.    Due process requires a pre-detention hearing at which Defendants provide notice and an opportunity to be heard regarding the revocation of deferred action status, and if revoked, at which Defendants then prove that the class member they seek to detain is sufficiently dangerous or a flight risk that detention is required.

233.    Thus, the detention of Deferred Action Class members under the De Facto Revocation Policy without a pre-detention hearing violates their due process rights.

**Seventh Claim for Relief**
***Fourth Amendment – Detention of Individuals with Deferred Action Under the De Facto Revocation Policy Constitutes an Unreasonable Seizure***
**(Lupe A., Camila B., Paulo C., Mrs. Merlos, Deferred Action Class, and all Organizational Plaintiffs)**

234.    Plaintiffs reallege and incorporate, as though fully set forth herein, each and every allegation contained in the above paragraphs.

235.    The Fourth Amendment prohibits unreasonable searches and seizures by the Government. *Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 978 (C.D. Cal. 2024). This requires "a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty." *Baker v. McCollan*, 443 U.S. 137,

COMPLAINT (CLASS ACTION)

142 (1979). Probable cause requires "facts and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (cleaned up).

236.   In the immigration context, "[t]he Fourth Amendment requires probable cause to seize or detain an individual for a civil immigration offense." *Gonzalez v. United States Immigr. & Customs Enf't*, 975 F.3d 788, 798 (9th Cir. 2020).

237.   Under the De Facto Revocation Policy, Defendants routinely seize individuals in valid deferred action status without probable cause that such individuals have committed acts between the grant of that status and the seizure sufficient to warrant its revocation. Further, Defendants make such arrests without a warrant and without probable cause to believe that the individual is such a flight risk that a warrant cannot be obtained.

**Eighth Claim for Relief**
*INA § 237(d)(1) – The Blind Removal Policy Violates 8 U.S.C. § 1227(d)(1)*
**(All Plaintiffs and Stay of Removal Class)**

238.   Plaintiffs reallege and incorporate, as though fully set forth herein, each and every allegation contained in the above paragraphs.

239.   8 U.S.C. § 1227(d)(1) states—

> If the Secretary of Homeland Security determines that an application for nonimmigrant status under subparagraph (T) or (U) of section 1101(a)(15) of this title filed for an alien in the United States sets forth a prima facie case for approval, the Secretary may grant the alien an administrative stay of a final order of removal.

240.   Thus, under 8 U.S.C. § 1227(d)(1), when a person with a pending U or T visa petition requests a stay of a removal order, Defendants must determine whether the pending petition demonstrates prima facie eligibility.

COMPLAINT (CLASS ACTION)

241.    "Looking to the plain language of the Statute, it is clear that the Statute establishes the prima facie determination as a pre-condition to the Secretary granting or denying an administrative stay of removal." *Jimenez v. Dep't of Homeland Sec.*, Case No. 222-CV-00967-SSS-JPRX, 2022 WL 19410308, at *3 (C.D. Cal. Nov. 14, 2022). Thus, because the "Secretary's prima facie determination is a non-discretionary pre-requisite to the action described in the second segment," only "following the prima facie determination, [does] the Secretary [have] the discretion to grant or deny a request for an administrative stay." *Id.* (citing 8 U.S.C. § 1227(d)(1)).

242.    Defendants engage in a policy and practice of removing people with pending U and T visas who have requested a stay, without first seeking or obtaining a prima facie determination from USCIS as required by § 1227(d)(1). The practice is enabled by the 2025 Guidance, which authorizes ICE to seek expedited prima facie determinations only when it is "ICE's best interests," but not when it is in the petitioner's best interests.

243.    Stay of Removal Class members are within the zone of interests protected by 8 U.S.C. §1227(d).

244.    Because Defendants engage in a Blind Removal Policy of denying stays of removal for U and T visa petitioners without first determining their prima facie eligibility for relief, the Blind Removal Policy violates INA § 237(d)(1).

**Ninth Claim for Relief**
***5 U.S.C. 706(2)(A), (C) – The Blind Removal Policy is Not in Accordance with Law and in Excess of Statutory Authority***
**(All Plaintiffs and Stay of Removal Class)**

245.    Plaintiffs reallege and incorporate, as though fully set forth herein, each and every allegation contained in the above paragraphs.

