CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Bardis Vakili (Cal. Bar No. 247783)
bardis@centerforhumanrights.org
Sarah E. Kahn (Cal. Bar No. 341901)
sarah@centerforhumanrights.org
Erika Cervantes (Cal. Bar No. 344432)
erika@centerforhumanrights.org
1505 E 17th St. Ste. 117
Santa Ana, CA 92705
Tel: (909) 274-9057

Attorneys for Plaintiffs

Additional counsel listed on following page

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

|  |  |
|---|---|
| Immigration Center for Women and Children, et. al., <br><br> Plaintiffs, <br><br> v. <br> Kristi Noem, et. al, <br> Defendants. | Case No.: 2:25-cv-09848-AB-AS <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR APA § 705 RELIEF AND INDIVIDUAL AND CLASSWIDE PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** <br><br> Hon. André Birotte Jr. <br> Hearing Date: December 12, 2025 <br> Hearing Time: 10:00 AM |

*Additional Counsel for Plaintiffs:*

LA RAZA CENTRO LEGAL
Stephen A. Rosenbaum (Cal. Bar No. 98634)
srosenbaum@law.berkeley.edu
Jordan Weiner (Cal. Bar No. 356297)
jordan@lrcl.org
474 Valencia Street, Suite 295
San Francisco, CA 94103
Tel: (415) 575-3500

PUBLIC COUNSEL
Rebecca Brown (Cal. Bar No. 345805)
rbrown@publiccounsel.org
Kathleen Rivas (Cal. Bar No. 333600)
krivas@publiccounsel.org
610 South Ardmore Ave.
Los Angeles, CA 90005
Tel: (213) 385-2977

COALITION FOR HUMANE IMMIGRANT RIGHTS
Carl Bergquist (DC Bar 1720816)*
cbergquist@chirla.org
2351 Hempstead Road
Ottawa Hills, OH 43606
Tel: (310) 279-6025

Adam Reese (Cal. Bar No. 362898)
areese@chirla.org
2533 W 3rd Street, #101
Los Angeles, CA 90057
Tel: (213) 353-1333

* *Admitted pro hac vice*

Plaintiffs' Notice of Motion and Motion for APA § 705 Relief and Individual and Classwide Preliminary Injunction; Memorandum of Points and Authorities in Support

**NOTICE OF MOTION**

PLEASE TAKE NOTICE that, on December 12, 2025, at 10:00 a.m., or as soon thereafter as the matter may be heard in Courtroom 7B of the First Street U.S. Courthouse, located at 350 West First Street, Los Angeles, California, 90012, before the Honorable André Birotte Jr., Plaintiffs Lupe A., Camila B., Paulo C., Kenia "Jackie" Merlos, Luna E., Carmen F., Yesenia Ruano, Daniel H., Immigration Center for Women and Children ("ICWC"), Coalition for Humane Treatment of Immigrants ("CHIRLA"), La Raza Centro Legal ("LRCL"), and California Collaborative for Immigrant Justice ("CCIJ") move the Court for interim relief under § 705 of the Administrative Procedures Act and a preliminary injunction. Specifically, they seek, against Defendants Kristi Noem, U.S. Immigration and Customs Enforcement ("ICE"), and United States Citizenship and Immigration Services ("USCIS"), an order:

(1) Staying, pursuant to 5 U.S.C. § 705, the 2025 Guidance (including its recission of prior policies), De Facto Revocation Policy, and Blind Removal Policy, and enjoining their enforcement against Plaintiffs and those similarly situated, pending further order from this Court;

(2) Enjoining Defendants from applying new policies substantially similar to those of the 2025 Guidance against Plaintiffs and those similarly situated that do not presumptively protect individuals with a pending, valid petition for relief under the Violence against Women Act ("VAWA") or for a U or T visa from civil immigration detention and deportation;

(3) Enjoining Defendants from ignoring or unilaterally revoking deferred action granted by USCIS based on a U or T visa petition to Individual Plaintiffs or those similarly situated without first providing constitutionally due process, including notice and an opportunity to be heard;

(4) Enjoining Defendants from removing Plaintiffs who requested stays of removal and those similarly situated without determining whether their U or

Plaintiffs' Notice of Motion and Motion for APA § 705 Relief and Individual and Classwide Preliminary Injunction; Memorandum of Points and Authorities in Support

T visa petitions demonstrate prima facie eligibility for lawful status;

(5) Enjoining ICE from continuing to detain Plaintiff Paulo C. without providing an individualized hearing to justify his detention;

(6) Enjoining Defendants from preventing the re-entry of Plaintiffs Lupe A., Carmen F., or Yesenia Ruano to the United States; and

(7) Enjoining Defendants from similar conduct as applied to the clients and members of the Organizational Plaintiffs.

This motion is made on the grounds that Plaintiffs and those similarly situated are likely to prevail on the merits, that they will suffer irreparable injury unless preliminary relief issues, and that the interests of Defendants and the public do not weight against the granting of preliminary relief.

This motion is made in accordance with the Court's Standing Order, the Local Rules of this District, and the Federal Rules of Civil Procedure, and is based upon this notice of motion and motion; the supporting memorandum of points and authorities; all documents and pleadings on file in this action; and such other oral and documentary evidence and hearing as the Court may consider prior to or at the hearing on this motion.

## STATEMENT OF COMPLIANCE WITH L.R. 7-3

On October 15, 2025, undersigned counsel emailed Assistant U.S. Attorney Daniel Beck to inform him of Plaintiffs intention to seek preliminary relief for Individual Plaintiffs. Declar. of Bardis Vakili, November 14, 2025 ("Vakili Decl.") ¶ 3. The parties met and conferred later that week, the result of which was Plaintiffs, due in part to the uncertainty caused by the lapse in government funding, informing Mr. Beck that they intended to pursue the issues raised in a preliminary injunction instead. *Id.* Mr. Beck has stated he does not represent Defendants in this matter, that he expects the Department of Justice to assign an attorney from its Washington D.C. office, and that, as a result, he cannot take definitive substantive positions for Defendants in this case. *Id.* ¶ 4.

Plaintiffs' Notice of Motion and Motion for APA § 705 Relief and Individual and Classwide Preliminary Injunction; Memorandum of Points and Authorities in Support

On November 10, 2025, with no government attorney having entered an appearance, I emailed Mr. Beck and asked if he or another Department of Justice attorney could meet and confer regarding the present motion, which now also includes class claims and claims for the organizational Plaintiffs. *Id*. ¶6. He responded that he would endeavor to identify an attorney to do so. *Id.* To date, likely due at least in part to the lapse in government funding, no government attorney has entered an appearance or been made available to meet and confer. *Id*. Due to the urgency of the issues and irreparable harm being suffered by Plaintiffs and putative class members, and in light of counsels' duties to their clients, counsel Plaintiffs have determined it is necessary to file this motion now. *Id.* ¶ 7. Once appropriate counsel for Defendants is assigned, Plaintiffs will promptly request a conference with such counsel to discuss this and any other pending matters. *Id*. ¶ 10.

Dated: November 14, 2025          Respectfully submitted,

                                  */s/ Bardis Vakili*
                                  Bardis Vakili

                                  CENTER FOR HUMAN RIGHTS &
                                  CONSTITUTIONAL LAW
                                  Bardis Vakili
                                  Sarah Kahn
                                  Erika Cervantes

                                  LA RAZA CENTRO LEGAL
                                  Stephen A. Rosenbaum
                                  Jordan Weiner

                                  PUBLIC COUNSEL
                                  Rebecca Brown
                                  Kathleen Rivas

                                  COALITION FOR HUMANE IMMIGRANT
                                  RIGHTS

Carl Bergquist
Adam Reese

*Attorneys for Plaintiffs*

Plaintiffs' Notice of Motion and Motion for APA § 705 Relief and Individual and Classwide
Preliminary Injunction; Memorandum of Points and Authorities in Support

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ III

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 4

    I.     Relevant Factual and Legal Background ......................................... 4

        A.    Creation and Expansion of Survivor-based Benefits. ............... 4

        B.    Interim Benefits: Deferred Action and Work Authorization. ............................................................................ 7

        C.    The 2025 Guidance Reverses Decades of Prior Policies. ......... 8

        D.    Overview of Select Individual Plaintiffs' Experiences. ........... 11

LEGAL STANDARD ................................................................................................. 14

ARGUMENT .............................................................................................................. 15

    I.     Plaintiffs are Likely to Succeed on the Merits. ............................ 15

        A.    Plaintiffs are Likely to Prevail on Their First and Second Claims that the 2025 Guidance is Arbitrary, Capricious and Contrary to Law. .......................................... 15

            1.    *The 2025 Guidance constitutes final agency action for which there is no other adequate remedy.* ............... 15

            2.    *The 2025 Guidance is arbitrary and capricious.* ........... 16

            3.    *The 2025 Guidance is contrary to law.* ......................... 21

        B.    Plaintiffs Are Likely To Succeed on the Merits of Their Claims Challenging the De Facto Revocation Policy. ............. 23

            1.    *Detaining or removing someone in deferred action status constitutes de facto revocation of deferred action.* ................................................................... 24

            2.    *Plaintiffs are likely to succeed on their Fifth Claim that procedural due process requires notice and an opportunity to be heard before deferred action can be revoked.* .................................................................... 25

            3.    *Plaintiffs are likely to succeed on their Sixth Claim that detention of individuals in valid deferred action status violates due process.* ............................. 28

            4.    *Plaintiffs are likely to succeed on their Third Claim that the De Facto Revocation Policy is arbitrary and capricious.* ............................................... 31

            5.    *Plaintiffs are likely to succeed on their Fourth Claim that the De Facto Revocation Policy violates the* Accardi *Doctrine.* ............................................ 34

        C.    Plaintiffs Are Likely to Succeed on Their Eighth and Ninth Claims That the Blind Removal Policy Violates 8 U.S.C. § 1227(d). ................................................................... 36

    II.    Plaintiffs are Suffering Irreparable Harm. .................................. 38

Plaintiffs' Notice of Motion and Motion for APA § 705 Relief and Individual and Classwide Preliminary Injunction; Memorandum of Points and Authorities in Support

A.   Individual Plaintiffs and Class Members are Irreparably Harmed............................................................................38

B.   Organizational Plaintiffs are Irreparably Harmed. ....................39

III.   The Balance of Hardships and Public Interest Weigh in Favor of Preliminary Relief. ................................................................................40

IV.   The Court Should Not Require Payment of a Security........................41

CONCLUSION.............................................................................................................41

Plaintiffs' Notice of Motion and Motion for APA § 705 Relief and Individual and Classwide Preliminary Injunction; Memorandum of Points and Authorities in Support

# TABLE OF AUTHORITIES

**CASES**

*Alcaraz v. I.N.S.*,
384 F.3d 1150 (9th Cir. 2004)................................................................34

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011)................................................................15

*All. for the Wild Rockies v. Petrick*,
68 F.4th 475 (9th Cir. 2023)..................................................................19

*Altera Corp. & Subsidiaries v. Comm'r*,
926 F.3d 1061 (9th Cir. 2019)................................................................16

*Aracely R. v. Nielsen*,
319 F. Supp. 3d 110 (D.D.C. 2018) .......................................................32

*Barrios Garcia v. U.S. Dep't of Homeland Sec.*,
25 F.4th 430 (6th Cir. 2022)..................................................................37

*Bell v. Burson*,
402 U.S. 535 (1971).............................................................................26

*Bennett v. Spear*,
520 U.S. 154 (1997).......................................................................16, 31

*Cabaccang v. U.S. Citizenship & Immigr. Servs.*,
627 F.3d 1313 (9th Cir. 2010)................................................................16

*Corley v. United States*,
556 U.S. 303 (2009).............................................................................37

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
591 U.S. 16 (2020) .........................................................................passim

*Doe v. Becerra*,
787 F. Supp. 3d 1083 (E.D. Cal. 2025)...................................................28

*Doe v. Noem*,
778 F. Supp. 3d 1151 (W.D. Wash. 2025) .........................................40, 41

*Dubin v. United States*,
599 U.S. 110 (2023).............................................................................22

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016).......................................................................19, 20

*F.C.C. v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009).......................................................................17, 19

*F.R.P. v. Wamsley*,
No. 3:25-CV-01917-AN, 2025 WL 3037858 (D. Or. Oct. 30, 2025)..........26, 30

*Gamez Lira v. Noem*,
No. 1:25-CV-00855-WJ-KK, 2025 WL 2581710 (D.N.M. Sept. 5, 2025)................................................................................................30

*Goss v. Lopez*,
419 U.S. 565 (1975).............................................................................40

*Hernandez v. Ashcroft*,
345 F.3d 824 (9th Cir. 2003)...................................................................5

*Hernandez v. Sessions*,

Plaintiffs' Notice of Motion and Motion for APA § 705 Relief and Individual and Classwide Preliminary Injunction; Memorandum of Points and Authorities in Support

