CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Bardis Vakili (Cal. Bar No. 247783)
bardis@centerforhumanrights.org
Sarah E. Kahn (Cal. Bar No. 341901)
sarah@centerforhumanrights.org
Erika Cervantes (Cal. Bar No. 344432)
erika@centerforhumanrights.org
1505 E 17th St. Ste. 117
Santa Ana, CA 92705
Tel: (909) 274-9057

Attorneys for Plaintiffs

Additional counsel listed on following page

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

Immigration Center for Women and Children, et. al.,

Plaintiffs,

v.

Kristi Noem, et. al,

Defendants.

Case No.: 2:25-cv-09848-AB-AS

**DECLARATION OF JESSICA FARB IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

*Additional Counsel for Plaintiffs:*

LA RAZA CENTRO LEGAL
Stephen A. Rosenbaum (Cal. Bar No. 98634)
srosenbaum@law.berkeley.edu
Jordan Weiner (Cal. Bar No. 356297)
jordan@lrcl.org
474 Valencia Street, Suite 295
San Francisco, CA 94103
Tel: (415) 575-3500

PUBLIC COUNSEL
Rebecca Brown (Cal. Bar No. 345805)
rbrown@publiccounsel.org
Kathleen Rivas (Cal. Bar No. 333600)
krivas@publiccounsel.org
610 South Ardmore Ave.
Los Angeles, CA 90005
Tel: (213) 385-2977

COALITION FOR HUMANE IMMIGRANT RIGHTS
Carl Bergquist* (DC Bar 1720816)
cbergquist@chirla.org
2351 Hempstead Road
Ottawa Hills, OH 43606
Tel: (310) 279-6025

Adam Reese (Cal. Bar No. 362898)
areese@chirla.org
2533 W 3rd Street, #101
Los Angeles, CA 90057
Tel: (213) 353-1333

* *Pro Hac Vice Application Forthcoming*

# DECLARATION OF JESSICA FARB

I, Jessica Farb, declare and state as follows:

1. My name is Jessica Farb, and I submit this declaration in support of the Immigration Center for Women and Children and our clients pursuing survivor-based benefits before the United States Citizenship and Immigration Services ("USCIS").

2. I am the Deputy Director of the Immigration Center for Women and Children ("ICWC"). Our principal place of business is Los Angeles. We have offices in Los Angeles, California; San Diego, California; San Francisco, California; and Las Vegas, Nevada. I have been working at ICWC for 14 years.

3. ICWC's mission is to provide free and affordable immigration services, including legal representation, to underrepresented immigrants in California and Nevada. ICWC strives to provide security and stability for children who are abused, abandoned or neglected and for immigrants who are survivors of domestic violence, sexual assault and other violent crimes.

4. ICWC provides legal assistance to victims of crime and trafficking, including services concerning (a) Petitions for U Nonimmigrant Status; (b) Self-Petitions under the Violence Against Women Act; (c) Applications for T Nonimmigrant Status; and (d) Applications to Adjust Status based on the aforementioned statuses.

5. ICWC also provides a range of free and affordable immigration legal services, including services concerning (a) Asylum for Unaccompanied Children; and (b) Special Immigrant Juvenile Status (SIJS).

6. The following figures represent ICWC's best available estimates based on current records and case tracking systems. While accurate to the best of our knowledge, they may be subject to minor variation.

7. ICWC currently represents 6,245 clients with pending U-Visa applications, either as principal petitioners or derivative applicants. As for ICWC's derivative U visa cases, ICWC represents 2,394 derivative applicants. These clients have survived one or more of the U-Visa's qualifying criminal activities, including but not limited to: domestic violence, sexual assault, sexual exploitation, rape, stalking, felonious assault, kidnapping and trafficking. Of the 3,851 clients who are *principal* petitioners for U Nonimmigrant Status, 2,279 have Deferred Action and work authorization through the bona fide determination process, and 35 have Deferred Action and work authorization through the wait list determination. the 1, 537 clients who are principal petitioners are waiting for bona fide determinations. ICWC represents 64 U Visa clients who have upcoming Master Calendar Hearings before an immigration court, and 110 U Visa clients in administratively closed removal proceedings.

8. ICWC currently represents 15 clients with pending T-Visa applications.

9. ICWC currently represents 343 clients who are survivors of domestic violence, including abuse perpetrated by their spouses, children, or parents. These individuals have either pending VAWA self-petitions or approved VAWA self-petitions with pending Adjustment of Status applications.

