CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Bardis Vakili (Cal. Bar No. 247783)
bardis@centerforhumanrights.org
Sarah E. Kahn (Cal. Bar No. 341901)
sarah@centerforhumanrights.org
Erika Cervantes (Cal. Bar No. 344432)
erika@centerforhumanrights.org
1505 E 17th St. Ste. 117
Santa Ana, CA 92705
Tel: (909) 274-9057

Attorneys for Plaintiffs

Additional counsel listed on following page

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

Immigration Center for Women and Children, et. al.,

Plaintiffs,

v.

Kristi Noem, et. al,

Defendants.

Case No.: 2:25-cv-09848-AB-AS

**DECLARATION OF JORDAN WEINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

*Additional Counsel for Plaintiffs:*
LA RAZA CENTRO LEGAL
Stephen A. Rosenbaum (Cal. Bar No. 98634)
srosenbaum@law.berkeley.edu
Jordan Weiner (Cal. Bar No. 356297)
jordan@lrcl.org
474 Valencia Street, Suite 295
San Francisco, CA 94103
Tel: (415) 575-3500

PUBLIC COUNSEL
Rebecca Brown (Cal. Bar No. 345805)
rbrown@publiccounsel.org
Kathleen Rivas (Cal. Bar No. 333600)
krivas@publiccounsel.org
610 South Ardmore Ave.
Los Angeles, CA 90005
Tel: (213) 385-2977

COALITION FOR HUMANE IMMIGRANT RIGHTS
Carl Bergquist* (DC Bar 1720816)
cbergquist@chirla.org
2351 Hempstead Road
Ottawa Hills, OH 43606
Tel: (310) 279-6025

Adam Reese (Cal. Bar No. 362898)
areese@chirla.org
2533 W 3rd Street, #101
Los Angeles, CA 90057
Tel: (213) 353-1333

* *Pro Hac Vice Application Forthcoming*

# DECLARATION OF JORDAN WEINER

I, Jordan Weiner, hereby declare pursuant to 28 U.S.C. § 1746:

1. I am the Legal Director of the Immigration Removal Defense Program at La Raza Centro Legal ("LRCL"), which is located at 474 Valencia Street, Suite 295, San Francisco, CA 94103. I have been working at LRCL since November 2022.

2. Born out of the civil rights and Chicano movements of the 1960's and 1970's, LRCL was founded in 1973 by Latino law students to fill a gap in the availability of economically and culturally accessible legal services for the Bay Area's Latino population. LRCL's mission is to provide high quality, free legal representation to the Latino community and low-income immigrant families. LRCL's legal services are organized into four programs: (1) Affirmative Immigration, (2) Immigration Removal Defense, (3) Workers' Rights, and (4) Elder & Disability Law.

3. LRCL's Affirmative Immigration Program is comprised of a legal director, two staff attorneys, a paralegal, and is currently in the process of hiring a second paralegal. The program offers a wide range of affirmative immigration legal services to support the low-income, immigrant and Spanish-speaking community of San Francisco and San Mateo counties. These services include (1) providing legal consultations, assessing eligibility for immigration relief, and assisting noncitizens in applying for immigration relief; (2) helping U.S. citizens and legal permanent residents prepare applications to petition family members to immigrate to this country; (3) assisting noncitizens with applying for legal residency or citizenship; (4) helping noncitizens renew their green cards and work permits; (5) assisting youth in filing for legal status under the Deferred Action Executive Order; and (6) assisting affirmative asylum seekers. The program also has a long-running bi-weekly community immigration clinic, in which experienced immigration attorneys provide community members with free legal consultations.

4. One of the Affirmative Immigration Program's core services is providing legal assistance to victims of crimes and trafficking. The program has about 77 pending U Visa cases, many of which include multiple derivative beneficiaries. The program anticipates filing at least five more U Visa applications in the next couple

of months, and more after that, to comply with our organization's community and grant obligations. The program also has at least two pending Violence Against Women Act (VAWA) self-petitions.

