TODD BLANCHE
Deputy Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
PUSHKAL MISHRA (Cal. Bar No. 298695)
Special Assistant United States Attorney
        Federal Building, Suite 7516
        300 North Los Angeles Street
        Los Angeles, California 90012
        Telephone: (714) 338-3503
        E-mail: pushkal.mishra@usdoj.gov

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IMMIGRATION CENTER FOR WOMEN AND CHILDREN, *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> KRISTI NOEM, Secretary of Homeland Security, *et al*., <br><br> Defendants. | No. 2:25-cv-09848-AB-AS <br><br> **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Hearing Date:   February 10, 2026 <br> Hearing Time:   10:00 a.m. <br> Courtroom:      7B <br><br> Hon. André Birotte Jr. |

**TABLE OF CONTENTS**

DESCRIPTION                                                                    PAGE

I.      INTRODUCTION ...................................................................................... 1

II.     BACKGROUND ........................................................................................ 7

        A.      Parties ............................................................................................. 7

        B.      Executive Enforcement of the Immigration Laws ........................ 8

        C.      Executive Order 14159 ................................................................... 9

        D.      ICE's 2025 Internal Interim Policy Guidance ............................... 9

        E.      Enforcement Actions Related to U-Visa, T-Visa, and VAWA .................. 10

III.    LEGAL STANDARD ............................................................................... 11

IV.     ARGUMENT ........................................................................................... 12

        A.      Plaintiffs Fail to Meet the High Bar for Injunctive Relief ......................... 12

                1.      Plaintiffs Cannot Show a Likelihood of Success on the Merits ....... 12

                2.      Plaintiffs Cannot Show Irreparable Harm ......................................... 31

                3.      Balance of the Equities and Public Interest Favors Defendants ....... 33

        B.      If the Court Were to Grant a Preliminary Injunction, It Should Require
                Plaintiffs to Post Security ................................................................ 34

        C.      The Stay or Injunction Plaintiffs Propose is Improper and Unnecessary
                .............................................................................................................. 35

V.      CONCLUSION ......................................................................................... 36

i

**TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Aguilar v. U.S. Immigr. & Customs Enf't*,
   510 F.3d 1 (1st Cir. 2007) ...................................................................... 19

*Ajlani v. Chertoff*,
   545 F.3d 229 (2d Cir. 2008) .................................................................. 19

*Alcaraz v. I.N.S.*,
   384 F.3d 1150 (9th Cir. 2004) .......................................................... 22-23

*Alvarez v. U.S. Immigr. & Customs Enf't*,
   818 F.3d 1194 (11th Cir. 2016) ............................................................ 17

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
   559 F.3d 1046 (9th Cir. 2009) ........................................................ 10-11

*Am.-Arab Anti-Discrimination Comm. v. Ashcroft*,
   241 F. Supp. 2d 1111 (C.D. Cal. 2003) ................................................ 30

*U.S. Army Corps of Engineers v. Hawkes Co.*,
   578 U.S. 590 (2016) .............................................................................. 21

*Arizona v. United States*,
   567 U.S. 387 (2012) .................................................................... 7, 8, 24

*Asgari v. United States Citizenship & Immigr. Servs.*,
   2023 WL 6785801 (C.D. Cal. July 31, 2023) ...................................... 12

*Ayala v. Bondi*,
   2025 WL 2084400 (W.D. Wash. July 24, 2025) .................................. 30

*Biden v. Texas*,
   597 U.S. 785 (2022) .............................................................................. 15

*Blackie's House of Beef, Inc. v. Castillo*,
   659 F.2d 1211 (D.C. Cir. 1981) ........................................................... 33

*Block v. Rutherford*,
   468 U.S. 576 (1984) .............................................................................. 30

*Caribbean Marine Servs. Co., Inc. v. Baldrige*,
   844 F.2d 668 (9th Cir. 1988) ............................................................... 31

i

*Christensen v. Harris County*,
529 U.S. 576 (2000) ................................................................................ 23

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) .................................................................................. 31

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ................................................................................ 12

*Clark v. Martinez*,
543 U.S. 371 (2005) ................................................................................ 17

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) ................................................................................ 20

*Ctr. for Biological Diversity v. McCarthy*,
2014 WL 4340672 (N.D. Cal. Sept. 2, 2014) ......................................... 11

*Ctr. For Responsible Sci. v. Gottlieb*,
346 F. Supp. 3d 29 (D.D.C. 2018) .......................................................... 13

*Dames & Moore v. Regan*,
453 U.S. 654 (1981) .............................................................................. 1-2

*Delgado v. Quarantillo*,
643 F.3d 52 (2d Cir. 2011) ...................................................................... 20

*Delgado-Chavez v. I.N.S.*,
765 F.2d 868 (9th Cir. 1985) ................................................................... 21

*Doran v. Salem Inn, Inc.*,
422 U. S. 922 (1975) ................................................................................. 5

*Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*,
543 F.3d 586 (9th Cir. 2008) ................................................................... 24

*F.C.C. v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ............................................................................. 2, 26

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ............................................................. 11, 12, 13, 14

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) .................................................................................. 2

*Galvan v. Press*,
347 U.S. 522 (1954) ................................................................................ 14

ii

*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015)................................................................. 11

*Garland v. Aleman Gonzalez*,
  596 U.S. 549 (2022) ................................................................. 5, 15, 16

*Gill v. Whitford*,
  585 U.S. 48 (2018) ................................................................. 34

*Go Leasing, Inc. v. Nat'l Transp. Safety Bd.*,
  800 F.2d 1514 (9th Cir. 1986) ................................................................. 24

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
  527 U.S. 308 (1999) ................................................................. 34

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ................................................................. 13

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ................................................................. 24

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ................................................................. 12

*J.E.F.M. v. Lynch*,
  837 F.3d 1026 (9th Cir. 2016) ................................................................. 19

*J.P. v. Santacruz*,
  2025 WL 2998305 (C.D. Cal. Oct. 24, 2025) ................................................................. 32

*Jazi v. Rubio*,
  2025 WL 2420690 (S.D. Cal. Aug. 20, 2025) ................................................................. 33

*Jennings v. Rodriguez*,
  583 U.S. 281 (2018) ................................................................. 20, 30

*Judulang v. Holder*,
  565 U.S. 42 (2011) ................................................................. 27

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ................................................................. 4, 12

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) ................................................................. 34

*Motor Vehicle Manufacturers Ass'n v. State Farm*,
  463 U.S. 29 (1983) ................................................................. 28

iii

*Murthy v. Missouri*,
    603 U.S. 43 (2024) .......................................................................... 13

*Nat'l Treasury Emps. Union v. Von Raab*,
    489 U.S. 656 (1989) ........................................................................ 33

*Nken v. Holder*,
    556 U.S. 418 (2009) ........................................................................ 32

*Noem v. Perdomo*,
    — S.Ct.—, 2025 WL 2585637 (Sept. 8, 2025) ......................................... 33

*Norton v. S. Utah Wilderness Alliance*,
    542 U.S. 55 (2004) .......................................................................... 20

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) ...................................................................... 23-24

*Rauda v. Jennings*,
    55 F.4th 773 (9th Cir. 2022) ............................................................. 18

*Reno American-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999) ........................................... 16, 19, 20, 21, 22, 30

*Ruiz v. Mukasey*,
    552 F.3d 269 (2d Cir. 2009) ............................................................. 19

*S. California All. of Publicly Owned Treatment Works v. U.S. Env't Prot. Agency*,
    8 F.4th 831 (9th Cir. 2021) .............................................................. 23

*Sampson v. Murray*,
    415 U.S. 61 (1974) ..................................................................... 15-16

*Scripps-Howard Radio v. F.C.C.*,
    316 U.S. 4 (1942) ..................................................................... 15, 16

*Transportation Div. of the Int'l Ass'n v. Fed. R.R. Admin.*,
    988 F.3d 1170 (9th Cir. 2021) ........................................................ 3, 28

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) ........................................................................ 34

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ................................................................... 34, 35

*U.S. ex rel. Hintopoulos v. Shaughnessy*,
    353 U.S. 72 (1957) .......................................................................... 21

*United States v. Texas*,
    599 U.S. 670 (2023) ........................................................... 1, 5, 6, 7, 14, 24, 33

*United States v. Whittemore*,
    776 F.3d 1074 (9th Cir. 2015) ............................................................... 29

*Velarde-Flores v. Whitaker*,
    750 F. App'x 606 (9th Cir. 2019)....................................................... 17-18

*W. Radio Servs. Co. v. Espy*,
    79 F.3d 896 (9th Cir. 1996) ................................................................... 23

*Washington v. Glucksberg*,
    521 U.S. 702 (1997) .............................................................................. 30

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990) .............................................................................. 31

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................. 10, 11, 31, 32

*Xiao Ji Chen v. U.S. Dep't of Justice*,
    434 F.3d 144 (2d Cir. 2006) ................................................................. 19

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) .............................................................................. 30

**Federal Statutes**

5 U.S.C. § 551(13) ...................................................................................... 20

5 U.S.C. § 553 ............................................................................................. 22

5 U.S.C. § 705 ................................................................................. 4, 5, 15, 16

6 U.S.C. § 202(5) ........................................................................................ 24

8 U.S.C. § 1103 ............................................................................................. 8

8 U.S.C. § 1225............................................................................................ 11

8 U.S.C. § 1226............................................................................................ 8, 11

8 U.S.C. § 1227............................................................................................ 22, 29

8 U.S.C. § 1229 ........................................................................................... 22

8 U.S.C. § 1231 ............................................................................................. 8

8 U.S.C. § 1252 ........................................... 4, 5, 8, 11, 14, 15, 16, 17, 18, 19, 20

8 U.S.C. § 1357 ............................................................................................. 8

8 U.S.C. § 1367 .................................................................................. 3, 10, 25, 26, 27

18 U.S.C. § 3771 .................................................................................................. 10

28 U.S.C. § 1391 .................................................................................................. 11

34 U.S.C. § 20141 ................................................................................................ 10

**Others**

8 C.F.R. § 204.2 .................................................................................................. 10

8 C.F.R. § 214.14 ........................................................................................... 9, 10, 22

8 C.F.R. § 214.203 ................................................................................................. 9

8 C.F.R. § 214.204 ............................................................................................... 22

8 C.F.R. § 214.214 ............................................................................................... 10

8 C.F.R. § 274a.12 ............................................................................................ 21-22

90 Fed. Reg. 8443 ........................................................................................ 1, 8, 9, 28

U.S. Const. art. I, § 8, cl. 4 ................................................................................... 7-8

