CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Bardis Vakili (Cal. Bar No. 247783)
bardis@centerforhumanrights.org
Sarah E. Kahn (Cal. Bar No. 341901)
sarah@centerforhumanrights.org
Erika Cervantes (Cal. Bar No. 344432)
erika@centerforhumanrights.org
1505 E 17th St. Ste. 117
Santa Ana, CA 92705
Tel: (909) 274-9057

Attorneys for Plaintiffs

Additional counsel listed on following page

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| Immigration Center for Women and Children, et. al.,<br><br>Plaintiffs,<br>v.<br>Kristi Noem, et. al,<br>Defendants. | Case No.: 2:25-cv-09848-AB-AS<br><br>**DECLARATION OF KEVIN ALEJANDRO SARABIA** |

*Additional Counsel for Plaintiffs:*
LA RAZA CENTRO LEGAL
Stephen A. Rosenbaum (Cal. Bar No. 98634)
srosenbaum@law.berkeley.edu
Jordan Weiner (Cal. Bar No. 356297)
jordan@lrcl.org
474 Valencia Street, Suite 295
San Francisco, CA 94103
Tel: (415) 575-3500

PUBLIC COUNSEL
Rebecca Brown (Cal. Bar No. 345805)
rbrown@publiccounsel.org
Kathleen Rivas (Cal. Bar No. 333600)
krivas@publiccounsel.org
610 South Ardmore Ave.
Los Angeles, CA 90005
Tel: (213) 385-2977

COALITION FOR HUMANE IMMIGRANT RIGHTS
Carl Bergquist (DC Bar 1720816)*
cbergquist@chirla.org
2351 Hempstead Road
Ottawa Hills, OH 43606
Tel: (310) 279-6025

Adam Reese (Cal. Bar No. 362898)
areese@chirla.org
2533 W 3rd Street, #101
Los Angeles, CA 90057
Tel: (213) 353-1333

* *Admitted Pro Hac Vice*

**DECLARATION OF KEVIN ALEJANDRO SARABIA FOR LOYOLA'S BINATIONAL MIGRATION CLINIC**

I, Kevin Alejandro Sarabia, declare and state as follows:

1. I have personal knowledge of the facts set forth below, and if called to testify, I could and would do so competently.

2. My name is Kevin Alejandro Sarabia, and I am an attorney at Loyola's Immigrant Justice Clinic (LIJC), under the Binational Migration Advocacy Project. LIJC is located at 919 Albany Street, Los Angeles, CA 90015. I have been working at LIJC for 1 year and 3 months.

3. The Loyola Immigrant Justice Clinic (LIJC) is a community-based collaboration of Loyola Law School, Loyola Marymount University, Homeboy Industries Inc., and Dolores Mission Church. LIJC's mission is to advance the rights of the immigrant population in East Los Angeles through direct legal services, education, and community empowerment while teaching law students effective immigrants' rights lawyering skills in a real-world setting.

4. LIJC focuses on providing representation to individuals who are unable to obtain immigration legal services elsewhere, with an emphasis on immigrants with certain immigration and criminal complications who reside in the East Los Angeles area. Given the population we serve, we specialize in humanitarian forms of relief such as U visas, T visas, VAWA, and SIJS.

5. In 2024, LIJC started the Binational Migration Advocacy Project. The goal of this initiative is to replicate our community-based model to provide free immigration legal services to migrants and deportees in Mexico, specifically, Tijuana and Guadalajara. Our geographic focus is strategic, as these two cities form part of the migration corridor for individuals seeking to resettle in California, and are also where deportees and returnees from the Southern California region often relocate due to their community ties. In approximately September of 2024, our clinic started offering services in various migrant shelters in Tijuana to serve this client population.

6. In my current role, I oversee our clinical work in the Tijuana region. In this role, I often coordinate trips to Tijuana to provide services to migrant shelters. The people who often participate in these trips are the following: Loyola clinical law students, LIJC Director Helena Marissa Montes, Clinical Directors and fellows from other law schools, Mexican attorneys, and Mexican clinical students.

7. During our visits to Tijuana, we provide free legal services for people in migrant shelters. During these visits, we host Know Your Rights Workshop geared at informing shelter staff and tenants as to the current standing of immigration policy. At the end of these workshops, we offer free legal consultations to anyone interested in understanding the

status of their immigration cases and their ability to enter the United States in the future. Our goal is to provide free, accurate information to those who seek our assistance.

8. Before February 2025, our clinic hosted six service trips to the Tijuana region. We went approximately three times between September and December of 2024, and approximately three times in January 2025. We increased the number of visits in January, anticipating the policy changes that would be taking place with the arrival of the Trump Administration.

9. At each visit, we conducted approximately 25-60 intakes with individuals who were present. During those visits, I, nor anyone who participated in our programming, ever encountered an individual who had been deported with deferred action based on a pending U or T visa or a VAWA self-petition.

10. Since February 2025, when ICE Directive 11005.4 rescinded ICE Directive 11005.3 (Using a Victim-Centered Approach with Noncitizen Crime Victim), our clinic has visited Tijuana approximately 5 times.