246.    The Blind Removal Policy is reviewable under the APA because it constitutes "final agency action for which there is no other adequate remedy in a

COMPLAINT (CLASS ACTION)

court." 5 U.S.C. § 704. It marks the consummation of Defendants' decision-making process regarding their authority to remove U and T visa petitioners, and it is an action from which legal consequences will flow. *See Bennett*, 520 U.S. at 156.  Review is not available in any other forum because ICE executes removal pursuant to an existing removal order extremely quickly, and immigration courts have no authority to make prima facie determinations of eligibility for a U or T visa.

247.   For the same reasons that the Blind Removal Policy violates the INA, it also violates 5 U.S.C. § 706(2)(A) and (C) because denying a stay of removal to a U or T visa petitioner without first determining whether they are prima facie eligible for relief violates 8 U.S.C. § 1227(d).

## **REQUEST FOR RELIEF**

Plaintiffs respectfully requests that this Court grant the following relief:

1.    Issue an order certifying the classes defined in this Complaint pursuant to Fed. R. Civ. P. 23(a), (b)(2);

2.    Appoint undersigned counsel to serve as class counsel pursuant to Fed. R. Civ. P. 23(g);

3.    Regarding the 2025 Guidance:

    a. Declare that it is arbitrary and capricious, an abuse of discretion, and contrary to law in violation of the APA;

    b. Postpone and set it aside pursuant to the APA, including its provisions rescinding the 2021 Policy and 2011 Policy; and

    c. Preliminarily and permanently enjoin Defendants from implementing it or any other policy that fails to consider eligibility for VAWA, U visa, or T visa relief as a positive factor weighing against imposition of civil immigration enforcement;

4.    Regarding the De Facto Revocation Policy:

COMPLAINT (CLASS ACTION)

a. Declare that it is arbitrary, capricious and contrary to law;

b. Declare it violates the *Accardi* doctrine;

c. Declare that it violates the Due Process Clause of the Fifth Amendment of the United States Constitution;

d. Postpone and set it aside pursuant to the APA; and

e. Preliminarily and permanently enjoin it;

5. Declare that only USCIS may revoke deferred action granted by USCIS based on a U or T visa petition, after notice and an opportunity to be heard;

6. Preliminarily and permanently enjoin ICE from ignoring or overriding deferred action granted by USCIS based on a U or T visa petition;

7. Declare Defendants' policy and practice of incarcerating or removing individuals while in a period of deferred action granted by USCIS in connection with a pending U or T visa violates the Fourth Amendment and the Due Process Clause of the Fifth Amendment of the United States Constitution;

8. Issue orders requiring the release of Camila B., Paulo C., Mrs. Merlos, and all Deferred Action Class members currently in Defendants' custody;

9. Regarding the Blind Removal Policy

a. Declare that removing U or T visa petitioners who request a stay without first determining whether they are prima facie eligible for relief violates 8 U.S.C. § 1227(d)(1) and is contrary to law under 5 U.S.C. § 706(2);

b. Postpone, set aside, and preliminarily and permanently enjoin Defendants from removing U or T visa petitioners who request a stay without first determining whether they are prima facie eligible for relief;

10. Issue a writ of mandamus and/or habeas corpus requiring Defendants to allow the return to the United States of Plaintiffs Maria A., Carmen F., Ms.

74

Ruano, and other members of the Deferred Action Class and Stay of Removal Class who were removed while in deferred action status or without a prima facie determination, and that any subsequent adjudication for relief be conducted nunc pro tunc to the time prior to their removal;

11. Issue a writ of habeas corpus and/or enjoin Defendants from removing or continuing to detain any Individual Plaintiffs currently in ICE custody during the pendency of this litigation;

12. Preliminarily and permanently enjoin Defendants or their agents from taking retaliatory actions against Plaintiffs based on their participation in this action;

13. Grant Plaintiffs reasonable attorneys' fees, costs, and other expenses pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 or any other applicable law; and

14. Grant any other and further relief that this Court may deem just and proper.

Dated: October 14, 2025              Respectfully submitted,


                                     _/s/ Bardis Vakili_____
                                     Bardis Vakili

                                     CENTER FOR HUMAN RIGHTS &
                                     CONSTITUTIONAL LAW
                                     Bardis Vakili
                                     Sarah E. Kahn
                                     Erika Cervantes

                                     LA RAZA CENTRO LEGAL
                                     Stephen A. Rosenbaum
                                     Jordan Weiner

COMPLAINT (CLASS ACTION)

PUBLIC COUNSEL
Rebecca Brown
Kathleen Rivas

COALITION FOR HUMANE
IMMIGRANT RIGHTS
Carl Bergquist
Adam Reese

76

COMPLAINT (CLASS ACTION)