872 F.3d 976 (9th Cir. 2017) ................................................................28, 29, 38

*Herrera v. Knight*,
   No. 2:25-CV-01366-RFB-DJA, 2025 WL 2581792 (D. Nev. Sept.
   5, 2025) .................................................................................................... 31

*Holman v. City of Warrenton*,
   242 F. Supp. 2d 791 (D. Or. 2002) ........................................................... 25

*I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421 (1987) ....................................... 23

*Immigrant Defs. L. Ctr. v. Noem*,
   145 F.4th 972 (9th Cir. 2025) ................................................................... 15

*Inland Empire-Immigrant Youth Collective v. Duke*,
   No. EDCV-172048-PSG-SHKX, 2017 WL 5900061 (C.D. Cal.
   Nov. 20, 2017) ......................................................................................... 28

*Inland Empire—Immigrant Youth Collective v. Nielsen*,
   Case No. EDCV 17-2048, 2018 WL 4998230 (C.D. Cal. Apr. 19,
   2018) ....................................................................................25, 26, 27, 28

*Inland Empire-Immigrant Youth Collective v. Nielsen*,
   No. EDCV172048-PSG-SHKX, 2018 WL 1061408 (C.D. Cal. Feb.
   26, 2018) ..............................................................................24, 33, 34, 35

*Jajati v. U.S. Customs & Border Prot.*,
   102 F.4th 1011 (9th Cir. 2024) ................................................................. 32

*Jimenez v. Dep't of Homeland Sec.*,
   No. 2:22-cv-00967-SSS-JPRx, 2022 WL 19410308, (C.D. Cal.
   Nov. 14, 2022) ......................................................................................3, 36

*Johnson v. Couturier*,
   572 F.3d 1067 (9th Cir. 2009) ................................................................. 41

*Jorge M.F. v. Jennings*,
   534 F. Supp. 3d 1050 (N.D. Cal. 2021) ................................................... 31

*Judulang v. Holder*,
   565 U.S. 42 (2011) ................................................................................3, 33

*Lee v. Holder*,
   599 F.3d 973 (9th Cir. 2010) ................................................................... 27

*Lopez-Arevelo v. Ripa*,
   No. EP-25-CV-337-KC, 2025 WL 2691828 (W.D. Tex. Sept. 22,
   2025) ....................................................................................................... 31

*Maldonado v. Noem*,
   No. 4:25-CV-2541, 2025 WL 1593133 (S.D. Tex. June 5, 2025) ............... 30

*Mathews v. Eldridge*,
   424 U.S. 319 (1976) .............................................................25, 26, 27, 28

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut.*
   *Automobile Ins. Co.*,
   463 U.S. 29 (1983) ...............................................................................19, 20

*Ne. Marine Terminal Co. v. Caputo*,
   432 U.S. 249 (1977) ................................................................................. 23

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................................. 40

Plaintiffs' Notice of Motion and Motion for APA § 705 Relief and Individual and Classwide
Preliminary Injunction; Memorandum of Points and Authorities in Support

*Ocean Advocs. v. U.S. Army Corps of Eng'rs*,
  402 F.3d 846 (9th Cir. 2005).....................................................................22

*Oregon Council for Humans. v. United States DOGE Serv.*,
  No. 3:25-CV-829-SI, 2025 WL 2237478 (D. Or. Aug. 6, 2025)......................23

*Perez Perez v. Wolf*,
  943 F.3d 853 (9th Cir. 2019).....................................................................32

*Pinchi v. Noem*,
  No. 5:25-CV-05632-PCP, 2025 WL 2084921 (N.D. Cal. July 24,
  2025)......................................................................................................31

*Primero v. Mattivelo*,
  Case No. 1:25-CV-11442-IT, 2025 WL 1899115 (D. Mass. July 9,
  2025)......................................................................................................30

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*,
  No. CV 25-306 (RDM), 2025 WL 1825431 (D.D.C. July 2, 2025).................37

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
  525 U.S. 471 (1999) ...............................................................................24

*Rodriguez v. Marin*,
  909 F.3d 252 (9th Cir. 2018).....................................................................28

*Rodriguez-Flores v. Semaia*,
  No. CV 25-6900 JGB (JCX), 2025 WL 2684181 (C.D. Cal. Aug.
  14, 2025).................................................................................................31

*Santiago v. Noem*,
  Case No. EP-25-CV-361-KC, 2025 WL 2792588 (W.D. Tex. Oct.
  2, 2025)..................................................................................................29

*Sepulveda Ayala v. Bondi*,
  No. 2:25-CV-01063-JNW-TLF, 2025 WL 2084400 (W.D. Wash.
  July 24, 2025) ...................................................................................24, 30

*Siskiyou Reg'l Educ. Project v. U.S. Forest Serv.*,
  565 F.3d 545 (9th Cir. 2009).....................................................................32

*Sun v. Santacruz*,
  No. 5:25-CV-02198-JLS-JC, 2025 WL 2730235 (C.D. Cal. Aug.
  26, 2025).................................................................................................31

*United States ex rel. Accardi v. Shaughnessy*,
  347 U.S. 260 (1954) ...........................................................................34, 35

*United States v. Brumbaugh*,
  139 F.4th 1077 (9th Cir. 2025)...................................................................22

*Vasquez Perdomo v. Noem*,
  No. 2:25-cv-05605-MEMF-SP, 2025 WL 1915964 (C.D. Cal. July
  11, 2025).................................................................................................41

*W. Energy All. v. Salazar*,
  2011 WL 3738240 (D. Wyo. 2011) ............................................................16

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ....................................................................................15

*Xuyue Zhang v. Barr*,
  612 F. Supp. 3d 1005 (C.D. Cal. 2020).......................................................38

Plaintiffs' Notice of Motion and Motion for APA § 705 Relief and Individual and Classwide
Preliminary Injunction; Memorandum of Points and Authorities in Support

*Zadvydas v. Davis,*
  533 U.S. 678 (2001) ................................................................................... 26, 29

**STATUTES**
22 U.S.C. § 7105(b)(1) ....................................................................................... 7
5 U.S.C. § 704 .................................................................................................. 15
5 U.S.C. § 705 ......................................................................................... 1, 4, 15
5 U.S.C. § 706(2)(A) .................................................................................. 15, 21
8 U.S.C. § 1101(a)(15)(T) ................................................................................. 6
8 U.S.C. § 1101(a)(15)(U)(i)(I-IV) ................................................................... 6
8 U.S.C. § 1101(a)(51) ...................................................................................... 5
8 U.S.C. § 1154(a)(1)(A)(iii) ........................................................................... 5
8 U.S.C. § 1154(a)(1)(B)(iii) ............................................................................ 5
8 U.S.C. § 1154(a)(1)(K) .................................................................................. 5
8 U.S.C. § 1182(d)(13)-(14) ......................................................................... 6, 36
8 U.S.C. § 1184(p)(2) ........................................................................................ 7
8 U.S.C. § 1184(p)(6) .............................................................................. 7, 30, 37
8 U.S.C. § 1227(d) ..................................................................................... 3, 7, 22
8 U.S.C. § 1227(d)(1) ...................................................................................... 36
8 U.S.C. § 1611(a) ............................................................................................. 7
8 U.S.C. §1641(c) .............................................................................................. 7
BIWPA § 1502(a)(1)-(2) ............................................................................ 17, 22
BIWPA § 1505 .................................................................................................. 6
BIWPA § 1513(a)(2) ........................................................................................ 20
BIWPA § 1513(a)(2)(A)-(B) ...................................................................... 17, 22
BIWPA § 1513(a)(2)(B), (b) ............................................................................. 5
BIWPA § 1513(e) .............................................................................................. 6
TVPA § 102(b)(17) .......................................................................................... 18
TVPA § 102(b)(19) ..................................................................................... 18, 22
TVPA § 103(8) .................................................................................................. 6
TVPA § 107(e)(3) .............................................................................................. 6
TVPA §107(e) ............................................................................................... 6, 22
TVPRA § 201(c) ................................................................................................ 7
TVPRA § 204 ............................................................................................... 6, 22
TVPRA § 238(a) .............................................................................................. 21
TVPRA § 238(b)(5) ......................................................................................... 21
Violent Crime Control and Law Enforcement Act of 1994, Title IV,
  Pub. L. 103-322, 108 Stat. 1796 (September 13, 1994) ................................. 5

Plaintiffs' Notice of Motion and Motion for APA § 705 Relief and Individual and Classwide
Preliminary Injunction; Memorandum of Points and Authorities in Support

**REGULATIONS**

8 C.F.R. § 204.2(c)(6)(i) .................................................................................... 7

8 C.F.R. § 214.14(a)(10) .................................................................................... 6

8 C.F.R. § 214.14(c)(1) ..................................................................................... 27

8 C.F.R. § 214.14(c)(1)(ii) ............................................................................... 36

8 C.F.R. § 214.14(d)(2) .......................................................................... 7, 33, 35

8 C.F.R. § 214.14(d)(3) ..................................................................................... 35

8 C.F.R. § 214.204(b)(2) ................................................................................... 36

8 C.F.R. § 214.204(b)(2)(iii) .............................................................................. 8

8 C.F.R. § 214.205(a)(2) ...................................................................................... 8

8 C.F.R. § 214.205(c) ........................................................................................... 8

8 C.F.R. § 214.205(e) ........................................................................................... 8

8 C.F.R. § 214.205(g) ........................................................................................... 8

8 C.F.R. § 274a.12(c)(14) ............................................................................ 26, 33

**OTHER AUTHORITIES**

151 Cong. Rec. E2605-04, 151 Cong. Rec. E2605-04, E2607, 2005 WL 3453763 (Dec. 18, 2005) (statement of Rep. Conyers) .............................. 35

154 Cong. Rec. H10888-01, H10902, 2008 WL 5169865 (statement of Mr. Smith NJ) .................................................................................................. 23

154 Cong. Rec. H10888-01, H10905, 2008 WL 5169865 (Dec. 10, 2008) (statement of Reps. Berman and Conyers) ................................................. 7

Exec. Order No. 14159, *Protecting the American People Against Invasion*, (Jan. 20, 2025) ("Invasion EO") ........................................................ 17

Plaintiffs' Notice of Motion and Motion for APA § 705 Relief and Individual and Classwide Preliminary Injunction; Memorandum of Points and Authorities in Support

**INTRODUCTION**

On January 30, 2025, Defendant U.S. Immigration and Customs Enforcement ("ICE") issued a policy directive that, for the first time in the history of the Violence against Women Act ("VAWA"), U visa, and T visa programs, authorized the routine detention and removal of noncitizen victims of domestic violence, human trafficking, and other serious crimes who had petitioned for these forms of protection against removal. Cmplt. ¶¶ 82-95, Dkt No. 1; Decl. of Erika Cervantes ("Cervantes Decl.") Exh. H, ICE Policy Number 11005.4, *Interim Guidance on Civil Immigration Enforcement Actions Involving Current or Potential Beneficiaries of Victim-Based Immigration Benefits* (Jan. 30, 2025) ("2025 Guidance"). The havoc wreaked by this unlawful policy has only worsened since then.

Plaintiffs Lupe A., Camila B., Paulo C., Kenia J. Merlos, Luna E., Carmen F., Yessenia Ruano, and Daniel H. (collectively "Individual Plaintiffs") and Immigration Center for Women and Children ("ICWC"), Coalition for Humane Immigrants Rights ("CHIRLA"), La Raza Centro Legal ("LRCL"), and California Collaborative for Immigrant Justice ("CCIJ") (collectively "Organizational Plaintiffs") move for preliminary relief to protect themselves and members of the classes proposed herein from irreparable harm. The surging tide of unlawful immigration enforcement against petitioners for immigration status through VAWA, U visas, or T visas (collectively, "Survivor-based Benefits") does undeniable violence to Congress's effort to protect such survivors. To restore the status quo ante, Plaintiffs seek preliminary relief against three unlawful policies and practices. There is a strong likelihood they will prevail on their claims.

*First*, Plaintiffs seek to stay, pursuant to 5 U.S.C. § 705, the 2025 Guidance and to enjoin Defendants from implementing its policies, as well as any other policy that does not presumptively protect petitioners for Survivor-based Benefits against immigration detention and removal. The Supreme Court has repeatedly

1

made clear that, when an agency abandons decades of consistent policy, it must provide a reasoned explanation. *E.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 16, 30 (2020) ("*Regents*"). The 2025 Guidance makes scant effort at such explanation, justifying the sudden about-face by referencing a single line in one of President Trump's first-day executive orders. However, Congress made explicit its intent to presumptively protect such petitioners from removal, and, until the 2025 Guidance, Defendants interpreted the law the same way. Thus, Plaintiffs are likely to succeed on their claims that the 2025 Guidance is arbitrary, capricious, and contrary to law.