10. The protections and benefits offered by U and T Visas are crucial in allowing ICWC to provide legal services to our clients. ICWC attorneys routinely referred to and shared in print version ICE guidance directing agents to generally exercise discretion when encountering survivors of serious crimes, including most recently ICE Directive 11005.3: *Using a Victim-Centered Approach with Noncitizen Crime Victims* (Dec. 2, 2021) and ICE Policy Statement 10076.1: *Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs* (Jun. 17, 2011) to advise clients that ICE, absent exceptional circumstances, did not take enforcement actions against those applying for U Visas, T Visas, or self-petitioning under the Violence Against Women Act. ICWC's U Visa clients, for example, often need reassurance that cooperating with local law enforcement in the investigation or prosecution of a crime and then filing a petition to USCIS will not put them at risk of an ICE enforcement action. Without these protections, some noncitizens who

are prima facie eligible for relief will not submit applications to USCIS or not cooperate with law enforcement.

11. ICWC clients and their respective communities generally trust law enforcement in California and Nevada, particularly when compared to the conditions in their countries of origin, where corruption and abuse are far more prevalent. Many clients arrive with deep skepticism toward police due to past experiences, but find that here, they can report crimes and seek protection without fear of retaliation or exploitation. While broader community incidents have understandably impacted perceptions of law enforcement, ICWC clients have largely been able to feel safe engaging with police, especially when pursuing immigration relief through VAWA or U Visa processes. However, recent ICE raids and enforcement actions in communities like Los Angeles—where officers have entered neighborhoods masked or without clear identification—have created renewed fear and confusion, challenging the trust that many immigrant communities have worked hard to build. Despite those actions, over time and with continued education and advocacy, the relationship between ICWC clients and local law enforcement has strengthened, allowing survivors to come forward and cooperate in investigations with greater confidence.

12. Countless ICWC clients have been able to escape abusive relationships thanks to the protections and benefits afforded by having a pending or approved VAWA self-petition or U Visa petition. One such client, a woman from Honduras, endured years of compounded trauma before reaching safety. After fleeing her ex-partner's abuse, she was confined and raped by local gangs for an extended period, resulting in a pregnancy. She escaped with the help of a pastor, only to be abducted—alongside her five-year-old daughter—by a cartel in Mexico during their journey to the United States. Both were held hostage and repeatedly assaulted for over a month before being released at the U.S.-Mexico border. Once in California, the client was the victim of a felonious assault: a stranger followed her in a car, attempted to run her over, then exited the vehicle, threw her to the ground, and held her at gunpoint while robbing her. She reported the crime to law enforcement and filed for a U Visa. More recently, she was raped again by a housemate. She is now residing in a shelter, seeking a restraining order, and working to stabilize her

living situation. The client was granted deferred action and a work permit, which will be instrumental in helping her access support services and secure reliable employment once she regains housing stability. With these protections in place, she is now far more likely to escape the extreme and recurrent violence she has endured and begin rebuilding a life of safety and dignity.

13. Hundreds—potentially thousands—of current and former ICWC clients have played a critical role in successful criminal prosecutions through their cooperation with law enforcement. For example, our San Diego office represented a client who survived sexual abuse and courageously assisted investigators. Her cooperation led to the identification of multiple additional victims, and the perpetrator was ultimately sentenced to 267 years in prison. This client's U Visa was approved, and she has since rebuilt her life.

14. ICWC currently represents several clients in our Las Vegas office who are actively cooperating with an ongoing investigation led by the Department of Labor into workplace abuses by a large construction company. While cooperation with law enforcement remains a vital pathway to protection and relief, fear among our clients is ever-present—and has intensified in recent months. This fear is especially acute in light of recent ICE raids and enforcement actions in communities like Los Angeles, where officers have entered neighborhoods masked or without clear identification, undermining trust in law enforcement. Despite these challenges, ICWC continues to support our clients by informing them of their rights and options and encouraging cooperation with law enforcement when it is safe and appropriate to do so.

15. ICE Policy Number 11005.4 is arbitrary in both its design and implementation. The policy rescinded prior directives—specifically ICE Directive 11005.3 and Policy Statement 10076.1—that had long provided clear protections for immigrant survivors of crime, including guidance that ICE should not take enforcement actions against individuals applying for U Visas, T Visas, or VAWA self-petitions absent exceptional circumstances. The new policy fails to offer a reasoned explanation for this reversal. It does not acknowledge the reliance interests of organizations like ICWC, which have built legal strategies and client trust around the prior protections. Nor does it consider the destabilizing impact on survivors

who are now left uncertain about whether cooperation with law enforcement could lead to detention or removal.

16. The protections removed by ICE Policy 11005.4 are substantial. ICE agents are no longer required to affirmatively seek evidence that someone is a victim of crime or to consider such evidence as a positive discretionary factor in enforcement decisions. The policy also ends the routine practice of requesting prima facie determinations or expedited adjudications from USCIS when individuals with pending U or T visa petitions request stays of removal. These changes have led to enforcement actions against individuals with deferred action, undermining the very purpose of victim-based immigration relief and discouraging survivors from coming forward.