5. LRCL's Removal Defense Program provides free representation to San Francisco residents in immigration court proceedings. The program also represents Bay Area residents who are detained in Immigration and Customs Enforcement ("ICE") detention centers, including but not limited to, Mesa Verde and Golden State Annex. The program also participates in several regional rapid response networks that provide emergency services in the event of an ICE arrest and is part of the Attorney of the Day program at San Francisco Immigration Court. The program also participates in the California Collaborative for Immigration Justice's monthly clinics to provide free, in-person consultations to noncitizens detained at Central Valley detention centers.

6. The Removal Defense Program currently consists of a legal director, a senior staff attorney, two law graduates, and a paralegal. The program currently has about 8 pending U visa cases on behalf of 14 individuals (accounting for derivative family members). We also have one client with a pending T visa application and a client with a pending VAWA application we jointly represent with the Affirmative Immigration Program.

7. Between the two immigration programs, LRCL currently has about 85 pending U visa cases. The number is even higher when accounting for derivative beneficiaries. Almost all of LRCL's U visa clients have bonafide determinations (BFDs), work permits, and deferred action based on their pending U visa applications. Between the two immigration programs, LRCL also represents at least two clients with pending VAWA applications and one client with a pending T visa application.

8. Traditionally, the protections and benefits offered by U visa, T visa, and VAWA applications have been crucial to our work as a community resource here in the Mission. As a legal service provider directly serving the community, we are accessible to community members in need 40 hours a week, Monday-Friday. Our intake coordinator meets community members on about a weekly basis who are

seeking assistance in accessing legal support after suffering harm. Often, our office is the first interaction in which a recently arrived noncitizen has gotten an orientation to what resources are available to them when an injustice has been done against them. Generally, our office's response to victims of a crime outside of the clinic context has been to guide community members freshly reeling from harm to seek support and assistance from the local police department. We have encouraged those folks to speak with the local police and access victim services with the understanding that they would be safe in reporting the crimes, and that even if the process couldn't result in a conviction at least there was the chance of some semblance of being able to remain here in safety.

9. The New Trump Crime Victim Policy has had a significant negative impact on our work. Prior to the implementation of the New Trump Crime Victim Policy, LRCL would encourage almost all eligible crime victims to begin the U visa process. Now, however, our risk calculus has greatly changed. If the community member has never had contact with immigration officials in the United States before, in some situations, we are hesitant to counsel them to apply for a U visa. This is because we now worry their U visa application will trigger ICE enforcement, and ICE may detain them and/or place them in removal proceedings. If this happens, there are no longer any ways for us to advocate for their release or against their deportation. In addition, when we counsel clients with valid U visa claims that applying for a U visa may result in them being placed into removal proceedings, they are much less likely to want to move forward on their case. As such, LRCL has a smaller pool of noncitizens it can represent, which makes it harder to meet its grant deliverables and carry out the goals of its programs.

10. The administration's new immigration policies, including its crime victim policies, have also led to fewer community members seeking legal advice about U visas at our biweekly affirmative clinics. Since the ICE raids in Los Angeles began this year, there was a drastic decline in the amount of people who were signed up for the clinic showing up for their appointments, including people seeking U visa consultations. Relatedly, I have witnessed two instances in the past couple of months of noncitizens who were too scared to even enter the building where LRCL has its office and have sent people on their behalf instead to ask us a question while they waited outside. We do not share a building with any federal officials,

and the fact that the people in the population we serve – many of whom are crime and trafficking victims – are too scared to walk to into a building that houses only non-profit organizations, speaks a lot the high levels of fear and panic that immigration communities are undergoing.

11. In addition, the New Trump Crime Victim Policy has particularly impacted the Immigration Removal Defense Program. Previously, U visa, T visa, and VAWA applications were a powerful tool to defend our clients against deportation. For example, one of our clients received a final order of removal because of the actions of her abusive ex-husband, who is a U.S. Citizen, a few years ago. LRCL filed a VAWA application for her in 2023. We then used the pending VAWA application as the basis for a Form I-246, Application for a Stay of Deportation or Removal to ICE, which ICE granted on February 26, 2024. As such, our client was protected from what likely would have been detention and deportation at an upcoming ICE appointment. Such a scenario is no longer possible, however. If we had a client in a similar situation submit the stay application today, ICE will almost certainly deny it.