## I.    INTRODUCTION

"Under Article II, the Executive Branch possesses authority to decide how to prioritize and how aggressively to pursue legal actions against defendants who violate the law." *United States v. Texas*, 599 U.S. 670, 678-79 (2023) (cleaned up). "That principle of enforcement discretion over arrests and prosecutions extends to the immigration context, where the [Supreme] Court has stressed that the Executive's enforcement discretion implicates not only normal domestic law enforcement priorities but also foreign-policy objectives." *Id.* at 679 (citations and quotations omitted). Yet Plaintiffs—eight Individual Plaintiffs, only one of which is a resident in this District, and four Organizational Plaintiffs, with only two alleged to have their principal places of business here—now challenge ICE's 2025 Interim Guidance, which on its face states that it "may be modified, rescinded, or superseded at any time without notice" and which "is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." Pursuant to this guidance, Plaintiffs speculate, ICE has adopted two other *implied* policies—a "De Facto Revocation Policy" and a "Blind Removal Policy"—under which ICE purportedly: detains and removes U-visa petitioners, T-visa applicants, and VAWA self-petitioners, effectively revoking deferred action; and removes them without reviewing whether they have any active U-visa petitions, T-visa applications, or VAWA self-petitions. Based essentially on those allegations, Plaintiffs ask the Court to now enjoin or stay the 2025 Interim Guidance and the two purportedly implied policies, asserting APA, due process, statutory, and regulatory violations.

This Court should not do so for the reasons detailed below, but most notably because the 2025 Interim Guidance is not a final agency action, and in any event it certainly is not an arbitrary and capricious action under the APA. The disparate Plaintiffs also cannot obtain prospective injunctive relief because they lack standing.

At bottom, Plaintiffs invite this Court to set aside Executive Order 14159, 90 Fed. Reg. 8443 (Jan. 20, 2025), entitled "Protecting the American People Against Invasion."

Indeed, they candidly admit that nothing less than turning the clock back to 2021 would suffice as remedy for their claims, by resuscitating the 2021 ICE directives or policies, enacted pursuant to different immigration priorities set forth under a different executive order. That is not how it works: The enforcement priorities set forth in Executive Order 14159 have the force of law, and Plaintiffs cannot pick and choose which administration's enforcement priorities should apply to them. After all, "[w]hen the President acts pursuant to an express or implied authorization from Congress, he exercises not only his powers but also those delegated by Congress" and "the executive action 'would be supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it.'" *Dames & Moore v. Regan*, 453 U.S. 654, 668 (1981) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring))).

Moreover, the President's actions are not directly reviewable under the APA. *See Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992). Here, Executive Order 14159 merely tasks the U.S. government and its agencies to "faithfully execute the immigration laws against all inadmissible and removable aliens." That potential beneficiaries of victim-based immigration programs may now be subject to enforcement actions at the discretion of DHS and its enforcement officers—considering the totality of the circumstances—flows directly from those immigration laws, and the enforcement actions need not be authorized by some interim guidance or implicit policy.

In any event, the 2025 Interim Guidance is not a final agency action subject to this Court's review. *See infra* § IV.A.1.c(A). Even if it were, Plaintiffs still cannot show that it is arbitrary and capricious. *See id.* § IV.A.1.c(B). When an agency changes policy, it need only "show that there are good reasons for the new policy," not that "the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphases in original). The 2025

Interim Guidance memorandum lays that out explicitly, acknowledging that it is rescinding prior directives and explaining that it is being issued in light of Executive Order 14159, which directs "total and efficient enforcement of [immigration] laws" against all inadmissible and removable aliens and prioritizes the "safety," "security," and "financial and economic well-being of Americans." The 2025 Interim Guidance indisputably articulates a rational—and straightforward—justification for ICE's deliberate change of course in policy: The prior guidance imposed additional, resource-intensive and category-centric screening and coordination obligations on enforcement officers; but in light of the new Executive Order and its articulated focus, ICE will (a) prioritize "total and efficient enforcement," and (b) maintain legal protections for victims, but (c) no longer require officers to affirmatively search for indicia of victim status. That kind of efficiency-and-priority recalibration is a paradigmatic example of permissible policy change.

To be sure, the revised policy continues to give effect to statutory victim protections. Far from ignoring relevant law, the memorandum expressly reaffirms ICE's obligation to comply with 8 U.S.C. § 1367 and DHS's implementing instruction. It prohibits reliance on information obtained solely from enumerated "prohibited sources" (e.g., abusers, traffickers, etc.), unless independently corroborated and documented, and reiterates that information relating to beneficiaries of requests for victim-based relief generally may not be disclosed for non-legitimate purposes, with violations subject to disciplinary and civil penalties. These provisions show that the agency directly grappled with statutory confidentiality and victim-protection concerns and crafted rules tailored to those constraints. That is the opposite of arbitrary and capricious. Finally, the agency considered relevant factors: It reasonably concludes that officers "are not required to affirmatively seek to identify indicia or evidence suggesting an alien is a victim of a crime" in every encounter. That change is plainly grounded in legitimate considerations of resource allocation and operational efficiency—factors that fall squarely within the agency's expertise and that courts recognize as appropriate bases for policy change—and directly comports with Executive Order 14159. Plaintiffs cannot show that the APA requires ICE

3

to maintain a more resource-intensive screening regime indefinitely. The Ninth Circuit has repeatedly emphasized that under arbitrary-and-capricious review, the court's role is "narrow" and it "is not to substitute its judgment for that of the agency . . . ." *Transportation Div. of the Int'l Ass'n of Sheet Metal, Air, Rail, & Transportation Workers (SMART) v. Fed. R.R. Admin.*, 988 F.3d 1170, 1178 (9th Cir. 2021) (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020)).

Even setting all of that aside, Plaintiffs face a more foundational barrier to relief: Plaintiffs lack standing. To establish standing to sue in federal court, a plaintiff must show through all stages of the litigation that it has suffered a concrete and particularized injury that is fairly traceable to the challenged action of the defendant and redressable by a favorable decision from the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). If a plaintiff fails at either step, the court cannot reach the merits of the dispute. *Id*.

Start with the **_redressability_** aspect of the standing inquiry: A plaintiff must show from the outset of its suit that its injuries are capable of being remedied by a favorable decision from the court. *Id.* at 561. Ordinarily, to remedy harms such as those alleged here, an injunction or stay would be sought. That requested relief would direct federal officials to not detain aliens or even forego enforcement actions as to them. Even assuming that that would redress the injuries alleged here—it cannot—that form of relief is simply not available to Plaintiffs. *First*, that would mean this Court will need to order the Executive Branch to act inconsistently with what the immigration laws demand. *See, e.g.*, 8 U.S.C. §§ 1221-1232. *Second*, and relatedly, 8 U.S.C. § 1252(f)(1) squarely forbids such relief. There, Congress expressly provided that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of" certain immigration laws, including the ones Plaintiffs take issue with here. Put simply, the remedy that would ordinarily have the best chance of redressing the alleged harms here is a forbidden one.

To the extent Plaintiffs argue that a stay ordered under APA § 705 would not technically be injunctive relief, that makes no difference as it too "restrain[s]" the operation of the statutory authorization for ICE's actions here. By invoking 5 U.S.C. § 705

and asking this Court to stay the 2025 Interim Guidance, Plaintiffs seek the type of coercive order prohibited by Section 1252(f)(1). Regardless of how Plaintiffs name their motion or frame their claims, their requested relief is barred under the plain terms of the governing statute. 8 U.S.C. § 1252(f)(1) ("*Regardless of the nature of the action or claim* . . . no court (other than the Supreme Court) shall have jurisdiction or authority to . . . *restrain* the operation of the provisions of part IV of this subchapter . . . other than with respect to the application of such provisions to an individual alien against whom proceedings … have been initiated." (emphases added)). An order pursuant to 5 U.S.C. § 705 prevents—i.e., "enjoin[s] or restrain[s]"—DHS from implementing the immigration laws and is thus barred under Section 1252(f)(1).

If there was any doubt about how to construe this command, *Garland* v. *Aleman Gonzalez*, 596 U.S. 549 (2022), resolved it. There the Supreme Court made clear that Section 1252(f)(1) "prohibits lower courts from . . . order[ing] federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Id.* at 550. Indeed, as the Supreme Court held there, to "restrain" means to "check, hold back, or prevent (a person or thing) from some course of action," to "'inhibit' particular actions," or to "stop (or perhaps compel)" action. 596 U.S. at 549 (quoting, e.g., 5 Oxford English Dictionary 756 (2d ed. 1989)). An order staying the 2025 Interim Guidance would then necessarily constitute an order "restraining" federal officials, *id*. at 550. *See also Doran v. Salem Inn, Inc.*, 422 U. S. 922, 931 (1975) ("[N]either declaratory nor injunctive relief can directly interfere with the enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs . . . .").