11. I have personally attended all these trips. At each visit, we conduct approximately 15-25 intakes with individuals who were present at the shelters. On these trips, we encountered people who had been deported while their U visa, T visa, or VAWA self-petition was pending. Among these, we encountered a couple of individuals who had been deported with deferred action based on a U visa.

12. The majority of the individuals we interviewed on these trips were unrepresented in their removal proceedings.

13. Based on their collective stories, it is evident that the lack of access to counsel left them highly vulnerable to deportation despite having pending humanitarian benefits. Some of those we interviewed shared that they were detained and coerced into signing documents that they did not understand, which then resulted in their deportation. They also shared that they were not aware of their right to file a stay despite having pending petitions or that they could file a habeas as a result of being denied bond.

14. Based on our training and experience, we believe that it is more common for unrepresented individuals to be deported under the new policy than for represented individuals to be deported under the new policy. People's lack of access to counsel empowers immigration agents to violate the law, knowing there will be no accountability.

15. We also understand it is less likely that unrepresented individuals will have an opportunity to tell their stories or will be identified by advocates.

16. Before February 2025, I had never come across individuals who were deported with pending survivor-based benefits. This is now something I expect to encounter each time I conduct intakes with deported individuals.

17. As an immigration attorney, it is devastating to see victims of violent crimes, who assisted law enforcement in the United States, and who are deserving and entitled to a fair adjudication of their protection, be placed in an even more precarious situation. Many of the people I encounter tell me how they are revictimized after their deportation because they are left with no resources in a country they no longer recognize as home. It is heartbreaking to hear that many of these individuals were torn apart from their communities and families in the United States. It is difficult to advise people because I worry there is no viable recourse for them, as ICE ignored their right to due process and their grant of deferred action.

18. This has extreme, irreparable consequences for the individuals we meet. Some individuals were detained for weeks or months. During this time, they could not provide for or be with their families and endured grueling conditions of detention. Many of the people we met had to choose between separating from their families and tearing their families from their communities in the U.S. by bringing them to Mexico when they were deported. Individuals lost their livelihoods, homes, communities, educations, businesses, and lives in the U.S.

19. One individual I interviewed was a victim of a felonious assault in the United States. He made the courageous decision to report to the police and assist in the investigation of this violent crime. Subsequently, he filed for a U visa and received a bona fide determination. One day in June of 2025, this individual was stopped by masked men who started inquiring about his immigration status. He showed these masked men his work permit and explained that he had a bona fide determination, but the masked men took his work permit away, detained him, and turned him over to ICE. This individual was then deported to Mexico. He has three sons: one son is 22 years old and served in the US Marines, another son is 20 years old and suffers from anxiety and depression, and lastly, he has a 10-year-old son whom he cared for. In Mexico, he now faces persecution from the cartels. The hometown where he was from has a strong presence of the cartel Nueva Generacion. Since the cartel found out that his sons were sending him money, they came after him to extort him. He was then forced to flee his hometown to Tijuana, where I provided legal consultation.

20. Another individual, whom we recently served in Guadalajara, had an approved I-360 for his VAWA application. Multiple people beat this individual at his spouse's command. He obtained a restraining order from his spouse and subsequently filed for VAWA. In October 2025, he went to a scheduled ICE check-in and was told that he was going to be deported. He explained that he had an open case, but he was immediately detained in a basement and deported to Mexico in less than 24 hours. If placed in removal proceedings, this individual could have applied for cancellation of removal. He first

entered the United States in the 90s and had been a resident of Los Angeles for about 25 years. As a single father, he cared for his 15-year-old United States Citizen son, who suffers from a brain tumor, epilepsy, and ADHD. In Mexico, this individual has struggled to obtain a job to continue supporting his son, despite having experience as an electrician, plumber, and construction worker. Out of desperation, he tried to obtain informal work by calling a number on a billboard by a convenience store. When he went to this job offer, they attempted to take him to Michoacan, a region in Mexico, notorious for people being taken to and kidnapped by the cartels. He fled the scene and is now scared that these people will find and harm him.

21. Since February 2025, I have seen a significant increase in the number of people deported with pending survivor-based benefits. Many of them had deferred action when they were deported, something that was nearly unheard of just a year ago when we started doing work in Mexico. The rescission of protections for U, T, and VAWA petitioners has had a devastating effect on the individuals we meet and their family members in the United States, many of whom are United States citizens.

22. Based on our services being spread throughout months, the shelters we service have voiced that a lot of people come in and out of their shelter without receiving legal consultations. We also serve dedicated shelters, and there are many more active shelters in Tijuana that we have not had contact with. Based on this, we believe we have only scratched the surface of the number of people affected by the rescission of ICE Directive 11005.3, and that this is likely happening to many more individuals who have not had the opportunity to share their stories.

I declare under penalty of perjury and under the laws of the United States of America that the foregoing is true and correct.

Date: December 3, 2025

Kevin Sarabia

NAME