*Second*, Plaintiffs Lupe A. and Paulo C., as well as the Organizational Plaintiffs, move to stay Defendants' policy that ICE is not bound by USCIS grants of deferred action to U and T visa petitioners, and to enjoin Defendants from engaging in civil immigration enforcement actions against U and T visa petitioners who are lawfully present in the United States pursuant to deferred action. Such enforcement effectively revokes deferred action without affording Plaintiffs and putative Deferred Action Class members notice or an opportunity to be heard. This "De Facto Revocation Policy," pursuant to which Defendants are currently incarcerating Paulo C. and unlawfully deported Lupe A., violates due process because a formal grant of deferred action confers significant benefits such that it requires notice and an opportunity to be heard before it can be revoked.

Additionally, Defendants have formally authorized deferred action recipients to remain in the United States for a set period of time and explicitly determined them not to be dangerous or a flight risk. Therefore, detaining U and T visa petitioners during an authorized period of deferred action status must be justified in an individualized hearing at which Defendants demonstrate that the terms of deferred action have been violated and that detention is necessary.

The De Facto Revocation Policy is also arbitrary and capricious because it is not connected to the goals of the immigration laws and leaves the outcome of a

person's case in the hands of an enforcement agent. *Judulang v. Holder*, 565 U.S. 42, 57-58 (2011). It also violates Defendants' own written policies. Thus, Plaintiffs are likely to succeed on their Third, Fourth, Fifth, and Sixth Claims.

*Third*, Plaintiffs Carmen F., Ms. Ruano, and Organizational Plaintiffs seek to stay and enjoin Defendants' policy that the agencies need not determine whether U or T visa petitioners demonstrate prima facie eligibility for relief when such petitioners request a stay of removal. This "Blind Removal Policy" is inconsistent with 8 U.S.C. § 1227(d), which requires such a determination as a prerequisite to removing them. *See Jimenez v. Dep't of Homeland Sec.*, No. 2:22-cv-00967-SSS-JPRx, 2022 WL 19410308, at *3 (C.D. Cal. Nov. 14, 2022).

Preliminary relief is warranted because Plaintiffs are suffering irreparable harm from the challenged policies. Under the De Facto Revocation Policy, Defendants summarily deported Lupe A. despite having granted her deferred action, ripping her away from her children, grandchildren, and home of several decades. Defendants also continue to imprison Paulo C. despite his lawful deferred action status, which he received after helping his minor daughter report and prosecute her rapist. Plaintiff Carmen F. reported her abusive husband, whom Defendants deported. As Congress intended, Carmen thereafter applied for a U visa, but ICE deported her without determining her prima facie eligibility for lawful status, despite her having requested a stay of removal. She and her young son are now being forced to live in fear with their abuser in their home country. Under the same policy, Ms. Ruano, a survivor of human trafficking with a pending T visa petition, has been forced to live in a country she fled, causing her twin U.S. citizen daughters to be uprooted from their home.

Plaintiff ICWC expends significant resources trying to prevent the unlawful deportation of their clients under the challenged policies, including a U visa client with deferred action in the last week alone. CCIJ clients with pending U or T visa petitions face detention and removal, including a client who relied on the

protections of a T visa to help expose rampant sexual abuse at the FCI Dublin federal prison only to be deported earlier this year. These are but a few examples of the ongoing and irreparable harm Plaintiffs are enduring.

The balance of hardships and public interests likewise warrant the relief Plaintiffs seek. Defendants have no legitimate interest in detaining and removing victims whom Congress has sought to protect. Preliminary relief restoring the status quo of the previous several decades does not impair Defendants from pursuing their objectives lawfully.

The requested relief is appropriately tailored. In addition to staying the offending policies under §705, Plaintiffs seek an order that remedies their particular harms. Paulo C. respectfully requests an order preventing Defendants from continuing to detain him without a hearing. Luna E. and Daniel H. request an order enjoining Defendants from refusing to apply the policies rescinded by the 2025 Guidance to them. Lupe A., Carmen F., and Ms. Ruano seek an order enjoining Defendants from preventing their re-entry into the United States, thus restoring them to the same legal position they had prior to their detention or forced expulsions. And the Organizational Plaintiffs request an order applying these same forms of relief to their clients and members. Finally, Plaintiffs respectfully request that the Court certify the classes as requested in their pending Motion for Class Certification, or alternatively provisionally certify those classes for purposes of this motion, and issue corresponding classwide injunctions.[1]

## BACKGROUND

### I. Relevant Factual and Legal Background

**A. Creation and Expansion of Survivor-based Benefits.**

In 1994, Congress passed VAWA to break the cycle of noncitizens remaining in relationships with abusers who held the keys to their eligibility for

---

[1] Should the Court defer ruling on class certification, Plaintiffs respectfully request that the Court promptly grant the individual relief sought herein.

permanent immigration status in the United States. *See* Violent Crime Control and Law Enforcement Act of 1994, Title IV, Pub. L. 103-322, 108 Stat. 1796 (September 13, 1994). "[T]he goal of the bill is to 'permit[ ] battered immigrant women to leave their batterers without fearing deportation.'" *Hernandez v. Ashcroft*, 345 F.3d 824, 841 (9th Cir. 2003) (citation omitted). VAWA provides that noncitizens with abusive qualifying family members to "self-petition" for family-based immigrant visas without their abuser's knowledge, consent, or participation. 8 U.S.C. §§ 1101(a)(51), 1154(a)(1)(A)(iii), (B)(iii). If USCIS approves the petition but a visa is not immediately available, such individuals are eligible for work authorization and deferred action status while they wait, often for years, for a visa to become available. 8 U.S.C. § 1154(a)(1)(K); Decl. of Sarah Kahn in Support of Motion for Class Certification, Oct. 15, 2025 ("Kahn Decl.") at 123 (USCIS Policy Manual ("PM") vol. 3, pt. D, ch. 5.C.2), Dkt No. 23-12.[2]

In 2000, with overwhelming bipartisan support, *see* Decl. of Cristina Velez ("Velez Decl.") ¶ 9 [Dkt No. 23-24], Congress passed the Victims of Trafficking and Violence Protection Act of 2000 ("VTVPA"), which both reauthorized VAWA through the Violence against Women Act of 2000 ("VAWA 2000") and included the Trafficking Victims Protection Act of 2000 ("TVPA"). VTVPA § 2, Pub. L. No. 106-386, 114 Stat. 1464. The law dramatically expanded protections for immigrant survivors of domestic violence, crimes, and human trafficking.

First, through Title 5 of VAWA 2000 – the Battered Immigrant Women Protection Act of 2000 ("BIWPA") – Congress expanded VAWA protections for noncitizens. BIWPA §§ 1501-1512.

Second, Congress created the U visa, providing a path to U.S. citizenship for non-citizen survivors of qualifying crimes who assist law enforcement in investigating or prosecuting those crimes. *See* BIWPA § 1513(a)(2)(B), (b). A

---

[2] "The USCIS Policy Manual is the agency's centralized online repository for USCIS' immigration policies." PM, https://www.uscis.gov/policy-manual.

Plaintiffs' Notice of Motion and Motion for APA § 705 Relief and Individual and Classwide Preliminary Injunction; Memorandum of Points and Authorities in Support

noncitizen is eligible for a U visa if (1) the applicant "suffered substantial physical or mental abuse as a result of having been a victim of" certain explicitly identified types of crimes; (2) the applicant "possesses information concerning [the] criminal activity"; (3) the applicant "has been helpful, is being helpful or is likely to be helpful" to government officials regarding the criminal activity; and (4) the crime occurred in the United States or violated U.S. law. 8 U.S.C. § 1101(a)(15)(U)(i)(I-IV). Children, spouses, and, for petitioners younger than 21, siblings and parents, may also receive U visas as derivative beneficiaries. 8 C.F.R. § 214.14(a)(10).

Third, through the TVPA, Congress created the T visa, which provides a path to U.S. citizenship for survivors of severe human trafficking, defined as either sex or labor trafficking. TVPA §§ 103(8), 107(e). To be eligible for a T visa, a petitioner must (1) be a survivor of a "severe form of trafficking in persons," (2) be "physically present in the United States" or its territories, (3) have "complied with any reasonable request for assistance" by law enforcement, with some exceptions for age and the impact of trauma, and (4) be someone who would "suffer extreme hardship" if removed. 8 U.S.C. § 1101(a)(15)(T).

Congress went further than simply creating these visas. To minimize the potential immigration consequences for noncitizens pursuing these benefits, Congress also authorized broad waivers of inadmissibility to protect eligible petitioners from removal. *See* BIWPA § 1505 (creating waivers for VAWA self-petitioners); *id.* § 1513(e) (same for U visa petitioners); TVPA § 107(e)(3) (same for T visa petitioners); Velez Decl. ¶¶ 10-11; 8 U.S.C. § 1182(d)(13)-(14).

In 2008, Congress passed the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"). Pub. L. No.110-457, 122 Stat. 5044. The TVPRA authorized the Department of Homeland Security ("DHS") to issue a "stay of a final removal order" for U or T visa petitioners whose petition set "forth a prima facie case for approval," which allows them to remain in the United States until their petitions are adjudicated. TVPRA § 204

(codified at 8 U.S.C. § 1227(d)). The TVPRA also authorized employment for U visa petitioners with "a pending, bona fide application" awaiting full adjudication. TVPRA § 201(c) (codified at 8 U.S.C. § 1184(p)(6)).

**B. Interim Benefits: Deferred Action and Work Authorization.**

Congress and Defendant agencies also created policies by which petitioners could promptly receive interim benefits, including work authorization and deferred action, during the often-lengthy process for adjudicating and conferring visas through VAWA, U visa, and T visa petitions.

For instance, Congress ensured that VAWA self-petitioners who establish a "prima facie case" and bona fide T visa petitioners are eligible for federal benefits while their petitions are pending. 8 U.S.C. §§ 1611(a), 1641(c); 22 U.S.C. § 7105(b)(1). Accordingly, USCIS promptly makes VAWA prima facie determinations "[u]pon receipt of a self-petition." 8 C.F.R. § 204.2(c)(6)(i).

In 2007, to address backlogs caused by the 10,000-visa annual cap on U visas, 8 U.S.C. § 1184(p)(2), DHS promulgated regulations requiring that petitioners who will not receive U visas after their petition is fully adjudicated "due solely to the cap, must be placed on a waiting list." 8 C.F.R. § 214.14(d)(2). Consistent with Congress's intent to protect such petitioners from deportation, the regulations mandate that USCIS "will grant deferred action" and may grant work authorization to people on the waiting list, until a U visa becomes available. *Id.*

In 2021, to implement the requirement of 8 U.S.C. § 1184(p)(6) that U visa petitioners with bona fide petitions may receive work authorization, which necessarily includes permission to remain in the United States and therefore deferred action,[3] USCIS created a formal Bona Fide Determination ("BFD")

---

[3] This is made clear by two of the TVPRA's co-sponsors, who stated for the Congressional Record the expectations for the bona fide determination process: "The [USCIS] Vermont Service Center should therefore strive to issue work authorization *and deferred action* in most instances within 60 days of filing[.]" 154 Cong. Rec. H10888-01, H10905, 2008 WL 5169865 (Dec. 10, 2008) (statement of Reps. Berman and Conyers) (emphasis added).

7

Plaintiffs' Notice of Motion and Motion for APA § 705 Relief and Individual and Classwide Preliminary Injunction; Memorandum of Points and Authorities in Support

process, through which bona fide petitioners may receive deferred action and work authorization based on a streamlined review, rather than the full adjudication required for a waiting list placement. Kahn Decl. at 102-07 (PM vol. 3, pt. C, ch. 5). Such work authorization and deferred action are valid for four years and renewable. *Id.* at 106-07. If USCIS does not grant deferred action through a BFD, it proceeds to the full waiting list adjudication described above. *Id.* at 107.

USCIS also provides T visa petitioners with a prompt BFD process. 8 C.F.R. § 214.205. USCIS will deem a T visa petition bona fide if (1) "[t]he applicant has submitted a properly filed and complete [a]pplication," (2) "[t]he applicant has submitted a signed personal statement," and (3), "initial background checks are complete, have been reviewed, and do not present national security concerns." 8 C.F.R. § 214.205(a)(2). If the application is deemed bona fide, the petitioner is eligible for deferred action and work authorization. 8 C.F.R. § 214.205(c), (e). A bona fide T visa petition "automatically stays the execution of any final order of removal, . . . until any adverse decision" on the T visa petition "becomes final." 8 C.F.R. §§ 214.204(b)(2)(iii), 214.205(g).