17. The explanation provided for rescinding these protections—if any—was inadequate. The policy offers no meaningful justification for why ICE should abandon a victim-centered approach, nor does it address the real-world consequences for survivors of crime and trafficking. It fails to consider the chilling effect on cooperation with law enforcement, the erosion of trust in public institutions, and the increased risk of harm to vulnerable individuals.

18. Critically, ICE Policy Number 11005.4 disregards the lived realities of immigrant survivors. It does not account for the trauma, fear, and systemic barriers that survivors face when deciding whether to report crimes or seek legal relief. By removing safeguards that previously encouraged cooperation and protected survivors from enforcement, the policy exacerbates the risks of detention and deportation for individuals who are actively seeking justice and safety. ICWC has observed clients dropping out of services or losing contact due to fear and stress, and the organization has had to divert significant resources—including hiring temporary staff and increasing client communications—to mitigate the harm caused by the policy.

19. ICE Policy Number 11005.4 undermines the legal and humanitarian framework designed to protect immigrant survivors. It imposes arbitrary barriers, strips away essential protections, and fails to consider the complex challenges faced by those most in need of support. ICWC continues to advocate for its clients, but the policy has forced the organization to expend time, money, and staff capacity that would otherwise be used to expand services and reach more survivors in need.

20. ICE Policy Number 11005.4, and the resulting practices of immigration agents arresting individuals with deferred action and refusing to request prima facie determinations for those with pending U or T visa applications, have significantly

frustrated and impaired ICWC's core mission of providing legal representation to immigrant crime survivors in California and Nevada. The policy has led to a chilling effect among immigrant survivors of crime and trafficking, many of whom now fear that seeking legal relief or cooperating with law enforcement could result in detention or removal. ICWC has observed an increase in client anxiety, with clients missing scheduled appointments or losing contact with ICWC due to stress and fear. This has directly impacted ICWC's ability to maintain consistent communication and representation for vulnerable clients.

21. In recent months, ICWC has experienced a noticeable dip in new clients seeking initial representation — an outcome that could be tied to the heightened fear surrounding immigration enforcement. This decline in engagement not only affects ICWC's ability to serve survivors but also has potential implications for funding, as ICWC receives support based on the volume of applications and clients served.

22. To counteract the barriers imposed by ICE Policy Number 11005.4 and the immigration policies it enabled and to ensure that ICWC continues carrying out its mission and core business activity of providing legal representation to underrepresented immigrants in California and Nevada, ICWC has been forced to divert time, money, and resources. Considering the policy and its impact to our clients, ICWC hired 2.5 temporary employees for two months to enter the Alien Registration Number of every client into EOIR's Automated Case Information system to identify all clients in active removal proceedings, including administratively closed proceedings, and all clients with removal orders from EOIR. ICWC attorneys are spending increasing amounts of time discussing the risk of ICE enforcement with clients at all stages of a case. ICWC has received a substantial increase in calls from clients asking about ICE enforcement and whether their pending immigration case offers them any protection. This negatively impacts ICWC's ability to offer services to new potential clients.

23. Before the implementation of ICE Policy Number 11005.4, ICWC was not required to make the kinds of expenditures that are now essential to ensure the legal representation of our U Visa, T Visa, and VAWA clients. Under prior ICE directives, clients with pending victim-based immigration applications were generally protected from enforcement actions, allowing ICWC staff to focus on direct legal services and outreach. However, the new policy has created an environment of fear and uncertainty, compelling ICWC to invest in providing

additional materials and information and staff time to clients throughout representation – which can span upwards of a decade and hire staff to manually monitor EOIR records for every client. Attorneys now spend significantly more time counseling clients on enforcement risks and responding to urgent inquiries about ICE activity. Without these added resources, ICWC would be unable to maintain the trust and safety required to serve survivors of crime and trafficking effectively.

24. If it were not for the resources necessary to effectively represent our clients and carry out our mission in response to ICE Policy Number 11005.4 and the enforcement practices it enabled, ICWC would have spent its time, money, and staff capacity on expanding services to more immigrants in California and Nevada who urgently need legal representation. The policy has forced ICWC to limit the number and complexity of new U Visa, T Visa, and VAWA cases we can accept, as the legal work has become significantly more demanding and unstable. The evolving enforcement landscape—marked by increased detention risks and the refusal of immigration agents to request prima facie determinations—requires more intensive client counseling, record monitoring, and emergency response. As a result, ICWC has had to reject or defer cases that we would have otherwise taken. In recent months, we have also observed a decline in community outreach for U Visa services, which may be tied to heightened fear and uncertainty. This reduction in client engagement not only impacts our ability to serve survivors, but may also affect funding streams tied to the volume of applications and clients served. The diversion of resources toward defensive strategies has constrained our growth and limited our reach.

I declare under penalty of perjury and under the laws of California and the United States of America that the foregoing is true and correct. Executed on this 9th day of October, 2025.

Signed: ______________________