12. The New Trump Crime Victim Policy also reduces the number of removal defense clients we file U visa applications for. On at least one recent occasion, the Removal Defense Program has made the difficult decision of not filing a U visa application for a client who is eligible because of the limited protection it would provide him. The Removal Defense Program has limited resources, and we cannot put time and energy into legal strategies that do not have an immediate impact. I anticipate making similar difficult decisions in the future as a result of the New Trump Crime Victim Policy.

13. The Removal Defense Program is also part of several regional rapid response networks serving the Bay Area. Recently one of our staff members responded to a rapid response activation for a San Mateo County resident who was detained outside of his home. He suffers from a severe traumatic brain injury and acute neurocognitive disorder. We were concerned about his ability to competently engage in a Reasonable Fear Interview, which was the only thing preventing him from being removed. Years ago, he was the victim of a crime where someone forced their way into his home and threatened him at gunpoint while his children

were asleep in the other room. He was unaware such a crime could make him U Visa eligible. Had the protections of the prior policies applied, we would have advised him that he should seek counsel on the U Visa by using the police report that exists as a starting point, and file the U Visa application as soon as possible to pause his removal proceedings while USCIS considers his eligibility. However, the nature of our advisal regarding the U visa had to change because we could no longer assure him that filing a U visa application would offer any protection. He ended up failing his RFI and will soon be deported, if he has not been already.

14. The New Trump Crime Victim Policy has also inhibited our ability to fully represent our clients. In early 2025, an attorney in the Affirmative Immigration Program was in the process of preparing a VAWA application for a community member. She discussed the case at length with the client, including meeting with her for over three hours as they prepared a declaration about the abuse the client suffered at the hands of her U.S. citizen husband. During the process of preparing her application, the client expressed significant concern about the President's immigration policies. A few months later, as ICE ramped up immigration enforcement, the client stopped responding to her lawyer altogether. Her lawyer believes fear of ICE enforcement was a significant factor in her client abandoning her VAWA application.

15. The Removal Defense Program is also currently representing a woman who is detained at Mesa Verde detention center in a bond hearing. A key element to securing release on bond is whether a noncitizen has a pathway to immigration relief. Our client's only possibly pathway would be through her husband, who was the victim of a serious crime and therefore eligible to apply for a U visa, because it would give her derivative beneficiary status. Upon conferring with her husband to explore filing the U Visa, he immediately shut the idea down. Although he had reported this incident to the police and this form of relief would grant him and multiple family members status, he was terrified at the thought of us contacting the police department for a Supplement B certification. He was afraid somehow asking for the certification would trigger ICE to go to his home. When informed the U Visa process would also require him to get biometrics done at a USCIS Field Office after submission, his immediate response was "why, so they can jail me

too? My children need me while my wife is with ICE." We worry that our client will now be denied bond because her husband is too scared to start the U visa process.

16. The New Trump Crime Victim Policy also strains the Affirmative Immigration and Removal Defense Programs' resources. In addition to being unable to represent as many individuals as we would like due to stricter screening methods, we have to manage increased fear and stress levels of our existing clients. Many of our clients have been reaching out more often than they normally would and need frequent assurances that they will not be immediately deported, which we cannot give them. At least one U visa client has told a staff member that she does not feel any protection from her bona fide determination and is still scared to leave her house. It also impacts the well-being of our staff to be exposed to such constant high levels of stress and fear, and I worry about the staff members leaving LRCL because the work has become too difficult. In addition, with the injection of record levels of funding to DHS by the Big Beautiful Bill, I anticipate mass raids in the Bay Area in the near future, similar to what has occurred in Los Angeles earlier this year. If our clients are detained and/or placed in removal proceedings, it will be devastating for our staff to watch them be detained and deported without any tools to protect them, leading to low morale.

17. In sum, if it were not for the resources necessary to effectively represent our clients and carry out our mission in response to New Trump Crime Victim Policy, LRCL would be spending its time, money, and resources on other matters that would advance our mission, including by representing more immigrants in the Latino community who need our services.

I certify under penalty of perjury that the foregoing statement is true and correct. Executed on October 14, 2025



Jordan Weiner
Legal Director, Removal Defense Program
La Raza Centro Legal