With respect to the ***traceability*** aspect of the standing inquiry: The 2025 Interim Guidance merely advises federal officials on how to exercise their discretion when it comes to deciding which aliens to prioritize for arrest and removal. Even a judicial decree rendering that guidance a nullity does nothing to change the fact that federal officials already possess the same underlying discretion under the law. *See, e.g.*, 8 U.S.C. §§ 1221- 1232. Nor could such a decree require federal officials to change how they exercise that

discretion in the absence of that guidance. After all, as noted at the outset, "[u]nder Article II, the Executive Branch possesses authority to decide how to prioritize and how aggressively to pursue legal actions against defendants who violate the law." *United States v. Texas*, 599 U.S. 670, 678-79 (2023) (cleaned up). "That principle of enforcement discretion over arrests and prosecutions extends to the immigration context, where the [Supreme] Court has stressed that the Executive's enforcement discretion implicates not only 'normal domestic law enforcement priorities' but also 'foreign-policy objectives.'" *Id.* at 679 (quoting *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490-91 (1999)). "[C]ourts generally lack meaningful standards for assessing the propriety of enforcement choices in this area." *Id.*; *see also id.* at 680 ("In light of inevitable resource constraints and regularly changing public-safety and public-welfare needs, the Executive Branch must balance many factors when devising arrest and prosecution policies. That complicated balancing process in turn leaves courts without meaningful standards for assessing those policies."). "That is because the Executive Branch must . . . constantly react and adjust to the ever-shifting public-safety and public-welfare needs of the American people." *Id.* at 680. Against that backdrop and because the 2025 Interim Guidance directly rests on the immigration priorities articulated in Executive Order 14159, Plaintiffs then cannot show that their alleged injuries are a direct consequence of the 2025 Interim Guidance, but rather result from the Executive Order 14159 on which that guidance relies—or for that matter the statutory and regulatory scheme that fails to provide the absolute protection from detention and removal Plaintiffs seek. *See, e.g.*, 8 U.S.C. §§ 1221-1232; 8 C.F.R. § 214.14(c)(1)(ii) (making clear that "[t]he filing of a petition for U-1 nonimmigrant status has *no effect* on ICE's authority to execute a final order," unless the petitioner has "file[d] for a stay for removal . . . ." (emphasis added)); 8 C.F.R. § 214.204(b)(2)(i) (same as to T-visa) ("The filing of an Application for T Nonimmigrant Status has no effect on DHS authority or discretion to execute a final order of removal, although the applicant may request an administrative stay of removal . . . .").

The motion should therefore be denied.

## II.    BACKGROUND

### A.    Parties

Plaintiffs—Lupe A. ("Lupe"), Camila B. ("Camila"), Paulo C. ("Paulo"), Kenia J. Merlos ("Merlos"), Luna E. ("Luna"), Carmen F. ("Carmen"), Yessenia Ruano ("Ruano"), and Daniel H. ("Daniel") (collectively, "Individual Plaintiffs"); and Immigration Center for Women and Children ("ICWC"), Coalition for Humane Immigrant Rights ("CHIRLA"), La Raza Centro Legal ("LRCL"), and California Collaborative for Immigrant Justice ("CCIJ") (collectively, "Organizational Plaintiffs")—sued Defendants Kristi Noem, Secretary of U.S. Department of Homeland Security ("DHS"), and DHS's component agencies U.S. Immigration and Customs Enforcement ("ICE") and U.S. Citizenship and Immigration Services ("USCIS") in this action. *See generally* Compl., ECF No. 1. Plaintiffs allege various constitutional, statutory, and regulatory violations. *Id.* ¶¶ 180-247; *see also* Mot. for Prelim. Inj. ("Motion"), ECF No. 31.

Camila appears to be the only Individual Plaintiff who resides in this District. *Id.* ¶ 16; ECF No. 23-4 (Camila Decl.). ICWC and CHIRLA claim to have their principal places of business in this District. *Id.* ¶¶ 23-24. Plaintiffs include only the following U-visa petitioners in this action: Lupe, Camila, Paulo, Merlos, Carmen, and Daniel; the following T-visa applicants: Luna and Ruano; but apparently no VAWA self-petitioners. *Cf.* ECF Nos. 23-3 through 23-10 (identifying U-visa petitioners and T-visa applicants but failing to identify or reference a single VAWA self-petitioner or petition).

Individual Plaintiffs are in *remarkably* different circumstances relative to the overbroad claims they assert, and they generally lack standing due to the specific facts of their situations. Specifically, Plaintiffs cannot dispute that: Camila has been released from federal detention after a bond hearing and is currently in immigration proceedings in this District; Paulo too has been released and is also in immigration proceedings outside this District; Merlos has also been released and her immigration proceedings outside this District were terminated by the immigration court, which exercised its discretion pursuant to her deferred action grant (*see, e.g.*, ECF No. 23-12, Page 15 of 126 ¶ 3); Luna has had

7

a bond hearing in the immigration court, her bond request was denied, her T-visa application has also been rejected, and she is in a withholding-only proceeding in an immigration court outside this District; and Lupe, Carmen, Ruano, and Daniel have already been removed from the United States (*see, e.g.*, ECF No. 23-3 (Lupe Decl.) ¶¶ 27, 30; ECF No. 23-8 (Carmen Decl.) ¶¶ 42, 47, 51; ECF No. 23-9 (Ruano Decl.) ¶¶ 48-50).

**B.     Executive Enforcement of the Immigration Laws**

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012); *see also* U.S. Const. art. I, § 8, cl. 4 (granting Congress the power to "establish [a] uniform Rule of Naturalization"). Through the Immigration and Nationality Act ("INA") and related statutes, Congress has established an "extensive and complex" framework for the "governance of immigration and alien status." *Id.* at 395. Under that framework, the Executive Branch is tasked with enforcing the Nation's immigration laws. *See, e.g.*, 8 U.S.C. § 1103(a)(1).

To facilitate enforcement of the immigration laws, Congress vested the Executive Branch with authority to interview, arrest, detain, and remove aliens who are unlawfully present or otherwise removable. *See, e.g., id.* § 1226(a) (permitting arrest and detention upon warrant issued by the DHS's Secretary); *id.* § 1226(c)(1) (making clear that the Secretary "shall take into custody" aliens who have committed certain crimes); *id.* § 1231(a)(1)(A), (2) (authorizing detention of aliens with final removal orders and mandating it for certain criminal aliens); *id.* § 1357(a)(1)-(2) (listing DHS's powers that may be exercised without warrant, including interrogation of "any alien or person believed to be an alien as to his right to be or to remain in the United States" and arrest in certain circumstances). "A principal feature" of that congressionally established "removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396. To streamline the removal proceedings, Congress has restricted judicial review by removing courts' jurisdiction to hear certain claims in certain forums. Except in a case brought by "an individual alien" in removal proceedings, and "[r]egardless of the nature of the action

or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of" Sections 1221-1232. 8 U.S.C. § 1252(f)(1).

### C.    Executive Order 14159

Executive Order 14159, 90 Fed. Reg. 8443 (Jan. 20, 2025), entitled "Protecting the American People Against Invasion," noted "an unprecedented flood of illegal immigration into the United States" over the last four years in violation of longstanding federal laws. It further noted that the government now prioritizes the safety, security, and financial and economic well-being of Americans. *Id.* To that end, the Executive Order proclaimed that "it is the policy of the United States to achieve the total and efficient enforcement of those laws, including through lawful incentives and detention capabilities." *Id.* It revoked executive orders from the prior administration and commanded "[e]fficient [r]emovals" of aliens. *Id.* at 8443, 8445. To be sure, it also tasked the U.S. government to "faithfully execute the immigration laws against all inadmissible and removable aliens." *Id.* at 8443.

### D.    ICE's 2025 Internal Interim Policy Guidance

ICE Policy No. 11005.4, *Interim Guidance on Civil Immigration Enforcement Actions Involving Current or Potential Beneficiaries of Victim-Based Immigration Benefits* (Jan. 30, 2025) (the "2025 Interim Guidance"), stems from Executive Order 14159.[1] To implement its objectives, the 2025 Interim Guidance rescinded ICE Directive 11005.3, *Using a Victim-Centered Approach with Noncitizen Crime Victims* (Dec. 2, 2021) (the "VCA Directive"). *Id.* The 2025 Interim Guidance rescinding the VCA Directive represents a policy shift away from a victim-centered approach to a broader immigration enforcement-focused strategy, just as Executive Order 14159 mandated. *Id.*

The main difference between the 2025 Interim Guidance and the VCA Directive is that in implementing the former, the "[c]urrent beneficiaries of victim-based immigration benefits may be subject to civil immigration enforcement, subject to applicable legal

---

[1] https://www.ice.gov/doclib/foia/policy/11005.4.pdf (last visited Dec. 10, 2025).

limitations, at the discretion of Field Office Directors (FODs) and Special Agents in Charge (SACs) in consultation with the Office of the Principal Legal Advisor (OPLA), where *the totality of circumstances* warrant enforcement and/or the termination of the victim-based immigration benefit." *Id.* at 1 n.1 (emphasis added).

**E.    Enforcement Actions Related to U-Visa, T-Visa, and VAWA**

The approval of a U-nonimmigrant visa petition or a T-nonimmigrant visa application for an alien in the United States confers lawful nonimmigrant status. 8 C.F.R. §§ 214.204(o), 214.211(i)(1), 214.14(c)(5)(i)(A), (f)(6)(i). That does not prevent DHS from taking enforcement actions against recipients in the future should they become removable. *See, e.g.*, 8 C.F.R. § 214.214(a) (T-visa) ("Nothing in this section prohibits DHS from instituting removal proceedings . . . ."); *cf.* 8 C.F.R. § 214.14(i) (U-visa) (similar). When a petition for a T- or U-visa is filed but not approved—assuming compliance with 8 U.S.C. § 1367; the Crime Victims' Rights Act, 18 U.S.C. § 3771; the Victims' Rights and Restitution Act, 34 U.S.C. § 20141; and 8 C.F.R. §§ 214.204-214.205 (automatic stay for bona fide T visa applications)—there generally is no legal prohibition of an enforcement action, including removal. *Id.* In the U-visa context, for example: "The filing of a petition for U-1 nonimmigrant status has no effect on ICE's authority to execute a final order, although the alien may file a request for a stay of removal pursuant to 8 C.F.R. 241.6(a) and 8 C.F.R. 1241.6(a). If the alien is in detention pending execution of the final order, the time during which a stay is in effect will extend the period of detention . . . reasonably necessary to bring about the petitioner's removal." 8 C.F.R. § 214.14(c)(1)(ii). The regulations do not address the effect of a deferred action grant on an alien's removability.