**C. The 2025 Guidance Reverses Decades of Prior Policies.**

Consistent with Congress's intent, for nearly two decades, an unbroken line of ICE enforcement policies required ICE generally to refrain from pursuing removal efforts against people with pending Survivor-based Benefits, absent serious public safety concerns. *See* Velez Decl. ¶¶ 13-15; Cmplt. ¶¶ 71-81 (describing policies issued in 2005, 2007, 2009, 2011, 2019, and 2021); Cervantes Decl., Exhs. A-G. "These policies worked to encourage noncitizen survivors of domestic violence, sexual assault, human trafficking, and other crimes, to step forward to seek help and cooperate with law enforcement." Velez Decl. ¶ 18.

Of note are the 2011 and 2021 policies, which the 2025 Guidance explicitly "rescinded and superseded." 2025 Guidance at 1; Cervantes Decl., Exh. E ("2011 Policy"), Exh. G ("2021 Directive"). As with prior policy, the 2011 Policy

reiterated that it is generally "against ICE policy to initiate removal proceedings against" known victims of crime unless there are "serious adverse factors." *Id.* Notably, the 2011 Policy explains "that a flag now exists" in DHS systems "to identify those victims of domestic violence, trafficking, or other crimes" with pending petitions for "victim-based immigration relief," so agents can identify such individuals when encountered. *Id.*

The 2021 Directive continued ICE's longstanding policy to "refrain from taking civil enforcement action against" individuals "known to have a pending application" for "victim-based immigration benefits," "absent exceptional circumstances" such as national security or public safety concerns. 2021 Directive at 1-2, 9. If such an application was pending, ICE was to "defer" enforcement until USCIS adjudicates the petition or issues a negative interim adjudication. *Id.* at 2. Agents were to request expedited prima facie adjudications from USCIS for people in ICE custody, and eligibility "for victim-based immigration benefits . . . must be considered" a positive "discretionary factor." *Id.* at 2, 9.

Shortly after President Trump took office in 2025, ICE issued the 2025 Guidance, which became "effective immediately and remains in effect until superseded." 2025 Guidance at 1. It explicitly "rescinded and superseded" the 2021 Directive and 2011 Policy and reversed the longstanding presumption of protection for noncitizen crime victims, replacing it with a presumption of detention and removal. Specifically, the 2025 Guidance requires, when ICE officers seek to detain or remove individuals with pending Survivor-based Benefit petitions, that they (1) merely "coordinate and deconflict internally" and with law enforcement agencies "to ensure criminal investigative and other enforcement actions will not be compromised," (2) "consult with" local ICE attorneys only "to ensure any such action is consistent with applicable legal limitations," (3) need not consider a noncitizen being "a victim of a crime" as "a positive discretionary

Plaintiffs' Notice of Motion and Motion for APA § 705 Relief and Individual and Classwide Preliminary Injunction; Memorandum of Points and Authorities in Support

factor," and (4) will not "routinely request expedited adjudications from USCIS," but may do so only when "it is in ICE's best interests." 2025 Guidance at 2-3.

Thus, the 2025 Guidance imposed a sea change from decades of agency practice under which immigration agencies generally refrained from enforcement against crime victims unless warranted by serious adverse factors. Instead, the 2025 Guidance effectively requires enforcement against survivors of crime to the maximum extent that ICE attorneys say it is legal to do so, with the only exception being when enforcement will interfere with active law enforcement investigations.

The 2025 Guidance has also resulted in two additional unlawful policies and practices by Defendants. *First,* under the De Facto Revocation Policy, ICE now takes the position that it is not bound by USCIS grants of deferred action, and neither ICE nor USCIS provides any notice or opportunity to be heard regarding whether such deferred action should be revoked prior to engaging in immigration enforcement actions. *See, e.g.* Decl. of Oscar Montes ("Montes Decl.") ¶¶ 10-12. Accordingly, ICE now regularly detains and deports people in lawful deferred action status based on pending U or T visa petitions. *See, e.g.,* Decl. of Lupe A. ("Lupe Decl.") ¶¶ 18-27, Dkt No. 23-3; Decl. of Paulo C. ("Paulo Decl.") ¶¶ 24-29, Dkt No. 23-5; Decl. of Kenia J. Merlos ("Merlos Decl.") ¶ 23-46, Dkt No. 23-6; Decl. of Claire Fawcett ¶ 17, Dkt No. 23-19; Decl. of Nerea Woods ¶¶ 7-9, Dkt No. 23-21; Decl. of Magdalena Matelska ("Matelska Decl.") ¶¶ 13-14, Dkt No. 23-22; Decl. of Cristina Corbaci ("Corbaci Decl.") ¶¶ 5-7, Dkt No. 23-23.

*Second*, under the Blind Removal Policy, ICE takes the position that 8 U.S.C. § 1227(d) does not require consideration of prima facie eligibility whenever U and T visa petitioners request a stay of their removals, and it therefore now engages in a pattern and practice of removing such petitioners without requesting prima facie determinations from USCIS. *See, e.g.,* Decl. of Carmen F. ("Carmen Decl.") ¶¶ 37-42, Dkt No. 23-8; Decl. of Yessenia Ruano ("Ruano Decl.") ¶ 41, Dkt No. 23-9; Matelska Decl. ¶ 14; Corbaci Decl. ¶ 9.

10

**D. Overview of Select Individual Plaintiffs' Experiences.**

Lupe A. is a 64-year-old grandmother who lived in Los Angeles for 21 years until ICE deported her while in deferred action status this year. Lupe Decl. ¶ 22. She is a regular church volunteer with four adult children and three U.S. citizen grandchildren. *Id*. ¶ 3-4. After enduring abuse from her former partner, Lupe reported the abuse to police, provided information about him, and testified against him in court. *Id*. ¶¶ 11-13. In November 2017, she applied for a U visa. *Id*. ¶ 10. On November 2, 2022, USCIS determined her petition was bona fide and granted her deferred action. *Id*. ¶ 18; Kahn Decl. at 7. On April 28, 2025, while still in valid deferred action status, ICE agents arrived at her home, shackled her, and brought her to an ICE facility. Lupe Decl. ¶¶ 20-21, 24, 26. She and her attorney informed ICE that she had a pending U visa petition and deferred action, but ICE unlawfully deported Lupe the next day. *Id*. ¶¶ 21-22, 23-25, 27. Neither USCIS nor ICE provided notice that her deferred action status was revoked, and she had committed no act to place her status at risk. *Id*. ¶¶ 20, 29. She remains in Mexico, separated from her family, church, pets, and business. *Id*. ¶ 28.

Ms. Merlos came to the United States in 2003. Merlos Decl. ¶ 1. She resides in Portland, Oregon, is married, and has 9-year-old triplets and a 7-year-old son, all born in the United States. *Id*. ¶ 4. In 2023, Ms. Merlos and her husband were held at gunpoint and reported the crime. *Id*. ¶ 17-18. They filed a U visa petition, and in December 2024, USCIS granted Ms. Merlos a BFD, deferred action, and work permit. *Id*. ¶ 24; Kahn Decl. at 59. In June 2025, U.S. Customs and Border Protection ("CBP") agents arrested Ms. Merlos, her minor U.S. citizen children, her 71-year-old mother who was visiting on a valid tourist visa, and her sister and sister's children who are Canadian permanent residents, while they were having a family reunion at a park in Washington near the Canadian border. Merlos Decl. ¶¶ 25-42. CBP subjected Ms. Merlos and her children to a harrowing two weeks of incommunicado detention. *Id*. DHS then released her children and transferred her

Plaintiffs' Notice of Motion and Motion for APA § 705 Relief and Individual and Classwide Preliminary Injunction; Memorandum of Points and Authorities in Support

to ICE custody in Tacoma, Washington, where ICE kept her in custody notwithstanding her valid deferred action status for about three and a half months. *Id.* Ms. Merlos describes conditions in the ICE detention as prison-like and cruel. *Id*. ¶ 45. While Ms. Merlos was in ICE custody, she understands that ICE arrested and deported her husband during the first week of October 2025, effectively orphaning their children. *Id*. ¶¶ 43-44. On October 14, 2025, an immigration judge terminated Ms. Merlos' removal proceedings, but ICE kept her in custody while it considered appeal. Kahn Decl. at 15. ICE finally released Ms. Merlos around October 27, 2025, in response to a habeas petition.

Paulo C. is a 43-year-old husband and father of four U.S. citizen daughters who has lived in Texas since 2010. Paulo Decl. ¶¶ 1-4. In 2018, Paulo's then-13-year-old stepdaughter was raped. *Id*. ¶ 18. He and his wife reported it to police and assisted in the investigation, resulting in the perpetrator pleading guilty to felony injury of a child. *Id*. ¶ 20. Paulo and his wife applied for a U visa, and on March 27, 2023, USCIS granted Paulo deferred action status and work authorization, valid until March 16, 2027. Kahn Decl. at 17-19. ICE took custody of Paulo in July 2025 after a traffic stop by local police. *Id*. ¶¶ 26, 29, 31-33. Paulo's attorney informed ICE of his deferred action status, but ICE has refused to release him to this day, and he remains detained by ICE, having been recently transferred from one ICE jail in Texas to another, served by a different immigration court. *Id*. ¶ 33-36; Supp. Decl. of Bardis Vakili ¶ 2, Dkt No. 28-1. Paulo has never received notice that his deferred action has been revoked. Paulo Decl. ¶ 39. In a declaration, Paulos's daughter explains the devastating impact his detention has had on his family. Decl. of Paulo C.'s Daughter ¶¶ 3-12, Dkt No. 23-11.

Carmen F. lived in the United States since arriving in August 2022 until Defendants recently deported her with her eight-year-old son. Carmen Decl. ¶ 2. Carmen's husband physically and sexually abused her while they were in the United States, and in the summer of 2024, a week of escalating violence

culminated when Carmen locked herself in her room and her husband kicked the door and threatened to kill her, while her son was hysterical with fear. *Id.* ¶¶ 17-20. Resolved to protect her son, Carmen called the police and obtained a restraining order. *Id.* In November 2024, under the then-current 2021 Directive, ICE granted Carmen and her son a six-month stay of removal to prepare a U visa application. Kahn Decl. at 26-31. In March 2025, Carmen learned her husband had been deported. *Id.* ¶ 28. That same month, she submitted a U visa petition. *Id.* ¶ 22. However, instead of extending her stay based on her pending petition for the same reasons they granted it in 2024, ICE, under the 2025 Guidance, ordered her to appear for a check-in and detained her and her son in June 2025. *Id.* ¶¶ 29-32. After two months of detention, ICE deported them after opposing her stay request, without determining her prima facie eligibility. *Id.* ¶¶ 33-36, 43; Kahn Decl. at 34, 39, 48. When the deportation plane landed, Carmen's husband was waiting for them. *Id.* ¶ 44. He coerced her into leaving with him, and now she and their son are trapped in his home. *Id.* ¶¶ 47-48. He monitors and controls their every move, keeping tabs on their location, and polices her communications. *Id.* ¶¶ 48-49. As Carmen laments, instead of protecting them, ICE "put [them] on a plane and sent [them] into the arms of the person [they] had sought protection from." *Id.* ¶ 51.

Yessenia Ruano lived in the United States for fourteen years until Defendants forced her to self-deport in June 2025. Ruano Decl. ¶¶ 1, 18-21. She is married with twin ten-year-old U.S. citizen daughters. *Id.* ¶ 16. While fleeing violence and threats in El Salvador, she became a victim of human trafficking into the United States. *Id.* ¶¶ 3-9. Ms. Ruano received employment authorization while she pursued immigration relief and became a teacher's aide in Wisconsin, where she worked for the last eight years. *Id.* ¶ 17. During the intervening years, she was given annual check-ins with ICE, which she always attended. Kahn Decl. at 61-62. In February 2025, Ms. Ruano submitted a T visa petition. *Id.* at 64. At a February 14, 2025 ICE check-in, ICE gave her a "Warning for Failure to Depart." *Id.* at 66-

67. Her immigration attorney submitted a request for a stay of removal the same day. *Id.* at 69. Ms. Ruano's ICE officer gave her a deadline to depart the United States by June 4, 2025, and ICE denied the stay request. *Id.* at 61, 71. With the 2025 Guidance in effect, ICE did not request a prima facie determination on the pending T visa petition. At one of her 2025 check-ins, an officer told Ms. Ruano that if she did not self-deport, they would hunt her down and that she would be separated from her daughters, detained, and deported. Ruano Decl. ¶ 38. On June 11, 2025, ICE denied her attorney's second stay request without requesting a prima facie determination from USCIS. Kahn Decl. at 73-79. Fearing forcible separation from her daughters, Ms. Ruano departed with them. Ruano Decl. ¶¶ 48-49. They had never been to El Salvador and were "constantly crying" as they struggled to adjust. *Id*. ¶¶ 49-50.