A VAWA self-petition (Form I-360) functions similar to a family-based petition (Form I-130) in that it does not confer immigration status but establishes immigrant classification and eligibility to apply for an immigrant visa. The VAWA self-petitioner may follow the steps for consular processing or adjustment of status as an immediate relative or in a family-based preference category when an immigrant visa is available.

10

USCIS has sole jurisdiction to adjudicate VAWA self-petitions. *See generally* 8 C.F.R. § 204.2. While ICE may choose within its discretion not to pursue enforcement action against an alien who is a VAWA self-petitioner because of congressional intent, DHS policies, or significant law enforcement equities, there is no known regulation or statute that prohibits removal of a standalone VAWA self-petitioner.

## III.    LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear slowing that the [Petitioner] is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain this relief, a plaintiff must establish the "*Winter*" factors: (1) the plaintiff "is likely to succeed on the merits"; (2) the plaintiff "is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [the plaintiff's] favor"; and (4) "an injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20). The operative inquiry remains whether plaintiffs make a "clear showing" to merit injunctive relief. *Winter*, 555 U.S. at 22. "Because it is a threshold inquiry, when a plaintiff has failed to show the likelihood of success on the merits, [a court] need not consider the remaining three *Winter* elements." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) (cleaned up). Plaintiffs must meet an even higher standard in this case because they seek a mandatory injunction that would alter the status quo and impose affirmative requirements on DHS officials as they carry out their duties. *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (mandatory injunctions are "particularly disfavored" and the "district court should deny such relief unless the facts and law clearly favor the moving party").

//

//

//

//

//

11

## IV.    ARGUMENT[2]

### A.    Plaintiffs Fail to Meet the High Bar for Injunctive Relief

#### 1.    Plaintiffs Cannot Show a Likelihood of Success on the Merits

##### a.    *Plaintiffs lack standing to redress their alleged injuries here*

"[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting

---

[2] The center of gravity here lies entirely outside the Central District of California: The ICE field offices involved are in Texas, Washington, Oregon, and Wisconsin; the arrests, detentions, and removal actions occurred outside this District; the USCIS adjudications occurred in the Vermont Service Center or the Nebraska Service Center, not here; several plaintiffs were detained or removed abroad, eliminating any meaningful forum connection. Thus, even if 28 U.S.C. § 1391(e)(1)(C) makes venue technically possible at a first glance, it does not make it proper, because the claims do not arise from events in this District. Courts consider venue improper when plaintiffs "attempt to manufacture venue by including a resident plaintiff with no meaningful connection to the claims." *See, e.g.*, *Ctr. for Biological Diversity v. McCarthy*, 2014 WL 4340672, at 5 (N.D. Cal. Sept. 2, 2014). If Plaintiffs' theory were correct—that the presence of a single resident plaintiff automatically establishes venue for a nationwide challenge—then every federal policy could be challenged in every district where any advocacy organization has an office.

Here, only Camila resides in this District. *See supra* § II.A. She is currently in immigration proceedings, and so her claims relate to pre-removal Section 1226 custody, not to the post-removal claims asserted by the other plaintiffs. *See id*. Her individual circumstances have no factual overlap with the out-of-district events affecting other Individual Plaintiffs. ICWC and CHIRLA claim to be headquartered in this District, but organizational plaintiffs cannot manufacture venue merely by existing here: They must show a forum-specific injury because organizational resource-diversion theories do not create an Article III injury. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 384-85 (2024). Thus, the presence of ICWC and CHIRLA in the District cannot anchor venue or jurisdiction for claims centered, for example, in Texas, Washington, Oregon, or Wisconsin. *See infra* § IV.A.1.a (analyzing organizational standing). As to the other Plaintiffs, their claims bear no nexus to this District and certainly do not arise from or related to Defendants' actions here.

Plaintiffs cannot dispute that Camila was released on a Section 1226 bond hearing. Her removal proceedings are ongoing and Section 1252(g) now vests the immigration court—not this Court—with jurisdiction over her claims for relief. 8 U.S.C. § 1252(g); *see also infra* § IV.A.1.b (analyzing so). But to extent the Court finds subject matter jurisdiction, it can sever other Plaintiffs, *see* Fed. R. Civ. P. 21 (providing that "the court may at any time, on just terms, add or drop a party"), as to whom none of "the events or omissions giving rise to the claim occurred" here, 28 U.S.C. § 1391(e)(1)(B). *See also Asgari v. United States Citizenship & Immigr. Servs.*, No. 22-cv-01888-FWS-KES, 2023 WL 6785801, at *4 (C.D. Cal. July 31, 2023) (finding improper proposed joinder of multiple plaintiffs with their immigration petitions filed at different times and resulting in different interactions with the agency, concluding that "the parties' claims are not sufficiently related to constitute the same transaction or occurrence" under Rule 20).

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)). One element of this limitation is that a plaintiff must have standing to sue, a requirement that is "built on separation-of-powers principles" and "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Id.* As the parties invoking federal jurisdiction, Plaintiffs bear the burden of establishing the three elements that constitute the "irreducible constitutional minimum of standing"—namely that they have (1) suffered an "injury in fact"—an invasion of a legally protected interest which is "concrete and particularized," "actual or imminent" and not "conjectural" or "hypothetical" that is (2) "fairly traceable" to the challenged conduct of the defendant and will (3) "likely" be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61. Plaintiffs do not meet that burden here.

*First*, organizations have standing to sue on their own behalf only if they satisfy the three elements of standing that apply to individuals. *All. for Hippocratic Med.*, 602 U.S. at 393-94. Organizations have standing to sue on their members' behalf when their members "would otherwise have standing to sue in their own right," the interests they "seek[] to protect are germane" to their purpose, and "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). "At the preliminary injunction stage," Plaintiffs "must make a 'clear showing'" that they are "'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024).

Organizational Plaintiffs argue standing by asserting that: ICWC has experienced an increase in counseling time, a decline in aliens seeking services, and a likelihood of increased immigration enforcement; CHIRLA has increased the number of presentations it gives to people that could be eligible for U, T, or VAWA benefits, and that it has a member who is fearful of attending immigration court; LRCL has noticed a decrease of people seeking information about these visas; and CCIJ has increased assistance to U and T visa clients when they are going to ICE check-ins. *See, e.g.*, Motion at 39-40. But organizations generally cannot "demonstrate standing" by arguing a policy has "impaired" their "ability to provide services and achieve their organizational missions." *All. for*

13

*Hippocratic Med.*, 602 U.S. at 394. Instead, "something about the challenged action itself—rather than the organization's response to it—must make the organization's task more difficult." *Ctr. For Responsible Sci. v. Gottlieb*, 346 F. Supp. 3d 29, 41 (D.D.C. 2018) (cleaned up). These organizations have not pled their operations have changed— they continue to provide legal advice to aliens who have pending victim-based applications. The fact that there are more or fewer potential clients is insufficient to show injury as the organizations retain discretion to manage their resources accordingly.

Organizational Plaintiffs must show "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). They have not done so here. The purported organizational injuries that Organizational Plaintiffs allege here are of the same nature as those considered and rejected by the Supreme Court when a group of medical associations claimed to have organizational standing to challenge the FDA's relaxed regulatory requirements for mifepristone, providing easier access to the abortion drug. *All. for Hippocratic Med.*, 602 U.S. at 372-73, 394. The medical associations claimed standing because they incurred costs to oppose the FDA's actions, including conducting studies to "better inform their members and the public about mifepristone's risks," and causing them to "expend considerable time, energy, and resources drafting citizen petitions to FDA, as well as engaging in public advocacy and public education, causing the association to expend resources to the detriment of other spending priorities." *Id.* at 394 (cleaned up). The Supreme Court held that the associations could "not spend [their] way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* So too here: The Organizational Plaintiffs' expenditure of resources to assist their members does not constitute a concrete injury.

*Second*, Plaintiffs cannot show traceability and redressability. *See supra* § I (arguing so, incorporated herein by reference). With respect to traceability, the 2025 Interim Guidance merely advises federal officials about how to exercise their discretion when it comes to deciding which aliens to prioritize for arrest and removal; even a judicial decree

nullifying that guidance does nothing to change the fact that federal officials possess—and will continue to possess—the same underlying discretion. *Texas*, 599 U.S. at 678-79 ("Under Article II, the Executive Branch possesses authority to decide how to prioritize and how aggressively to pursue legal actions against defendants who violate the law."); *Galvan v. Press*, 347 U.S. 522, 531 (1954) ("Policies pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political conduct of government."). Given so and because the 2025 Interim Guidance rests squarely on the immigration priorities articulated in Executive Order 14159, Plaintiffs then cannot show that their alleged injuries are fairly traceable to the 2025 Interim Guidance, and not the direct legal consequences that flow from the Executive Order 14159 on which that guidance relies, or for that matter the vast statutory and regulatory scheme that forecloses any absolute protection from detention and removal. *See supra* § I, II.C, II.E.

As to redressability, Plaintiffs seek to stay or enjoin the government from enforcing the immigration laws. But 8 U.S.C. § 1252(f)(1) explicitly bars such relief. It provides: "Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to *enjoin or restrain* the operation of the provisions of part IV of this subchapter . . . other than with respect to the application of such provisions to an individual alien against whom proceedings . . . have been initiated." 8 U.S.C. § 1252(f)(1) (emphasis added). Plaintiffs here seek the type of coercive order prohibited by 8 U.S.C. § 1252(f)(1). Regardless of how Plaintiffs name their motion or frame their claims, their requested relief is barred. The Supreme Court has held that 8 U.S.C. § 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or *to refrain from taking* actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Biden v. Texas*, 597 U.S. 785, 797 (2022) (same) (quoting *Aleman Gonzalez*, 596 U.S. at 544) (emphasis added); *see* Black's Law Dictionary (12th ed. 2024) (defining injunction as "[a] court order commanding or preventing an action"). As the Supreme Court held in *Aleman Gonzalez*, to "restrain" means to "check, hold back, or prevent (a

15

person or thing) from some course of action," to "inhibit particular actions," or to "stop (or perhaps compel)" action. 596 U.S. at 549 (quoting 5 Oxford English Dictionary 756 (2d ed. 1989)). Any order enjoining the 2025 Interim Guidance then constitutes an order "restraining" federal officials or preventing them from enforcement actions. *Id*. at 550.