Daniel H. is a husband and proud father of two U.S. citizen daughters. Decl. of Daniel H. ¶ 3, Dkt No. 23-10. In 2009, Daniel and his father were attacked, and Daniel required emergency hospitalization. *Id.* ¶ 12. Daniel was able to identify one of his attackers and cooperated with police, and the attacker pled guilty. *Id.* ¶ 13. In or around April 2025, Daniel unknowingly hired a *notario*, who filed an incomplete U visa petition for him. *Id.* ¶ 16. In August 2025, ICE took custody of Daniel. *Id.* ¶ 17-18. He is currently detained in the Rio Grande ICE Detention Center. *Id.* ¶ 19. After his arrest, Daniel hired a new immigration attorney, who promptly filed a corrected and complete U visa petition on his behalf. *Id.* ¶ 22. His attorney requested an expedited prima facie determination on his pending petition, but USCIS will only consider such requests if they come from ICE, and pursuant to its Blind Removal Policy, ICE will not do so. *Id.* ¶ 23. He remains in ICE detention and misses his family every day. *Id.* ¶ 25.

## LEGAL STANDARD

To obtain a preliminary injunction, the movant "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the

absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Alternatively, under the Ninth Circuit's "sliding scale test," which recognizes that "a weaker claim on the merits can still justify" preliminary relief "depending on the amount of 'net harm' that could be prevented," a preliminary injunction is appropriate if there are "serious questions going to the merits" and the "balance of hardships tips sharply in the plaintiff's favor." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (citation omitted).

Similar to preliminary injunction, § 705 of the Administrative Procedures Act ("APA") authorizes preliminary relief by allowing the Court "to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings, . . . [o]n such conditions as may be required and to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. Such § 705 "'stays' under the APA turn on the same factors as preliminary injunctions." *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 983 (9th Cir. 2025) (citations omitted).

## ARGUMENT

### I. Plaintiffs are Likely to Succeed on the Merits.

#### A. Plaintiffs are Likely to Prevail on Their First and Second Claims that the 2025 Guidance is Arbitrary, Capricious and Contrary to Law.

Under the APA, courts "shall… hold unlawful and set aside agency action" that is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Plaintiffs are likely to prevail on their claims that the 2025 Guidance violates § 706(2)(A).

##### 1. *The 2025 Guidance constitutes final agency action for which there is no other adequate remedy.*

The APA permits "judicial review" of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. The 2025 Guidance constitutes "final agency action" because it is "the consummation of the agency's

decision-making process," by which "rights" of petitioners for Survivor-based Benefits "have been determined" or "[f]rom which legal consequences" for such petitioners "will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations and quotation marks omitted). These consequences include detention and removal, which the Guidance now authorizes routinely. *See*, *e.g.*, *W. Energy All. v. Salazar*, 2011 WL 3738240, *7 (D. Wyo. 2011) (finding *Bennett's* final agency action test satisfied, in part, where new guidance "was a complete 'about-face' by the Federal Respondents compared to their past practices" while also "bind[ing] the Federal Respondents"). There is no other adequate remedy because "[n]o statute authorizes judicial review" of policies like the 2025 Guidance in another tribunal. *Cabaccang v. U.S. Citizenship & Immigr. Servs.*, 627 F.3d 1313, 1315 (9th Cir. 2010).

### 2. *The 2025 Guidance is arbitrary and capricious.*

"The APA 'sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts.'" *Regents*, 591 U.S. at 16 (citation omitted) (finding rescission of Deferred Action for Childhood Arrivals program arbitrary and capricious). "[T]he touchstone of 'arbitrary and capricious' review under the APA is 'reasoned decisionmaking.'" *Altera Corp. & Subsidiaries v. Comm'r*, 926 F.3d 1061, 1080 (9th Cir. 2019) (citation omitted).

The 2025 Guidance reverses decades of consistent DHS policy that, barring serious adverse factors, immigration agencies will not take civil enforcement actions against individuals with pending applications for Survivor-based Benefits. Instead of the protections required by prior policies, the only considerations the 2025 Guidance requires of ICE officers when conducting immigration enforcement against such individuals are (1) whether enforcement would conflict with an active criminal investigation, and (2) whether ICE's attorneys assert there are any "legal limitations" to enforcement. 2025 Guidance at 2. It is thus a policy of detention and deportation whenever possible.

16
Plaintiffs' Notice of Motion and Motion for APA § 705 Relief and Individual and Classwide Preliminary Injunction; Memorandum of Points and Authorities in Support

The *sole* explanation provided in the 2025 Guidance for this about-face is a single sentence referencing President Trump's first-day executive order stating "it is the policy of the United States to achieve the 'total and efficient enforcement of the [immigration] laws' against all inadmissible and removable" individuals. 2025 Guidance at 2 (quoting Exec. Order No. 14159, *Protecting the American People Against Invasion*, § 1 (Jan. 20, 2025) ("Invasion EO")). For at least three reasons, this scant reasoning fails the APA's "requirement that [the agency] provide a reasoned explanation for its action." *Regents*, 591 U.S. at 35.

*First*, the 2025 Guidance fails to provide a sufficiently "reasoned explanation" for ICE's "disregarding facts and circumstances that underlay or were engendered by the prior policy." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009). Here, both Congress and Defendants have made robust factual findings regarding the importance of protecting immigrant survivors of domestic violence, crime, and human trafficking from removal that the 2025 Guidance ignores and contradicts.

Regarding VAWA relief, when Congress reauthorized VAWA and expanded its protections in 2000, it stated explicitly that "the goal of the immigration protections" in VAWA is "to remove immigration laws as a barrier that kept battered immigrant women and children locked in abusive relationships" and that providing "protection against deportation allows them to obtain protection orders against their abusers and frees them to cooperate with law enforcement and prosecutors." BIWPA §§ 1502(a)(1)-(2).

Regarding the U visa, Congress stated the "purpose of" creating the U visa was to "facilitate the reporting of crimes . . . by trafficked, exploited, victimized, and abused [noncitizens] who are not in lawful immigration status" which would in turn "strengthen the ability of law enforcement agencies to detect, investigate, and prosecute" crimes "while offering protection to victims" by providing a "means to regularize the status of such individuals." *Id.* § 1513(a)(2)(A), (B)

17

Congress also made explicit findings to accompany its creation of the T visa, including that, because "[e]xisting laws often fail to protect victims of trafficking, and because victims are often illegal immigrants in the destination country, they are repeatedly punished more harshly than the traffickers themselves." TVPA § 102(b)(17). "Victims of severe forms of trafficking should not be inappropriately incarcerated, fined, or otherwise penalized solely for unlawful acts committed as a direct result of being trafficked." *Id.* § 102(b)(19).

Defendants have long echoed these findings. Regarding the U visa, DHS has acknowledged that Congress "created the U nonimmigrant status program out of recognition that victims without legal status may otherwise be reluctant to help in the investigation or prosecution of criminal activity." Cervantes Decl., Exh. I. Regarding the T visa, USCIS has stated the TVPA "was enacted to strengthen the ability of law enforcement agencies to investigate and prosecute trafficking in persons, while offering protections to victims of such, including temporary protections from removal . . . and the ability to apply for T nonimmigrant status." *Id.*, Exh. K (PM vol. 3, pt. B, ch. 1.A.).

Further, ICE stated the purpose of the 2011 Policy was to "minimize any effect that immigration enforcement may have on the willingness and ability of victims, witnesses, and plaintiffs to call police and pursue justice." 2011 Policy at 1. Similarly, in the now-rescinded 2021 Directive, ICE found that "Congress created victim-based immigration benefits to encourage noncitizen victims to seek assistance and report crimes committed against them despite their undocumented status," and that, "[w]hen victims have access to humanitarian protections, regardless of their immigration status, and can feel safe in coming forward, it strengthens the ability of local, state, and federal law enforcement agencies, including ICE, to detect, investigate, and prosecute crimes." 2021 Directive at 1.

The 2025 Guidance does not address, refute, or even acknowledge any of these past findings that formed the foundation of prior policies protecting

18

Plaintiffs' Notice of Motion and Motion for APA § 705 Relief and Individual and Classwide Preliminary Injunction; Memorandum of Points and Authorities in Support

immigrant crime survivors. It rests instead upon a general statement from the President that his policy is to deport everyone he can, providing no countervailing facts at all. "[A]n agency's action can only survive arbitrary or capricious review where it has articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 493 (9th Cir. 2023) (cleaned up). "An agency cannot simply disregard contrary or inconvenient factual determinations that it made in the past[.]" *F.C.C.*, 556 U.S. at 537. When "new policy rests upon factual findings that contradict those which underlay its prior policy," the APA requires "a more detailed justification." *Id*. at 515. Thus, because Defendants "offered an explanation for its decision that runs counter to the evidence before the agency," Plaintiffs are likely to succeed on the merits of their claim that the 2025 Guidance is arbitrary and capricious. *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 47-48 (1983) ("*State Farm*").[4]

*Second*, the 2025 Guidance is also arbitrary and capricious because it fails to account for the reliance interests of noncitizens who applied for the protections that Congress and Defendants promised. "When an agency changes course . . . it 'must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *Regents*, 591 U.S. at 30 (quoting *Encino Motorcars, LLC* v. *Navarro*, 579 U.S. 211, 222 (2016)). Thus, an agency reversing prior policy must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id*. at 33. "It would be arbitrary and capricious to ignore such matters. . . [y]et that is what the [2025 Guidance] did." *Id*. at 30.

---

[4] In *State Farm*, after "Congress directed the agency to issue" vehicle safety regulations and it did so, the "agency reversed course and rescinded" an airbag regulation "[f]ollowing a change in Presidential administration." *F.C.C.*, 556 U.S. at 537-38 (describing case). The Supreme Court "found the agency's rescission arbitrary and capricious because the agency did not address its prior finding that airbags save lives." *Id*. at 538. The same reasoning applies to the 2025 Guidance.

Plaintiffs' Notice of Motion and Motion for APA § 705 Relief and Individual and Classwide Preliminary Injunction; Memorandum of Points and Authorities in Support

Needless to say, the reliance interests of applicants for Survivor-based Benefits are significant. More than 600,000 noncitizen victims of abuse, crime, and trafficking have applied for U visa, T visa, and VAWA relief based on the Congressional promise of eligibility for protection from deportation. Velez Decl. ¶¶ 3-4, 17-18; *see also* Declaration of Susan Beaty ("Beaty Decl.") ¶ 14; Decl. of Bethany Hoffman ¶ 10, Dkt No. 23-16; Decl of Lucy Egberg ¶¶ 5-6, Dkt No. 23-17; Decl. of Emma Dempster-Greenbaum ¶¶ 5-7, Dkt No. 23-18; Decl. of Jasmine McGee ("McGee Decl.") ¶ 13, Dkt No. 23-20. Indeed, Congress counted on such reliance and created these benefits as an enticement to report crime and cooperate with law enforcement. BIWPA § 1513(a)(2). As the Chief Deputy Attorney General of Delaware – a career federal and state prosecutor and former "Border Security Coordinator" for the Trump Administration – explains, "[t]he U-visa is an essential part of assuring undocumented victims that the State will do everything she can to protect the necessary witness in exchange for full cooperation with law enforcement." Decl. of Daniel Logan Jr. ("Logan Decl.") ¶¶ 2-3, 5-7; *see also* Cervantes Decl., Exh J. (quoting several police chiefs).

The 2025 Guidance arbitrarily unleashes "total" immigration enforcement against "all" crime survivors with pending petitions, including those who relied on prior protections at great risk to themselves, where the longstanding policies it rescinded would have protected them. *See, e.g.*, Beaty Decl. ¶ 17. Thus, "[i]n light of the serious reliance interests at stake, Defendants' conclusory statements do not suffice to explain [their] decision." *Encino Motorcars*, 579 U.S. at 224.

*Third*, ICE "entirely failed to consider [] important aspect[s] of the problem." *State Farm*, 463 U.S. at 43. In addition to the issues identified above, the 2025 Guidance also failed to consider the public safety risks of reverting to an enforcement-heavy approach to noncitizen crime victims, and the resulting "chilling effect that civil immigration enforcement actions may have on the willingness and ability of noncitizen crime victims to contact law enforcement,

participate in investigations and prosecutions, pursue justice, and seek benefits." 2021 Policy at 1; *see also* Logan Decl. ¶ 7 ("U visas are critical for the justice system."); McGee Decl. ¶¶ 15, 16(f).

Ignoring the public safety implications is particularly capricious because maintaining protections for victims could be achieved consistently with the supposedly competing policy concerns of the Invasion EO it cites. For instance, if DHS's goal truly was to "enforce[e]" immigration "laws against all inadmissible and removable" noncitizens, it could do so by having USCIS adjudicate U and T visas and VAWA petitions more quickly and initiating removal proceedings only against individuals denied a visa, as the 2011 Policy and 2021 Directive did. *See Regents*, 591 U.S. at 5 ("While DHS was not required to consider all policy alternatives," it was arbitrary and capricious not to consider an alternative that "was within the ambit" of the competing policy justification) (cleaned up).