To the extent Plaintiffs could argue that a stay would not technically be injunctive relief, that argument would rely on the incorrect assumption that 5 U.S.C. § 705 creates a new form of remedy that is distinct from an injunction. Section 705 does not, however, create any new remedies beyond the traditional equitable relief that existed when the Administrative Procedure Act (APA) was enacted. *Scripps-Howard Radio v. F.C.C.*, 316 U.S. 4, 16-17 (1942). When Congress adopted Section 705, there is no evidence that it intended to create a wholly new, never-before-seen species of remedy. Instead, Congress simply codified existing equitable remedies. Section 705 allows a court to issue only that "process" which is "necessary and appropriate." 5 U.S.C. § 705. And the Supreme Court concluded long ago that "[t]he relevant legislative history of that section . . . indicates that it was primarily intended to reflect existing law." *Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974); *see Scripps-Howard Radio*, 316 U.S. at 9-10 (articulating that "a federal court can stay the *enforcement of a judgment pending the outcome of an appeal*" (emphasis added)). Section 705 was not intended "to fashion new rules of intervention for District Courts." *Id*. Thus, the text, context, legislative history, and sources contemporaneous with the APA's passage show merely that 5 U.S.C. § 705 does nothing more than preserve traditional equitable relief—relief that 8 U.S.C. § 1252(f)(1) forbids.

Plaintiffs do not seek an order that would operate on individual removal proceedings or some other agency adjudication pending judicial review. Plaintiffs instead ask this Court to "prevent" the government from implementing its chosen "course of action"—and then extend that relief to non-parties not before this Court. *Aleman Gonzalez*, 596 U.S. at 549, 551 (making clear that orders requiring government to "refrain from actions that (again in the Government's view) are allowed" by covered provisions are barred by Section 1252(f)). Such an order, even if labeled a stay, is injunctive in effect and barred

16

by 8 U.S.C. § 1252(f)(1). Thus, Plaintiffs' stay request is no different from an injunction under the governing statute in any event—an equivalence underscored by the preliminary-injunction standard applying to it, to which Plaintiffs patently agree via requesting that relief in this motion.

        *b.*      *8 U.S.C. § 1252(g), (b)(9), (a)(5) foreclose jurisdiction here*

Individual Plaintiffs seem to suggest that their pursuit of collateral relief pursuant to their pending applications for victim-based immigration benefits should allow this Court to shield them from any immigration consequences on account of deferred action. Section 1252(g)—which the Supreme Court has explained is "directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion," *Reno*, 525 U.S. at 485 n.9—specifically deprives courts of jurisdiction to review such requests, and indeed, "any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to [1] commence proceedings, [2] adjudicate cases, or [3] execute removal orders against any alien under this chapter." 8 U.S.C. § 1252(g).[3] It also bars district courts from hearing challenges to the *method* by which the Secretary of Homeland Security chooses to commence removal proceedings, including the decision to detain an alien pending removal. *Alvarez v. U.S. Immigr. & Customs Enf't*, 818 F.3d 1194, 1203 (11th Cir. 2016) (holding that "[b]y its plain terms, [§ 1252(g)] bars us from questioning ICE's discretionary decisions to commence removal" and to review "ICE's decision to take [plaintiff] into custody and to detain him during removal proceedings"). And it applies regardless of whether the aliens seeking to forestall removal have pending victim-based immigration benefit requests. *See, e.g.*, *Velarde-Flores v. Whitaker*, 750 F. App'x 606, 607 (9th Cir. 2019) ("Because this petition arises from the government's decision to execute valid orders of removal, it facially falls within the statutory jurisdictional bar. The decision whether to remove aliens subject to valid removal orders who have applied for

---

[3] Much of the Attorney General's authority has been transferred to the DHS's Secretary and many references to the Attorney General are therefore understood to refer to the Secretary. *See Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005).

17

U-visas is entirely within the Attorney General's discretion.").

Congress enacted 8 U.S.C. § 1252(g) to bar challenges to the decision to enforce removal orders precisely because aliens so frequently raised last-minute arguments as to why removal was putatively unwarranted or unlawful, and sought to block—or at least *delay* (and thereby effectively block)—a removal. This made enforcing final removal orders incredibly difficult. Courts have thus consistently held that 8 U.S.C. § 1252(g) strips jurisdiction in District Court over claims seeking to *delay* removal pending another process that will allegedly stop a removal. The Ninth Circuit rather exhaustively explained this in connection with affirming a district court's finding that it had no jurisdiction to block a removal pending the resolution of a putatively meritorious motion to reopen immigration proceedings filed with the Board of Immigration Appeals ("BIA"):

> [Petitioner] Matias also attempts to avoid § 1252(g)'s jurisdictional bar by arguing that his challenge pertains not to the Attorney General's discretionary authority, but rather to the Attorney General's allegedly unlawful decision to "remov[e] him *now*." But § 1252(g)'s jurisdictional bar on "claim[s] . . . arising from the decision or action by the Attorney General to . . . execute removal orders" does not include any temporal caveats. As the Third Circuit has observed, "the discretion to decide *whether* to execute a removal order includes the discretion to decide *when* to do it. Both are covered by the statute."

*Rauda v. Jennings*, 55 F.4th 773, 777 (9th Cir. 2022) (quoting *Tazu v. Att'y Gen. United States*, 975 F.3d 292, 297 (3d Cir. 2020)) (emphasis in original).

The Ninth Circuit explained that there is no authority for entering a stay of removal pending a motion to reopen, when the BIA had not granted a stay:

> [Petitioner] Matias asserts that applying the plain text of § 1252(g) and refusing to enter a stay of removal pending the resolution of his motion to reopen "would deprive a noncitizen

18

[of] his statutory right to file a motion to reopen." But that's not true. Matias's motion to reopen has already been filed, and is currently pending before the BIA. Once the BIA decides that motion, Matias will be able to file a petition for our court to review that final agency action—including review of the BIA's denial of his request for a stay of removal pending its decision.

55 F.4th at 777. An alien may, consequently, be removed prior to a ruling on a motion to reopen, regardless of whether the motion is meritorious, because there is no jurisdiction to stay the removal in District Court while the motion to reopen is pending before the BIA. The Ninth Circuit made clear that even if removed, aliens can continue to litigate their reopened claim while abroad. *Id.* ("[Petitioner] Matias has taken full advantage of his statutory rights and will continue to have access to the process guaranteed to him under the statute even if he is removed." (*citing Nken v. Holder*, 556 U.S. 418, 424 (2009)).

If there was any doubt, 8 U.S.C. § 1252(b)(9) further provides that "judicial review of all questions of law . . . including interpretation and application of statutory provisions . . . arising from *any action taken* . . . to remove an alien from the United States" is only proper before the appropriate federal court of appeals in the form of a petition for review of a final removal order. 8 U.S.C. § 1252(b)(9) (emphasis added); *Reno*, 525 U.S. at 483. Section 1252(b)(9) is an "unmistakable 'zipper' clause" that "channels judicial review of all [claims arising from removal proceedings]" to a court of appeals in the first instance. *Reno*, 525 U.S. at 483. To that end, 8 U.S.C. § 1252(a)(5) further makes clear that a petition for review is the exclusive means for judicial review of immigration proceedings: "[A] petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal . . . ." 8 U.S.C. § 1252(a)(5). "Taken together, § 1252(a)(5) and § 1252(b)(9) mean that *any* issue—whether legal or factual—arising from *any* removal-related activity can be reviewed *only* through the [petition-for-review] process." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016) (emphases in original); *see id.* at 1035 ("§§

19

1252(a)(5) and [(b)(9)] channel review of all claims, including policies-and-practices challenges . . . whenever they 'arise from' removal proceedings"); *accord Ruiz v. Mukasey*, 552 F.3d 269, 274 n.3 (2d Cir. 2009) (holding that only when the action is "unrelated to any removal action or proceeding" is it within the district court's jurisdiction); *cf. Xiao Ji Chen v. U.S. Dep't of Justice*, 434 F.3d 144, 151 n.3 (2d Cir. 2006) (a "primary effect" of the REAL ID Act is to "limit all aliens to one bite of the apple" (quotation marks omitted)).

Critically, "[§] 1252(b)(9) is a judicial channeling provision, not a claim-barring one." *Aguilar v. U.S. Immigr. & Customs Enf't*, 510 F.3d 1, 11 (1st Cir. 2007). Indeed, 8 U.S.C. § 1252(a)(2)(D) provides that "[n]othing . . . in any other provision of this chapter . . . shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section." *See also Ajlani v. Chertoff*, 545 F.3d 229, 235 (2d Cir. 2008) ("[J]urisdiction to review such claims is vested exclusively in the courts of appeals[.]"). The petition-for-review process before the court of appeals ensures that aliens have a proper forum for claims arising from their immigration proceedings and "receive their day in court." *J.E.F.M.*, 837 F.3d at 1031-32 (internal quotations omitted). In evaluating the reach of subsections (a)(5) and (b)(9), the Second Circuit explained that jurisdiction turns on the substance of the relief sought. *Delgado v. Quarantillo*, 643 F.3d 52, 55 (2d Cir. 2011). Those provisions divest district courts of jurisdiction to review both direct and indirect challenges to removal orders, including decisions to detain for purposes of removal or for proceedings. *See Jennings v. Rodriguez*, 583 U.S. 281, 294-95 (2018) (holding that Section 1252(b)(9) includes challenges to the "decision to detain [an alien] in the first place or to seek removal").