ICE also failed to consider the views of "the specially-trained Violence Against Women Act Unit at the [U.S.] Citizenship and Immigration Service's Vermont Service Center," which adjudicates the majority of Survivor-based Benefits, despite Congress making clear it expects "routine consultation between the Violence Against Women Act Unit" and other DHS agencies "during the development of any Department of Homeland Security regulations or policies that impact" non-citizen survivors of domestic violence. TVPRA § 238(a), (b)(5).

Thus, Plaintiffs are likely to prevail on their First Claim for relief.

### 3. *The 2025 Guidance is contrary to law.*

The 2025 Guidance is also "contrary to law," 5 U.S.C. § 706(2)(A), because it does not require that noncitizens with pending VAWA, U visa, or T visa petitions shall presumptively be protected against removal. Specifically, by stating "ICE officers and agents are not required" to consider evidence that a noncitizen "is a victim of a crime" as "a positive discretionary factor," and by not requiring ICE to "request expedited adjudications from USCIS" regarding prima facie

Plaintiffs' Notice of Motion and Motion for APA § 705 Relief and Individual and Classwide Preliminary Injunction; Memorandum of Points and Authorities in Support

eligibility, except when it is "in ICE's best interest," the 2025 Guidance contradicts the legislative scheme Congress designed precisely to protect such individuals from removal. 2025 Guidance at 2-3.

APA "review must not rubber-stamp administrative decisions" that are "inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 859 (9th Cir. 2005) (cleaned up). Here, as detailed *supra*, Congressional policy in creating Survivor-based Benefits was explicit: to promote public safety by protecting noncitizen survivors of crime from unnecessary removal. BIWPA § 1502(a)(1)-(2) (describing "protection against deportation" for VAWA self-petitioners); *Id.* 1513(a)(2)(A)-(B) (stating the U visa "offer[s] protection to victims" through a "means to regularize the[ir] status"); TVPA § 102(b)(19) (stating "[v]ictims of severe forms of trafficking should not be . . . penalized solely for unlawful acts committed as a direct result of being trafficked").

The titles of the provisions further communicate the intent to protect against removal. TVPA § 107(e) (provision that created the T visa entitled "Protection from Removal for Certain Crime Victims"); TVPRA § 204 (creating stay of removal provision at 8 U.S.C. § 1227(d) and entitling it "Relief for Certain Victims Pending Actions on Petitions and Applications for Relief"). "[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." *Dubin v. United States*, 599 U.S. 110, 120-21 (2023) (citations and quotation marks omitted). These specific provisions override any general authority to enforce immigration laws, because "where, as here, Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions," then "the specific governs the general." *United States v. Brumbaugh*, 139 F.4th 1077, 1085 (9th Cir. 2025) (cleaned up).

Statements from cosponsors of the bills creating these protections further underscore the legislative intent to protect VAWA, U visa, and T visa petitioners

from removal. *See, e.g.,* 154 Cong. Rec. H10888-01, H10902, 2008 WL 5169865 (statement of Mr. Smith NJ in support of TVPRA that "[b]y protecting the victims and not sending them back to their home country where they are often exploited in a vicious cycle of exploitation, we say to the victims we will make every effort to make you safe and secure.").

Even Defendants have acknowledged that their "duty to protect and assist noncitizen crime victims" was "enshrined in" VAWA and the TVPA. 2021 Directive at 1; 2011 Policy at 2 (expressly acknowledging that VAWA, the TVPA, and TVPRA created "protections for the victims of crime" through the VAWA self-petition, U visa, and T visa processes).

Should there remain any doubt, the Court should construe the statutes liberally, as "remedial legislation… must be liberally construed in conformance with its purpose, and in a way which avoids harsh and incongruous results." *Ne. Marine Terminal Co. v. Caputo*, 432 U.S. 249, 268 (1977) (citations and quotation marks omitted). The Court must also employ "the longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the [noncitizen]." *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987) (citing cases).

Where an agency takes action "to comply with President Trump's Executive Orders" which "directly contradict Congress's repeated and explicit instruction[s]," the actions are "contrary to law" under the APA. *Oregon Council for Humans. v. United States DOGE Serv.*, No. 3:25-CV-829-SI, 2025 WL 2237478, at *11, 25-29 (D. Or. Aug. 6, 2025). Thus, Plaintiffs are likely to succeed on their Second Claim.

## B. Plaintiffs Are Likely to Succeed on the Merits of Their Claims Challenging the De Facto Revocation Policy.

Due process does not permit ICE to unilaterally revoke Plaintiffs' deferred action without notice, and Defendants are required to adhere to their written

Plaintiffs' Notice of Motion and Motion for APA § 705 Relief and Individual and Classwide Preliminary Injunction; Memorandum of Points and Authorities in Support

policies. Thus, Plaintiffs are likely to prevail on their claims challenging the De Facto Revocation Policy.

### 1. *Detaining or removing someone in deferred action status constitutes de facto revocation of deferred action.*

"The Ninth Circuit has consistently held that deferred action means the Government agency 'takes no action to proceed against an apparently deportable [noncitizen] based on a prescribed set of factors generally related to humanitarian grounds,'" an interpretation that "finds strong support in Supreme Court precedent, circuit authority, and USCIS policy." *Sepulveda Ayala v. Bondi*, No. 2:25-CV-01063-JNW-TLF, 2025 WL 2084400, at *7-8 (W.D. Wash. July 24, 2025) (collecting cases) (citations omitted); *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 484 (1999) ("*AAADC*") ("Approval of deferred action status means that… no action will thereafter be taken to proceed against an apparently deportable [non-citizen], even on grounds normally regarded as aggravated."). As another court in this District succinctly put it: "Deferred action is a longstanding form of administrative action by which the Executive Branch decides, for humanitarian or other reasons, to refrain from seeking a noncitizen's removal and to authorize his or her continued presence in the United States." *Inland Empire-Immigrant Youth Collective v. Nielsen*, No. EDCV172048-PSG-SHKX, 2018 WL 1061408, at *1 (C.D. Cal. Feb. 26, 2018) (*Inland Empire II*).

Despite such authorized presence, ICE takes the position that a grant of deferred action by USCIS "does not affect ICE" and that they can detain and remove such individuals despite their deferred action status. Montes Decl. ¶ 10. This policy renders the promise of deferred action entirely illusory. Because imprisoning noncitizens in immigration detention facilities and seeking their removal are clearly "action[s] to proceed" against them, ICE's unilateral action to do so against people in valid deferred action status necessarily constitutes a de

facto revocation of that status. *Cf. Holman v. City of Warrenton*, 242 F. Supp. 2d 791, 807 (D. Or. 2002) (finding due process violation for unilateral "decision to withhold [a] building permit" which served as "*de facto* revocation of the previously-issued conditional use permit").

### 2. Plaintiffs are likely to succeed on their Fifth Claim that procedural due process requires notice and an opportunity to be heard before deferred action can be revoked.

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). "The essence of due process is the requirement that a person in jeopardy of serious loss" receive "notice" and "opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Id.* at 333, 348-49 (citations omitted).

When USCIS issued formal grants of deferred action to putative Deferred Action Class members, including proposed class representatives Lupe A., Camila B., Paulo C., and Ms. Merlos, after "a standardized review process" based on objective criteria, "the result of these adjudications—DHS's decision to grant deferred action…—[wa]s an affirmative act of approval" that "confer[red] affirmative immigration relief." *Regents*, 591 U.S. at 3. "[E]ven absent a claim of entitlement to an important benefit, once [deferred action] is conferred, recipients have a protected property interest that requires a fair process before the government may take that benefit away." *Inland Empire—Immigrant Youth Collective v. Nielsen*, Case No. EDCV 17-2048, 2018 WL 4998230, at *19 (C.D. Cal. Apr. 19, 2018) ("*Inland Empire III*") (internal quotation marks omitted).

To determine what process is due when ICE unilaterally revokes deferred action status through its enforcement actions, the Court must apply the *Mathews*

three-part balancing test. *Mathews*, 424 U.S. at 335. Here, *Mathews* balancing comes out strongly in favor of Deferred Action Class members.

*First*, "the private interest that will be affected," *id.*, are profound because deferred action protects recipients from immigration detention and removal while in that status. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Thus, "it is beyond dispute that" a person with deferred action "has a protected interest in his freedom." *F.R.P. v. Wamsley*, No. 3:25-CV-01917-AN, 2025 WL 3037858, at \*4 (D. Or. Oct. 30, 2025) (holding VAWA petitioner with deferred action was likely to succeed on merits of claim that his detention violated due process).

Additionally, "[t]he benefits attendant to deferred action" granted to U and T visa petitioners "provide further confirmation that [it] is more than simply a non-enforcement policy." *Regents*, 591 U.S. at 18. Like the deferred action recipients in *Regents*, U and T visa petitioners with deferred action "may request work authorization," *id.*, among other benefits. 8 C.F.R. § 274a.12(c)(14). Where "continued possession" of benefits has "become essential in the pursuit of a livelihood," and revocation of those benefits "involves state action that adjudicates important interests," they "are not to be taken away without [] procedural due process." *Bell v. Burson*, 402 U.S. 535, 539 (1971).

Indeed, the experiences of Lupe A., Paulo C., and Ms. Merlos described *supra* "demonstrate[] the significant private interests at stake for [deferred action] recipients, and the deleterious effects of [its] termination." *Inland Empire III*, 2018 WL 4998230, at \*19.

*Second*, "the risk of an erroneous deprivation of" these interests "through the procedures used" is extremely high, compared to "the probable value" of Plaintiffs' proposed "procedural safeguards" of a pre-deprivation process. *Mathews*, 424 U.S. at 335. That is especially so because Defendants provide *no*

26

*process at all* before engaging in immigration enforcement against them that effectively revokes their deferred action. *See, e.g.,* Lupe Decl. ¶¶ 26-27; Paulo Decl. ¶ 34; Merlos Decl. ¶ 46. "[T]he practice of *automatic* termination" of deferred action "creates an unacceptably high risk of erroneous deprivation." *Inland Empire III,* 2018 WL 4998230, at *19 (emphasis added).

Removal proceedings in immigration court do not sufficiently mitigate the risk of error for at least two reasons. First, immigration courts have no authority to review deferred action decisions or eligibility for U or T visas on which such deferred action is based. *Lee v. Holder*, 599 F.3d 973, 975-76 (9th Cir. 2010) ("USCIS, and not the [immigration judge], had jurisdiction over Lee's request for interim relief" that provides "deferred action, and stays of removal to individuals who showed prima facie eligibility for U visas"); 8 C.F.R. § 214.14(c)(1) ("USCIS has sole jurisdiction over all petitions for U nonimmigrant status."); Kahn Decl. at 118 (PM vol. 3, pt. B, ch. 6.D.3 n.18) ("[D]eferred action is by its nature an exercise of prosecutorial discretion," and whether to "exercise favorable prosecutorial discretion is appropriately an action within USCIS' sole and unreviewable discretion" in T visa cases). As the Board of Immigration Appeals held in Plaintiff Carmen F.'s case, although she "established a prima facie case of crime victim status," she did "not establish her prima facie eligibility for any relief that is within the authority of the Immigration Judge or the Board." Kahn Decl. at 53-54. Second, removal proceedings determine whether someone may receive a removal order, not the distinct questions whether they may be detained during that process or whether ICE may effect that removal order.

*Third*, "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail," are minimal. *Mathews*, 424 U.S. at 335. USCIS already provides a pre-deprivation process, listing the grounds on which it may revoke deferred action it conferred based on a U or T visa petition. Kahn Decl. at

105-08 (PM vol. 3, pt. C, ch. 5.C.1, 6) (discussing conditions for USCIS to "terminate deferred action" based on U visa BFD); *Id.* at 116-17 (PM vol. 3, pt. B, ch. 6.E.3) ("Termination and Revocation" of T visa deferred action). Indeed, in other deferred action contexts, USCIS provides a written "Notice of Intent to Terminate," with an opportunity to "file a brief or statement contesting the grounds cited." *Inland Empire-Immigrant Youth Collective v. Duke*, No. EDCV-172048-PSG-SHKX, 2017 WL 5900061, at *8 (C.D. Cal. Nov. 20, 2017) (*Inland Empire I*). Compared to the "staggering" "costs to the public of immigration detention," *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017), the "effort and cost required" for USCIS to simply provide notice and an opportunity to be heard "is minimal." *Doe v. Becerra*, 787 F. Supp. 3d 1083, 1094 (E.D. Cal. 2025).

Because the *Mathews* balance tips sharply in their favor, "Plaintiffs have sufficiently demonstrated that the grant of [deferred action] constitutes a conferred benefit that requires procedural safeguards before it can be terminated." *Inland Empire III*, 2018 WL 4998230, at *20. If DHS wishes to terminate deferred action early, it must provide notice and an opportunity to be heard, not unilateral revocation through enforcement action.