Individual Plaintiffs' claims fall squarely within the provisions of Section 1252(g) as they arise from ICE's decision to detain and/or remove them and are therefore barred from consideration by this Court. In *Reno*, 525 U.S. at 471, the Supreme Court held that broad "pattern-or-practice" challenges to DHS's discretionary enforcement decisions are foreclosed because Congress "barred federal courts from reviewing broad challenges to

20

immigration enforcement decisions" under 8 U.S.C. § 1252(g). So too here: Plaintiffs cannot challenge ICE "practices" or "policies," including the 2025 Interim Guidance (as well as the so-called "De Facto Revocation Policy" and "Blind Removal Policy") and seek systemic injunctions restraining the timing or manner of removals. To the extent Individual Plaintiffs want to "receive their day in court," Section 1252(a)(5), (b)(9) requires them to go to the BIA and from there to the courts of appeals—just not here.

### c. *Plaintiffs cannot show that the 2025 Interim Guidance is final agency action, nor that it is arbitrary and capricious*

#### (A) The 2025 Interim Guidance is not a final agency action

Judicial review under the APA "is available only for 'final agency action.'" *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024) (quoting 5 U.S.C. § 704). The APA defines "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent[,] or denial thereof, or failure to act." 5 U.S.C. § 551(13). By limiting APA review to "final" agency action, Congress restricted "pervasive oversight by federal courts over the manner . . . of agency compliance with . . . congressional directives," which would "inject[] the judge into day-to-day agency management." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 67 (2004). The Supreme Court has articulated "two conditions that generally must be satisfied for agency action to be 'final' under the APA." *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (citing *Bennett v. Spear*, 520 U.S. 154 (1997)). "First, the action must mark the consummation of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature." *Id.* (quoting *Bennett*, 520 U.S. at 177). "Second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (quoting *Bennett*, 520 U.S. at 177-78).

Plaintiffs argue ***first*** that the 2025 Interim Guidance is in fact final because it determines "consequences including detention and removal, which the Guidance now authorizes routinely." Motion at 15-16; *see also id.* at 21-23 (arguing that those consequences are unlawful). Not so: Statutory authority, under 8 U.S.C. §§ 1225-1232,

already authorizes those consequences against Individual Plaintiffs. And it does so as long as they have not been conferred lawful status pursuant to their pending applications.

Indeed, even if USCIS has made a bona fide determination and/or granted deferred action while the applications or petitions are pending, there is no legal prohibition that prevents ICE from enforcement actions. After all, deferred action is an act of administrative grace. *Delgado-Chavez v. I.N.S.*, 765 F.2d 868, 869 (9th Cir. 1985) ("Compliance with the statutory requirements for suspension of deportation does not automatically entitle an alien to such relief—it is a matter of discretion and administrative grace."). The Supreme Court has also made that amply clear, calling "deferred action" a "commendable exercise in administrative discretion," but acknowledging that it is "developed without express statutory authorization." *Reno*, 525 U.S. at 484; *see also id.* (aptly observing that "[s]ince no generous act goes unpunished, . . . the INS's exercise of this discretion opened the door to litigation in instances where the INS chose *not* to exercise it"); *U.S. ex rel. Hintopoulos v. Shaughnessy*, 353 U.S. 72, 77 (1957) (noting that "[s]uspension of deportation is a matter of discretion and of administrative grace").

The relevant regulations and statutes similarly make that clear. *See, e.g.*, 8 C.F.R. § 274a.12(c)(14) (describing "granted deferred action" as "an act of administrative convenience to the government that gives some cases lower priority" for purposes of employment eligibility); *id.* § 214.14(c)(1)(ii) ("The filing of a petition for U-1 nonimmigrant status has *no effect* on ICE's authority to execute a final order," unless the petitioner has "file[d] for a stay for removal . . . ." (emphasis added)); *id.* § 214.204(b)(2)(i) (same as to T-visa) ("The filing of an Application for T Nonimmigrant Status has no effect on DHS authority or discretion to execute a final order of removal, although the applicant may request an administrative stay of removal . . . ."); 8 U.S.C. § 1227(d) and 8 C.F.R. § 241.6(a) (contemplating "a request for an administrative stay of removal" on "Form I–246, Stay of Removal," but vesting the discretion to immigration officials, and listing deferred action and stay of removal as distinct concepts); 8 U.S.C. § 1229a(c)(2) (making clear that "the alien has the burden of establishing" admissibility and lawful status).

ICE therefore retains discretion to determine whether a subsequent enforcement action is appropriate. Plaintiffs merely reference Congressional policy findings and benefits for which they could apply, *see* Motion at 21-23—none of which compels the government to ignore immigration laws. Individual Plaintiffs do not show—nor can they—what statutory or regulatory authority operates to bar their detention and/or removal here. *Cf.* Motion at 16 (citing to nothing in support); *see also Reno*, 525 U.S. at 484 (noting that "deferred action" is an "exercise in *administration discretion*" that is "developed *without express statutory authorization*" (emphases added)).

Moreover, the 2025 Interim Guidance contains general statements of policy, procedure, or practice, which do not suggest a final agency action. *See* 5 U.S.C. § 553(b)(A). It in fact expressly states that it "may be modified, rescinded, or superseded at any time without notice" and "is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." 2025 Interim Guidance at 4. The language mirrors the disclaimers that the Ninth Circuit has found dispositive in concluding that immigration guidance is not final agency action. *See, e.g.*, *Alcaraz v. I.N.S.*, 384 F.3d 1150, 1153,1162-63 (9th Cir. 2004) (holding that internal INS policy memoranda directing "repapering"—administratively closing immigration cases of aliens for them to reapply for cancelation of removal—were not reviewable because the memoranda did not create enforceable rights, did not bind the agency, and therefore were not final agency action); *S. California All. of Publicly Owned Treatment Works v. U.S. Env't Prot. Agency*, 8 F.4th 831, 837-38 (9th Cir. 2021) (holding that guidance document was not a final agency action where, on its face, it clarified that it did "not bind anyone to anything"). As another court exhaustively explained:

> [T]he Manual and Handbook are not substantive in nature. . . .
> [T]he Forest Service Manual merely establishes guidelines for
> the exercise of the Service's prosecutorial discretion; it does not
> act as a binding limitation on the Service's authority. . . . The

> Manual and Handbook are a series of procedures for the conduct of Forest Service activities. . . . The Manual and Handbook are not promulgated in accordance with the procedural requirements of the Administrative Procedure Act. Neither is published in the Federal Register or the Code of Federal Regulations. Nor are the Manual and Handbook promulgated pursuant to an independent congressional authority. The National Forest Management Act authorizes the Secretary to promulgate regulations, but the Manual and the Handbook are not regulations from the Secretary. . . . The Manual and Handbook provisions are contemplated in a Service regulation, not in a congressional statute. We hold that the Manual and Handbook do not have the independent force and effect of law.

*W. Radio Servs. Co. v. Espy*, 79 F.3d 896, 901 (9th Cir. 1996); *see also Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (explaining that "interpretations contained in policy statements, agency manuals, and enforcement guidelines" all "lack the force of law"); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96-97 (2015) (holding that interpretive rules do not have the force and effect of law); *Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*, 543 F.3d 586, 593-95 (9th Cir. 2008) (holding that although the Corps' jurisdictional determination marked the consummation of the agency's process, it was not a final agency action because it imposed no obligations, denied no rights, and produced no legal consequences).

Plaintiffs further ignore the settled principle that courts also consider whether a decision has traditionally been committed to agency discretion. *Heckler v. Chaney*, 470 U.S. 821, 832 (1985) ("We of course only list the above concerns to facilitate understanding of our conclusion that an agency's decision not to take enforcement action should be presumed immune from judicial review under § 701(a)(2). For good reasons, such a decision has traditionally been committed to agency discretion, and we believe that

the Congress enacting the APA did not intend to alter that tradition." (cleaned up)). Enforcement decisions, in particular, traditionally involve considerable agency discretion. *See, e.g., Texas*, 599 U.S. at 680 ("[T]he Executive Branch must balance many factors when devising arrest and prosecution policies."); *Go Leasing, Inc. v. Nat'l Transp. Safety Bd.*, 800 F.2d 1514, 1523 (9th Cir. 1986) ("[T]he Administrator need not promulgate rules constraining his discretion as to when to employ a particular statutory enforcement action."). The 2025 Interim Guidance provides internal guidance to immigration enforcement officers that is clearly committed to agency discretion: After all, the INA and related statutes grant immigration officers broad discretion in enforcing immigration laws. *See* 6 U.S.C. § 202(5) (charging DHS with "[e]stablishing national immigration enforcement policies and priorities"); *Arizona*, 567 U.S. at 396 ("A principal feature of the [congressionally established] removal system is the broad discretion exercised by immigration officials."). Congress has not limited the agency's exercise of enforcement power "either by setting substantive priorities, or by otherwise circumscribing [the] agency's power" to conduct immigration enforcement actions. *Cf. Heckler*, 470 U.S. at 833. Indeed, Congress has not provided any "law to apply" as to internal guidance on enforcement actions against aliens with pending applications for certain benefits, particularly when the alien has a lawful final order of removal. *Id.* at 830-31. Internal guidance on immigration enforcement requires a "complicated balancing" of "many factors when devising arrest and prosecution policies," uniquely within ICE's expertise. *Texas*, 599 U.S. at 680 ("[T]he Executive Branch must balance many factors when devising arrest and prosecution policies."). The 2025 Interim Guidance is thus committed to agency discretion and is not reviewable under the APA.

To that end, it bears noting that the 2025 Interim Guidance does not mandate a specific course of action in individual cases, and it does not amend the INA, any statute, or any rule; therefore, it does not have the force and effect of law. Plaintiffs miss the plain details laid out on the face of the guidance. It does not impose any bar on reviewing known information or coordinating with USCIS on victim-based immigration benefits. To the

contrary, to comply with the applicable law, the 2025 Interim Guidance guides officers and agents to consult with the Office of the Principal Legal Advisor (OPLA), ICE's internal legal counsel, whenever ICE encounters "an alien who is the beneficiary of a victim-based immigration benefit" before taking enforcement action, reaffirming that ICE must consider known legal limitations before proceeding. 2025 Interim Guidance at 2. This language directly contradicts Plaintiffs' assertion that ICE officers apply enforcement actions "de facto" or "blindly" or without considering available information. Most notably, whatever process may be due on account of pending applications, the guidance does not foreclose denial of process in the correct proceedings—in immigration proceedings before an immigration judge, at the BIA, or before the proper circuit court. *Cf. supra* § IV.A.1.b (arguing that 8 U.S.C. §§ 1252(a)(5) and 1252(b)(9) channel such claims there).