### 3. *Plaintiffs are likely to succeed on their Sixth Claim that detention of individuals in valid deferred action status violates due process.*

Until proper procedures for revoking deferred action are followed, noncitizens in deferred action status, such as Paulo C., lawfully maintain that status. Accordingly, their detention for civil immigration enforcement purposes violates their due process rights unless justified at a fair hearing.

Because "[a]rbitrary civil detention is not a feature of our American government," *Rodriguez v. Marin*, 909 F.3d 252, 256 (9th Cir. 2018), civil confinement is only permissible "in certain special and narrow non-punitive circumstances," where a "special justification" asserted by the government

Plaintiffs' Notice of Motion and Motion for APA § 705 Relief and Individual and Classwide Preliminary Injunction; Memorandum of Points and Authorities in Support

"outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Zadvydas*, 533 U.S. at 690 (cleaned up). The only two accepted justifications for keeping someone in civil immigration custody are insufficient as applied to the Deferred Action Class.

"The first justification—preventing flight—is weak or nonexistent where removal seems a remote possibility." *Id.* at 679. That is necessarily the case for members of the putative Deferred Action Class, to whom Defendants have made a formal commitment not to deport and whose status has not been properly revoked. Because they are not removable while in deferred action status, immigration "detention's goal is no longer practically attainable," and their "detention no longer 'bear[s] [a] reasonable relation to the purpose for which the individual [was] committed.'" *Zadvydas*, 533 U.S. at 690 (citation omitted). "Where an individual is protected from removal through deferred action, their detention serves no valid purpose." *Santiago v. Noem*, Case No. EP-25-CV-361-KC, 2025 WL 2792588 at *12-13 (W.D. Tex. Oct. 2, 2025) (ordering release because there is no "articulable, legitimate interest in detaining" individual with deferred action).

"Preventive detention based on the second justification—protecting the community—has been upheld only when limited to specially dangerous individuals and subject to strong procedural protections." *Zadvydas*, 533 U.S. at 679. Any dangerousness justification here would be specious. By definition, all members of the Deferred Action Class have passed background checks and been vetted for national security and public safety risks as a prerequisite to receiving deferred action. Kahn Decl. at 105-07 (for U visa); *Id.* at 112 (for T visa). "[T]he government has no legitimate interest in detaining individuals who have been determined not to be a danger to the community and whose appearance at future immigration proceedings can be reasonably ensured by . . . alternative conditions." *Hernandez*, 872 F.3d at 994.

Plaintiffs' Notice of Motion and Motion for APA § 705 Relief and Individual and Classwide
Preliminary Injunction; Memorandum of Points and Authorities in Support

Thus, for Defendants to keep someone they know to have deferred action in custody, due process requires a hearing at which the government establishes both that the recipient is no longer in compliance with the conditions on which deferred action was granted, and that the person is sufficiently dangerous or a flight risk that their detention is necessary. As a Texas district court summarized in a case similar to that of Plaintiff Paulo C., "ICE detained Petitioner and initiated removal proceedings without notice or a hearing on the effect his lawful grant of deferred action has on his potential removal…. Had he received due process" before such detention, "he could have challenged his detention and removal, as his BFD and deferred action status arguably rendered him presumptively ineligible for removal under 8 U.S.C. § 1184(p)(6)." *Maldonado v. Noem*, No. 4:25-CV-2541, 2025 WL 1593133, at *2 (S.D. Tex. June 5, 2025). Thus, the "decision to detain and remove Petitioner without an opportunity to respond and without a hearing appears to be a procedural due process violation that is likely to succeed on the merits." *Id.*

A mounting list of courts have agreed. *See Sepulveda Ayala*, 2025 WL 2084400 at *8 ("[T]he Government's position that it can grant deferred action while simultaneously ignoring it entirely in order to detain people would also create the kind of 'arbitrary imprisonment without law or the appearance of law' that violates due process."); *Gamez Lira v. Noem*, No. 1:25-CV-00855-WJ-KK, 2025 WL 2581710 (D.N.M. Sept. 5, 2025) (granting TRO for deferred action recipient in custody); *F.R.P.*, 2025 WL 3037858, at *5 (ordering release of VAWA self-petitioner with deferred action after surveying cases and concluding "the Court is unaware of any that held that ICE could lawfully detain deferred action recipients without notice or an individualized finding"); *Primero v. Mattivelo*, Case No. 1:25-CV-11442-IT, 2025 WL 1899115, at *5 (D. Mass. July 9, 2025) ("[W]here Petitioner has shown that USCIS granted him deferred action that will remain valid until September 7, 2026" and "early termination has not

Plaintiffs' Notice of Motion and Motion for APA § 705 Relief and Individual and Classwide Preliminary Injunction; Memorandum of Points and Authorities in Support

occurred," the "Petitioner has shown that there is no significant likelihood of his removal in the reasonably foreseeable future.").

Even outside the deferred action context, a growing chorus of district courts across the country have held that when DHS seeks to detain a noncitizen it has previously determined presents no security or flight risk, it must provide a pre-deprivation hearing. *See, e.g., Rodriguez-Flores v. Semaia*, No. CV 25-6900 JGB (JCX), 2025 WL 2684181, at *6 (C.D. Cal. Aug. 14, 2025); *Sun v. Santacruz*, No. 5:25-CV-02198-JLS-JC, 2025 WL 2730235, at *8 (C.D. Cal. Aug. 26, 2025); *Lopez-Arevelo v. Ripa*, No. EP-25-CV-337-KC, 2025 WL 2691828, at *12 (W.D. Tex. Sept. 22, 2025); *Herrera v. Knight*, No. 2:25-CV-01366-RFB-DJA, 2025 WL 2581792, at *12 (D. Nev. Sept. 5, 2025); *Pinchi v. Noem*, No. 5:25-CV-05632-PCP, 2025 WL 2084921, at *3 (N.D. Cal. July 24, 2025); *Jorge M.F. v. Jennings*, 534 F. Supp. 3d 1050, 1055 (N.D. Cal. 2021).

Thus, Plaintiffs are likely to succeed on their Sixth Claim that detention without a hearing of Deferred Action Class members, including Paulo C., violates due process.

### 4. *Plaintiffs are likely to succeed on their Third Claim that the De Facto Revocation Policy is arbitrary and capricious.*

The De Facto Revocation Policy is also arbitrary and capricious. Like the 2025 Guidance, the De Facto Revocation Policy is subject to APA review because it is final agency action that marks the consummation of Defendants' decision-making process, by which rights of putative Deferred Action Class members flow. *Bennett*, 520 U.S. at 156 (1997). The De Facto Revocation Policy stems directly from the 2025 Guidance' statement that "Current beneficiaries of victim-based immigration benefits," of which deferred action is one, "may be subject to civil immigration enforcement, subject to applicable legal limitations, at the discretion of [ICE]." 2025 Guidance at 1 n.1. ICE has clearly taken the position through its

statements and enforcement actions that deferred action does not constitute a "legal limitation." *See, e.g.,* Montes Decl. ¶ 12. A challenge to an agency's "actions taken pursuant to its interpretation" of law constitutes "final agency action." *Siskiyou Reg'l Educ. Project v. U.S. Forest Serv.*, 565 F.3d 545, 554 (9th Cir. 2009). It makes no difference that the policy is otherwise unwritten. A "de facto immigration policy" may be challenged under the APA because "agency action need not be in writing to be judicially reviewable as a final action." *Aracely R. v. Nielsen*, 319 F. Supp. 3d 110, 123, 138 (D.D.C. 2018) (citing cases).

"As long as there is a 'meaningful standard against which to judge the agency's exercise of discretion,' judicial review is available" under the APA because there is "law to apply." *Perez Perez v. Wolf*, 943 F.3d 853, 862 (9th Cir. 2019). This can be so where a statute or agency policy "establishes the goal of the program" or "agency duties… including the duty to consider certain criteria." *Jajati v. U.S. Customs & Border Prot.*, 102 F.4th 1011, 1018 (9th Cir. 2024).

That is the case here, where the goals of deferred action based on U and T visas are readily apparent. USCIS itself states it "grants deferred action in order to promote victim stability," among other reasons. Kahn Decl. at 106, 112. Further, USCIS details three processes under which it may grant deferred action status to noncitizens based on pending U or T visa petitions, each of which involves formal procedures describing USCIS's duties and require it to "consider certain criteria." *Jajati*, 102 F.4th at 1018. First is the U visa BFD process. *See* Kahn Decl. at 103, 105-06 (USCIS grants deferred action if (1) the petition is complete with "all required initial evidence," and (2) "USCIS conducts background and security checks to identify petitioners who may pose risks to  national security and public safety," using criteria that "align[] with inadmissibility grounds evaluated" for U visa adjudication). Second is the U visa waiting list process, under which USCIS *must* confer deferred action to petitioners who qualify for a U visa but who, "due solely to the [annual] cap" on the number of U visas, must wait for a visa to come

available. 8 C.F.R. § 214.14(d)(2). And third is the T visa BFD process, which "contains two steps," (1) "determining whether the pending application is complete, and whether the results of initial background checks are complete, have been reviewed, and do not present national security concerns," and (2) determining whether "all relevant factors" revealed by the background checks warrant deferred action. Kahn Decl. at 112. USCIS also provides formal notice that a person has received deferred action by providing a notice and/or approving work authorization through category (c)(14), the category for people in deferred action status, 8 C.F.R. § 274a.12(c)(14). *See, e.g.*, Kahn Decl. at 7, 10. Thus, there are meaningful standards by which to judge the De Facto Revocation policy.

This policy, under which ICE may unilaterally revoke deferred action status without regard for whether the person still meets USCIS's criteria for deferred action, is necessarily arbitrary and capricious because it has "no connection to the goals of the deportation process or the rational operation of the immigration laws." *Judulang*, 565 U.S. at 58. "A method for disfavoring deportable aliens that bears no relation to these matters—that neither focuses on nor relates to an alien's fitness to remain in the country—is arbitrary and capricious." *Id.* at 55 (internal quotations and citations omitted).

The De Facto Revocation Policy is arbitrary and capricious for the additional reason that "the outcome" of whether individuals keep their deferred action status is controlled solely by the "immigration official's charging decision." *Id.* at 57. Prior to 2025, "ICE religiously honored deferred action status[.]" Logan Decl. ¶ 12. However, now, a noncitizen "appearing before [USCIS] may gain the right to stay in this country," while the same person "appearing before [ICE] may suffer deportation." *Judulang*, 565 U.S. at 58. "[T]hat is what the APA's 'arbitrary and capricious' standard is designed to thwart." *Id.* at 59.

Indeed, due to the arbitrary nature of unilaterally revoking deferred action without individualized analysis, the court in *Inland Empire II* issued a nationwide

33

preliminary injunction preventing USCIS from, inter alia, "terminating grants of" deferred action for childhood arrivals "based solely on the issuance of a Notice to Appear" in immigration court or doing so "without notice, a reasoned explanation, or an opportunity to respond prior to termination." *Inland Empire II,* 2018 WL 1061408 at *22. Plaintiffs here are similarly likely to succeed on the merits of their arbitrary and capricious claim against the De Facto Revocation policy.

### 5. *Plaintiffs are likely to succeed on their Fourth Claim that the De Facto Revocation Policy violates the* Accardi *Doctrine.*

Plaintiffs are also likely to succeed on their *Accardi* doctrine claim. The Supreme Court has long recognized that, "[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures." *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954). The Ninth Circuit has applied this principle to the immigration context. *See, e.g., Alcaraz v. I.N.S.*, 384 F.3d 1150, 1162 (9th Cir. 2004). The *Accardi* doctrine extends beyond just "regulations" to include, e.g., "internal operating procedures," "handbook[s]," "policy statements," and other evidence of an agency's "usual practice." *Id*.

Here, the USCIS Policy Manual lays out specific grounds on which deferred action may be revoked, contemplating such revocation may only be done by USCIS. For deferred action based on a U visa BFD, USCIS identifies four specific situations in which it may revoke: (1) "if USCIS determines a national security or public safety concern is present," (2) "if USCIS determines the BFD EAD and deferred action is no longer warranted," (3) if "the Form I-918 Supplement B law enforcement certification is withdrawn" by the certifying agency, or (4) "USCIS determines the prior BFD EAD was issued in error." Kahn Decl. at 107-08 (PM vol. 3, pt. C, ch. 5.C).

For the waiting list, because USCIS *must* grant deferred action to people placed on the waiting list, and waiting list placement is contingent on eligibility

for a U visa but-for the statutory cap, revocation of waiting-list deferred action is only permissible if USCIS determines the person no longer qualifies for the U visa. 8 C.F.R. § 214.14(d)(2)-(3).