Similarly, the 2025 Interim Guidance reiterates that ICE personnel "remain bound to adhere to all applicable statutory and policy requirements," including 8 U.S.C. § 1367, which imposes strict confidentiality limits and requires officers to be aware of what victim-based information may or may not be used in particular circumstances. That section appears under "Adherence to Laws," not under a list of permissible enforcement actions, confirming that ICE must consider legal constraints—not disregard them. 2025 Interim Guidance at 3. Plaintiffs' theory hinges on a misreading of paragraph 3 of the guidance, which provides only that officers "are not required to affirmatively seek to identify indicia" of victim status for unknown individuals. *Id*. at 2-3. It eliminates a *mandatory, proactive search requirement*, but it does not prohibit officers from considering such information when it is known, nor does it instruct officers to avoid checking available systems before removal. In short, Plaintiffs' "Blind Removal Policy" is a fiction unsupported by the text of guidance. The guidance expressly requires legal review for known beneficiaries, preserves officer discretion, and contains no directive to ignore victim-based filings. Plaintiffs' bold claims (*see, e.g.*, Compl. ¶¶ 82–95) thus fail at the threshold because they rest on a false premise.

(B)    Even otherwise, the 2025 Interim Guidance is not arbitrary and capricious

Having incorrectly argued that it is final agency action, Plaintiffs argue **_next_** that the 2025 Interim Guidance is arbitrary and capricious. Motion at 16. They allege a lack of reasoned explanation and point to Congressional findings related to victim-based immigration status, but fail to show which part of 28 U.S.C. §§ 1225-1231 contemplates an absolute immunity from detention and/or removal proceedings. *Id.* at 17-21.

To be sure, when an agency changes policy, it need only "show that there are good reasons for the new policy," not that the new policy is the best or only choice. *F.C.C.*, 556 U.S. at 515 (holding that when an agency changes policy, it need only "show that there are good reasons for the new policy," not that "the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates" (emphases in original)). ICE easily does so.

*First*, the 2025 Interim Guidance acknowledges and reasonably explains a policy shift. It explicitly rescinds prior ICE victim-focused directives, explaining that it is being issued in light of Executive Order 14159 (Jan. 20, 2025), entitled "Protecting the American People Against Invasion," which directs "total and efficient enforcement of [immigration] laws" against inadmissible and removable aliens. This satisfies the requirement under *Fox* that an agency recognize it is changing course and articulate a rational justification. Rather than being unexplained or pretextual, the 2025 Interim Guidance's core rationale is straightforward: The prior guidance imposed additional, resource-intensive and category-centric screening and coordination obligations on officers; in light of the new Executive Order, ICE will (a) prioritize "total and efficient enforcement," and (b) maintain legal protections for victims, but (c) no longer require officers to affirmatively search for indicia of victim status in every encounter. Under *Fox*, that kind of efficiency-and-priority recalibration is a paradigmatic example of permissible policy change.

*Second*, the 2025 Interim Guidance continues to give effect to statutory victim

27

protections. Far from ignoring relevant law, it expressly reaffirms ICE's obligation to comply with 8 U.S.C. § 1367 and the DHS implementing instruction. It prohibits reliance on information obtained solely from enumerated "prohibited sources" (abusers, traffickers, etc.) unless independently corroborated and documented; and reiterates that information relating to beneficiaries of victim-based relief generally may not be disclosed for non-legitimate purposes, with violations subject to disciplinary and civil penalties. 2025 Interim Guidance at 3-4. These provisions show that the agency directly grappled with statutory confidentiality and victim-protection concerns and crafted rules tailored to those constraints. That is the opposite of the sort of arbitrary and capricious decisionmaking condemned in *Judulang v. Holder,* 565 U.S. 42, 55-57 (2011), for example, where the Supreme Court invalidated a BIA rule as arbitrary and capricious because it conditioned relief on statutory comparisons unrelated to any legitimate factor in the removal decision. Here, ICE ties its guidance directly to both the new Executive Order and existing statutory confidentiality rules and regulations.

*Third*, the 2025 Interim Guidance preserves case-by-case discretion rather than imposing rigid, irrational rules. The memorandum does not categorically mandate enforcement against victims, nor does it bar favorable exercises of discretion. Instead, it guides officers to "coordinate and deconflict" with other law enforcement to avoid compromising criminal investigations; to consult with OPLA, through FODs or SACs, before taking civil immigration enforcement action against known beneficiaries or applicants for victim-based relief, to ensure consistency with "applicable legal limitations"; and provides that expedited adjudication requests to USCIS may still be made "subject to a case-by-case determination that it is in ICE's best interests." 2025 Interim Guidance at 1-3. This flexible, individualized framework is precisely the kind of discretionary enforcement structure courts routinely uphold under the APA (and unlike the rule struck down in *Judulang* as "arbitrary and capricious" as it turned on irrelevancies) because ICE's interim guidance on its face channels officer discretion in ways that are logically linked to enforcement priorities and statutory limits.

*Fourth*, ICE considered relevant factors, including resource constraints and operational efficiency. The 2025 Interim Guidance reasonably concludes that officers "are not required to affirmatively seek to identify indicia or evidence suggesting an alien is a victim of a crime" in every encounter. 2025 Interim Guidance at 2-3. That change is plainly grounded in legitimate considerations of resource allocation and operational efficiency—in light of "unprecedented flood of illegal immigration" that has, among other things, taxed resources and "cost taxpayers billions of dollars at the Federal, State, and local levels." Executive Order 14159, 90 Fed. Reg. at 8443. These factors fall squarely within agency expertise, and courts recognize them as appropriate bases for policy change. *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983) (recognizing that agency must consider "the relevant factors," including feasibility and cost, and provide a rational explanation). Nothing in the APA requires ICE to maintain a more resource-intensive screening regime indefinitely. The Ninth Circuit has repeatedly emphasized that under arbitrary-and-capricious review, the court's role is "narrow" and it "is not to substitute its judgment for that of the agency." *SMART*, 988 F.3d at 1178 (quoting *Regents*, 591 U.S. at 16).

The question is simply whether the agency "articulate[d] a satisfactory explanation for its action," showing "a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. Here, ICE identifies the new Executive Order and "total and efficient enforcement" as the governing policy backdrop; describes the prior guidance's requirements; explains how the new guidance alters those requirements (e.g., no affirmative duty to search for victim indicia; no routine expedited requests, but case-by-case discretion); and explicitly preserves statutory confidentiality and "applicable legal limitations" around victims. That is more than enough under *Fox* and *Regents*.

> d.       *Plaintiffs cannot show that the 2025 Interim Guidance led to  a De Facto Revocation Policy or Blind Removal Policy or for that matter violates any law or regulation*

Plaintiffs claim that ICE detains and removes aliens despite their grants of deferred

29

action. *See, e.g.*, Motion at 24-35 (relying on, for example, Decl. of Oscar Montes). As an initial matter, to establish that claim, an ICWC counsel purports to have averred—under the penalty of perjury—"true and correct" facts as to which they have no personal knowledge and that are admittedly hearsay (heard from an out-of-court declarant). That is improper. *See United States v. Whittemore*, 776 F.3d 1074, 1082 (9th Cir. 2015) ("Under Rule 602 [of the Federal Rules of Evidence], a witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Rule 602 requires any witness to have sufficient memory of the events such that she is not forced to fill the gaps in her memory with hearsay or speculation. Witnesses are not permitted to speculate, guess, or voice suspicions." (cleaned up)). Moreover, as discussed earlier, Plaintiffs do not show which part of 28 U.S.C. §§ 1225-1231 contemplates an absolute immunity from detention and/or removal. Nor can they. As to the alleged Blind Removal Policy, Plaintiffs ignore that the relevant statute (which they appear to misread) and regulation (which they seem to gloss over) vest the discretion to immigration officials and indeed require an alien to first and foremost request a stay subject to that discretion. *See, e.g.*, 8 U.S.C. § 1227(d) and 8 C.F.R. § 241.6(a).

Plaintiffs then spill much ink claiming that Defendants provided Plaintiffs no due process on account of anyone's deferred action grant. *See, e.g.*, Motion at 25-28. Not so: Plaintiffs cannot dispute that Merlos, for example, identified her deferred action to the Immigration Court and requested it to exercise the discretion vested in it. *See supra* § II.A. The Immigration Court did so, and she was then released. Camila, the only plaintiff who is a resident of this District, has also been released on a bond hearing at the Immigration Court. *See id.* To the extent she seeks the Immigration Court to exercise its discretion on account of her deferral status and terminate or stay her immigration proceeding, she is required to argue so there, not here. *See supra* § IV.A.1.b. No additional process is due— surely not an absolute immunity from detention or removal—and no controlling authority

requires otherwise.[4]

Put another way, Plaintiffs fail to state a claim for due process violations for two reasons: (1) contrary to their overstatement, the due process protections afforded to immigration detainees are limited and have already been satisfied here, such that they fail to raise an unfulfilled or infringed upon qualifying property interest, *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997); and (2) they do not allege facts showing that the restrictions placed on them are punitive, and not rationally related to a legitimate government purpose, *Block v. Rutherford*, 468 U.S. 576, 583-84 (1984). Indeed, due process protections "may vary depending on status and circumstance[s]." *Zadvydas v. Davis*, 533 U.S. 678, 693-94 (2001); *Jennings*, 583 U.S. at 314 (noting that due process claims "call for such protections as the situation demands" (cleaned up)).