Similarly, USCIS identifies specific circumstances under which deferred action based on a T visa petition may be revoked. Kahn Decl. at 116-17 (PM vol. 3, pt. B, chap. 6.E.3) (If USCIS "determines the favorable exercise of discretion or BFD EAD are no longer warranted, or the prior deferred action and BFD EAD were granted in error," based on "adverse information, such as new information pertaining to the risks the applicant poses to national security or public safety."). T visa "deferred action is by its nature an exercise of prosecutorial discretion," and "[t]he decision not to exercise [such] favorable prosecutorial discretion is appropriately an action *within USCIS' sole and unreviewable discretion*." Dkt No. 23-12 at 118 (PM vol. 3, pt. B, ch. 6.D.3. n.18) (emphasis added).

Thus, Defendants' longstanding policy is that USCIS, not ICE, has exclusive authority to revoke its deferred action determinations and that revocation must be based on specific criteria. As one of the TVPRA's co-sponsors stated when Congress reauthorized VAWA in 2005, "Immigration enforcement officials at the Bureau of Immigration and Customs Enforcement do not have authority to overrule a [US]CIS grant of deferred action to [a noncitizen] victim" and "should refer" any such individuals they encounter to the "specially trained VAWA unit." Rep. Conyers, 151 Cong. Rec. E2605-04, 151 Cong. Rec. E2605-04, E2607, 2005 WL 3453763 (Dec. 18, 2005) (statement of Rep. Conyers).

Thus, Plaintiffs are likely to succeed on their *Accardi* claim. *See Inland Empire II*, 2018 WL 1061408 at * 22 (enjoining Defendants from "terminating grants of Deferred Action for Childhood Arrivals" without following "DACA Standard Operating Procedures").

**C. Plaintiffs Are Likely to Succeed on Their Eighth and Ninth Claims That the Blind Removal Policy Violates 8 U.S.C. § 1227(d).**

Plaintiffs will also likely succeed on their challenge to the Blind Removal Policy. As the 2025 Guidance makes clear through its refusal to mandate requests for prima facie determinations, Defendants take the position that determining prima facie eligibility is not required by statute when U or T visa petitioners request a stay of removal. 2025 Guidance at 3. They are wrong.

Because Congress created waivers for nearly every ground for inadmissibility for U and T visa petitioners, 8 U.S.C. § 1182(d)(13)-(14), a final order of removal does not render a petitioner ineligible for a U or T visa. 8 C.F.R. §§ 214.14(c)(1)(ii), 214.204(b)(2). Indeed, issuance of a T visa automatically cancels a removal order. 8 C.F.R. § 214.204(o)(1).

Thus, to allow petitioners with final removal orders time for their petition to be adjudicated by USCIS, Congress authorized DHS to stay the removal of any petitioner whose U or T visa petition demonstrates prima facie eligibility for the visa. Specifically, 8 U.S.C. § 1227(d)(1) states—

> If the Secretary of Homeland Security determines that an application for nonimmigrant status under subparagraph (T) or (U) of section 1101(a)(15) of this title filed for an alien in the United States sets forth a prima facie case for approval, the Secretary may grant the alien an administrative stay of a final order of removal.

"Looking to the plain language of the Statute, it is clear that [§ 1227(d)(1)] establishes the prima facie determination as a pre-condition to the Secretary granting or denying an administrative stay of removal." *Jimenez*, 2022 WL 19410308, at *3. Thus, because the "Secretary's prima facie determination is a non-discretionary pre-requisite to the action described in the second segment," only "following the prima facie determination, [does] the Secretary [have] the discretion to grant or deny a request for an administrative stay." *Id.*; *see Corley v.*

*United States*, 556 U.S. 303, 314 (2009) ("A statute should be construed to give effect to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.").

This "back-to-front" reading of the statute is consistent with how courts have read similar statutes. For instance, construing the text of 8 U.S.C. § 1184(p)(6) – which states that DHS "may grant work authorization to any [noncitizen] who has a pending, bona fide application" for a U visa – the Sixth Circuit "read this statute as requiring the DHS Secretary to decide if an application is 'pending' and 'bona fide' *before* the agency can wield its discretion to grant an applicant work authorization." *Barrios Garcia v. U.S. Dep't of Homeland Sec.*, 25 F.4th 430, 444 (6th Cir. 2022) (emphasis in original).

This reading is also consistent with Defendants' own interpretation of the statute. ICE's 2009 policy, issued soon after the TVPRA created § 1227(d), directed agents "to request a *prima facie* determination from USCIS's [VAWA Unit]" when a U visa petitioner requests a stay of removal. Cervantes Decl., Exh. C. If the U-visa petitioner is detained, ICE was to "inform USCIS" and "request that USCIS expedite the case." *Id.* The next day, ICE issued further guidance to ICE attorneys explicitly "to ensure compliance with the [TVPRA]," reiterating these protections and requiring attorneys to allow sufficient time in immigration court for USCIS to make prima facie determinations. *Id.*, Exh. D.

Thus, Plaintiffs are likely to succeed on their Eighth and Ninth claims.[5]

---

[5] Plaintiffs Eighth Claim alleges a violation of the INA. The Court may adjudicate this claim as an equitable cause of action without requiring compliance with the APA's procedural requirements, because "non-statutory review of unlawful executive action existed long before the APA was enacted, and '[n]othing in the subsequent enactment of the APA altered' the understanding that, '[w]hen an executive acts ultra vires, courts are normally available to reestablish the limits on his authority.'" *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, No. CV 25-306 (RDM), 2025 WL 1825431, at *30 (D.D.C. July 2, 2025) (citation omitted). Should the Court disagree and hold that review under the APA is necessary, then Plaintiffs are likely to prevail on their Ninth Claim, because the requirements for APA review are met.

Plaintiffs' Notice of Motion and Motion for APA § 705 Relief and Individual and Classwide Preliminary Injunction; Memorandum of Points and Authorities in Support

## II.     Plaintiffs are Suffering Irreparable Harm.

The irreparable harm the challenged policies impose on Plaintiffs and class members – vulnerable victims of crime and their representatives – are profound.

### A. Individual Plaintiffs and Class Members are Irreparably Harmed.

As described *supra*, Plaintiffs Lupe A., Paulo C., Luna E., Carmen F., Ms. Ruano, and Daniel H. have been torn from their communities, lives, and families through detention in harsh ICE prisons and/or deportation to countries where some face extreme danger. *See, e.g.* Merlos Decl. ¶ 3, 45; Paulo Decl. ¶ 40, Ruano Dec. ¶ 10. Countless putative class members – survivors of domestic violence, human trafficking and serious crime – face the same harms.

The Ninth Circuit has recognized the "irreparable harms imposed on anyone subject to immigration detention," including "the economic burdens imposed on detainees and their families as a result of detention, and the collateral harms to children of detainees whose parents are detained." *Hernandez*, 872 F.3d at 995. For an individual in immigration custody such as Paulo C., "each passing day [he] spends within the walls of [ICE detention] is an irreparable injury: a day of freedom he cannot get back." *Xuyue Zhang v. Barr*, 612 F. Supp. 3d 1005, 1016 (C.D. Cal. 2020). The Court need look no further than the declaration of Paulo C.'s daughter to see a vivid glimpse of this harsh reality for class members and their families. Decl. of Paulo C.'s Daughter ¶¶ 3-12, Dkt No. 19-9.

Similarly, for Plaintiffs unlawfully removed, each day brings irreparable harm. Carmen F. and her son have been forced to live with the very abuser she tried to escape, relying on the promise of a U visa to protect her. Carmen Decl. ¶ 44-49. Ms. Ruano's U.S. citizen twins have been torn from their school, community, and life in the United States and are struggling to adjust to a vastly different world that is dangerous and unfamiliar to them. Ruano Decl. ¶¶ 2. Lupe A. is separated from her family and her home of several decades. Lupe Decl. ¶ 30.

With every passing day, countless class members face similar harms.

Plaintiffs' Notice of Motion and Motion for APA § 705 Relief and Individual and Classwide
Preliminary Injunction; Memorandum of Points and Authorities in Support

**B. Organizational Plaintiffs are Irreparably Harmed.**

Organizational plaintiffs also suffer irreparable harm, as their clients are subjected to these harsh policies, and prospective clients are chilled from coming forward to seek relief, thus impacting the organizations' core activities.

ICWC "built legal strategies and client trust around prior protections" afforded to immigrant survivors that the 2025 Guidance rescinded. Decl. of Jess Farb ¶ 15. The current "policy has led to a chilling effect" and ICWC "has experienced a noticeable dip in new clients seeking initial representation," impacting ICWC's core business activities and funding. *Id*. ¶¶ 20-21. Further, the heightened risk of detention and removal to previously protected existing clients forced ICWC to hire additional employees to "identify all clients in active removal proceedings, including administratively closed proceedings, and all clients with final removal orders" and to "spend[] increasing amounts of time discussing the risk of ICE enforcement with clients" and responding to a "substantial increase in calls." *Id*. ¶ 22. Naturally, the resources expended on these matters come at the expense of ICWC's ability to represent more clients. Indeed, during the pendency of this action, an ICWC attorney had to address the immediate removal of a client in valid deferred action status. Montes Decl. ¶¶ 4-13.

CCIJ has similarly seen an increase in harm to its clients and interference with its ability to provide services. Beaty Decl. ¶ 17. For instance, CCIJ relies on the protection of U and T visa petitions to help survivors expose rampant sexual assault at the Bureau of Prisons FCI Dublin facility after "abusive officers explicitly targeted undocumented women and threatened to alert ICE if survivors reported their abuse." *Id*. ¶¶ 16-17. "[O]ver the course of the past eight months, numerous survivors of crime" since the 2025 Guidance went into effect, including a class member who relied on these protections in litigating FCI Dublin claims with CCIJ, "have been detained and deported." *Id*. CCIJ attorneys must now also actively represent petitioners with denied stays and accompany clients to ICE

39

check ins, when those clients previously would not have had ICE check ins or could have attended them safely alone. *Id*. ¶¶ 19, 21.

LRCL represents U, T, and VAWA petitioners as part of its core business activities but now advises caution to clients who have not had contact with immigration officials when considering whether to apply for a U visa, because it could "trigger ICE enforcement." Decl. of Jordan Weiner ¶ 9. "[F]ewer community members seek[] legal advise about U visas" and many clients now forego applying for survivor-based benefits, "which makes it harder to meet its grant deliverables and carry out the goals of its programs." *Id*. ¶¶ 9-15.

CHIRLA is a membership and community organization that has also seen a drop in people seeking its services. Decl. of Angelica Salas ¶¶ 3, 10, 18-21. Further, one CHIRLA member "missed a week of school" because he was "scared to leave his home" despite his BFD deferred action. *Id*. ¶ 31; *cf. Goss v. Lopez*, 419 U.S. 565, 576 (1975) ("[T]otal exclusion from the educational process for more than a trivial period, and certainly… for 10 days, is a serious event in the life of the suspended child"). Another member with a pending survivor-based visa application "received a motion to reopen her administratively closed case," which ICE had previously agreed to stay under now-rescinded policies. Salas Decl. ¶ 34.

**III.    The Balance of Hardships and Public Interest Weigh in Favor of Preliminary Relief.**

The final factors "merge when the Government is the opposing party." *Nken v. Holder,* 556 U.S. 418, 435 (2009). "Of course there is a public interest in preventing [noncitizens] from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Id*. Further, "the public has a strong interest in having a government that conducts itself fairly and according to its stated regulations and policies." *Doe v. Noem*, 778 F. Supp. 3d 1151, 1166 (W.D. Wash. 2025) (citation and internal brackets omitted). Meanwhile,

Plaintiffs' Notice of Motion and Motion for APA § 705 Relief and Individual and Classwide Preliminary Injunction; Memorandum of Points and Authorities in Support

Defendants have no interest in unlawful detention and rushed removals that fail to "compl[y] with the relevant statutory scheme." *Id*.

## IV.    The Court Should Not Require Payment of a Security.

A "district court may dispense with the filing of a bond" under Fed. R. Civ. P. 65(c) "when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009). Here, the Court should find a "strong likelihood of success on the merits and that the balance of the equities overwhelmingly favors" Plaintiffs, such "that no security shall be required." *Vasquez Perdomo v. Noem*, No. 2:25-cv-05605-MEMF-SP, 2025 WL 1915964, at *28 (C.D. Cal. July 11, 2025); *see Doe*, 778 F. Supp. 3d at 1166-67.

CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant this motion as requested herein.

Dated: November 14, 2025            Respectfully submitted,

 _/s/ Bardis Vakili_____
Bardis Vakili

CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Bardis Vakili
Sarah E. Kahn
Erika Cervantes

LA RAZA CENTRO LEGAL
Stephen A. Rosenbaum
Jordan Weiner

PUBLIC COUNSEL
Rebecca Brown
Kathleen Rivas

COALITION FOR HUMANE
IMMIGRANT RIGHTS
Carl Bergquist
Adam Reese