### 2.     Plaintiffs Cannot Show Irreparable Harm

Plaintiffs argue generally that the 2025 Interim Guidance has caused them irreparable harm. *See, e.g.*, Motion at 38-40. But, according to their logic, the harm they seek to avoid—namely, any adverse immigration consequences—would necessarily follow from the current immigration laws. After all, Plaintiffs do not—indeed, cannot—show that Executive Order 14159 is unlawful. With or without the 2025 Interim Guidance, Executive Order 14159 and the vast statutory and regulatory landscape undergirding it vest quite broad enforcement discretion in the Executive Branch. "[L]egal consequence[s] under the law," cannot therefore be "shown to constitute an irreparable injury." *Am.-Arab Anti-Discrimination Comm. v. Ashcroft*, 241 F. Supp. 2d 1111, 1113-14 (C.D. Cal. 2003).

Take Camila, for example, the only Individual Plaintiff in this District who is alleged to have deferred action under an active petition for a U-visa. Plaintiffs cannot dispute that she has already been released from detention, via the existing process of the

---

[4] Plaintiffs appear to misconstrue *Ayala v. Bondi*, No. 2:25-CV-01063-JNW-TLF, 2025 WL 2084400, at *7-8 (W.D. Wash. July 24, 2025) and *Reno*, 525 U.S. at 484, *see* Motion at 2. Both, as well as the cases they in turn rely on, recognized the prosecutorial discretion on detention and removal that accompany any deferred action grant. *Ayala*, 2025 WL 2084400, at *7; *Reno*, 525 U.S. at 484.

31

Immigration Court that presides over her removal proceedings. To the extent she now maintains that the government may re-detain her allegedly unlawfully again, that mere "possibility" of irreparable harm is insufficient to sustain her burden. *Winter*, 555 U.S. at 22. Instead, she must show "immediate threatened injury." *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (citing *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League,* 634 F.2d 1197, 1201 (9th Cir. 1980)). That she cannot do. Relatedly, Article III requires a concrete, actual or imminent injury; mere speculation about possible future injury is insufficient. *See, e.g.*, *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983) (making plain that plaintiff must show an injury or threat of injury that is "real and immediate," not "conjectural" or "hypothetical"); *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) ("Each of these cases demonstrates what we have said many times before and reiterate today: Allegations of possible future injury do not satisfy the requirements of Art. III. A threatened injury must be 'certainly impending' to constitute injury in fact."). Merely showing a "possibility" of irreparable harm is insufficient. *Winter*, 555 U.S. at 22. Indeed, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* Camila identifies no concrete, imminent plan by the government to re-detain her unlawfully—she simply cannot.

The same applies to other Plaintiffs who have already been released (Paulo and Merlos), who have already had their bond hearing (Luna, who in fact no longer has any claim to deferred action), or who have already been removed from the United States (Lupe, Carmen, Ruano, and Daniel). And the Organizational Plaintiffs similarly cannot show standing let alone a concrete, imminent injury under their resource-diversion theories. "Absent a sufficient likelihood that [she] will again be wronged *in a similar way*," *Lyons*, 461 U.S. at 111 (emphasis added), Camila—or for that matter Plaintiffs—cannot establish standing to seek an injunction much less show irreparable harm. *See, e.g.*, *Hai Chieu Dam v. Timothy Robbins*, 2:25-cv-08133-JWH-MAA, Docket No. 7 at 6 (C.D. Cal. Sept. 16,

2025) (declining to address whether petitioner was "in custody" because petition for an injunction barring re-detainment was not ripe). Recently, where a habeas petitioner argued that "his future detention is not speculative because the call-in for a physical appointment is a typical ruse to re-detain noncitizens on supervised release, and that he still faces a risk of unlawful future detention," the court found that he "fail[ed] to sufficiently allege an injury or threat of injury because the event giving rise to the Petition has passed and Petitioner's alleged threat of future injury is too speculative and unripe" and relatedly that he "fail[ed] to present sufficient allegations or evidence of the threat of future injury to confer Article III standing." *J.P. v. Santacruz*, No. 8:25-CV-01640-FWS-JC, 2025 WL 2998305, at *4 (C.D. Cal. Oct. 24, 2025). Because Individual Plaintiffs cannot show an injury or threat of injury that is "real and immediate" and rest merely on the "possibility" of some indeterminate harm in the future, they cannot carry their burden to make a clear showing of irreparable harm to warrant an injunctive relief. *Winter*, 555 U.S. at 22.

### 3. Balance of the Equities and Public Interest Favors Defendants

The final two preliminary injunction factors, public interest and the balance of equities, also weigh against granting Plaintiffs' motion. These factors merge when the Executive Branch is a party. *Nken*, 556 U.S. at 435. As explained above, Plaintiffs cannot establish an injury sufficient to confer Article III standing, let alone the much higher standard of an irreparable injury required for a preliminary injunction. *See Winter*, 555 U.S. at 21-22 (stating that the moving party must establish that irreparable harm is "*likely* in the absence of an injunction" and not merely a "possibility"). In contrast, an injunction restraining the law enforcement discretion of individual offices—a blanket prohibition or strict boundaries of whether ICE may arrest, detain, initiate removal proceedings, or execute final orders of removal—would have significant adverse impact on ICE's civil immigration enforcement mission and in turn compromise the government and the public's "significant" interest "in enforcement of the immigration laws." *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981) (collecting cases); *see also Nat'l Treasury Emps. Union v. Von Raab,* 489 U.S. 656, 672 (1989) (stating that the

33

government has "compelling interests in safety and in the integrity of our borders").

Due to "resource constraints and regularly changing public-safety and public-welfare needs, the Executive Branch must balance many factors when devising arrest and prosecution policies." *Texas*, 599 U.S. at 680. Indeed, the Executive's enforcement discretion in immigration law "implicates not only 'normal domestic law enforcement priorities' but also 'foreign policy objectives.'" *Id.* at 679 (quoting *Reno*, 525 U.S. at 490-91). An injunction restricting the discretion of law enforcement officers in deciding when, where, and how to enforce this country's immigration laws would undermine these important interests and hinder "vigorous enforcement of [Congress's] prohibition against illegal immigration." *Castillo*, 659 F.2d at 1221; *Jazi v. Rubio*, No. 25-cv-27 BEN, 2025 WL 2420690, at *2 (S.D. Cal. Aug. 20, 2025) ("Courts should act cautiously when reviewing matters entrusted to the Executive Branch, especially those involving immigration, lest it alter the balance between co-equal branches of government."); *Noem v. Perdomo*, — S.Ct.—, 2025 WL 2585637, at *5 (Sept. 8, 2025) (Kavanaugh, J., concurring) ("Especially in an immigration case like this one, it is also important to stress the proper role of the Judiciary . . . . [W]e . . . must decline to step outside our constitutionally assigned role to improperly *restrict* reasonable Executive branch enforcement of the immigration laws." (emphasis in original)). Balance of the equities and public interest therefore tips in Defendants' favor.

**B.  If the Court Were to Grant a Preliminary Injunction, It Should Require Plaintiffs to Post Security**

Even if the Court were to grant the Motion, it should require Plaintiffs to post security. Under Rule 65(c) of the Federal Rules of Civil Procedure, the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). If the Court issues a preliminary injunction here, it should require Plaintiffs to post a bond commensurate with the scope of any injunction.

**C.      The Stay or Injunction Plaintiffs Propose is Improper and Unnecessary**

The Supreme Court recently clarified that district courts lack authority to issue orders "broader than necessary to provide complete relief to each plaintiff with standing to sue." *Trump v. CASA, Inc.*, 606 U.S. 831, 839-41, 859-61 (2025). And so an injunction "must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 585 U.S. 48, 73 (2018), and "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). That principle has deep roots. It is well settled that the scope of a court's statutory authority to enter injunctive relief is circumscribed by the type of relief that was "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318-19 (1999). And the tradition of equity inherited from English law was premised on "providing equitable relief only to parties" because the fundamental role of a court was to "adjudicate the rights of 'individual[s].'" *Trump v. Hawaii*, 585 U.S. 667, 718 (2018) (Thomas, J., concurring) (quoting The Federalist No. 78 at 466 (Alexander Hamilton)). As a result, "a plaintiff could not sue to vindicate the private rights of someone else." *Id.*

Yet that is precisely the relief Plaintiffs seek here. They ask this Court to broadly enjoin the law enforcement discretion that is vested in ICE as to an innumerable number of non-parties who are not before the Court. Any such broad-based injunction "take[s] a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Id.* at 713 (Thomas, J., concurring). Law enforcement discretion is exercised on a case-by-case basis and is inherently party specific (as illustrated even by the disparate circumstances of the Individual Plaintiffs in this case). Thus, there is no reason for an injunction to extend to non-parties here. More fundamentally, Plaintiffs' uniformity argument usurps the role of the political branches. "[T]he admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial

control.'" *Hawaii*, 585 U.S. at 702 (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)).

Given the foregoing, the Court should reject the terms of Plaintiffs' overbroad proposal for injunctive relief that would prohibit Defendants "applying the 2025 Guidance *or any policies* substantially similar to it, which do not presumptively protect individuals with a pending, valid petition for VAWA, U visa, or T visa relief from civil immigration detention and deportation, against Individual Plaintiffs and the clients and members of Organizational Plaintiffs." Pls.' Proposed Order at 5 (emphasis added), ECF No. 31-9. That broad-based proposal exemplifies how Plaintiffs will accept nothing short of reinstating the prior guidance or policies, enacted pursuant to different immigration priorities set forth under a different executive order and under a different administration. *See, e.g., id.* (asking a stay as to "the 2025 Guidance" and "its rescission of prior policies"). Plaintiffs' attempted end run around Executive Order 14159 is remarkable—and improper.

## V.    CONCLUSION

Defendants respectfully request that the Court deny the motion.

Respectfully submitted,

Dated: December 19, 2025

TODD BLANCHE
Deputy Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney

*/s/ Pushkal Mishra*

PUSHKAL MISHRA
Special Assistant United States Attorney

Attorneys for Defendants

## CERTIFICATE OF COMPLIANCE WITH L.R. 11-6.2

The undersigned, counsel of record for Defendants, certifies that the memorandum of points and authorities contains 36 pages, which complies with the 41-page limit set by the Court in its November 14, 2025 order. *See* ECF No. 30.

Dated: December 19, 2025          */s/ Pushkal Mishra*
                                   PUSHKAL MISHRA

37