UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Immigration Center for Women and Children, Lupe A., Camila B., Paulo C., Kenia J. Merlos, Luna E., Carmen F., Yessenia Ruano, Daniel H., Coalition for Humane Immigrant Rights, La Raza Centro Legal, and California Collaborative for Immigrant Justice, <br><br> Plaintiffs, <br><br> v. <br><br> Kristi Noem, Secretary of Homeland Security, in her official capacity, U.S. Immigration & Customs Enforcement, U.S. Citizenship and Immigration Services, <br><br> Defendants. | Case No. 2:25-cv-09848-AB-AS <br><br> **ORDER <u>GRANTING</u> PLAINTIFFS' MOTION FOR CLASS CERTIFICATION [DKT. NO. 23] AND <u>GRANTING IN PART AND DENYING IN</u> PART PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION [DKT. NO. 31]** |

Before the Court are Plaintiffs' Motion for Class Certification ("CC Motion," Dkt. No. 23) and Plaintiffs' Motion for Preliminary Injunction ("PI Motion," Dkt. No. 31). The Defendants filed oppositions to both Motions ("CC Opp'n," Dkt. No. 39; "PI Opp'n," Dkt. No. 40). The Plaintiffs filed replies in support of both Motions. ("CC Reply," Dkt. No. 44; "PI Reply," Dkt. No. 45). Plaintiffs filed voluminous declarations and exhibits in support of the Motions. Plaintiff also filed a Notice of

1

Supplemental Authority (Dkt. No. 50). The Court heard oral argument on February 10, 2026. Thereafter, Defendants filed a Notice of Supplemental Authority, to which Plaintiffs filed a Response (Dkt. Nos. 54, 55). For the following reasons, Plaintiffs' Motion for Class Certification is **<u>GRANTED</u>**, and Plaintiffs' Motion for Preliminary Injunction is **<u>GRANTED IN PART and DENIED IN PART</u>**.

## I.    BACKGROUND

On January 30, 2025, U.S. Immigration and Customs Enforcement ("ICE") issued a new policy governing its immigration enforcement actions against "aliens who are known beneficiaries of victim-based immigration benefits or are known to have pending applications or petitions for such benefits." *See* ICE Policy No. 11005.4, *Interim Guidance on Civil Immigration Enforcement Actions Involving Current or Potential Beneficiaries of Victim-Based Immigration Benefits* (Jan. 30, 2025) ("2025 Guidance"), https://www.ice.gov/doclib/foia/policy/11005.4.pdf. The 2025 Guidance expressly repealed previous policy and dramatically changed ICE's enforcement posture towards individuals with pending petitions for victim-based immigration benefits from a policy of refraining from immigration enforcement against such persons in deference to their pending applications, to a policy of enforcement despite their pending applications. The victim-based immigration benefits[1] in issue are VAWA self-petitions, U visas, and T visas, which the Court describes below.

Plaintiffs are eight individuals ("Individual Plaintiffs") who, at the time the Complaint was filed, had petitions for U visas or T visas pending with the United States Citizenship and Immigration Services ("USCIS"), and four non-profit and legal services organizations that advocate for immigrants and provide affordable or pro bono legal services and other assistance to immigrants. Plaintiffs challenge the 2025

---

[1] Plaintiffs refer to these benefits as "survivor-based benefits" and the 2025 Guidance and the policies it rescinded refer to them as "victim-based benefits." The Court will use the term "victim-based benefits" to match the terminology used in the policies, which also appears to be the term used in most of the legislation.

Guidance and two policies that they allege ICE has implemented pursuant to that Guidance; Plaintiffs refer to these resulting policies as the De Facto Revocation Policy and the Blind Removal Policy. Plaintiffs allege that the 2025 Guidance and the two resulting policies allow for the detention and removal of VAWA self-petitioners and of U visa and T visa petitioners contrary to protections afforded them by Congress and contrary to congressional intent, and represent a sea change in policy that Defendants adopted in violation of the Administrative Procedure Act and the *Accardi* doctrine.

Plaintiffs assert nine causes of action arising under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2); the *Accardi* doctrine; the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1227(d)(1); the Due Process Clause of the Fifth Amendment to the United States Constitution; and the Fourth Amendment to the United States Constitution. The Individual Plaintiffs bring their claims on their own behalf and on behalf of three putative classes. Plaintiffs' Complaint seeks various forms of relief, including declaratory relief that the 2025 Guidance, the De Facto Revocation Policy, and the Blind Removal Policy are unlawful on various grounds. Plaintiffs also seek an order setting aside the 2025 Guidance, the De Facto Revocation Policy, and the Blind Removal Policy pursuant to § 706 of the APA. Plaintiffs also seek several forms of injunctive relief barring Defendants from implementing or enforcing the 2025 Guidance and the Policies, among other relief. Plaintiffs also seek "a writ of mandamus and/or habeas corpus" requiring Defendants to allow certain deported Individual Plaintiffs and members of two classes to return to the United States. *See* Complaint ("Compl.," Dkt No. 1) Request for Relief, pp. 73-75.

The eight Individual Plaintiffs are Lupe A., Camila B., Paulo C., Kenia J. Merlos, Luna E., Carmen F., Yessenia Ruano, and Daniel H. (collectively, "Individual Plaintiffs"). The four Organizational Plaintiffs are Immigration Center for Women and Children ("ICWC"), Coalition for Humane Immigrant Rights ("CHIRLA"), La Raza Centro Legal ("LRCL"), and California Collaborative for Immigrant Justice ("CCIJ") (collectively, "Organizational Plaintiffs"). The Court includes detailed allegations

about each of them below.

The Defendants are Kristi Noem, Secretary of the U.S. Department of Homeland Security ("DHS") when this case was filed, since replaced by Markwayne Mullin; and U.S. Customs and Immigration Services ("USCIS") and U.S. Immigration and Customs Enforcement ("ICE"), two component agencies of DHS. USCIS adjudicates affirmative applications for immigration benefits, including VAWA self-petitions, U visa petitions, and T visa petitions.[2] Compl. ¶ 29. USCIS administers interim benefits related to these petitions, including by making determinations that the petitions are prima facie eligible for approval or bona fide, and by granting deferred action and employment authorization. *Id.* ICE enforces immigration laws, including by detaining noncitizens and pursuing their removal through civil immigration enforcement (removal) cases in immigration court within the Department of Justice, and by executing final orders of removal, among other things. *Id.* ¶ 28. ICE also promulgates policies such as the 2025 Guidance to govern its enforcement actions.

In their Motion for Class Certification, Plaintiffs seek certification of a Pending Petition Class, a Deferred Action Class, and a Stay of Removal Class. In their Motion for Preliminary Injunction, Plaintiffs move the Court to stay the 2025 Guidance, the De Facto Revocation Policy, and the Blind Removal Policy under § 705 of the APA. Plaintiffs also seek injunctive relief specific to the Organizational Plaintiffs and several Individual Plaintiffs. Finally, Plaintiffs seek classwide injunctive relief

---

[2] The Court explains the terminology. Persons seeking benefits under VAWA are referred to as "self-petitioners," and the primary form they file, Form I-360, is entitled *Petition* for Amerasian, Widow(er), or Special Immigrant. The form used to seek a U visa, Form I-918, is entitled *Petition* for U Nonimmigrant Status. The form used to seek a T visa, Form I-914, is referred to as *Application* for T Nonimmigrant Status. In this context, the terms "petition" and "petitioner," and "application" and "applicant" are commonly used interchangeably. The Court has endeavored to use the terms "petition" and "petitioner" in reference to U visas and T visas and to collective references to all three victim-based immigration benefits. However, the terms "application" or "applicant" also appear and should be considered synonymous with "petition" and "petitioner," and do not signify any legally-material difference.

4

enjoining Defendants from applying the 2025 Guidance, the De Facto Revocation Policy, and the Blind Removal Policy to members of the three classes. *See* Prop. Order (Dkt. No. 31-9). Defendants oppose on various grounds.[3]

Because Plaintiffs challenge the legality of the 2025 Guidance, the Court begins with a general overview of that Guidance. The Court then gives a brief overview of the three victim-based immigration benefit programs impacted by the 2025 Guidance. Next, the Court describes the prior policies rescinded by the 2025 Guidance. Finally, the Court describes the new policies set forth in the 2025 Guidance.

## A. The Stated Purpose and Background of the 2025 Guidance

The 2025 Guidance explains that its purpose is to "provide[] interim guidance governing [ICE] civil immigration enforcement actions involving aliens who are known beneficiaries of victim-based immigration benefits or are known to have pending applications or petitions for such benefits." 2020 Guidance, p. 1. ICE promulgated interim guidance because the 2025 Guidance also expressly "rescinded and superseded" two prior policies towards such beneficiaries: ICE Policy Statement

---

[3] The Defendants relegated several substantive arguments and extensive citations to footnotes, some of which are lengthy. *See, e.g.*, PI Opp'n n.2; CC Opp'n nn. 2, 3, 4, 5, 9. This is improper. *See* Standing Order (Dkt. No. 10) 6:18 ("Footnotes must be used sparingly…"); *see also First Advantage Background Servs. Corp. v. Private Eyes, Inc.*, 569 F.Supp.2d 929, 935 n.1 (N.D. Cal. 2008) ("A footnote is the wrong place for substantive arguments on the merits of a motion . . ."). "Moreover, raising an issue in a footnote not only creates procedural difficulties for the Court in ruling on a pending motion but also creates confusion within the underlying record." *American Express Company v. Ponnambalam*, 2020 WL 13442489, at *5 (D. Ariz. 2020). For these reasons, "[m]any courts will disregard arguments raised exclusively in footnotes." *Sanders v. Sodexo, Inc.*, No. 2:15-cv-00371-JAD-GWF, 2015 WL 4477697, at *5 (D. Nev. July 20, 2015) (quoting Bryan Garner, *The Redbook: A Manual on Legal Style* 168 (3d ed. 2013), and disregarding request made in footnote as neither fairly raised nor adequately developed). *See also Cheever v. Huawei Device USA, Inc.*, No. 18-CV-06715-JST, 2019 WL 8883942, at *3 (N.D. Cal. Dec. 4, 2019) ("Arguments raised only in footnotes, or only on reply, are generally deemed waived and need not be considered.") (citing *Estate of Saunders v. Comm'r*, 745 F.3d 953, 962 n.8 (9th Cir. 2014)). The Court deems such arguments and case references to not have been fairly raised and therefore largely disregards them.

10076.1, *Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs* (Jun. 17, 2011) ("2011 Policy")[4], and ICE Directive 11005.3, *Using a Victim-Centered Approach with Noncitizen Crime Victims (*Dec. 2, 2021) ("2021 Directive")[5]. *See* 2025 Guidance, p. 1. In its background section, the 2025 Guidance briefly states the statutory context of these prior policies and some of their requirements. This account is consistent with Plaintiffs' more detailed presentation in the Complaint and their memoranda, which it appears Defendants do not dispute. The Court will limit its summary of the victim-based immigration benefits and the policies to what is material to resolving the Motions.

**B. Victim-Based Immigration Benefits: VAWA Self-Petitions, U Visas, and T Visas**

At issue in this case are three immigration-related benefits for victims of domestic violence, survivors of certain crimes, and survivors of severe human trafficking: the VAWA self-petition, the U visa, and the T visa. Congress created each of these benefit programs through legislation amending the Immigration and Nationality Act (INA), beginning with the Violence Against Women Act of 1994 ("VAWA"), and continuing with the Victims of Trafficking and Violence Protection Act of 2000 ("VTVPA") (including the Battered Immigrant Women's Protection Act ("BIWPA"), and the Trafficking Victims Protection Act of 2000 ("TVPA")), and their multiple amendments and reauthorizations.[6]

---

[4] ICE Policy Statement 10076.1 was filed at Cervantes Decl. Exh. E, and is available at https://www.ice.gov/doclib/foia/prosecutorial-discretion/certain-victims-witnesses-plaintiffs.pdf.
[5] ICE Directive 11005.3 was filed at Cervantes Decl. Exh. G, and is available at https://www.ice.gov/doclib/foia/policy/11005.3_UsingVictimCenteredApproachNoncitizenVictims.pdf.
[6] The legislative history is fairly complex. USCIS Policy Manual Volume 3, *Humanitarian Protection and Parole,* Parts B, C, and D reflect USCIS policy and procedure for each of the three benefits. Each Part includes a Chapter 1 entitled "Purpose and Background" that summarizes each benefit's provisions and legislative history. *See* USCIS Policy Manual, *https://www.uscis.gov/policy-manual.* Plaintiffs also filed portions of the USCIS Policy Manual as exhibits to the Kahn Declaration

First, beginning with the 1994 Violence Against Women Act (VAWA), Congress created the VAWA self-petition, which provided that noncitizens with abusive qualifying family members can "self-petition" for family-based immigrant visas without their abuser's knowledge, consent, or participation. *See* 8 U.S.C. §§ 1101(a)(51), 1154(a)(1)(A)(iii), (B)(iii). Second, the U visa, which Congress created in 2000, provides a path to legal status for non-citizen survivors of qualifying crimes who assist law enforcement in investigating or prosecuting those crimes. *See* Battered Immigrant Women and Protection Act of 2000 ("BIWPA") § 1513(a)(2)(B), (b). A noncitizen is eligible for a U visa if (1) the applicant "suffered substantial physical or mental abuse as a result of having been a victim of" certain identified types of crimes; (2) the applicant "possesses information concerning [the] criminal activity"; (3) the applicant "has been helpful, is being helpful or is likely to be helpful" to government officials regarding the criminal activity; and (4) the crime occurred in the United States or violated U.S. law. *See* 8 U.S.C. § 1101(a)(15)(U)(i)(I)-(IV). There is a 10,000-visa annual cap on U visas for principal applicants, *see* 8 U.S.C. § 1184(p)(2), resulting in long waits for a visa to become available. Compl. ¶ 50. And third, the T visa, also created in 2000, provides legal status for survivors of severe human trafficking. Trafficking Victims Protection Act of 2000 ("TVPA") §§ 103(8), 107(e). To be eligible for a T visa, a petitioner must (1) be a survivor of a "severe form of trafficking in persons"; (2) be "physically present in the United States" or its territories; (3) have "complied with any reasonable request for assistance" by law enforcement, with some exceptions for age and the impact of trauma; and (4) be someone who would "suffer extreme hardship" if removed. *See* 8 U.S.C. § 1101(a)(15)(T). There is a 5,000-visa annual cap on T visas for principal applicants, *see* 8 U.S.C. § 1184(o)(2)-(3), but it has never been reached. Compl. ¶ 64.

For all three programs, Congress authorized broad waivers of inadmissibility to

---

(Dkt. No. 23-12).

7

allow a successful petitioner to remain in the country despite being otherwise removable. *See* BIWPA § 1505 (creating waivers of inadmissibility for VAWA self-petitioners); *id.* § 1513(e) (same for U visa applicants); TVPA § 107(e)(3) (same for T visa applicants); 8 U.S.C. § 1182(d)(13)-(14) (waivers of inadmissibility for U visa and T visa petitioners). Thus, a successful VAWA self-petitioner, U visa petitioner, or T visa petitioner can remain in the United States lawfully and eventually apply for permanent residence and then citizenship.

### C. Interim Benefits for Prima Facie Eligible or Bona Fide Applications

To avoid potential immigration consequences for noncitizens pursuing these benefits, to encourage victims to come forward, and to fulfill the purposes of the victim-based benefits programs, Congress provided interim benefits including deferred action, work authorization, and other benefits during the often-lengthy pendency of these petitions. Some of these interim benefits are as follows; they all depend on some kind of preliminary review of the application to determine whether it sets forth a "prima facie case for approval" or is "bona fide." [7]

VAWA self-petitioners who establish a "prima facie case" are eligible for federal public benefits such as welfare, health, disability, or unemployment and similar benefits while their petitions are pending. *See* 8 U.S.C. §§ 1611(a), 1641(c). To ensure VAWA self-petitioners have timely access to these benefits, USCIS promptly makes VAWA prima facie determinations "[u]pon receipt of a self-petition." 8 C.F.R. § 204.2(c)(6)(i). If USCIS approves a VAWA self-petition but a visa is not immediately available, the VAWA self-petitioner is eligible for work authorization

---

[7] Determining whether a petition is prima facie eligible for approval or is bona fide are slightly different processes, but the differences do not appear germane to the resolution of the Motions and the terms sometimes appear to be used interchangeably. The key fact is that both processes are a preliminary and expedited screening of the petition to determine whether it has sufficient merit such that the petitioner should be afforded interim benefits (immigration benefits such as work authorization and deferred action or a stay or removal, or public assistance-type benefits).

and may apply for deferred action status while they wait for a visa to become available. *See* 8 U.S.C. § 1154(a)(1)(K); USCIS Policy Manual ("USCIS PM") vol. 3, pt. D, ch. 5.D.2.[8]

U visa petitioners whom USCIS determines set forth a prima facie case for approval are eligible to request an administrative stay of removal from DHS; if granted, the stay remains in effect while the application is pending, during which time the applicant "shall not be removed." 8 U.S.C. § 1227(d)(1)-(3). U visa applicants with a "bona fide application" awaiting full adjudication by USCIS are also eligible for work authorization, which entails permission to remain in the United States and, therefore, deferred action. 8 U.S.C. § 1184(p)(6). In 2021, USCIS created a formal, streamlined bona fide determination ("BFD") process. The Complaint explains this process in detail. For purposes of these Motions, it suffices to say that USCIS conducts an initial streamlined review to determine whether the application is "bona fide." If it is, and the applicant "warrant[s] a favorable exercise of discretion, USCIS issues them BFD EADs [Bona Fide Determination (BFD) Employment Authorization Document (EAD)] and grants deferred action." USCIS PM vol. 3, pt. C, ch. 5.C; Compl. ¶ 53.

U visa petitioners may also receive deferred action by being placed on a waiting list: if an applicant is fully adjudicated as eligible for a U visa but cannot receive a U visa "due solely to the cap, [the applicant] must be placed on a waiting list" until a U visa becomes available. 8 C.F.R. § 214.14(d)(2). In the meantime, "USCIS will grant deferred action or parole . . . and may authorize employment" while the petitioner remains on the waiting list. *Id.*

T visa petitioners are also eligible for interim benefits similar to those available to VAWA self-petitioners and U visa petitioners. T visa petitioners who present a

---

[8] The first sentence of the online USCIS Policy Manual states, "The USCIS Policy Manual is the agency's centralized online repository for USCIS' immigration policies." USCIS PM, https://www.uscis.gov/policy-manual.

prima facie case for approval or who are bona fide are eligible for federal public benefits while their petitions are pending. 22 U.S.C. § 7105(b)(1), (b)(1)(E)(i). Like U visa petitioners, T visa petitioners whom USCIS determines set forth a prima facie case for approval are eligible for an administrative stay of removal from DHS while the application is pending, during which time the applicant "shall not be removed." 8 U.S.C. § 1227(d)(1)-(3). As it did for U visa petitioners, USCIS established a prompt "initial review" BFD process for T visa applicants. *See* 8 C.F.R. § 214.205 ("Bona fide determination"). If USCIS deems an application bona fide, the applicant is eligible for deferred action and work authorization. 8 C.F.R. § 214.205(c), (e). Although the mere *filing* of a T visa petition "has no effect on DHS authority or discretion to execute a final order of removal," 8 C.F.R. § 214.204(b)(2)(i), a T visa petition that USCIS subsequently determines is bona fide "automatically stays" a final order or removal "until a final decision is made" on the application and "until any adverse decision" on the T visa petition "becomes final." 8 C.F.R. §§ 214.204(b)(2)(iii), 214.205(g).

In summary, VAWA self-petitioners, U visa petitioners, and T visa petitioners whose petitions USCIS determines present a prima facie case for approval or are bona fide are eligible for a combination of federal public benefits and protection from enforcement by ICE until USCIS finally adjudicates their petitions. Most important for this case, petitioners whose petitions USCIS finds to be prima facie approvable or bona fide are eligible for two different protections from deportation: a grant of deferred action from USCIS, or an administrative stay of removal from DHS. To ensure that applicants have timely access to these protections, USCIS promptly makes these preliminary adjudications and adjudicates requests for deferred action.

**D. Prior ICE Policies: the 2011 Policy and the 2021 Directive**

As the agency under the Department of Homeland Security responsible for immigration enforcement, ICE adopts policies to execute that responsibility. Plaintiffs point out that ICE had adopted enforcement policies that generally required ICE to

10

refrain from pursing removal against persons with pending VAWA petitions, U visa petitions, or T visa petitions. Plaintiffs provided declarations of counsel to this effect and filed ICE policy memoranda from October 2005 through December 2021 embodying these policies. *See* Velez Decl. (Dkt. No. 23-24) ¶¶ 13-15; Compl. ¶¶ 71-81 (describing policies issued in 2005, 2007, 2009, 2011, 2019, and 2021); Cervantes Decl. (Dkt. No. 31-8) Exhs. A-G (copies of these ICE policy memoranda from 2005 through 2021, along with links to them on the ICE website).

As mentioned, the key policies that the 2025 Guidance rescinded and superseded are the 2011 Policy and the 2021 Directive, which provided as follows.

The 2011 Policy expressly stated that it builds on prior guidance. It directed ICE personnel to "minimize any effect that immigration enforcement may have on the willingness and ability of victims, witnesses, and plaintiffs to call police and pursue justice." *See* 2011 Policy, p. 1. It stated that "[a]bsent special circumstances or aggravating factors, it is against ICE policy to initiate removal proceedings against" known victims of crime. *Id.* Furthermore, in the absence of "serious adverse factors" such as "national security concerns or evidence the alien has a serious criminal history," "exercising favorable discretion, such as release from detention and deferral or a stay of removal generally, will be appropriate." *Id.*, p. 2. The 2011 Policy also "advised that a flag now exists in the [DHS database] to identify those victims of domestic violence, trafficking, or other crimes who already have filed, or have been granted, victim-based immigration relief" so ICE agents can identify them and contact local ICE counsel. *Id.*, p. 3.

The 2021 Directive continued ICE's policy to "refrain from taking civil enforcement action against" individuals "known to have a pending application" for "victim-based immigration benefits," and directed ICE to "seek [from USCIS] expedited adjudication of victim-based immigration applications and petitions." 2021 Directive ¶ 2. For persons with pending applications or petitions, "absent exceptional circumstances," ICE was to "defer" enforcement until USCIS adjudicates the petition

or issues a negative interim adjudication. *Id.* ¶ 2.1. And agents were to request expedited prima facie adjudications from USCIS for people in ICE custody, and eligibility "for victim-based immigration benefits . . . must be considered" a positive "discretionary factor." *Id.* ¶ 2. The 2021 Directive set forth policies of "Deferring to USCIS Adjudications" of whether the petition stated a prima facie case or was bona fide. And petitioners with final orders of removal "should generally be issued a stay of removal," while for those in pending removal proceedings, ICE officers should inform ICE's Office of the Principal Legal Advisor ("OPLA")[9] of the pending petition so that OPLA can consider whether to stay the removal proceedings. *Id.*, p. 8, ¶ 5.4(a).

The 2025 Guidance itself, in its background section, includes a synopsis of the 2011 Policy and the 2021 Directive consistent with the above. It states, in relevant part, that these policies "generally required ICE officers and agents, absent exceptional or exigent circumstances, to refrain from taking civil immigration enforcement actions against known beneficiaries of victim-based immigration benefits, or primary and derivative applicants or petitioners for such benefits. [] ICE officers and agents were required to coordinate with U.S. Citizenship and Immigration Services (USCIS) to seek expedited adjudication of victim-based immigration applications and petitions, when necessary and appropriate." 2025 Guidance, p. 2.

In summary, the 2011 Policy and the 2021 Directive established that ICE policy was to refrain from immigration enforcement against persons with pending petitions for victim-based benefits, including by releasing them from detention; identifying persons with pending petitions; seeking expedited preliminary adjudications of their petitions from USCIS; deferring to USCIS preliminary adjudications; and granting administrative stays of removal.

---

[9] ICE's Office of the Principal Legal Advisor represents ICE in removal proceedings and provides ICE legal advice and other counsel. *See* https://www.ice.gov/opla.

**E. New ICE Policy: the 2025 Guidance**

The 2025 Guidance expressly "rescinded and superseded" the 2011 Policy and 2021 Directive, eliminating the above-described express presumption of protection from immigration enforcement for petitioners for victim-based benefits and replacing it with a presumption of enforcement subject to narrow limitations. Citing President Trump's January 20, 2025, Executive Order (EO) 14159, *Protecting the American People Against Invasion*,[10] "which states it is the policy of the United States to achieve the 'total and efficient enforcement of [immigration] laws' against all inadmissible and removable aliens," the 2025 Guidance establishes that the following policies govern ICE officers' enforcement actions towards individuals with pending victim-based benefit petitions: officers should (1) "coordinate and deconflict internally" and with law enforcement agencies "to ensure criminal investigative and other enforcement actions will not be compromised"; (2) "consult with" local ICE attorneys only "to ensure any such [civil enforcement] action is consistent with applicable legal limitations"; (3) need not consider a noncitizen being "a victim of a crime" as "a positive discretionary factor"; and (4) will not "routinely request expedited adjudications from USCIS," but may do so on a case-by-case basis when "it is in ICE's best interests." 2025 Guidance, pp. 2-3. Absent from these policies is any direction that ICE officers refrain from enforcement actions against petitioners or request expedited interim adjudications from USCIS and defer to them—central elements of the prior policies. Instead, when pursuing such enforcement actions, ICE agents "should" avoid compromising criminal investigations, and "should" consult with local ICE attorneys to "ensure" its action is "is consistent with applicable legal limitations," but "will no longer" request USCIS interim adjudications except on a

---

[10] Exec. Order No. 14159, *Protecting the American People Against Invasion*, 90 FR 8443, § 1 (Jan. 20, 2025), https://www.federalregister.gov/documents/2025/01/29/2025-02006/protecting-the-american-people-against-invasion.

case-by-case basis if it is in ICE's best interests.

Plaintiffs further contend that the 2025 Guidance resulted in two additional policies. First, the 2025 Guidance results in a De Facto Revocation Policy, whereby ICE does not honor USCIS grants of deferred action to persons with pending VAWA self-petitions and U visa or T visa petitions and instead pursues immigration enforcement action against them. This amounts to a policy of ICE de facto revoking deferred action because the individuals are provided no process before ICE chooses to disregard the USCIS grant of deferred action and instead pursues enforcement proceedings. Individual Plaintiffs Lupe A., Camila B., Paulo C., and Kenia J. Merlos were granted deferred action by USCIS when ICE detained or deported them. And Plaintiffs have filed declarations of various counsel attesting that as of the 2025 Guidance, ICE regularly detains and deports people in lawful deferred action status based on pending petitions, something ICE seldom did before. *See* PI Mot. 10:19-21 (citing practitioner declarations filed in support of CC Motion); *see also* Dkt. Nos. 23-12 to 23-24 (practitioner declarations filed in support of CC Motion attesting to such conduct).

Second, the 2025 Guidance results in a Blind Removal Policy, whereby ICE detains or removes petitioners who have requested a stay of removal without first conducting a statutorily-required inquiry into whether the petitions present a prima facie case for approval, such as by requesting prima facie determinations from USCIS. Such detentions and removals are "blind" because ICE executes them in ignorance of the individual's prima facie eligibility for approval of their pending petitions. ICE denied stay requests of Individual Plaintiffs Carmen F. and Yessenia Ruano without first ascertaining their prima facie eligibility for approval, and deported Carmen F. and encouraged Yessenia Ruano to self-deport. Plaintiffs have also filed declarations of counsel attesting to the effect that ICE "now engages in a pattern and practice of removing such petitioners without requesting prima facie determinations from USCIS." *See* PI Mot. 10:22-28 (citing practitioner declarations filed in support of CC

14

Motion); *see also* Dkt. Nos. 23-12 to 23-24 (practitioner declarations filed in support of CC Motion attesting to such conduct).

## F. The Plaintiffs

As noted, all of the Individual Plaintiffs had U visa petitions or T visa petitions pending with USCIS when this action was filed. All of the Individual Plaintiffs seek to represent the Pending Petition Class and challenge the 2025 Guidance.

Plaintiffs Lupe A., Camila B., Paulo C., and Kenia J. Merlos were granted deferred action status by USCIS pursuant to its bona fide determinations of their U visa applications, but ICE arrested and detained them without any pre-deprivation process. They seek to represent the Deferred Action Class and challenge Defendants' De Facto Revocation Policy.

Plaintiffs Carmen F. and Yessenia Ruano had pending U visa and T visa petitions, respectively, and requested stays of their removals. ICE denied their stay requests without first seeking from USCIS a determination of their prima facie eligibility. They seek to represent the Stay of Removal Class and challenge Respondent's Blind Removal Policy.

Below, the Court recites some allegations about each Individual Plaintiff and Organizational Plaintiff.

Lupe A., a 64-year-old national of Mexico, lived in Los Angeles for 21 years until ICE deported her while she was in deferred action. In 2017, Lupe A. applied for a U visa. USCIS determined she was prima facie eligible and granted her deferred action that was valid until October 2026. On April 28, 2025, while Lupe A. was still in valid deferred action status, ICE agents arrived at her home, handcuffed her, and brought her to an ICE facility to enforce a 1998 removal order. Lupe A. Decl. (Dkt. No. 23-2) ¶¶ 20-21, 24, 26; Compl. ¶ 16. Lupe A. and her attorney informed ICE that she had a pending U visa petition and deferred action, but ICE deported her the next day. Lupe A. Decl. ¶¶ 21-22, 23-25, 27. Neither USCIS nor ICE provided notice that her deferred action status was revoked, and she had committed no act to place her

15

status at risk. *Id.* ¶¶ 20, 29. She remains in Mexico, separated from her family, church, pets, and business. *Id.* ¶ 28.

Kenia J. Merlos ("Ms. Merlos"), a 43-year-old national of Honduras, came to the United States in 2003. Merlos Decl. (Dkt. No. 23-6) ¶ 1. In 2023, Ms. Merlos and her husband were held at gunpoint and reported the crime. *Id.* ¶¶ 17-18. They filed a U visa petition, and in December 2024, USCIS determined that Ms. Merlos's petition was bona fide and granted her deferred action and a work permit. *Id.* ¶ 24; Kahn Decl. (Dkt. No. 23-12) Exh. C and Exh. K, p. 59. In June 2025, U.S. Customs and Border Protection ("CBP") agents arrested Ms. Merlos, her minor U.S. citizen children, her 71-year-old mother who was visiting on a valid tourist visa, and her sister and sister's children who are Canadian permanent residents, while they were having a family reunion at a park in Washington near the Canadian border. Merlos Decl. ¶¶ 25-42. CBP subjected Ms. Merlos and her children to a harrowing two weeks of incommunicado detention. *Id.* DHS then released her children and transferred her to ICE custody in Tacoma, Washington. Despite her valid deferred action status, ICE kept her in custody for about three and a half months. *Id.* Ms. Merlos describes conditions in the ICE detention as prison-like and cruel. *Id.* ¶ 45. Ms. Merlos understands that, while she was in ICE custody, ICE arrested and deported her husband during the first week of October 2025, effectively orphaning their children. *Id.* ¶¶ 43-44. On October 14, 2025, an immigration judge terminated Ms. Merlos' removal proceedings, but ICE kept her in custody while it considered an appeal. Kahn Decl. Exh. C, p. 15. ICE finally released Ms. Merlos around October 27, 2025, in response to a habeas petition

Paulo C., a 43-year-old national of Mexico, is a husband and father of four U.S. citizen daughters who has lived in Texas since 2010. Paulo C. Decl. (Dkt. No. 23-5) ¶¶ 1-4. In 2018, Paulo C.'s then-13-year-old stepdaughter was raped. *Id.* ¶ 18. He and his wife reported the crime to police and assisted in the investigation, resulting in the perpetrator pleading guilty to felony injury of a child. *Id.* ¶ 20. Paulo C. and his wife

applied for a U visa, and on March 27, 2023, USCIS granted Paulo C. deferred action status and work authorization, valid until March 16, 2027. Kahn Decl. Exh. D, pp. 17-19. In July 2025, ICE took custody of Paulo C. after a traffic stop by local police. Paulo C. Decl. ¶¶ 26, 29, 31-33. Paulo C.'s attorney informed ICE of his deferred action status, but ICE has refused to release him, and he remained detained by ICE through the filing of these Motions. *Id.* ¶ 33- 36; Vakili Supp. Decl. (Dkt No. 28-1) ¶ 2. Paulo C. has never received notice that his deferred action has been revoked. Paulo C. Decl. ¶ 39. Paulos C.'s daughter has explained the devastating impact his detention has had on his family. *See* Paulo C.'s Daughter Decl. (Dkt No. 23-11) ¶¶ 3-12.

Carmen F., a "42-year-old national of a South American Country," Compl. ¶ 20, arrived in the United States in August 2022. Defendants recently deported her with her eight-year-old son. Carmen F. Decl. (Dkt. No. 23-8) ¶ 2. Carmen F.'s husband physically and sexually abused her while they were in the United States, and in the summer of 2024, a week of escalating violence culminated when Carmen F. locked herself in her room and her husband kicked the door and threatened to kill her, while her son was hysterical with fear. *Id.* ¶¶ 17-20. Carmen F. called the police and obtained a restraining order. *Id.* In November 2024, under the then-current 2021 Directive, ICE granted Carmen F. and her son a six-month stay of removal to prepare a U visa application. Kahn Decl. Exh. E. In March 2025, Carmen F. learned that her husband had been deported. Carmen F. Decl. ¶ 28. That same month, she filed a petition for a U visa. *Id.* ¶ 22. However, instead of extending Carmen F.'s stay based on her pending petition for the same reasons they granted it in 2024, ICE, under the 2025 Guidance, ordered her to appear for a check-in and detained her and her son in June 2025. *Id.* ¶¶ 29-32. ICE detained them for two months, and then deported them after opposing her stay request, without determining her prima facie eligibility. *Id.* ¶¶ 33-36, 43; Kahn Decl. pp. 34, 39, 48. When the deportation plane landed, Carmen F.'s abusive husband was waiting for them. Carmen F. Decl. ¶ 44. He coerced her into leaving with him, and now she and their son are trapped in his home. *Id.* ¶¶ 47-48. He

17

monitors and controls their every move, keeping tabs on their location, and polices her communications. *Id*. ¶¶ 48-49. Carmen F. laments that instead of protecting them, ICE "put [them] on a plane and sent [them] into the arms of the person [they] had sought protection from." *Id*. ¶ 51.

Yessenia Ruano ("Ms. Ruano"), a 38-year-old national of El Salvador, lived in the United States for fourteen years until Defendants forced her to self-deport in June 2025. Ruano Decl. ¶¶ 1, 18-21 (Dkt. No. 23-9). She is married with twin ten-year-old U.S. citizen daughters. *Id*. ¶ 16. While fleeing violence and threats in El Salvador, she became a victim of human trafficking into the United States. *Id*. ¶¶ 3-9. Ms. Ruano received employment authorization while she pursued immigration relief and became a teacher's aide in Wisconsin, where she worked for the last eight years. *Id.* ¶ 17. During the intervening years, she was given annual check-ins with ICE, which she always attended. Kahn Decl. pp. 61-62. In February 2025, Ms. Ruano filed a T visa petition. Compl. ¶ 21. At a February 14, 2025, ICE check-in, ICE gave her a "Warning for Failure to Depart." Kahn Decl. pp. 66-67. Her immigration attorney submitted a request for a stay of removal the same day. *Id.* at 69. Ms. Ruano's ICE officer gave her a deadline to depart the United States by June 4, 2025, and ICE denied the stay request. *Id.* at 61, 71. With the 2025 Guidance in effect, ICE did not request from USCIS a prima facie determination on her pending T visa petition. At one of her 2025 check-ins, an officer told Ms. Ruano that if she did not self-deport, they would hunt her down and that she would be separated from her daughters, detained, and deported. Ruano Decl. ¶ 38. On June 11, 2025, ICE denied her attorney's second stay request without requesting a prima facie determination from USCIS. Kahn Decl. pp. 73-79. Fearing forcible separation from her daughters, Ms. Ruano departed with them. Ruano Decl. ¶¶ 48-49. The daughters had never been to El Salvador and were "constantly crying" as they struggled to adjust. *Id*. ¶¶ 49-50.

Daniel H., a 35-year-old national of Guatemala, has lived in the United States for 18 years. Compl. ¶ 22. He is a husband and father of two U.S. citizen daughters.

Daniel H. Decl. (Dkt No. 23-10) ¶ 3. In 2009, Daniel H. and his father were attacked, and Daniel H. required emergency hospitalization. *Id.* ¶ 12. Daniel H. identified one of his attackers and cooperated with police, and the attacker pled guilty. *Id.* ¶ 13. In April 2025, Daniel H. tried to file a U visa petition but unknowingly hired a *notario* who filed an incomplete petition. *Id.* ¶ 16. In August 2025, ICE took Daniel H. into custody. *Id.* ¶ 17-18. He is currently detained in the Rio Grande ICE Detention Center. *Id.* ¶ 19. After his arrest, Daniel H. hired a new immigration attorney who promptly filed a corrected and complete U visa petition on his behalf. *Id.* ¶ 22. His attorney requested an expedited prima facie determination on his pending petition, but USCIS will only consider such requests if they come from ICE, and pursuant to its Blind Removal Policy, ICE will not do so. *Id.* ¶ 23. Daniel H. was still in ICE custody when the Motions were filed, *id.* ¶ 25, but has since been deported. *See* CC Reply p. 5, n.1.

Camila B., a 46-year-old national of Mexico, has lived in Los Angeles for the last 23 years. Camila B. Decl. (Dkt. No. 23-4) ¶¶ 2, 3. In 2021, Camila B. was assaulted and cooperated with law enforcement to apprehend the suspect. In 2023, she applied for a U visa. In May 2025, USCIS determined that her petition was bona fide and granted her deferred action status. *Id.* ¶¶ 13, 14. On July 1, 2025, while working her tamale stand, ICE agents arrested her and held her in and ICE facility in downtown Los Angeles, and then transferred her to the Adelanto ICE processing center. *Id.* ¶¶ 17-22. An immigration judge released her on bond, but ICE did not stipulate to this and requires an ankle monitor and weekly check-ins. *Id.* ¶¶ 27-31. Camila B. is terrified of being detained again. *Id.* ¶ 35.

Luna E., a 47-year-old national of Mexico, came to the United States in 2005 to join the man who is the father of her eldest child. He was abusive and she escaped him. Luna E. Decl. (Dkt. No. 23-7) ¶¶ 2, 4, 5, 8. At some point, Luna E. served a sentence for possession of a controlled substance, and in 2023, after she was released, ICE detained her. *Id.* ¶¶ 17, 21, 25, 26. She filed a petition for a T visa. *Id.* ¶ 23. In February 2025, USCIS determined that Luna E.'s petition was bona fide and she

19

understood that any removal was automatically stayed. *Id.* ¶¶ 35, 36. At the time the Complaint was filed, ICE continued to detain Luna E. without identifying any new facts that would justify her detention despite the stay of removal. Compl. ¶ 20.

Immigration Center for Women and Children ("ICWC") is a nonprofit legal organization whose "mission is to provide free and affordable immigration services," with its principal place of business in Los Angeles. *See* Farb Decl. (Dkt. No. 31-2) ¶¶ 2, 3. According to its website, "ICWC strives to provide security and stability for children who are abused, abandoned or neglected and for immigrants who are survivors of domestic violence, sexual assault and other violent crimes." *See* Compl. ¶ 2, *and* http://www.icwclaw.org; *see also* Farb Decl. ¶ 3. The Complaint alleges that ICWC has 6,245 clients with pending U visa petitions, of which 2,279 have deferred action; 15 clients with pending T visa petitions; and 343 clients with pending VAWA self-petitions. Compl. ¶ 23. ICWC alleges that its core business is affected, so it is suing on its own behalf. *Id.*

Coalition for Humane Immigrant Rights ("CHIRLA") is a Los Angeles-headquartered nonprofit and membership organization that "engages in advocacy, organization, and legal representation on behalf of immigrants. [] CHIRLA's mission is to achieve a just society fully inclusive of immigrants." Compl. ¶ 24; Salas Decl. (Dkt. No. 31-5) ¶¶ 3, 4. CHIRLA has a number of programs to serve this mission, including Legal Services, Community Education & Outreach, and Humanitarian Response and Migrant Assistance programs. Salas Decl. ¶ 5. CHIRLA represents "many" U visa petitioners in affirmative petitions and in removal proceedings. Compl. ¶ 24. Specifically, CHIRLA has 269 clients with pending U visa applications, and 7 with pending VAWA self-petitions. Salas Decl. ¶ 15. CHIRLA also conducts "Path to Immigration 101" workshops that provide community education regarding the U visa, T visa, and VAWA programs. Salas Decl. ¶ 9. CHIRLA is also a membership-based organization with about 52,000 members, many in Los Angeles County. At least 3 of CHIRLA's members have pending U visa petitions; as a result of the 2025 Guidance,

they live in fear of deportation and have changed their activities to limit possible exposure to law enforcement, thus also reducing their ability to earn a living. Salas Decl. ¶¶ 26-41. For one of these members, ICE previously agreed to administratively close her immigration case based on her pending U visa petition, but ICE has since sought to reopen that case based on the 2025 Guidance. Compl. ¶ 24; Salas Decl. ¶ 34. CHIRLA sues on behalf of itself and its members. Compl. ¶ 24.

La Raza Centro Legal ("LRCL") is a community-based nonprofit legal services organization "whose mission is to provide high quality, free legal representation to the Latino community and low-income immigrant families." Weiner Decl. (Dkt. No. 31-4) ¶ 2. Its principal place of business in the San Francisco Bay Area. Through its Affirmative Immigration Program, LRCL attorneys provide legal assistance to victims of domestic violence, crime, and human trafficking. Compl. ¶ 25; Weiner Decl. ¶ 4. LRCL's Immigration Removal Defense Program includes representing U visa, T visa, and VAWA petitioners who have been detained or placed into removal proceedings. Weiner Decl. ¶ 5. LRCL alleges that its core business is affected, so it is suing on its own behalf. Compl. ¶ 25.

California Collaborative for Immigrant Justice ("CCIJ") is a nonprofit legal and advocacy organization "whose mission is to utilize coordination, advocacy, and legal services to fight for the liberation of immigrants in detention in California." Compl. ¶ 26; Beaty Decl. (Dkt. No. 31-3) ¶ 3. CCIJ's principal place of business is in Oakland, California. CCIJ operates clinics and engages in impact litigation to challenge "conditions and abuse in carceral facilities, including immigration detention centers." Compl. ¶ 26. Through such activities, "CCIJ provides direct representation, consultations, and legal support to victims of crime and human trafficking. As one example of CCIJ's work, the organization has assisted dozens of immigrant women formerly incarcerated at the now-shuttered FCI Dublin prison, helping to empower them to come forward and expose a years-long pattern of sexual abuse that has resulted in numerous prosecutions. Many of these survivors are eligible and have

applied for U or T visas with CCIJ's assistance." *Id.*; Beaty Decl. ¶ 9. CCIJ has 9 clients with pending U visa applications, four of whom have received BFDs and deferred action, and 3 clients with pending T visa applications, one of whom has a BFD. Beaty Decl. ¶¶ 10, 11. At clinics, CCIJ provides counseling and legal services about the potential protections provided by U visas and T visas, and such protections are "crucial in allowing CCIJ to provide legal services to our clients and immigrant communities in California," as exemplified by its work at FCI Dublin. Beaty Decl. ¶¶ 14, 16. CCIJ sues on its own behalf. Compl. ¶ 26.

### G. The Current Motions

Plaintiffs seek to certify 3 classes, as discussed below.

Plaintiffs also seek several types of preliminary relief pending the resolution of this action. Under APA § 705, Plaintiffs seek a stay of the 2025 Guidance, the De Facto Revocation Policy, and the Blind Removal Policy pending the Court's final review of the polices under APA § 706. Plaintiffs also seek preliminary injunctive relief barring Defendants from applying the 2025 Guidance, the De Facto Revocation Policy, and the Blind Removal Policy against the Individual Plaintiffs, the clients and members of the Organizational Plaintiffs, and members of the three classes. Three Individual Plaintiffs who were deported (or self-deported) despite being in deferred action status or without a prima facie determination of their petitions seek injunctive relief barring Defendants from preventing their re-entry into the United States.

## II.    THRESHOLD QUESTIONS

Defendants raise numerous threshold challenges to both Motions. None of them defeat Plaintiffs' claims.

### A. None of the Subsections of 8 U.S.C. § 1252 that Defendants Cite Forecloses Plaintiffs' Claims

Defendants argue that several sections of the Immigration and Nationality Act—8 U.S.C. §§ 1252(g), (b)(9), and (a)(5)—concerning review of orders of removal

strip this court of jurisdiction to hear Individual Plaintiffs'[11] claims. In making these arguments, Defendants mischaracterize the relief Individual Plaintiffs seek as asking this Court "to shield them from any immigration consequences on account of deferred action," PI Opp'n 17:6-8, or as seeking "absolute immunity from detention and/or removal." PI Opp'n 30:11-13. Individual Plaintiffs do not seek to be "shield[ed] from any immigration consequences" or "absolute immunity." Rather, they seek to require ICE to honor USCIS grants of deferred action and to not de facto revoke that grant without process in violation of the due process clause of the Fifth Amendment. They also seek to require ICE to set in motion the prima facie adjudication process with USCIS before ICE decides petitioners' requests for stays of removal—a process that precedes enforcement and that Plaintiffs argue is required by law and is not a matter of discretion. Seeking to require ICE to honor deferred action or to formally revoke it in a manner that comports with due process, and seeking to require ICE to request a prima facie adjudication from USCIS before pursuing enforcement, does not amount to seeking immunity from removal based on deferred action. Furthermore, Defendants address these sections of the INA in about 4 pages of general discussion and general quotes from cases with no real explanation of how the Individual Plaintiffs' challenges to the 2025 Guidance are in fact the types of claims foreclosed by 8 U.S.C. §§ 1252(g), (b)(9), and (a)(5).

Nevertheless, the Court has sought to apply the law to the facts of this case and, as discussed below, the Court concludes that, properly characterized, the Individual Plaintiffs' claims are not foreclosed by any of these sections of the INA.

### 1. 8 U.S.C. § 1252(g) Does Not Apply

Section 1252(g) provides, in relevant part: "[N]o court shall have jurisdiction to

---

[11] Defendants do not argue that the Organizational Defendants' claims are barred by these sections. Indeed, it does not appear that these jurisdiction-stripping provisions could apply to the claims of the Organizational Defendants, as organizations are not subject to orders of removal and therefore cannot challenge them.

hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." 8 U.S.C. § 1252(g). Defendants argue that this jurisdiction-stripping provision applies to Individual Plaintiffs' claims because "they arise from ICE's decision to detain and/or remove them," PI Opp'n 20:24-26, but Defendants do not identify which of the three types of decisions referenced in § 1252(g)—to *commence* proceedings, *adjudicate* cases, or *execute removal* orders—Individual Plaintiffs' claims "arise from."

The Ninth Circuit has recently repeated that "[t]he Supreme Court has given a 'narrow reading' to § 1252(g) . . . [such that] [t]he provision applies only to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.' " *Ibarra-Perez v. United States*, 154 F.4th 989, 996 (9th Cir. 2025) (citing *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999) ("*AAADC*") (quoting 8 U.S.C. § 1252(g)). In *AAADC*, the Supreme Court explained that § 1252(g) was a "discretion-protecting" provision: it was designed to shield from judicial interference exercises of prosecutorial discretion at the various stages in the deportation process where the agency has "discretion to abandon the endeavor." *AAADC*, 525 U.S. at 484–486.

Properly understood, Individual Plaintiffs' claims challenge ICE's adoption of a policy that allows ICE to ignore USCIS's grants of deferred action—an affirmative immigration benefit that Plaintiffs argue cannot be revoked without due process, *see, e.g., Inland Empire – Immigrant Youth Collective v. Nielsen*, No. EDCV 17-02048-PSG, 2018 WL 4998230, at *20 (C.D. Cal. 2018) ("*Inland Empire III*") (so holding)—and that excuses ICE officers from seeking a prima facie adjudication from USCIS despite their alleged statutory obligation to seek one. *See* 8 U.S.C. § 1227(d)(1) (if application is prima facie approvable, DHS may grant a stay request). Thus, the Individual Plaintiffs' claims "arise" not from ICE's decisions to commence proceedings, adjudicate cases, or execute removal orders, but from ICE's decisions to

ignore prior grants of deferred action and their statutory obligation to seek prima facie determinations. That such conduct does not trigger the bar of § 1252(g) is consistent with the Ninth Circuit's conclusion in *Arce v. United States*, 899 F.3d 796 (9th Cir. 2018) that "[w]here the Attorney General totally lacks the discretion to effectuate a removal order, § 1252(g) is simply not implicated." *Arce*, 899 F.3d at 801. Correspondingly, the Court retains jurisdiction to decide "a 'purely legal question' that 'does not challenge the Attorney General's discretionary authority' . . . 'even if the answer to that legal question . . . forms the backdrop against which the Attorney General later will exercise discretionary authority.'" *Ibarra-Perez*, 154 F.4th at 996 (citing *United States v. Hovsepian*, 359 F.3d 1144, 1155 (9th Cir. 2004). Here, because Defendants lack discretion to detain or remove someone with a valid grant of deferred action, and lack the discretion to ignore statutory obligations, § 1252(g) does not apply.

Finally, as the Court in *Oliveira v. Edlow*, No. CV 25-13228-BEM, 2025 WL 3492110 (D. Mass. Dec. 4, 2025) observed in determining that § 1252(g) did not strip its jurisdiction to hear an APA challenge to the 2025 Guidance, the "2025 Policy constitutes at least the partial rescission of the U visa interim relief system, 'a program for conferring affirmative immigration relief,' which offers the 'types of benefits . . . 'courts are often called upon to protect.'" *Oliveira*, 2025 WL 3492110, at *8 (quoting as *cf. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1 (2020) (quoting *Heckler v. Chaney*, 470 U.S. 821, 832 (1985)).

In sum, Individual Plaintiffs challenge ICE's issuance of the 2025 Guidance and its corresponding rescission of the 2011 Policy and 2021 Directive that required ICE to honor USCIS grants of deferred action, and to ask USCIS to make prima facie adjudications of pending petitions before ICE decides whether to pursue removal or to grant stay requests. The issuance of a new policy and the rescission of prior policies is not a "decision or action . . . to execute removal orders." 8 U.S.C. § 1252(g). The Court therefore concludes that Plaintiffs are likely to establish that § 1252(g) does not

25

bar their claims.

## 2. Sections 1252(a)(5) and (b)(9) Do Not Apply

Defendants also argue that this Court has no jurisdiction to hear Individual Plaintiffs' claims because 8 U.S.C. § 1252(a)(5) and § 1252(b)(9) channel such claims through a petition-for-review of a final order of removal filed with the Court of Appeals. Again, Defendants do not apply the law to the claims in this case. But the Court concludes that Individual Plaintiffs are likely to establish that their claims are not barred by these sections.

Section 1252(a)(5), entitled "Exclusive means of review," establishes the petition for review with the Court of Appeals as the exclusive vehicle for judicial review of an order of removal: "[A] petition for review filed with an appropriate court of appeals . . . shall be the sole and exclusive means for judicial review of an order of removal . . ." 8 U.S.C. § 1252(a)(5). Section 1252(b)(9), entitled "Consolidation of questions for judicial review," establishes the scope of a petition for review: "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States . . . shall be available only in judicial review of a final order. . ." 8 U.S.C. § 1252(b)(9).

"Section 1252(b)(9) bars review of claims arising from 'action[s]' or 'proceeding[s] brought to remove an alien.'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 19 (2020) ("*Regents*") (quoting 8 U.S.C. § 1252(b)(9)). This provision "present[s] a jurisdictional bar" only where plaintiffs are "asking for review of an order of removal, the decision to seek removal, or the process by which removability will be determined." *Id.* (citation modified) (quoting *Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018)). Section 1252(b)(9) does not apply to claims that are "collateral to, or independent of, the removal process." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1032 (9th Cir. 2016). Here, as discussed above, Petitioners challenge ICE's adoption of a policy that permits ICE to disregard USCIS grants of deferred

action, that bars ICE from routinely requesting expedited BFD determinations from UCSIS before deciding stay requests, and that permits ICE to request expedited BFDs only when it is in ICE's best interests. These claims do not challenge the removal proceedings themselves but instead concern matters collateral to removal proceedings.

The Court therefore concludes that the Individual Plaintiffs are likely to show that their claims are not barred by § 1252(a)(5) and § 1252(b)(9).

## B. Plaintiffs' Claims are Justiciable

Defendants also argue that the Plaintiffs' claims are not justiciable because all of the Plaintiffs lack standing, and because none of the Plaintiffs can show traceability or redressability. *See* PI Opp'n  pp.12-17. Defendants also argue that Individual Plaintiffs lack standing to pursue classwide injunctive relief and that their claims are not ripe. *See* CC Opp'n pp. 6-12. The Court will address these latter two arguments when it addresses Plaintiffs' Motion for Class Certification.

### 1. Legal Standard for Standing

Article III, § 2, of the of the United States Constitution "limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Murthy v. Missouri*, 603 U.S. 43, 56 (2024). "One element of the "case-or-controversy requirement is that [Plaintiffs], based on their complaint, must establish that they have standing to sue." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

A plaintiff must demonstrate standing "for each claim he seeks to press" and for "'each form of relief sought.'" *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (quoting *Friends of the Earth, Inc.*, 528 U.S. at 185). The plaintiff bears the

27

burden to establish standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice," because we "'presume that general allegations embrace those specific facts that are necessary to support the claim.'" *Id.* (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)). "At the preliminary injunction stage," Plaintiffs "must make a 'clear showing'" that they are "'likely' to establish each element of standing." *Murthy*, 603 U.S. at 58.

### 2. The Organizational Plaintiffs Have Shown Injury-In-Fact

Defendants argue that the Organizational Plaintiffs lack standing because they have not demonstrated a cognizable injury-in-fact. Defendants argue that the Organizational Plaintiffs' claimed injury is no different from the injury that the Supreme Court found insufficient to establish standing in *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) ("*Hippocratic Medicine*"). *See* PI Opp'n pp.11-14. Organizational Plaintiffs respond that they have direct organizational standing because they allege and have demonstrated that the Defendants' actions have interfered with their core business activities, and in so doing they have shown far more than the plaintiffs in *Hippocratic Medicine* did.

"[O]rganizations are entitled to sue on their own behalf for injuries they have sustained." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982); *see also Hippocratic Med.*, 602 U.S. at 369. "Direct organization standing can be satisfied if the organization alleges that a defendant's actions 'affected and interfered with [it's] core business activities.'" *Immigrant Defenders Law Center v. Noem*, 145 F.4th 972, 987 (9th Cir. 2025) ("*Imm. Defs. I")* (citing *Hippocratic Med.*, 602 U.S. at 395). An organization has direct standing to sue where a defendant's conduct has "frustrated its mission and caused it to divert resources in response to that frustration of purpose." *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021).

Like an individual, an organization cannot establish standing simply based on

the "intensity of the litigant's interest" or because of strong opposition to the government's conduct, *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 486 (1982), "no matter how longstanding the interest and no matter how qualified the organization." *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972). A plaintiff must show "far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp.*, 455 U.S. at 379.

In arguing that under *Hippocratic Medicine*, the Organizational Plaintiffs lack standing, Defendants mischaracterize the Organizational Plaintiff's allegations, misapply *Hippocratic Medicine*, and ignore recent Ninth Circuit authority that squarely rejects their argument. In *Immigrant Defenders*, the Ninth Circuit rejected the government's similar reliance on *Hippocratic Medicine* to conclude that the plaintiff legal representation organization had standing to challenge the government's Remain in Mexico Policy, and rejected the government's attempt to characterize the organization's injury as nothing more than expending money to advocate against the policy. "Unlike the plaintiffs in *Hippocratic Medicine*, ImmDef is not 'assert[ing] standing simply because [it] object[s] to [the government's] actions' or is gathering information and advocating against Remain in Mexico. *See* [*Hippocratic Medicine*,] 602 U.S. at 394 [] ('[A]n organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action.') Rather, to continue advancing its core business activities and longstanding mission of providing direct representation, counseling, and legal assistance to noncitizens in removal proceedings in southern California, ImmDef adopted several initiatives in 2020 to limit the adverse impacts of MPP—by opening its San Diego Office, establishing its Cross-Border Initiative ('CBI'), and engaging in international, cross-border travel to Mexico." *Imm. Defs. I*, 145 F.4th at 988. More specifically, the organization would have to "hire additional staff, expand its office space, conduct additional fundraising

29

efforts, increase travel to Mexico, and divert staff resources away from other projects towards MPP-related projects to continue carrying out its core business activities and longstanding mission." *Imm. Defs. I*, 145 F.4th at 988. The Circuit concluded that this amounted to "'concrete and demonstrable injury' to its core activities [] which was far more extensive than the 'issue-advocacy' work that was found insufficient in *Hippocratic Medicine*" and that therefore the organizational plaintiff presented a concrete and imminent injury sufficient to establish standing. *Id.* at 988–989.

The Organizational Plaintiffs here allege and substantiate with evidence that, in order to continue their core business activities and longstanding missions of providing direct representation and counseling to noncitizen victims of crime, trafficking, and abuse, they had to undertake several measures to limit the impact of the 2025 Guidance, the De Facto Revocation Policy, and the Blind Removal Policy. Some of these measures included hiring additional staff to examine immigration court records; strengthening outreach and workshop efforts to counsel fearful survivors; devoting more staff time to respond to the increased concerns of frightened clients and to represent clients fighting removal or attending ICE check-ins, whom ICE would likely excuse from such enforcement under prior policies; and taking fewer new cases. These efforts come at the expense of representing additional clients, which frustrates their missions and impacts some of their funding bottom lines. *See* Farb Decl. (Dkt. No. 31-2) ¶¶ 22-24 (ICWC hired 2.5 new temporary employees to review its records for clients who could potentially be targeted under new policy; it is receiving more calls and has to provide additional counseling to current clients, so it can take fewer new clients, impacting its ability to provide services; it has to limit the number and complexity of new U visa, T visa, and VAWA cases; and its funding streams are impacted because they are based on the volume of clients served); Weiner Decl. (Dkt. No. 31-4) ¶ 16 (because of the new policies, LRCL cannot represent as many clients, and engages in additional client counseling because of client fear and concerns); Salas Decl. (Dkt. No. 31-5) ¶¶ 22-23, 21 (because of the new policies, to continue its

30

community education and outreach mission and core activities, CHIRLA has had to divert its resources to "reestablish community trust and access to services and resources" including by developing new outreach formats and organizing them in such a way that attendees feel comfortable enough to attend; all of its legal services take longer and require more resources, including providing clients extensive additional counseling about the risks of pursuing their applications and conducting additional research; this takes resources away from advancing its mission by investing in other programs and initiatives and representing more clients; the new policy frustrates CHIRLA's mission because it discourages clients from seeking CHIRLA's services and reporting crimes because they know a U visa application won't provide the protection it did previously); Beaty Decl. (Dkt. No. 31-3) ¶¶ 20-21, 23 (CCIJ has had to expend significant resources to protect from detention or deportation clients who previously would not have been targeted, including by having to engage in additional proceedings with ICE, having to accompany clients to check-ins, and preparing habeas petitions in case such clients are detained, all of which diverts resources and prevents CCIJ from taking on other clients and providing consultations, which impacts its ability to fulfill its mission).

Respondents do not challenge the veracity of these assertions. These impacts constitute a "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources." *Havens Realty Corp.*, 455 U.S. at 379. Defendants themselves recognize that such impacts are injury-in-fact. *See* PI Opp'n 14:8-10. Unlike the mere expenditure of resources to *advocate* against a policy that was insufficient to establish injury-in-fact in *Hippocratic Medicine*, here, the Organizational Defendants are expending resources and changing how they engage with clients and community members in order to help those clients and community members navigate the changes. This is not "merely" advocating against the policy. *See Imm. Defs. I*, 145 F.4th at 988 ("ImmDef cites to ample record evidence of how Remain in Mexico caused 'concrete and demonstrable injury' to its core activities []

which was far more extensive than the 'issue-advocacy' work that was found insufficient in *Hippocratic Medicine* [].") The Organizational Plaintiffs have therefore made a clear showing of a concrete and demonstrable injury to their core activities sufficient to establish direct organizational standing.[12]

### 3. The Three Plaintiffs Who Were Removed or "Self-Deported" Have Standing to Seek Injunctive Relief Requiring Defendants to Allow Them to Re-Enter the United States

Defendants argue that none of the Individual Plaintiffs have standing to seek injunctive relief because any future harm is speculative because they cannot show that Defendants are likely to take any enforcement actions against them in the future. *See* PI Opp'n 31:13-33:13. Defendants relatedly argue that Individual Plaintiffs cannot show irreparable harm as required to secure injunctive relief. But the only Individual Plaintiffs who seek preliminary injunctive relief for themselves are Lupe A., Carmen F., and Ms. Ruano: they seek an order enjoining Defendants from preventing their return to the United States.[13] These Plaintiffs allege that they were removed or "self-deported" because of the Defendants' allegedly unlawful new policies. Being wrongfully removed is an injury-in-fact, and Defendants do not argue otherwise. *Cf. Zegarra-Gomez v. I.N.S.*, 314 F.3d 1124, 1127 (9th Cir. 2003) ("[T]he case or controversy requirement is satisfied where the petitioner is deported.") These

---

[12] In their PI Reply, Plaintiffs argue that CHIRLA also has associational standing. *See* PI Reply 5:10-6:8. At oral argument, counsel clarified that CHIRLA's associational standing was redundant to its organizational standing. The Court therefore declines to address CHIRLA's associational standing.

[13] Plaintiffs initially sought individualized injunctive relief for Paulo C. but withdrew that request. Plaintiffs also initially sought an injunction barring Defendants from applying the 2025 Guidance against all Individual Plaintiffs. *See* Prop. Order (Dkt. No. 31-9) p. 5, ¶ 2. However, at oral argument, counsel for Plaintiffs stated that this relief would not be necessary if the Court stays the Guidance under the APA. Because the Court is staying the Guidance under the APA, the Court considers Plaintiffs' Proposed Order ¶ 2 to be withdrawn. That leaves Lupe A., Carmen F., and Ms. Ruano as the only Individual Plaintiffs seeking preliminary injunctive relief, so the Court limits this analysis of Individual Plaintiffs' standing to them.

Plaintiffs remain out of the county, so the harm is ongoing. And their requested injunctive relief—to be allowed to return—serves as redress for that injury. These Plaintiffs have therefore made a clear showing that they are suffering an injury-in-fact that may be redressed by their requested injunction, so they have established standing. Other Individual Plaintiffs seek injunctive relief on behalf of their respective classes; the Court will address Defendants' arguments that they don't have standing to do so when it addresses Plaintiffs' Motion for Class Certification.

### 4. Plaintiffs' Injuries are Fairly Traceable to Defendants' Policies and are Redressable by the Court

The "fairly traceable" element requires a causal connection between the injury and the conduct complained of, that is, the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . [the result of] the independent action of some third party not before the court." *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976). Redressability means that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision" on the merits. *Lujan*, 504 U.S. at 561 (internal quotations omitted). In addition, an injury is not redressable where the "only apparent avenue of redress for plaintiffs' claimed injuries . . . is unavailable." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010). Having carefully considered all of the parties' arguments, the Court finds that traceability and redressability are satisfied.

Defendants argue that the Plaintiffs' alleged injuries are not fairly traceable to the 2025 Guidance because that Guidance "merely advises federal officials on how to exercise their discretion when it comes to deciding which aliens to prioritize for arrest and removal," and no decree vacating the Guidance would change the discretion officials have or how they exercise it. CC Opp'n 9:20:26. Defendants' argument is not persuasive: it implies that the 2025 Guidance of is no consequence at all. But Plaintiffs have presented substantial evidence showing that prior to the 2025 Guidance, Defendants seldom detained and removed people with pending petitions for

victim-based benefits because they honored USCIS grants of deferred action, requested USCIS to perform expedited prima facie determinations, and granted requests for stay of removal based on positive USCIS prima facie determinations, whereas now such persons are routinely detained and deported. *See* Logan Decl. (Dkt. No. 31-6) ¶ 12 (former AUSA attesting that prior to 2025, "ICE religiously honored deferred action status"); Mas Cabrera Decl. (Dkt. No. 44-14) ¶ 16 ("Before 2025, none of ProBAR's clients with pending U, T, or VAWA petitions were deported without any review of their petition," and "ProBAR had never had a client deported who was in valid deferred action status."); Marty Decl. (Dkt. No. 44-10) ¶ 12 ("[B]efore February 2025, ICE routinely granted stays of removal for clients with pending U visa applications. If a client was detained, ICE routinely requested expedited prima facie review from USCIS."); Velez Decl. ¶ 29 (since the victim-centered approach was rescinded in January 2025, "ASISTA has also noted an increase in practitioners requesting support to file habeas petitions on behalf of noncitizens with pending or approved U, T, and VAWA petitions"). Plaintiffs' allegations and evidence tend to show that the 2025 Guidance and the alleged sub-policies entirely changed how the Defendants engage with applicants for victim-based benefits from a stance of protection and accommodation, to a stance of "total and efficient enforcement," just as the 2025 Guidance explains. Plaintiffs have made a clear showing that they are likely to establish that their harm is "fairly traceable to the challenged" policies, *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009), so they satisfy traceability.

Defendants also argue on two grounds that Plaintiffs' claims are not redressable because the relief they seek is not available to them. First, Defendants generally argue that Plaintiffs seek an equitable remedy that "would direct federal officials to not detain aliens or even forego enforcement actions as to them," a remedy that is not available because "this Court [would] need to order the Executive Branch to act inconsistently with what the immigration laws demand." *See* CC Opp'n 8:3-9. This is

34

inaccurate. What Plaintiffs actually seek is declaratory relief that the three distinct policies they challenge are unlawful, a corresponding stay under the APA, and corresponding injunctive relief. If the Court concludes that the policies are unlawful and orders corresponding relief, Defendants could still pursue enforcement actions through lawful means.

Defendant's second redressability argument is that 8 U.S.C. § 1252(f)(1) forbids much of the relief that Plaintiffs seek.[14] Section 1252(f)(1) states: "Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter . . . , other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." 8 U.S.C. § 1252(f)(1). Thus, this provision bars this district court from enjoining the operation of certain provisions of the INA with respect to anyone but an individual alien. Classwide injunctions are barred. Pointing to the phrase "[r]egardless of the nature of the action or claim," Defendants argue that this prohibition on the district court issuing classwide injunctions bars *all* classwide relief that Plaintiffs seek here.

Plaintiffs seek one classwide preliminary injunction: an order enjoining Defendants from applying the three policies to the three respective classes. *See* Prop. Order ¶ 11. The Court is not satisfied that such classwide injunctive relief avoids the prohibition of § 1252(f)(1). Insofar as Plaintiffs argue in their CC Reply that the classwide injunction they seek only requires Defendants to comply with the law or their own policies so it does not "enjoin or restrain the operation of" a covered provision, that argument is not viable in light of *Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022). There, the Supreme Court held that § 1252(f)(1) "prohibits lower

---

[14] Defendants make this redressability argument based on § 1252(f)(1) in their oppositions to both motions. The Court therefore addresses it as a threshold issue.

courts from . . . order[ing] federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions [§§ 1221–1232]." *Garland*, 596 U.S. at 550. An order that requires officials to take actions, or to refrain from taking actions, that are governed by one of § 1252(f)(1)'s covered provisions interferes with the government's efforts to operate that provision, and thus "enjoins or restrains the operation" of that provision. *Id.* at 551. It does not matter that the Court understands its order to be enforcing the law rather than "restraining the operation of" that law. If such an order is entered on behalf of a class, it is prohibited by § 1252(f)(1). *See also Al Otro Lado v. Exec. Off. for Immigr. Review*, 120 F.4th 606, 627 (9th Cir. 2024) (noting that "an injunction is barred even if a court determines that the Government's 'operation' of a covered provision is unlawful or incorrect" (citing *Aleman Gonzalez*, 596 U.S. at 552-54)). Thus, if Plaintiff's proposed classwide injunction interferes with the government's operation of a covered provision, it is barred.

Defendants do not clearly explain which covered provision of the INA the Plaintiffs' proposed classwide injunction would enjoin the operation of. *See* CC Opp'n 8:9-13 (arguing that § 1252(f)(1) prohibits this court from enjoining the operation of "certain immigration laws, including the ones Plaintiffs take issue with here," without identifying those laws); *see also* CC Opp'n p. 22 n.9 (footnote referencing Defendants' invocation of §§ 1225-1226, 1229, and 1231). For their part, Plaintiffs address § 1252(f)(1) only in reply, presenting relatively complicated arguments that Defendants did not have an opportunity to address. Such arguments include that *Galvez v. Jaddou*, 52 F.4th 821 (9th Cir. 2022) controls this question in their favor because it implies that § 1227(d) (the statute underlying their challenge to the Blind Removal Policy) is not one of § 1252(f)(1)'s covered provisions, and that an injunction requiring Defendants to follow a specific process before revoking deferred action "does not enjoin the operation of the detention and removal statutes…" CC Reply 9:5-6. The Court declines to address these specific questions further without

36

fuller briefing. For purposes of these Motions, the Court has enough doubt about whether the classwide injunction Plaintiffs seek survives § 1252(f)(1) that it will not enter such relief.

Defendants did not expressly argue that § 1252(f)(1) bars such injunctive relief in favor of the "Organizational Plaintiffs' clients and members," as Plaintiffs seek in Proposed Order ¶¶ 6 and 9. Nor did Plaintiffs address this question. However, the Court has reservations about the propriety of such an order. Section 1252(f)(1) permits district court injunctions against the operation of the covered provisions only "to an individual alien against whom proceedings under such part have been initiated." 8 U.S.C. § 1252(f)(1). Here, Proposed Orders ¶¶ 6 and 9 seek such injunctions for the benefit of unspecified, unnamed "clients and members" of the Organizational Plaintiffs. The Court cannot find that unspecified, unnamed "clients and members" of the Organizational Plaintiffs are equivalent to "an individual alien." Accordingly, Proposed Orders ¶¶ 6 and 9 may be impermissible under § 1252(f)(1), so the Court will not enter them.

However, that § 1252(f)(1) bars some relief that Plaintiffs seek does not render Plaintiffs' claims unredressable because they also seek a stay under APA § 705 and declaratory relief. Defendants argue that such relief is also barred by § 1252(f)(1), but they are incorrect. Defendants urge the Court that because § 1252(f)(1) bars classwide injunctive relief, it also bars a stay under the APA because they are the same, notwithstanding Plaintiffs' labeling the relief they seek under the APA a "stay" or "vacatur." This argument is at odds with Supreme Court precedent. *See AAADC*, 525 U.S. at 481 ("By its plain terms, and even by its title, [§ 1252(f)(1)] is nothing more or less than a limit on injunctive relief"). And the Ninth Circuit has expressly rejected the argument. *See Imm. Defs. I*, 145 F.4th at 990 ("§ 1252(f)(1) does not bar the district court's stay pursuant to § 705 of the APA pending further review of the merits of Plaintiffs' APA challenge"); *National TPS Alliance v. Noem*, 166 F.4th 739, 761 (9th Cir. 2026) ("Set aside relief under the APA is [] not barred by § 1252(f)(1).")

37

Defendants' argument that § 1252(f)(1) also bars declaratory relief is equally meritless because it is "foreclosed by circuit precedent holding that § 1252(f)(1) does not 'bar classwide declaratory relief.'" *Al Otro Lado*, 120 F.4th 606 (quoting *Rodriguez v. Hayes*, 591 F.3d 1105, 1119 (9th Cir. 2010)); *see also Rodriguez v. Marin*, 909 F.3d 252, 256 (9th Cir. 2018). Plaintiffs' injuries are therefore redressable by a stay or vacatur under the APA.

Having disposed of most of Defendants' numerous threshold challenges, the Court turns to the substantive merits of each Motion.

### III.    MOTION FOR CLASS CERTIFICATION

Plaintiffs seek to certify[15] the following three classes:

- **Pending Petition Class:** All individuals with pending principal or derivative U visa petitions, T visa petitions, or VAWA self-petitions who ICE detains or seeks to detain for civil immigration enforcement.

- **Deferred Action Class:** All individuals to whom USCIS has granted deferred action based on a pending U or T visa petition and who, during the authorized period of deferred action, ICE detains, seeks to detain, or removed without providing notice and an opportunity to be heard regarding potential revocation of their deferred action status.

- **Stay of Removal Class:** All individuals with a pending U or T visa petition who, since January 30, 2025, have been, are, or will be detained by ICE, and who request or requested a stay of a final removal order prior to enforcement of that removal order.

The following Individual Plaintiffs seek to represent the respective classes:

---

[15] Plaintiffs do not specify whether they seek class certification or provisional class certification, nor do Defendants make any argument about this distinction. Although the record is relatively robust, given the early stage of litigation, the Court's certification will be provisional. It is also not clear from the briefing whether the latter two classes are subclasses. The difference does not appear to be material to the resolution of the Motions, so the Court refers to them all as "classes."

38

- **Pending Petition Class:** All Individual Plaintiffs seek to represent the Pending Petition Class because all of them were detained or removed by ICE despite their pending U visa or T visa petitions. They challenge the 2025 Guidance under the Administrative Procedure Act ("APA") (Counts 1 and 2).

- **Deferred Action Class:** Plaintiffs Lupe A., Camila B., Paulo C., and Ms. Merlos seek to represent the Deferred Action Class. USCIS granted each of these Plaintiffs had deferred action status pursuant to bona fide determinations in their U visa cases, but ICE arrested and detained them without pre-deprivation process. These Plaintiffs challenge Defendants' policy and practice of unilaterally revoking deferred action conferred by USCIS based on a pending U visa or T visa petition by arresting, detaining, and/or deporting petitioners with deferred action status without providing notice and an opportunity to be heard. They bring corresponding claims under the APA, the *Accardi* doctrine, the Due Process Clause of the Fifth Amendment, and the Fourth Amendment (Counts 3-7).

- **Stay of Removal Class**: Plaintiffs Carmen F. and Ms. Ruano seek to represent the Stay of Removal Class. These Plaintiffs had pending U visa and T visa petitions, respectively, and requested stays of their removals. ICE denied their stay requests without first determining the prima facie eligibility of their petitions. These Plaintiffs challenge Defendants' policy and practice that permits them to deny U visa and T visa petitioners' requests for stays of removal without first determining whether the petition presents a prima facie case for approval or is bona fide. Plaintiffs bring such claims under the Immigration and Nationality Act ("INA") and APA (Counts 8 and 9).

Defendants challenge some of the Individual Plaintiffs' standing to represent the classes—a threshold question that the Court reserved until it reached the Motion for Class Certification. Defendants otherwise argue that Plaintiffs do not satisfy any of the criteria for class certification.

39

**A. The Individual Plaintiffs Have Standing to Pursue Prospective Classwide Injunctive Relief**

Defendants argue that the Individual Plaintiffs lack standing to pursue classwide prospective relief, and further argue that their claims are not justiciable because they are not ripe.[16] *See* CC Opp'n pp. 6-12.

**1.  Standing to Represent a Class Seeking Prospective Injunctive Relief**

"In a class action, the plaintiff class bears the burden of showing that Article III standing exists." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 978 (9th Cir. 2011). In a class action, "[s]tanding exists if at least one named plaintiff meets the requirements." *Id.* For a Rule 23(b)(2) class, standing is evaluated based on "the facts as they exist[ed] at the time the complaint was filed." *Slayman v. FedEx Ground Package Sys., Inc.*, 765 F.3d 1033, 1047 (9th Cir. 2014) (citation omitted).

Because "[a] plaintiff must demonstrate standing separately for each form of relief sought . . . a plaintiff who has standing to seek damages for a past injury . . . does not necessarily have standing to seek prospective relief." *Mayfield v. United States*, 599 F.3d 964, 969 (9th Cir. 2010) (quoting *Friends of the Earth, Inc.*, 528 U.S. at 185). To seek prospective relief, "a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers*, 555 U.S. at 493. To have standing to seek an injunction against future unlawful conduct, a plaintiff must show a "sufficient likelihood" that they will suffer a similar injury in the future. *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).

**a.  The Individual Plaintiffs Have Shown Injury-In-Fact**

Defendants do not appear to dispute that having been subjected to the 2025

---

[16] The Court rejects Defendants' traceability and redressability challenges above.

40

Guidance, the De Facto Revocation Policy, and the Blind Removal Policy plausibly resulted in injury-in-fact to Individual Plaintiffs. Indeed, at the time the Complaint was filed, Paulo C., Ms. Merlos, Luna E., and Daniel H. were in ICE detention. "[O]ngoing" or "prospective detention" qualifies as "an Article III injury plain and simple." *Gonzalez v. United States Immigr. & Customs Enforcement*, 975 F.3d 788, 804 (9th Cir. 2020) (citations omitted). And, when the Complaint was filed, Lupe A., Carmen F., and Ms. Ruano had already been deported. "[T]he case or controversy requirement is satisfied where the petitioner is deported." *Zegarra-Gomez*, 314 F.3d at 1127; *Chadha v. Immigr. & Naturalization Serv.*, 634 F.2d 408, 418 (9th Cir. 1980), *aff'd,* 462 U.S. 919 (1983) ("deportation" is "a concrete injury"). Finally, Camila B. was, and remains, subject to onerous reporting requirements, including answering ICE's calls "right away" or she may be re-detained. Camila B. Decl. ¶¶ 29-31. Being subject to such restraints on liberty constitutes sufficient injury for standing purposes. *See, e.g., Ortega v. Bonnar*, 415 F. Supp. 3d 963, 969 (N.D. Cal. 2019) (finding released immigrant had standing to seek "a pre-deprivation hearing . . . prior to being re-arrested"). Thus, all eight Individual Plaintiffs suffered injury-in-fact.

### b. The Individual Plaintiffs' Claims Are Not Moot and They Are Ripe for Purposes of Standing to Represent the Classes

Defendants argue that the individual Plaintiffs' claims seeking prospective injunctive relief are not ripe because future action against them is just a matter of conjecture and speculation. Relatedly, Defendants contend that post-filing events foreclose Plaintiffs from showing that they are likely to suffer concrete, actual, or imminent injury. Specifically, several Plaintiffs were released from federal detention and are in immigration proceedings or their proceedings were terminated, or they were already removed so they "suffer no ongoing concrete harm from the challenged policy itself—indeed, the 2025 Interim Guidance or any other alleged policy does not require them 'to do anything or to refrain from doing anything.'" CC Opp'n 10:19-11:5 (citing *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)).

Defendants' argument relying on post-filing events appears to really be a mootness argument. The mootness inquiry is directed towards "[w]hether standing and the other requirements for a live case or controversy exist [] throughout the entirety of a case." *Wolfe v. City of Portland*, 566 F. Supp. 3d 1069, 1081 (D. Or. 2021). First, the Court notes that at least two Individual Plaintiffs for each proposed class are experiencing the same ongoing harm as they were experiencing when the case was filed: Lupe A. and Camila B. for the Pending Petition and Deferred Action classes, and Carmen F. and Ms. Ruano for the Stay of Removal Class. Lupe A., Carmen F., and Ms. Ruano were removed before this action was filed, and remain out of the country. And Camila B. remains subject to the same onerous reporting requirements. Thus, Defendants' argument that subsequent events moot Plaintiffs' claims and those of the putative classes they seek to represent does not apply to these Plaintiffs or, as a result, to any of the classes.

Regarding those Individual Plaintiffs whose circumstances *have* changed, in the context of a class action, when the plaintiff's claims are inherently transitory, the relation-back doctrine applies to maintain the representative plaintiff's standing to represent class members. Under the relation-back doctrine, where plaintiffs make "a timely motion for class certification" involving "inherently transitory" claims such that the court does not have "enough time to rule on a motion for class certification before the proposed representative's individual interest expires," those class members "may continue to represent the class until the district court decides the class certification issue." *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1090–92 (9th Cir. 2011). "Application of the relation back doctrine in this context thus avoids the spectre of plaintiffs filing lawsuit after lawsuit, only to see their claims mooted before they can be resolved." *Id.* at 1090. Certification thus "relates back to the filing of the complaint." *Id.* at 1092. Accordingly, "the termination of a class representative's claim does not moot the claims of the unnamed members of the class," and "the 'relation back' doctrine is properly invoked to preserve the merits of the case for

42

judicial resolution." *County of Riverside v. McLaughlin*, 500 U.S. 44, 51–52 (1991); *Haro v. Sebelius*, 747 F.3d 1099, 1110 (9th Cir. 2014) (based on relation back doctrine, claim that expired one month after plaintiff filed suit is not moot for purposes of class certification for injunctive relief, and justiciability is satisfied).

An inherently transitory claim is one that "will certainly repeat as to the class, either because '[t]he individual could nonetheless suffer repeated [harm]' or because 'it is certain that other persons similarly situated' will have the same complaint. [citation] In such cases, the named plaintiff's claim is 'capable of repetition, yet evading review,' [citation] and 'the 'relation back' doctrine is properly invoked to preserve the merits of the case for judicial resolution.'"" *Pitts*, 653 F.3d at 1089–1090 (citing *Gerstein v. Pugh*, 420 U.S. 103, 110 (1975), and *McLaughlin*, 500 U.S. at 52).

Here, the Individual Plaintiffs' claims are inherently transitory. Defendants argue that Plaintiffs' claims are not inherently transitory "given the protracted timeline of immigration litigation," CC Opp'n at 19-20, but the facts of this case show that Defendants detain and remove individuals quickly. For example, Lupe A. was removed in less than two days and Carmen F. was removed in less than two months. Lupe A. Decl. ¶¶ 20-29, (removed in less than two days); Carmen F. Decl. ¶¶ 29-30, 42 (removed in less than two months). And while Paulo C. and Ms. Merlos secured their release in several months, their release occurred after this case was filed but before the Court could rule on class certification. It is also clear that Plaintiffs' claims will certainly repeat as to the class: given that Plaintiffs claims arise out of ICE policies that, by definition, apply to thousands of class members, and given that the evidence shows that ICE is applying these policies, "it is certain that other persons similarly situated" will experience the same complaint. Application of the relation back doctrine in this context thus avoids the problem of plaintiffs filing lawsuit after lawsuit, only for their claims to be mooted before they can be resolved. When Plaintiffs filed their CC Motion on October 30, 2025, the following Individual Plaintiffs whose circumstances have since changed were still impacted by Defendants'

policies: Paulo C. and Daniel H. were still detained, and Luna E.'s T visa petition was still pending. Paulo C. Decl. ¶ 33, Daniel H. Decl. ¶ 1; Luna E. Decl. ¶¶ 35-36. Under the relation back doctrine, these Plaintiffs' claims are not moot.

Defendants' ripeness argument appears to be that the Plaintiffs whose circumstances have changed cannot show a likelihood that they will be injured again the same way. The doctrine of ripeness permits courts to "dispose of matters that are premature for review because the plaintiff's purported injury is too speculative and may never occur." *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010). This inquiry focuses on whether an injury "is real and concrete rather than speculative and hypothetical," so it "merges almost completely with standing." *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000). In fact, "[i]n many cases, the constitutional component of ripeness 'is synonymous with the injury-in-fact prong of the standing inquiry.'" *Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, Kentucky v. Labrador*, 122 F.4th 825, 839 (9th Cir. 2024) (citation omitted). But as with the mootness inquiry, because Plaintiffs are "presenting a classic example of a transitory claim, . . . the 'relation back' doctrine will relate to [Plaintiffs'] standing at the outset of the case in order 'to preserve the merits of the case for judicial resolution.'" *Wade v. Kirkland*, 118 F.3d 667, 670 (9th Cir. 1997) (citing *McLaughlin*, 500 U.S. at 52). Accordingly, there is a case and controversy "*even if* there is no indication that [Plaintiffs] or other current class members may again be subject to the acts that gave rise to the claims . . . because there is a constantly changing putative class that will become subject to these allegedly unconstitutional conditions." *Wade*, 118 F.3d at 670. Thus, even if Plaintiffs with changed circumstances cannot "show" that Defendants are likely to again subject them to the same conduct, that does not render their claims unripe because like the other standing and case-or-controversy requirements, ripeness relates back to the filing of the Complaint. There is no doubt that the Individual Plaintiffs whose circumstances changed since the case was filed—they were released from detention or

their immigration proceedings were terminated, for example—had ongoing injury when the Complaint was filed—they were detained or in removal proceedings. Their claims are therefore ripe and they may represent the classes.

But the claims of Plaintiffs whose circumstances have changed are ripe even independent of the relation back doctrine. A plaintiff seeking to represent a class seeking injunctive relief "must demonstrate 'that he is realistically threatened by a repetition of [the violation].'" *Armstrong v. Davis*, 275 F.3d 849, 860–61 (9th Cir. 2001) (quoting *Lyons*, 461 U.S. at 109), *overruled on other grounds by Johnson v. California*, 543 U.S. 499 (2005). A plaintiff "need not establish that future harm is certain, or even probable" but "must establish [] that recurrence is not 'conjectural' or 'hypothetical.'" *Multi-Ethnic Immigrant Workers Org. Network v. City of Los Angeles*, 246 F.R.D. 621, 628 (C.D. Cal. 2007) (citing *Lyons*, 461 U.S. at 105–08). In *Armstrong*, the Ninth Circuit identified two ways that a plaintiff can demonstrate that an injury is likely to recur for the purpose of standing to seek injunctive relief. One of these is that "a plaintiff may show that the defendant had, at the time of the injury, a written policy, and that the injury stems from that policy. In other words, where the harm alleged is directly traceable to a written policy, there is an implicit likelihood of its repetition in the immediate future." *Armstrong*, 275 F.3d at 861 (internal quotations and citations omitted). Such is the circumstance here: Plaintiffs point to Defendants' written 2025 Guidance and the two policies within it as the cause of their injury, as explained at length herein. "Because the harm Plaintiffs allege is traceable to [Defendants' policies], the Court can infer a realistic repetition of [Defendants'] course of action sufficient for standing purposes." *Puente v. City of Phoenix*, No. CV-18-02778-PHX-JJT, 2019 WL 4849613, at *9 (D. Ariz. Sept. 30, 2019).

For all of these reasons, the Individual Plaintiffs have made a "clear showing" that they are "likely" to establish that their claims are ripe and not moot such that they have standing to represent the proposed classes.

**B. Legal Standard for Class Certification**

To attain class certification, Plaintiffs must satisfy the threshold criteria of Fed. R. Civ. P. 23(a) and demonstrate that the action is one of the "types of class action" defined in Fed. R. Civ. P. 23(b). *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010) ("*Shady Grove*"). Only those types of cases described by Rule 23(b) are susceptible to adjudication on a classwide basis and thus eligible for certification.

Rule 23(a) provides that a case may be certified as a class action if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class*; and*

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These requirements are referred to as numerosity, commonality, typicality, and adequacy, respectively. *See Shady Grove*, 559 U.S. at 398.

Plaintiffs move to certify the classes under Rule 23(b)(2), which authorizes a class when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

"Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "[A] party must not only be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)," but "also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).

**1. Plaintiffs Satisfy Rule 23(a)**

The Court concludes that Plaintiffs satisfy Rule 23(a).

**a. Defendants' "Ascertainability" Objections are Without Merit**

Defendants argue that the classes should not be certified because they are not ascertainable. However, the Ninth Circuit has not adopted an "ascertainability" requirement and it has refrained from using that term "because courts ascribe widely varied meanings" to it. *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124-25 nn.3, 4 (9th Cir. 2017). Instead, the Ninth Circuit has "addressed the types of alleged definitional deficiencies other courts have referred to as 'ascertainability' issues [] through analysis of Rule 23's enumerated requirements." *Id.* at n.4.

Nevertheless, Defendants summarize their objections as follows: "Plaintiffs' proposed classes are not ascertainable because their membership turns on subjective, merits-laden 'reasonable suspicion' judgments rather than objective records, making identification administratively infeasible and inviting mini-trials." CC Opp'n 13:11-14. The Ninth Circuit has found complaints about administrative feasibility to bear no weight, stating "it is not clear why requiring an administratively feasible way to identify all class members at the certification stage is necessary to protect [a defendant's] due process rights. As the Seventh Circuit put it, '[t]he due process question is not whether the identity of class members can be ascertained with perfect accuracy at the certification stage but whether the defendant will receive a fair opportunity to present its defenses when putative class members actually come forward.'" *Briseno*, 844 F.3d at 1132 (quoting *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 670 (7th Cir. 2015)); *see also True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 929 (9th Cir. 2018) (explaining that *Briseno* addressed a defendant's "ascertainability" argument that "identification of class members must be 'administratively feasible'," and stating that in *Briseno* "[w]e held that there is no free-standing requirement above and beyond the requirements specifically articulated in Rule 23.")

Defendants' particular complaints appear to boil down to this: the class definitions are open-ended and amorphous in that they capture everyone affected by

the policies without regard to whether they were harmed, are harmed, or will be harmed, and that, relatedly, they include members who lack cognizable injury because whether they will be detained is speculative, so some class members might lack standing.

None of Defendants' complaints has merit. First, the class definitions are clear and not amorphous. Each class definition limits membership to persons who satisfy two conditions: (1) they have applied for and/or received an immigration benefit, and (2) Defendants detained or will detain them, or removed them. Thus, the Pending Petition Class consists of those who have applied for a victim-based benefit and whom ICE has "detained or seeks to detain." The Deferred Action Class consists of persons to whom Defendants have granted deferred action and who Defendants have "detain[ed], [will] seek[] to detain, or [have] removed." And the Stay of Removal Class consists of persons with a pending U visa or T visa petition who "request or requested a stay" of removal, but whom Defendants have detained or seek to detain after January 30, 2025. Both elements of each of these definitions is intelligible, specific, and within Defendants' knowledge: Defendants' own records identify persons with pending petitions for victim-based benefits, or persons to whom they have granted deferred action or who have requested a stay, and Defendants know or will know who they have detained or will seek to detain, and who they have removed.

Defendants' objection that the classes may include members who will not suffer any injury is unavailing for another reason: the Ninth Circuit allows class certification under Rule 23(b)(2) where some class members are subject to but might not be harmed by the challenged practice or procedure. *See, e.g., Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998) (for certification under Rule 23(b)(2), "[i]t is sufficient if class members complain of a pattern or practice that is generally applicable to the class as a whole. Even if some class members have not been injured by the challenged practice, a class may nevertheless be appropriate.") That is because Rule 23(b)(2) "does not require [courts] to examine the viability or bases of class members'

48

[individual] claims for declaratory and injunctive relief, but only to look at whether class members seek uniform relief from a practice applicable to all of them." *Rodriguez*, 591 F.3d at 1125, *abrogated on other grounds as recognized by Rodriguez Diaz v. Garland*, 53 F.4th 1189 (9th Cir. 2022). As a result, "[t]he fact that some class members may have suffered no injury or different injuries from the challenged practice does not prevent the class from meeting the requirements of Rule 23(b)(2)." *Id.* Defendants inaptly rely on cases involving Rule 23(b)(3) *damages* classes where it is important to exclude from the class—and thus avoid compensating—persons who did not suffer harm. Such concerns do not obtain for a Rule 23(b)(2) class seeking prospective declaratory and injunctive relief

For all of these reasons, Defendants' "ascertainability" arguments are no obstacle to class certification under Rule 23(b)(2).

### b. Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder is impractical." Fed. R. Civ. P. 23(a)(1). A proposed class is sufficiently numerous where joinder of all class members "would impose very substantial logistical burdens." *A. B. v. Hawaii State Dep't of Educ.*, 30 F.4th 828, 837 (9th Cir. 2022). Thus, the "numerosity" requirement is actually "an impracticability-of-joinder rule, not a strict numerosity rule.[] It is based on considerations of due process, judicial economy, and the ability of claimants to institute suits." 1 Newberg and Rubenstein on Class Actions § 3:11 (6th ed. 2025). To determine practicality of joinder, courts consider: "(1) the number of individual class members; (2) the ease of identifying and contacting class members; (3) the geographical spread of class members; and (4) the ability and willingness of individual members to bring claims . . ." *Twegbe v. Pharmaca Integrative Pharmacy, Inc.*, No. CV 12-5080 CRB, 2013 WL 3802807, at *2 (N.D. Cal. July 17, 2013).

"The Ninth Circuit has not offered a precise numerical standard [but] district courts generally hold . . . 'that the numerosity requirement is usually satisfied where

the class comprises 40 or more members, and generally not satisfied when the class comprises 21 or fewer members.'" *J.L. v. Cissna*, No. 18-CV-04914-NC, 2019 WL 415579, at *8 (N.D. Cal. Feb. 1, 2019). Regarding the Pending Petition Class, Plaintiffs point out that USCIS data indicates that there were over 160,000 VAWA self-petitions pending in 2024, over 395,000 U visa principal and derivative petitions pending in 2024, and over 23,000 principal and derivative T visa petitions received in 2024. *See* CC Mot. 11:16-19, nn.3-5 (citing data from USCIS website). As of 2025, around 600,000 persons were awaiting adjudication of their VAWA, U visa, and T visa petitions. Velez Decl. ¶ 18. Plaintiffs cannot provide an estimate of how many persons with pending petitions will be arrested, detained, and deported under the 2025 Guidance, but based on the 2025 Guidance's policy of "total" enforcement against "all" allegedly removable noncitizens, it is reasonable to infer that they will be sufficiently numerous that joinder would be impracticable. Plaintiffs also point to news articles to demonstrate that Defendants are indeed targeting VAWA self-petitioners and U visa and T visa petitioners for enforcement. *See* CC Mot. 11:21-12:14, nn.6-8. Based on this evidence, it stands to reason that Pending Petitioner Class members will be so numerous that joinder is impracticable.

Plaintiffs make similar arguments regarding the numerosity of the Deferred Action Class and the Stay of Removal Class, pointing to attorney declarations attesting to the De Facto Revocation Policy and the Blind Removal Policy being applied regularly, along with court cases evidencing Defendants' execution of these policies against would-be class members. *See* CC Mot. 12:15-14:17. Thus, it stands to reason that the class members are numerous, and their numbers will continue to grow.

In their CC Reply, Plaintiffs' counsel estimates that "the declarations submitted thus far identify more than 200 Pending Petition Class members, approximately 65 Deferred Action Class members, and approximately 32 Stay of Removal Class members already." CC Reply 12:14-17. Such numbers, along with the certainty that they will grow, are sufficient to establish numerosity.

50

The Court is not swayed by Defendants' arguments that Plaintiffs' contentions are unsupported by admissible evidence and that their chain of reasoning is faulty. First, evidence presented "in support of class certification . . . need not be admissible," it need only be "'material sufficient to form a reasonable judgment on each [Rule 23(a)] requirement.'" *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1004–05 (9th Cir. 2018). The evidence Plaintiffs presented is sufficient for this purpose. Second, Plaintiffs' chain of reasoning is sensible and persuasive: it is based on Defendants' own raw numbers of petitioners for victim-based benefits from a recent year (2024), Defendants' self-proclaimed objective of "total" enforcement, numerous declarations from experienced practitioners attesting to the existence of persons impacted by the policies, and court cases and news reports reflecting that impact. Defendants do not explain exactly what is wrong with Plaintiffs' reasoning. And the nature of Plaintiffs' claims and Defendants' alleged conduct means it is difficult if not impossible to accurately quantify the classes. And to quantify them more rigorously is unnecessary: Plaintiffs need only show that they are sufficiently numerous that joinder is impracticable, and "where 'only injunctive or declaratory relief is sought, some courts have held that the numerosity requirement is relaxed so that even speculative or conclusory allegations regarding numerosity are sufficient to permit class certification.'" *Sueoka v. United States*, 101 F. App'x 649, 653 (9th Cir. 2004) (quoting 5 Moore's Federal Practice § 23.22[3][b] (3d ed. 2003)). Furthermore, where, as here, "a class's membership changes continually over time, that factor weighs in favor of concluding that joinder of all members is impracticable . . . even if current class members are relatively fewer in number." *A. B.*, 30 F.4th at 838.

For all of these reasons, all three classes satisfy the numerosity requirement.

### c. Commonality

Rule 23(a)(2) requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality mandates there be a common question of law or fact among the class members where the same evidence will suffice for each member to

make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Small v. Allianz Life Ins. Co. of N. Am.*, 122 F.4th 1182, 1198 (9th Cir. 2024), *cert. denied,* 145 S. Ct. 2852 (2025) (citation modified). "Commonality requires that the class members' claims 'depend upon a common contention' such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each [claim] in one stroke.'" *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012), *overruled on different grounds by Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) (quoting *Dukes*, 564 U.S. at 350). "Commonality only requires a single significant question of law or fact." *Mazza*, 666 F.3d at 589. And "in a civil-rights suit, [] commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members. [] In such circumstance, individual factual differences among the individual litigants or groups of litigants will not preclude a finding of commonality." *Armstrong*, 275 F.3d at 868 (citations omitted).

Here, all of the classes' claims turn on common questions of law and fact. First, all three putative classes challenge the legality of the 2025 Guidance under the APA on several grounds. *See* Compl. Counts 1, 2. The legal standards governing these claims are uniform across the classes, and the same facts determine the outcome of all of these claims because they are focused on ICE's conduct in adopting the 2025 Guidance. For example, the claim that the 2025 Guidance violates the APA because it is arbitrary and capricious turns on the legal question of whether Defendants' adoption of the 2025 Guidance was sufficiently reasoned, including, for example, whether they articulated a satisfactory explanation for the action and whether they failed to consider an important aspect of the problem. The answers to these questions turn on the administrative record reflecting Defendants' decision-making, so the individual circumstances of class members have no bearing: either the 2025 Guidance is insufficiently reasoned and "is unlawful as to every [class member] or it is not. That inquiry does not require [the Court] to determine the effect of those policies . . . upon

any individual class member (or class members) or to undertake any other kind of individualized determination." *Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014).

The Deferred Action Class challenges the De Facto Revocation Policy as arbitrary and capricious under the APA. *See* Compl. Count 3. This claim necessarily involves common questions of law and fact that can be resolved in one stroke, including the question of whether Defendants in fact have a policy and practice of de facto revoking deferred action granted by USCIS, and if so, whether the policy is arbitrary and capricious because it is insufficiently reasoned. Again, the answers to these questions turn on common facts proven by common evidence, including the Defendants' policy and practice and the administrative record evidencing the bases of the Defendants' decision. The Deferred Action Class also challenges the De Facto Revocation policy as violating the *Accardi* doctrine (Count 4) and the Due Process Clause of the Fifth Amendment (Counts 5 and 6).[17] These claims, too, turn on common questions that can be resolved in a single stroke: the *Accardi* doctrine claim focuses on whether Defendants' policy of allowing ICE to de facto revoke deferred action status violates other existing policies that establish that USCIS alone grants or revokes deferred action status, and the Fifth Amendment claims turn on a question of law—whether a person who has been granted deferred action is entitled to due process if the Defendants intend to revoke that deferred action, or whether Defendants may legally revoke deferred action de facto by their conduct and without process.

The Stay of Removal Class challenges the Blind Removal Policy as violating the INA (Count 8), and therefore also as violating the APA because it is not in accordance with law (Count 9). These claims turn on common questions of law and fact resolvable by common evidence and facts. These include the factual question of whether Defendants have a policy and practice of denying requests for stay of removal

---

[17] The Deferred Action Class also brings a claim that the De Facto Revocation Policy violates the Fourth Amendment (Count 7), but neither of the two pending motions addresses this claim, so the Court does not address it.

from people with pending U visa or T visa petitions, and then removing them, without Defendants first requesting from USCIS a prima facie determination regarding their pending petitions, and if so, the legal question of whether that violates 8 U.S.C. § 1227(d)(1) and the APA—questions answerable for the class as a whole without reference to any class members' individualized circumstances.

Defendants argue that variations in the class members' circumstances defeat commonality, without addressing any of the classes in particular. Their main position is that ICE enforcement against petitioners for victim-based benefits happens under varying circumstances, and that the 2025 Guidance authorizes ICE to consider the "totality of the circumstances" in deciding whether to pursue enforcement. But the existence of "varying circumstances" and ICE's ability to consider the "totality of the circumstances" do not eliminate the common questions identified above that determine whether Defendants' policies are unlawful for the specific reasons Plaintiffs assert in the Complaint.

For all of the foregoing reasons, there are questions of law and fact common to each of the classes, so the commonality requirement is satisfied.

### d. Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Under this permissive standard, "representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Parsons*, 754 F.3d at 685 (citation omitted). "The test of typicality is 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Id.* Applying this standard, the Court concludes that the class representatives' claims are typical of the claims of their respective classes.

All Plaintiffs seek to represent the Pending Petition Class, and all have been

54

impacted by the 2025 Guidance in ways that are typical of other class members: contrary to prior policy that required Plaintiffs' pending petitions to be viewed as a positive factor, the 2025 Guidance has subjected the Plaintiffs to immigration enforcement without regard for their pending petitions, and Defendants apply the 2025 Guidance equally to all class members, without regard for the individual facts of their cases. Defendants point out that the Pending Petition Class definition encompasses VAWA self-petitioners, yet none of the Plaintiffs is a VAWA self-petitioner. But Defendants do nothing more than make this observation; they fail to explain how it renders the Plaintiffs atypical of VAWA self-petitioners. At oral argument, Plaintiffs pointed out that the 2025 Guidance treats petitioners for *all* victim-based immigration benefits the same, whether they are VAWA self-petitioners, or U visa or T visa petitioners. Upon review, the Court agrees. The Court is satisfied that, for purposes of this challenge to the 2025 Guidance, the claims of the U visa and T visa petitioner Plaintiffs are typical of the claims of VAWA self-petitioners, such that the claims of the former are typical of the claims of the latter.

Plaintiffs Lupe A., Camila B., Paulo C., and Ms. Merlos seek to represent the Deferred Action Class. Their claims are typical: each was granted deferred action in their U visa cases, but ICE arrested and detained them without pre-deprivation process to determine whether changed circumstances warranted revocation of their deferred action or whether their detention was necessary or justified. *See* Kahn Decl. Exhs. A-D, K, T. All members of the Deferred Action Class have the same or similar injury in that Defendants have detained or removed, or seek to detain or remove, them without pre-deprivation process to adjudicate whether their deferred action status should be revoked. This injury exists regardless of whether such deferred action was conferred pursuant to a U visa or T visa application. Defendants argue that the proposed representatives are not typical because they "already had their day in court in the immigration proceedings" whereas the class is defined as persons who had no hearing. CC Opp'n 19:1-5. This misses the point. Plaintiffs did not get *pre-deprivation*

process—just the same as the class members. Even if Plaintiffs "had their day in immigration court" once Defendants decided to pursue enforcement against them notwithstanding their deferred action status, Plaintiffs did not have pre-deprivation process to determine whether Defendants had grounds to revoke their deferred action. Such pre-deprivation process and the immigration court process are different proceedings: they occur at different times and serve a different purpose. Neither the proposed representative Plaintiffs nor the members of the De Facto Revocation Class received pre-deprivation process before Defendants allegedly disregarded their deferred action status and took enforcement actions against them. The representative Plaintiffs' claims are therefore typical of the claims of the class members.

Finally, Plaintiffs Carmen F. and Ms. Ruano seek to represent the Stay of Removal Class to challenge Defendants' Blind Removal Policy. Their claims are typical. Both Carmen F. and Ms. Ruano requested a stay of removal so that their petitions could receive a prima facie adjudication from USCIS, and ICE denied each stay request without first seeking a prima facie adjudication based on its policy that 8 U.S.C. § 1227(d)(1) does not mandate a prima facie adjudication. *See* Kahn Decl. Exhs. E-J, O-Q. Defendants apply this policy to all class members, even if ICE sometimes requests a prima facie adjudication when it is "in ICE's best interest." 2025 Guidance at 3. Defendants do not dispute that Carmen F. and Ms. Ruano are typical of the Blind Removal Class. And the Court finds that they are typical.

For the foregoing reasons, Plaintiffs satisfy the typicality requirement as to all three classes.

### e. Adequacy

Rule 23(a)(4) requires Plaintiffs to establish that they "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Whether the "class representatives satisfy the adequacy requirement depends on 'the qualifications of counsel for the representatives, an absence of antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is

collusive.'" *Walters*, 145 F.3d at 1046 (citations omitted).

By all of these measures, Plaintiffs are adequate. The four proposed class counsel are non-profit organizations that regularly engage in class action litigation on immigrants' rights issues, and several of the specific counsel engaged in this case have previously been appointed to represent large classes of noncitizens. Class counsel attest that they have successfully litigated claims challenging DHS policies under the APA and the United States Constitution, and collectively they have extensive experience representing immigrants and survivors and have deep knowledge of victim-based benefits and the impacted community. Defendants do not dispute the qualifications of class counsel.

And the proposed class representative Plaintiffs are adequate. They have filed declarations explaining the facts of their case and the impact of Defendants' actions on them and their families and attesting that they joined this action and seek to represent their respective classes because they seek the same remedies for members of those classes as they do for themselves. And each named Plaintiff has stated they wish to help other VAWA, U visa, and T visa petitioners experiencing similar harms.[18] Finally, none of the Plaintiffs seek money damages and there are no apparent adverse interests or conflicts between the representative Plaintiffs and the classes.

Yet Defendants challenge the adequacy of the Plaintiffs in three ways. First, they argue that the Plaintiffs are not adequate because their claims are unripe, but the Court rejects Defendants' ripeness challenge above. Second, and unfortunately, Defendants suggest that the Plaintiffs are inadequate class representatives because they lack understanding and are not sufficiently engaged with the in-the-weeds legal

---

[18] Each declaration concludes with a variation of the following paragraph: "I understand that I will be representing others in this lawsuit. I think it is important that all survivors of crime are given protection and safety. Even if I receive my visa or protection from deportations, I will continue to assist with this litigation so that others like me can also be protected." *See, e.g.*, Decl. Camila B. (Dkt No. 23-4) ¶ 36.

questions this case raises. *See* CC Opp'n 20:2-11 ("[t]he record shows that Plaintiffs lack any understanding of their responsibilities as class representatives: Their declarations . . . [do not identify] who the proposed classes include and how their respective circumstances compare to those of absent members, or how the requested relief would affect individuals in different procedural postures. [] There is also no indication that the Individual Plaintiffs reviewed the complaint, understood the legal theories asserted, or exercised any independent judgment over the litigation strategy. That undercuts adequacy.") Unsurprisingly, Defendants cite no authority imposing such a rigorous standard. Plaintiffs' declarations reflect commitment to this case and to the class members, and an understanding of the issues and the stakes for themselves and for others, and there are no apparent conflicts among them; this is sufficient to establish their adequacy. The rest is for their capable counsel to manage.

Finally, and also unfortunately, Defendants insinuate that some kind of undefined conflict of interest arises from the involvement of the Organizational Plaintiffs, and that this defeats adequacy. *See* CC Opp'n 20:14-16 ("Organizational Plaintiffs seek to use Individual Plaintiffs to pursue their institutional goals—including publicity and funding. But those goals are not consistent with the interests of the proposed class.") The Court rejects without discussion this undeveloped and speculative suggestion.

For the foregoing reasons, all of the Individual Plaintiffs are adequate to represent their respective classes.

### 2. The Classes Fit Within Rule 23(b)(2)

Rule 23(b)(2) permits a class action when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "[I]t is sufficient to meet the requirements of Rule 23(b)(2) that class members complain of a pattern or practice that is generally applicable to the class as a whole." *Rodriguez*, 591 F.3d at 1125 (citation and

quotation marks omitted). Rule 23(b)(2) "was adopted in order to permit the prosecution of civil rights actions." *Walters*, 145 F.3d at 1047; *see also Parsons*, 754 F.3d at 686 (noting "the primary role of this provision has always been the certification of civil rights class actions.")

The three classes here satisfy this standard: Defendants have allegedly applied the 2025 Guidance, the De Facto Revocation Policy, and the Blind Removal Policy generally to the classes, and Plaintiffs seek corresponding injunctive and declaratory relief and an APA stay for the benefit of the classes as a whole.

Defendants fault Plaintiffs' Rule 23(b)(2) analysis as being conclusory and in opposing it, Defendants repeat many of the same arguments they raise elsewhere in their memoranda. For example, Defendants argue generally that there is a lack of cohesion across the classes, but the differences Defendants refer to are immaterial. Defendants also argue that § 1252(f)(1) bars the classwide injunctive relief Plaintiffs seek here, but the classes also seek relief under the APA, which is not barred by § 1252(f)(1). Furthermore, although Defendants argue that "the classes" do not satisfy Rule 23(b)(2), the only claims they specifically address are the Fifth Amendment claims brought by the Deferred Action Class. Defendants argue that due process claims under the Fifth Amendment are not amenable to classwide resolution because due process is a flexible concept. But Defendants only say that the classes include dissimilarly-situated individuals, without describing any specific dissimilarity that is material to the Fifth Amendment claims of the Deferred Action Class: that they are entitled to process before Defendants revoke their deferred action status. As discussed above, the answer to this question does not turn on any of the circumstances of the individual Plaintiffs.

Finally, Defendants argue that *Trump v. CASA, Inc.*, 606 U.S. 831 (2025) ("*CASA*") "precludes class certification as a vehicle for the broad-based relief Plaintiffs now request." CC Opp'n 22: 12-13. *CASA* does not have that effect. *CASA* involved so-called "universal injunctions" issued in cases that are *not* class actions. In

59

*CASA,* the Court explained that "universal injunctions circumvent Rule 23's procedural protections and allow 'courts to create de facto class actions at will.'" *CASA,* 606 U.S. at 849 (cleaned up). The Court therefore rejected the universal injunction as "a class-action workaround." *Id.* at 850. The corollary of this is that the class action under Rule 23 can be an appropriate vehicle for seeking nationwide injunctive relief as long as the Rule 23 requirements are scrupulously applied. Insofar as Defendants suggest that declaratory relief or an APA stay are precluded by CASA, *see* CC Opp'n 23:5-11, *CASA* simply does not address either remedy.

The Court therefore concludes that the three classes and their claims fit within the parameters of Rule 23(b)(2).

For all of the foregoing reasons, Plaintiffs have satisfied all of the prerequisites of Rule 23(a), and the three classes and the claims they are pursuing fit within the parameters of Rule 23(b)(2). The Court will therefore **GRANT** Plaintiffs' Motion for Class Certification and will preliminarily certify the three classes and appoint the respective Plaintiffs and counsel to represent them.

## IV. MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs' Motion for Preliminary Injunction is based on 8 of the 9 causes of action alleged in the Complaint and seeks 8 separate orders for preliminary relief. *See* Proposed Order ¶¶ 1-11.[19] However, as discussed above, § 1252(f)(1) may bar the

---

[19] Plaintiffs' Proposed Order includes 10 orders for preliminary relief (stays and injunctions), plus an order certifying the classes. *See* Prop. Order ¶¶ 1-11. But only 8 proposed orders remain because Plaintiffs withdrew 2 of them, Proposed Order ¶¶ 2 and 4. Specifically, at oral argument, Plaintiffs' counsel withdrew ¶ 2, which *enjoins* Defendants from applying the 2025 Guidance against the Individual Plaintiffs and the clients and members of the Organizational Plaintiffs. Plaintiffs stated that ¶ 2 would be unnecessary if the Court entered the order at ¶ 1, which *stays* the 2025 Guidance under the APA. The Court would not enter ¶ 2 for another reason: ¶ 2 is based on Counts 1 and 2—the only Counts directed specifically to the 2025 Guidance—but these counts assert claims under the APA, for which the statutorily-authorized provisional remedy is to postpone or stay the action. *See* 5 U.S.C. § 705 ("the reviewing court … [may] postpone the effective date of an agency action … pending conclusion of the review proceedings"). Plaintiffs did not address whether a

injunctive relief sought in Proposed Order ¶¶ 6, 9, and 11, so the Court will decline to enter those orders. Accordingly, only 5 Proposed Orders remain: an order to stay each of the three policies under § 705 of the APA (Prop. Order ¶¶ 1, 2, and 7, corresponding to Counts 1, 2, 3, and 9 for violation of the APA); and two injunctions providing relief to deported Individual Plaintiffs (Prop. Order ¶¶ 5, 8, corresponding to Counts 4, 5, 6, and 8). Therefore, based on the relief that remains potentially available, all 8 causes of action are in issue. Those 8 causes of action are tied to the following requests for preliminary relief against Defendants' enforcement of the three policies:

Regarding the 2025 Guidance: based on two APA claims (Count 1, 2), Plaintiffs move the Court to stay the 2025 Guidance. *See* Prop. Order ¶ 1.

Regarding the De Facto Revocation Policy: based on an APA claim (Count 3), Plaintiffs move the Court to stay the De Facto Revocation Policy, *see* Prop Order. ¶ 3; based on Fifth Amendment Claims (Counts 5, 6) and the *Accardi* doctrine claim (Count 4), Plaintiffs seek an injunction enjoining Defendants from preventing already-deported Plaintiff Lupe A. from returning to the United States in the same immigration status she had prior to her removal, *see* Prop. Order ¶ 5.

Regarding the Blind Removal Policy: based on an APA claim (Count 9), Plaintiffs move the Court to stay the Blind Removal Policy, *see* Prop. Order ¶ 7; and based on a claim for violation of INA § 237(d)(1) (Count 8), Plaintiffs seek an order enjoining Defendants from preventing already-deported Plaintiffs Carmen F. and Ms. Ruano from returning to the United States in the same immigration status they had prior to their removal, and to not remove them again without a prima facie determination of their visa applications, *see* Prop. Order ¶ 8.

In summary, under the APA, Plaintiffs seek to stay each of the policies, and

---

preliminary injunction is available under the APA. And ¶ 2 may be barred by § 1252(f)(1). Plaintiffs also withdrew ¶ 4, which enjoins Defendants from keeping Paulo C. in custody unless they provide a bond hearing, because Paulo C. has been released.

based on other claims, Plaintiffs seek injunctive relief barring Defendants from preventing certain individual deported Plaintiffs from returning.

The Court will address each of the claims in detail, but they allege that the 2025 Guidance violates the APA because it is arbitrary and capricious (Count 1) and not in accordance with the law and in excess of statutory authority (Count 2); that the De Facto Revocation Policy violates the APA because it is arbitrary and capricious (Count 3), violates the *Accardi* doctrine because it does not comply with Defendants' own procedures(Count 4), and violates the Fifth Amendment's right to procedural due process because it authorizes Defendants to revoke the deferred action status of (Count 5) and to detain (Count 6) persons with deferred action without providing them any process; and that the Blind Removal Policy violates the Immigration and Nationality Act, 8 U.S.C. § 1227(d)(1) (Count 8) and violates the APA because it is not in accordance with the law and is in excess of statutory authority (Count 9).

## A. Legal Standard for a Preliminary Injunction

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The purpose of a preliminary injunction is to preserve the status quo and the rights of the parties until a final judgment on the merits can be rendered. *See U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010). Under *Winter*, "'A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Am. Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20). Alternatively, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011)

(quoting *Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003)). Serious questions are those "which cannot be resolved one way or the other at the hearing on the injunction." *Bernhardt v. Los Angeles Cnty.*, 339 F.3d 920, 926 (9th Cir. 2003) (quoting *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988)).

A preliminary injunction may only be entered "upon a clear showing" of evidence that supports each relevant preliminary injunction factor. *Winter*, 555 U.S. at 22. "This 'clear showing' requires factual support beyond the allegations of the complaint, but the evidence need not strictly comply with the Federal Rules of Evidence." *CI Games S.A. v. Destination Films*, No. 2:16-CV-05719-SVW-JC, 2016 WL 9185391, at *11 (C.D. Cal. Oct. 25, 2016) (citing *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)).

Regarding the second factor, conclusory affidavits are insufficient to demonstrate irreparable harm. *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985). The plaintiff must show more than the "possibility" of irreparable injury; he must demonstrate that irreparable injury is "likely" and "imminent" in the absence of preliminary relief. *Winter*, 555 U.S. at 22; *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674-675 (9th Cir. 1988) (plaintiff must demonstrate harm that is irreparable and imminent).

A plaintiff may also secure preliminary relief while pursuing an APA claim: "[T]o prevent irreparable injury," § 705 of the APA authorizes "the reviewing court . . . to postpone the effective date of an agency action . . . pending conclusion of the review proceedings." 5 U.S.C. § 705. A stay is "an exercise of judicial discretion," and "the party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Nken v. Holder*, 556 U.S. 418, 433–34 (2009) (citation modified).

Four factors guide courts' consideration of whether to stay agency action under the APA: "(1) whether the stay applicant has made a strong showing that he is likely

to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 433–34 (citation modified). These factors "substantially overlap with the *Winter* factors for a preliminary injunction." *Immigr. Defs.*, 145 F.4th at 986. As in the preliminary injunction context, "[t]he first two factors [] are the most critical." *Id.* (quoting *Nken*, 556 U.S. at 434). But "if a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a [stay] may still issue if the balance of hardships tips *sharply* in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Id.* (citation modified) (quoting *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017)). "Where the government is the opposing party," the final two factors—the balancing of the harms and the public interest—"merge." *Id.*

**B. Plaintiffs Are Likely to Succeed on the Merits of Their APA Claims Challenging the 2025 Guidance (Counts 1 and 2)**

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). The APA permits "judicial review" of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Plaintiffs assert two claims under the APA challenging the 2025 Guidance as arbitrary and capricious (Count 1), and as contrary to law and in excess of statutory authority (Count 2). Defendants argue that Plaintiffs cannot show a likelihood of success on the merits of these APA claims because the 2025 Guidance is not final agency action. Defendants also argue that if the 2025 Guidance is final agency action, it is not arbitrary and capricious, contrary to law, or in excess of statutory authority.

64

**1. Plaintiffs Are Likely to Establish That They Have No Other Adequate Remedy in a Court**

Section 704 provides for APA review of agency action "for which there is no other adequate remedy in a court." 5 U.S.C. § 704. The Supreme Court has stated that this provision "should not be construed to defeat the [APA's] central purpose of providing a broad spectrum of judicial review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). Rather, "Congress intended by that provision simply to avoid duplicating previously established special statutory procedures for review of agency actions." *Darby v. Cisneros*, 509 U.S. 137, 146 (1993).

Defendants do not appear to specifically point to another "adequate remedy in a court" within the meaning of the APA. Among their threshold jurisdictional arguments, Defendants do argue that some Plaintiffs were released by immigration judges presiding over their removal cases, and that 8 U.S.C. § 1252(a)(5) and § 1252(b)(9) channel the Individual Plaintiffs' claims in this case through the petition-for-review of a final order of removal filed before the Court of Appeals. The Court is not persuaded that such channels are an other adequate remedy. Those remedies are only available in individual cases after Defendants subjected individual Plaintiffs to enforcement, and it is not clear that they would involve scrutiny of the Defendants' policies broadly, let alone under standards comparable to those the APA imposes. Nor would such plaintiff-by-plaintiff procedures provide a remedy to the Organizational Plaintiffs. In addition, given the Court's preliminary determination that § 1252(f)(1) appears to bar injunctive relief on behalf of the classes or the "Organizational Plaintiff's clients and members," at least those parties have no other adequate remedy in a court. The Court concludes that the Plaintiffs are likely to establish that they have "no other adequate remedy in a court" that would allow them to challenge Defendants' 2025 Guidance, the De Facto Revocation Policy, and the Blind Removal Policy.

**2. Plaintiffs are Likely to Establish that the 2025 Guidance is a Final Agency Action**

Defendants argue that the 2025 Guidance is not a "final agency action." The APA defines "agency action" to "includ[e] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13); *see also id.* 5 U.S.C. § 701(b)(2). "This definition 'is meant to cover comprehensively every manner in which an agency may exercise its power.'" *San Francisco Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 576 (9th Cir. 2019) (quoting *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 478 (2001)). As relevant here, the term "'rule' means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4); *see also* 5 U.S.C. § 701(b)(2).

Agency action is considered "final" when it satisfies two conditions: "First, the action must mark the 'consummation' of the agency's decisionmaking process, []—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted). In determining whether these criteria are satisfied, courts "look to whether the action amounts to a definitive statement of the agency's position or has a direct and immediate effect on the day-to-day operations of the subject party." *Id.* "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Tohono O'odham Nation v. U.S. Dep't of the Interior*, 138 F.4th 1189, 1200 (9th Cir. 2025) (quoting *Franklin*, 505 U.S. at 797).

The 2025 Guidance likely satisfies both criteria. First, the 2025 Guidance appears to be the consummation of the agency's decision-making process and is neither tentative nor interlocutory, as "'immediate compliance with [its terms] is

66

expected.'" *Magassa v. Mayorkas*, 52 F.4th 1156, 1165 (9th Cir. 2022) (citations omitted). The 2025 Guidance itself states that it is "effective immediately and remains in effect until superseded," and that prior ICE policies are "now rescinded and superseded." 2025 Guidance at 1. Furthermore, Defendants state, and the 2025 Guidance itself states, that the 2025 Guidance was issued to effectuate President Trump's January 20, 2025 EO 14159, entitled *Protecting the American People Against Invasion*, which directs "total and efficient enforcement of [immigration] laws" and orders DHS to "rescind [certain] policy decisions of the previous administration." EO 14159, 90 FR 84433, § 1. And as discussed herein, Plaintiffs have presented substantial evidence demonstrating that the 2025 Guidance had "a direct and immediate effect on the day-to-day operations of" the agency, *Magassa*, 52 F.4th at 1165, as now, pursuant to the 2025 Guidance, Defendants routinely pursue immigration enforcement against applicants for victim-based benefits whereas they seldom did so before. A policy directive that effectuates a sea-change from prior policy is neither tentative nor interlocutory. Defendants' argument that the 2025 Guidance is not a "final agency action" because it includes disclaimers that it may be changed at any time is unavailing. That guidance may be changed is simply a truism; stating that truism does not disprove that the 2025 Guidance is a final agency action within the meaning of the APA.

Second, legal consequences flow from the 2025 Guidance: it rescinded the 2011 Policy and the 2021 Directive that required ICE agents to take certain actions to protect immigrant victims; in reliance on the 2025 Guidance, ICE agents have changed their conduct such that they do not provide those protective measures; and a result, such victims—including U visa and V visa petitioners like Plaintiffs—are now subject to routine detention and removal from which they were previously protected. Therefore, legal consequences flow from the 2025 Guidance. The Court rejects Defendants' argument that the 2025 Guidance is not a final agency action because of its nomenclature as "interim" and its disclaimers; it is a final agency action under the

*Bennett* test and is therefore subject to APA review. The Court's conclusion is consistent with other courts that have held that similar immigration policy guidance is final agency action reviewable under the APA. *See, e.g., Pablo Sequen v. Albarran*, 814 F. Supp. 3d 1005 (N.D. Cal. 2025) ("guidance issued by ICE and EOIR" authorizing arrests at immigration court is final agency action because it "'stat[ed] a definitive position', that ICE agents may arrest noncitizens at immigration courthouses at their discretion"); *Las Americas Immigrant Advoc. Ctr. v. Trump*, 475 F. Supp. 3d 1194, 1216 (D. Or. 2020), *reconsidered in other respects sub nom. Las Americas Immigrant Advoc. Ctr. v. Biden*, 571 F. Supp. 3d 1173 (D. Or. 2021) (directives imposing deadlines on immigration judges to adjudicate family cases were final agency action because the "policies change the way immigration judges run their dockets" and have "practical consequence for parties").

### 3. Plaintiffs Are Likely to Succeed on the Merits of Their Claim that the 2025 Guidance is Arbitrary and Capricious (Count 1)

Section 706(2)(A) of the APA authorizes courts to "set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "'[T]he touchstone of 'arbitrary and capricious' review under the APA is 'reasoned decisionmaking.'" *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 493 (9th Cir. 2023) (citation omitted). "That means an agency's action can only survive arbitrary or capricious review where it has articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (citation modified). If "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," it is arbitrary and capricious and must be set aside. *Id.* at 492. (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*")).

Important aspects include "the costs as well as the benefits" of the agency action. *State Farm*, 463 U.S. at 54; *cf. Michigan v. E.P.A.*, 576 U.S. 743, 753 (2015) ("[R]easonable regulation ordinarily requires paying attention to the advantages and the disadvantages of agency decisions.")

"Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). An agency that "changes its existing position" must at least "'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Id.* (quoting *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). An agency undertaking "policy change" must also provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy," including any "serious reliance interests" stemming from the prior policy. *Id.* at 222 (quoting *Fox Television Stations*, 556 U.S. at 515–16). "[A]n unexplained inconsistency in agency policy is a reason for holding [a new action] to be an arbitrary and capricious change from agency practice." *Id.* (citation modified) (quoting *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)).

Plaintiffs argue that the 2025 Guidance is arbitrary and capricious because it reverses decades of policy (1) without a sufficiently-reasoned explanation for disregarding the concerns underlying that prior policy, (2) without considering the reliance interests of persons who have acted in reliance on those policies, and (3) without considering serious aspects of the problem.

The Court finds that Plaintiffs are likely to show that the 2025 Guidance is arbitrary and capricious for all of these reasons. The Court considers the first and third grounds to overlap and will address them together.

The 2025 Guidance was issued without a reasoned explanation for disregarding the reasons underlying the prior 2011 Policy and 2021 Directive and apparently failed to consider important aspects of the problems that honoring victim-based protections

was meant to address. The 2025 Guidance states only that it was issued in response to EO 14159, referring only to the section of the EO that states "it is the policy of the United States to achieve the 'total and efficient enforcement of [immigration] laws'." First, the Court observes that the 2025 Guidance does not map on to this reasoning: the VAWA self-petition, U visa, and T visa programs and related benefits that the 2025 Guidance jeopardizes were created by immigration laws enacted by Congress, so it is unclear how jeopardizing these creatures of immigration law promotes the "total and efficient enforcement of [immigration] laws."

Second, this "total and efficient enforcement" reasoning fails to consider Congress's and Defendants' reasons for protecting immigrant victims that the now-rescinded 2011 Policy and 2021 Directive effectuated. Plaintiffs' PI Motion sets forth robust evidence of Congress's purpose for enacting these immigration protections, some of which is cited above. The "goal of the immigrant protections" in VAWA includes ensuring that immigration laws do not keep "battered immigrant women and children locked in abusive relationships" and "free[ing] them to cooperate with law enforcement and prosecutors." BIWPA §§ 1502(a)(1)-(2). Congress's purpose in creating the U visa was to "facilitate the reporting of crimes . . . by trafficked, exploited, victimized, and abused [noncitizens] who are not in lawful immigration status" which would in turn "strengthen the ability of law enforcement agencies to detect, investigate, and prosecute" crimes "while offering protection to victims" by providing a "means to regularize the status of such individuals." *Id.* § 1513(a)(2)(A), (B). Similarly, Congress created the T visa because "[e]xisting laws often fail to protect victims of trafficking, and because victims are often illegal immigrants in the destination country, they are repeatedly punished more harshly than the traffickers themselves." TVPA § 102(b)(17). "Victims of severe forms of trafficking should not be inappropriately incarcerated, fined, or otherwise penalized solely for unlawful acts committed as a direct result of being trafficked." *Id.* § 102(b)(19). DHS has repeated these goals over the years, including in connection with the rescinded 2021 Directive,

in which ICE stated "Congress created victim-based immigration benefits to encourage noncitizen victims to seek assistance and report crimes committed against them despite their undocumented status," and that "[w]hen victims have access to humanitarian protections, regardless of their immigration status, and can feel safe in coming forward, it strengthens the ability of local, state, and federal law enforcement agencies, including ICE, to detect, investigate, and prosecute crimes." 2021 Directive at 1. Prior policy was also concerned with public safety and the prosecution of crimes, noting the "chilling effect that civil immigration enforcement actions may have on the willingness and ability of noncitizen crime victims to contact law enforcement, participate in investigations and prosecutions, pursue justice, and seek benefits." 2021 Policy at 1. The 2025 Guidance grapples with none of these concerns; it does not even acknowledge that they exist. Rather, it reflects only that it was issued in response to EO 14159's directive to achieve the "total and efficient enforcement of [immigration] laws," and it reflects no consideration or acknowledgment of the concerns that animated Congressional legislation or Defendants' prior policies, let alone any reasoned explanation for rescinding them.

Defendants do not meaningfully refute that they disregarded these concerns. Nor did Defendants point to any evidence external to the 2025 Guidance that considers them. At oral argument, Defendants' counsel referred to an ICE Fact Sheet that purportedly showed an increase in U visa and T visa applications and stated that this accounts for some of the change in policy. This Fact Sheet was not filed and the description offered at oral argument was insufficient to show that the 2025 Guidance was sufficiently reasoned. But even assuming that the Fact Sheet pointed to an increase in applications, there are still many "important aspect[s] of the problem" that are not accounted for, such as the humanitarian and law enforcement concerns that animated prior policies. Defendants otherwise argue that ICE considered other issues: resource constraints and operational efficiency. Defendants presented no evidence that ICE considered these issues, so this *may* be a *post hoc* rationalization. *See Oregon*

71

*Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1120 (9th Cir. 2010) ("courts may not accept . . . *post hoc* rationalizations for agency action") (quoting *State Farm*, 463 U.S. at 50). However, at this early stage, the Court cannot determine if this is indeed a *post hoc* rationalization, *see Biden v. Texas*, 597 U.S. 785, 807–812 (2022) (explaining nuances of the prohibition on *post hoc* rationalization), so the Court's analysis does not turn on this concern. But even if Defendants did consider resource constraints and operational efficiency, that does not mean they could ignore the central concerns animating prior policy. It therefore follows that ICE "entirely failed to consider [] important aspect[s] of the problem," *State Farm*, 463 U.S. at 43, including policymaker's interest in protecting immigrant crime victims by shielding them from enforcement measures, and in promoting public safety by encouraging immigrants to cooperate with law enforcement. It stands to reason that withdrawing or weakening these protections is likely to undermine the goal of protecting victims and is likely to weaken law enforcement and compromise public safety. *See, e.g.*, Logan Decl. (Dkt. No. 31-6) ¶¶ 1, 2, 7, 12, 13 (Chief Deputy Attorney General for Delaware and former AUSA explaining detrimental impact of new policy on public safety and the administration of justice, attesting "U-Visas are critical for the justice system" as is "honoring the deferred action status of individuals who courageously agree to cooperate with law enforcement," and stating that the new policy "threatens the very core principal of public safety"). Defendants completely ignore these repercussions. Because Defendants did not give a reason for disregarding prior concerns or address other important aspects of the problem, the 2025 Guidance is arbitrary and capricious.

Defendants also failed to consider the "serious reliance interests" of noncitizens who applied for the protections that Congress and the Defendants promised in connection with VAWA self-petitions, and U visa and T visa petitions. When an agency changes policy, "it must 'be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Regents*, 591 U.S. at 30 (quoting *Encino Motorcars, LLC*, 579 U.S. at 222). The agency must

"assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 at 33. By definition, VAWA self-petitioners, and U visa and T visa petitioners are victims— of abuse, of crime, or both. Congress intended for such persons to rely on the offered protections so that they would come forward to seek protection from abuse and assist law enforcement. By Plaintiffs' estimate, around 600,000 persons have pending VAWA self-petitions and U visa and T visa petitions, many of whom came forward based on the Congressional promise of eligibility for protection from deportation. *See, e.g.,* Velez Decl. ¶¶ 17-18 (explaining that many petitioners decided to come forward based on policies of protection from enforcement and that as of 2025, 600,000 persons were awaiting adjudication of their petitions). Plaintiffs' declarations attest to their expectation that, in the absence of changes in their circumstances, they would be protected from certain kinds of immigration enforcement to which the 2025 Guidance now subjects them. *See, e.g.,* Paulo C. Decl. ¶¶ 22, 23; Luna E. Decl. ¶ 41; Carmen F. Decl. ¶ 23. The failure to respond demonstrates a lack of consideration of the serious reliance interests of persons impacted by the change in policy.

For all of these reasons, the 2025 Guidance is arbitrary and capricious.

### 4. Plaintiffs Are Likely to Succeed on the Merits of Their Claim that the 2025 Guidance Is Contrary to Law (Count 2)

A policy can violate the APA if it is "contrary to law." 5 U.S.C. § 706(2)(A). APA "review must not rubber-stamp administrative decisions" that are "inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 859 (9th Cir. 2005) (cleaned up).

Congress clearly stated its purpose in creating victim-based benefits: to protect noncitizen victims of crime from unnecessary removal. BIWPA § 1502(a)(1)-(2) (describing "protection against deportation" for VAWA self-petitioners); *Id.* 1513(a)(2)(A)-(B) (stating the U visa "offer[s] protection to victims" through a

73

"means to regularize the[ir] status"); TVPA § 102(b)(19) (stating "[v]ictims of severe forms of trafficking should not be . . . penalized solely for unlawful acts committed as a direct result of being trafficked"). As noted above, Congress did this for humanitarian reasons—to protect victims from abuse—and to promote public safety. The 2025 Guidance is contrary to law because it does not protect VAWA self-petitioners or U visa or T visa petitioners from enforcement, as it states that "ICE officers and agents are not required" to consider evidence that a noncitizen "is a victim of a crime" as "a positive discretionary factor," and does not require ICE to "request expedited adjudications from USCIS" regarding prima facie eligibility, except when it is "in ICE's best interest." 2025 Guidance at 2-3. By allowing ICE agents to turn a blind eye to persons with pending petitions, the 2025 Guidance undermines the legislative scheme Congress designed to protect such individuals from removal.

Defendants present a slim defense: they do not argue that the 2025 Guidance is consistent with decades of legislation and the documented congressional intent; they only point out that the 2025 Guidance has a savings clause stating that ICE "remain[s] bound to adhere to all applicable statutory and policy requirements." PI Opp'n at 26. But inserting this generic boilerplate disclaimer into a policy whose specific directives are unlawful or frustrate congressional policy does not cleanse the policy of those faults or insulate it from review. *See City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1240 (9th Cir. 2018) (if a statement that a policy is "'consistent with law' precludes a court from examining whether [it] is consistent with law, judicial review is a meaningless exercise, precluding resolution of the critical legal issues.")

The Court therefore concludes that Plaintiffs are likely to prevail on their claim that the 2025 Guidance violates the APA because it is contrary to law (Count 2).

**C. Plaintiffs Are Likely to Succeed on the Merits of Their Claims Challenging the De Facto Revocation Policy (Counts 3, 4, 5, and 6)**

Plaintiffs are likely to succeed on the merits of all four of their claims

challenging the De Facto Revocation Policy (Counts 3, 4, 5, and 6).

**1. Plaintiffs Are Likely to Succeed on the Merits of Their Claim that the De Facto Revocation Policy is Arbitrary and Capricious Under the APA (Count 3)**

As stated above, the APA permits "judicial review" of "final agency action," 5 U.S.C. § 704, and provides that courts "shall . . . hold unlawful and set aside agency action" that is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

First, Plaintiffs are likely to establish that Defendants have a de facto revocation policy that amounts to final agency action reviewable under the APA. Such a policy appears to be "the 'consummation' of the agency's decisionmaking process" and not tentative or interlocutory in nature. *Bennett*, 520 U.S. at 177–78 (citations omitted). Even though there is no written policy called "The De Facto Revocation Policy," it nevertheless arises out of the language of the 2025 Guidance, which states that "Current beneficiaries of victim-based immigration benefits may be subject to civil immigration enforcement, subject to applicable legal limitations, at the discretion of [ICE]." 2025 Guidance at 1 n.1. Deferred action is a victim-based immigration benefit because, as relevant here, it arises out of individuals' U visa and T visa petitions. The language above reflects a decision to subject persons with deferred action to immigration enforcement, directly contrary to caselaw holding that deferred action protects a person from immigration enforcement action. *See AAADC*, 525 U.S. at 484 ("Approval of deferred action status means that . . . no action will thereafter be taken to proceed against an apparently deportable alien, even on grounds normally regarded as aggravated.") Plaintiffs have filed extensive evidence showing that, notwithstanding the law, as of the issuance of the 2025 Guidance, Defendants have in fact been taking enforcement actions against persons with deferred action by detaining and removing them without formally revoking their deferred action status. With their CC Motion, Plaintiffs filed declarations of several counsel attesting that ICE has

75

detained and removed persons, including their clients, with deferred action status. *See, e.g.*, Fawcett Decl. (Dkt. No. 23-19), Woods Decl. (Dkt. No. 23-31), Matelska Decl. (Dkt No. 23-22), Corbaci Decl. (Dkt No. 23-23), Reed Decl. (Dkt. No. 44-12), Newman Decl. (Dkt. No. 44-13) (all attesting that ICE has detained, placed in removal proceedings, or started to execute removal orders against petitioners who have been granted deferred action). Plaintiffs also filed the Declaration of Oscar Montes, a Supervising Attorney with ICWC, who recounted exchanges he had with two ICE officers about a client with deferred action whom ICE detained and was trying to remove. *See* Montes Decl. (Dkt. No. 31-7). He attests that one officer told him that the fact that the client had deferred action does not affect ICE and that ICE could remove the client despite the grant, and the other officer emailed him that "there is currently no legal impediment to removal. [The prima facie determination] does not preclude ERO from carrying out your client's removal." Montes Decl. ¶¶ 10-12. Defendants challenge Plaintiffs' evidence, suggesting that the declaration "of ICWC counsel," presumably Oscar Montes, is inadmissible under Fed. R. Evid. 602 because the declarant lacks personal knowledge and the evidence is hearsay. This objection is without merit. "[G]iven the haste that is often necessary" at the preliminary injunction stage, the Court may rely on "evidence that is less complete than in a trial." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189–90 (9th Cir. 2024) (citation omitted); *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) (hearsay permitted at preliminary injunction stage). Notwithstanding the more liberal evidentiary standards for a preliminary injunction, the above-referenced declarations *are* based on personal knowledge.

Plaintiffs also listed numerous habeas corpus petitions filed on behalf of people with deferred action seeking relief from detention. *See* PI Reply p. 13 n.7. All of this shows that Defendants likely have a policy of detaining and removing noncitizens who have been granted deferred action, and that they are doing so pursuant to a final agency action. If there is no such policy, then various ICE agents throughout the

76

country are independently enacting an about-face in how ICE engages with persons granted deferred action—an unlikely scenario. And the fact that several named Plaintiffs with deferred action who were detained were released on bond does not disprove the existence of the policy; rather, it tends to show such a policy exists because they were released through process provided only after they were detained. It is also clear from the foregoing that Defendants' actions are ones "from which 'legal consequences will flow,'" *Bennett*, 520 U.S. at 177–78, given that ICE is detaining and deporting people with deferred action and represents that it has discretion to do so. Furthermore, while Defendants attack some of the evidence Plaintiffs filed, they do not deny that such a policy exists. The Court therefore concludes that Plaintiffs are likely to establish that the Defendants have a De Facto Revocation Policy and that it is a final agency action.

Defendants also argue that their enforcement actions are not reviewable because they have discretion to enforce immigration law. It is not entirely clear which of the three policies Defendants are referring to, but the Court treats this argument as referring to the De Facto Revocation Policy. A court can review an agency decision when "statutes, regulations, established agency policies, or judicial decisions that provide a meaningful standard against which to assess" an agency's action. *Mendez-Gutierrez v. Ashcroft*, 340 F.3d 865, 868 (9th Cir. 2003). The "mere fact that a statute contains discretionary language does not make agency action unreviewable." *Beno v. Shalala*, 30 F.3d 1057, 1066 (9th Cir. 1994). "Even where statutory language grants an agency 'unfettered discretion,' its decision may nonetheless be reviewed if regulations or agency practice provide a 'meaningful standard by which this court may review its exercise of discretion.'" *Socop-Gonzalez v. I.N.S.*, 208 F.3d 838, 844 (9th Cir. 2000) (citation omitted), *reaffirmed on reh'g en banc,* 272 F.3d 1176 (9th Cir. 2001) (*overruled on other grounds by Smith v. Davis*, 953 F.3d 582, 599 (9th Cir. 2020) (en banc)). Thus, "[a]s long as there is a 'meaningful standard against which to judge the agency's exercise of discretion,' judicial review is available." *Perez Perez v.*

*Wolf*, 943 F.3d 853, 862 (9th Cir. 2019) (*quoting Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). A meaningful standard can exist when, as here, the agency policy "establishes the goal of the program" or "agency duties . . . including the duty to consider certain criteria." *Jajati v. U.S. Customs & Border Prot.*, 102 F.4th 1011, 1018 (9th Cir. 2024).

Both sources of "meaningful standards" exist here. USCIS's own Policy Manual governing bona fide determinations sets forth these standards. *See* USCIS PM vol. 3, pt. C, ch. 5 and 6 ("Bona Fide Determination Process" and "Waiting List" process for U visa applicants), *and* vol. 3, pt. B, ch. 6 ("Bona Fide Determination Process" for T visa applicants). First, the Policy Manual states the goals of deferred action based on U visa and T visa applications: USCIS states that it "issues petitioners BFD EAD [Bona Fide Determination Employment Authorization Documents] and grants deferred action in order to promote victim stability and continued cooperation with law enforcement," as contemplated by the U visa and T visa programs. USCIS PM vol. 3, pt. C, ch. 5.C.1 (for U visa applicants), *and* vol. 3, pt. B, ch. 6.A (for T visa applicants). And second, USCIS sets forth the criteria it applies to each of three processes under which it may *grant* deferred action status to noncitizens based on pending U or T visa petitions—the U visa BFD process; the U visa waiting list process; and the T visa BFD process. *See* PI Mot. 32:15-33:10 (summarizing these processes as explained in the Policy Manual); *see also* USCIS PM vol. 3, pt. C, chs. 5 and 6 (bona fide determination and waiting list process for U visa applicants), and USCIS PM vol. 3, part B, ch. 6 (bona fide determination process for T visa applicants). These criteria include, for example, consideration of whether the petition is complete, and whether the petitioner poses a national security or public safety risk. *Id.* The USCIS Policy Manual also sets forth specific grounds on which deferred action may be *revoked* and contemplates that only USCIS can revoke deferred action status. Plaintiffs' PI Motion sets out these grounds for revocation in some detail for each of the three processes by which USCIS grants deferred action (the U visa BFD

process; the U visa waiting list process; and the T visa BFD process); they include, for an example, a determination that the petitioner poses a national security or public safety risk, if the law enforcement certification is withdrawn, if the deferred action was granted in error, or if the petitioner is no longer eligible for a U visa. *See* PI Mot. 34:17-35:13; *see* USCIS PM vol. 3, pt. C, chs. 5.C.1 and 6 (process for revoking deferred action for U visa applicant) *and* vol. 3, pt. B, ch. 6.E.3 (process for revoking deferred action for T visa applicant).

These self-imposed requirements establish a meaningful standard by which the Court can determine whether the De Facto Revocation Policy is arbitrary and capricious. The Court therefore concludes that the De Facto Revocation Policy is a final agency action subject to judicial review in light of meaningful standards.

When considered in light of Defendants' own standards, the De Facto Revocation Policy is likely arbitrary and capricious.[20] If USCIS grants deferred action "to promote victim stability and continued cooperation with law enforcement," and considers whether the petition is complete and the petitioner presents no national security or public safety risks, then ICE's policy of taking enforcement action against such victims without first considering "victim stability" or whether the petitioner still satisfies the criteria for deferred action is arbitrary and capricious, because it works against this purpose, defeats the criteria, and undermines the purposes of the U visa and T visa programs. Likewise, by de facto revoking deferred action by pursuing enforcement and without considering the specific grounds on which deferred action may be revoked, Defendants' conduct is likely arbitrary and capricious. Plaintiffs are also likely to establish that the policy is arbitrary and capricious because whether a person's status is honored or de facto revoked appears to depend on arbitrary factors such as the speed with which ICE can deport the person. Such unreasoned actions are

---

[20] Defendants do not meaningfully respond to Plaintiffs' arguments that the De Facto Revocation Policy is arbitrary and capricious.

inconsistent with the APA. "By hinging a deportable alien's eligibility for discretionary relief on [] a matter irrelevant to the alien's fitness to reside in this country [] the [Defendants] failed to exercise [their] discretion in a reasoned manner." *Judulang v. Holder*, 565 U.S. 42, 53 (2011).

Plaintiffs are therefore likely to establish that the De Facto Revocation Policy is arbitrary and capricious.

### 2. Plaintiffs Are Likely to Succeed on the Merits of Their Claim Under the *Accardi* Doctrine (Count 4)

Plaintiffs are also likely to prevail on their claim that the De Facto Revocation Policy violates the *Accardi* doctrine.[21] In *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), the Supreme Court stated that "[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures." *Accardi*, 347 U.S. at 268. This so-called *Accardi* doctrine has been applied in a variety of contexts, including to immigration procedures: *Accardi* itself was an immigration case, and the doctrine has been applied in immigration cases since then. *Nicholas v. Immigr. & Naturalization Serv.*, 590 F.2d 802, 806–08 (9th Cir. 1979) (addressing an INS operations instruction); *Romeiro de Silva v. Smith*, 773 F.2d 1021, 1025 (9th Cir. 1985) (noting that the INS can be bound by its "Operations Instructions"); *Montilla v. I.N.S.*, 926 F.2d 162, 166 (2d Cir. 1991) (INS hearing officer did not comply with hearing regulation). The doctrine requires an agency to adhere not just to formal regulations, but also "its own internal operating procedures," "internal procedures,"

---

[21] Because the Court eliminated several of Plaintiffs' requests for injunctive relief under § 1252(f)(1), the only remaining claim for relief that arises out of Count 4 is on behalf of Individual Plaintiff Lupe A. *See* Prop. Order ¶ 5. However, because the parties briefed this issue as it applies to all Plaintiffs, the Court resolves it in the same language as to all Plaintiffs; indeed, the analysis would not vary by Plaintiff because it is a question of law. However, the Court will limit any injunctive relief deriving from this claim only to Lupe A. For the same reason, the Court takes the same approach in the next section addressing the Due Process Claims (Counts 5 and 6) and will limit any resulting injunctive relief to Lupe A.

"handbook[s]," "policy statements," and other evidence of the agency's "usual practice." *Alcaraz v. I.N.S.*, 384 F.3d 1150, 1162 (9th Cir. 2004).

Plaintiffs allege that Defendants' De Facto Revocation Policy violates the *Accardi* doctrine because ICE engages in a policy of detaining and deporting persons to whom USCIS has granted deferred action without pursuing formal revocation of their deferred action status. Compl. ¶ 212. Plaintiffs are likely to succeed on the merits of this claim. Defendants offer no defense at all. As explained in the previous section, the USCIS Policy Manual sets forth specific grounds on which deferred action may be revoked and contemplates that only USCIS can revoke deferred action status. Under Defendants' De Facto Revocation Policy, ICE, in effect, revokes petitioners' deferred action status by detaining them placing them in removal despite their valid deferred action status and without applying the Policy Manual's criteria for revocation. Because ICE lacks authority to revoke USCIS grants of deferred action status, ICE cannot de facto revoke that status. Therefore, by permitting ICE to de facto revoke deferred action instead of following USCIS procedure, and without applying any of the applicable criteria from the USCIS Policy Manual, Defendants are not complying with their own policies for revoking deferred action and are likely violating the *Accardi* doctrine.

### 3. Plaintiffs Are Likely to Succeed on the Merits of Their Claims that the De Facto Revocation Policy Violates Their Fifth Amendment Right to Due Process (Counts 5 and 6)

Plaintiffs assert two claims alleging that the De Facto Revocation Policy violates their Fifth Amendment right to due process. Count 5 alleges that a policy by which Defendants revoke a person's deferred action status de facto and without any process violates due process. Count 6 alleges that detaining a person with deferred action for any longer than the cursory period it takes to confirm that status, without conducting a pre-deprivation hearing, violates due process.

The Fifth Amendment guarantees that no person shall be "deprived of life,

81

liberty, or property, without due process of law." U.S. Const. amend. V. The Due Process Clause generally "requires some kind of a hearing before the State deprives a person of liberty or property." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990). "'It is well established that the Fifth Amendment entitles aliens to due process of law' in the context of removal proceedings." *Trump v. J. G. G.*, 604 U.S. 670, 673 (2025) (citing *Reno v. Flores*, 507 U.S. 292, 306 (1993)). "[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)). "A procedural due process claim has two elements: '(1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections.'" *Miranda v. City of Casa Grande*, 15 F.4th 1219, 1224 (9th Cir. 2021) (citation omitted).

First, Plaintiffs are likely to establish that they have a protected liberty interest in their continued deferred action. When USCIS granted Plaintiffs deferred action, even if the grant was discretionary, it "confer[ed] affirmative immigration relief." *Regents,* 591 U.S. at 18. "Approval of deferred action status means that . . . no action will thereafter be taken to proceed against an apparently deportable alien, even on grounds normally regarded as aggravated." *AAADC*, 525 U.S. at 484. Thus, a person with deferred action should neither be removed nor detained for immigration enforcement (removal) purposes. The Individual Plaintiffs have filed declarations attesting to the lives they built in reliance on their deferred action status. The Plaintiffs have an interest in their continued freedom—whether that means freedom from being removed, or freedom from being detained pending their petitions or pending removal proceedings. In fact, Defendants do not dispute that deferred action confers a protected liberty interest.

Second, Plaintiffs are likely to show that they were denied adequate procedural protections before Defendants deprived them of this liberty interest. The Court considers the three-factor balancing test set forth in *Mathews v. Eldridge*, 424 U.S.

319 (1976) to determine whether Respondents' procedures satisfy the Due Process Clause: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 334–355. Plaintiffs briefed the *Mathews* factors while Defendants did not do so at all, thus conceding that they all favor Plaintiffs. Nevertheless, upon its independent consideration, the Court concludes that all of the *Mathews* factors favor Plaintiffs.

First, the Plaintiffs' private interest in avoiding removal or detention pending removal is great. As noted, they all built lives in reliance on their deferred action, which is itself a benefit that petitioners for victim-based benefits rely on to decide to come forward. *See Inland Empire III*, 2018 WL 4998230, at *19 ("This requirement of due process is especially pronounced in cases where, as here, the conferred benefit engenders substantial reliance.") Being removed or detained clearly jeopardizes these interests, especially so for victims or crime or abuse. Second, the risk of erroneous deprivation is high given that Defendants gave most removed Plaintiffs no pre-deprivation process to determine whether their deferred action should be revoked, or gave detained Plaintiffs only post-detention process. It appears that the detained Plaintiffs (who were not deported) were later released, which shows that, given their deferred action status, ICE should not have detained them in the first place. For this reason, Defendants' suggestion that post-detention process was sufficient to protect these Plaintiffs' liberty interest completely this misses the point. Furthermore, USCIS had already determined that all of the Plaintiffs pursuing these claims qualified for deferred action. Without a pre-deprivation process to determine whether any of the criteria for revoking deferred action exist, it is likely that a de facto revocation is erroneous. Finally, the government's interest in providing no pre-deprivation process

is insubstantial and entitled to no weight. As explained previously, Defendants, through USCIS, already provide a pre-deprivation process for revoking deferred action. *See* USCIS PM vol. 3, pt. C, chs. 5.C.1 and 6 (process for revoking deferred action for U visa applicant) *and* vol. 3, pt. B, ch. 6.E.3 (process for revoking deferred action for T visa applicant).

For all of the foregoing reasons, the Court concludes that Plaintiffs have made a sufficient showing that Defendants' De Facto Revocation Policy violated their Fifth Amendment right to due process because pursuant to the Policy, Defendants have pursued immigration enforcement actions against them despite their deferred action status.

## D. Plaintiffs Are Likely to Succeed on the Merits of Their Claims Challenging the Blind Removal Policy (Counts 8 and 9)

Plaintiffs also allege that Defendants' Blind Removal Policy violates INA § 237(d)(1), 8 U.S.C. § 1227(d)(1) (Count 8), and therefore that it also violates APA 5 U.S.C. § 706(2)(A) because it is not in accordance with law and APA 5 U.S C. § 706(2)(C) because it is in excess of statutory authority (Count 9). Thus, Counts 8 and 9 turn on the same underlying question of whether the Blind Removal Policy violates § 1227(d)(1).

8 U.S.C. § 1227(d)(1) states:

If the Secretary of Homeland Security determines that an application for nonimmigrant status under subparagraph (T) or (U) of section 1101(a)(15) of this title filed for an alien in the United States sets forth a prima facie case for approval, the Secretary may grant the alien an administrative stay of a final order of removal.

Plaintiffs contend that Defendants' Blind Removal Policy violates 8 U.S.C. § 1227(d)(1) because it allows Defendants to deny a U visa or T visa petitioner's request for an administrative stay of a final order of removal without first prima facie adjudicating the U visa and T visa petition, whereas the statute requires Defendants to

84

make a prima facie adjudication before deciding the request for an administrative stay. Defendants argue that the Blind Removal Policy is a "fiction," PI Opp'n 26:23-26, and that Plaintiffs misread § 1227(d)(1).

First, Plaintiffs are likely to show that the Defendants do have a Blind Removal Policy and that it is a final agency action subject to APA review. The policy is stated plainly in the 2025 Guidance: "ICE will no longer routinely request expedited adjudications from USCIS. ICE officers and agents may continue to do so subject to a case-by-case determination that it is in ICE's best interests." 2025 Guidance, p. 3, ¶ 4. Thus, this policy ends ICE's prior policy of seeking prima facie adjudications from USCIS before deciding whether to grant stay requests, and permits ICE agents to seek such adjudications only "subject to a case-by-case determination that it is in ICE's best interests." This policy therefore does what Plaintiffs allege it does: it allows ICE to deny stay requests and take enforcement action, including executing a final order of removal, without first determining if the petitioner's petition is prima facie approvable. Indeed, the policy appears to make requesting a prima facie adjudication an exception based on ICE's best interests. Consistent with the Court's determination that the 2025 Guidance is a final agency action, the Court also concludes that the Blind Removal Policy therein is also a final agency action subject to APA review. And Plaintiffs have filed sufficient evidence to establish, at this stage, that Defendants' conduct is in accordance with this policy: ICE removed the two representative Plaintiffs, Carmen F. and Ms. Ruano, who had requested a stay of removal based on their petitions without first requesting a prima facie determination from USCIS, and declarations of counsel attest to other episodes. *See* Matelska Decl. (Dkt No. 23-22) ¶ 14, Corbaci Decl. (Dkt No. 23-23) ¶ 9. This evidence is sufficient at this early stage. Furthermore, Defendants' arguments on the merits (discussed below) imply that this policy exists, except Defendants argue it is lawful because they are not required to make a prima facie determination.

Second, Plaintiffs are likely to establish that the Blind Removal Policy violates

8 U.S.C. § 1227(d)(1). Section 1227(d)(1) includes two clauses in an if-then relationship: *if* DHS determines that a U visa or T visa application sets forth a prima facie case for approval, *then* DHS *may* grant the applicant an administrative stay of removal. Defendants point out that whether to grant an administrative stay is a matter of discretion. This is correct, but Defendants ignore the first clause, which "establishes that the Secretary's prima facie determination is a non-discretionary pre-requisite to the action described in the second segment." *Jimenez v. Dep't of Homeland Sec.*, No. 222CV00967SSSJPRX, 2022 WL 19410308, at *3 (C.D. Cal. Nov. 14, 2022). Defendants also argue that Plaintiffs "ignore that [8 U.S.C. § 1227(d) and 8 C.F.R. § 241.6(a)] . . . require an alien to first and foremost request a stay subject to that discretion," PI Opp'n 30:13-16, but this argument is a red herring: the Complaint at ¶¶ 240, 242, 247 and the Stay of Removal Class definition in fact condition these claims on the applicant having requested stay of removal. And, the two representative Plaintiffs and the petitioners in counsels' anecdotes all requested stays of removal, and they were all denied without Defendants making a prima facie determination.

For these reasons, Plaintiffs are likely to establish that Defendants' Blind Removal Policy violates INA § 237(d)(1), 8 U.S.C. § 1227(d)(1) (Count 8), ande that it also violates APA 5 U.S.C. § 706(2)(A) because it is not in accordance with law and APA 5 U.S.C. § 706(2)(C) because it is in excess of statutory authority (Count 9).

Having determined that Plaintiffs are likely to succeed on the merits of the eight claims upon which their PI Motion is based, the Court turns to the remaining *Winter* factors.

**E. Plaintiffs Have Shown Irreparable Harm**

The Court also concludes that Plaintiffs have established irreparable harm.

For the Individual Plaintiffs and Class Members, the harm is manifest. Plaintiffs are likely to succeed on the merits of their two claims for violation of their Fifth Amendment right to due process. It is well established that the deprivation of constitutional rights "'unquestionably constitutes irreparable injury.'" *Melendres v.*

86

*Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Where, as here, the alleged deprivation of a constitutional right is involved, courts recognize that no further showing of irreparable injury is necessary. *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005).

The harms arising from Plaintiffs' other claims for violation of the APA, the *Accardi* doctrine, and the INA include being held in immigration detention or being deported. The Ninth Circuit has acknowledged the "irreparable harms imposed on anyone subject to immigration detention," including substandard medical and mental health care and separation from family. *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017). Unlawful detention constitutes "extreme or very serious" injury not compensable by money damages. *Id.* at 999. Those who were removed have also shown irreparable injury.[22] First, they will have been removed despite pending petitions for victim-based benefits and the protections from removal that those petitions offered in exchange for coming forward. Second, individuals have attested to specific harms particular to themselves. Carmen F. states that after she and her son were removed, the very abuser she tried to escape forced them to live with him again, despite having relied on the U visa process to protect her. *See* Carmen F. Decl. ¶ 44-49. Ms. Ruano's U.S. citizen twins have been taken away from their school, community, and life in the United States, and are struggling to adjust to living in El Salvador, a country they have never visited. *See* Ruano Decl. ¶ 2. Lupe A. has been separated from her family and her home of several decades. *See* Lupe A. Decl. ¶ 30. In short, their lives, and the lives of their children and families, have been upended,

---

[22] In *Nken v. Holder*, 556 U.S. 418 (2009), in the context of the appellant's motion to stay his removal pending his appeal of the removal order, the Supreme Court held that "the burden of removal alone cannot constitute the requisite irreparable injury." *Nken v. Holder*, 556 U.S. at 435. Neither side addresses this holding, but this case presents a different context: not a stay pending the appeal of a removal order itself, but rather a challenge to Defendants' policies that deprive Plaintiffs of protections from removal.

and they face ongoing personal danger (Carmen F.) and distress (Ms. Ruano, Lupe A.). Class Members who were removed are likely to experience similar injuries.

Defendants challenge Plaintiffs' showing of irreparable harm in two ways, neither of which has merit. First, they refashion their mootness-ripeness-standing arguments into a challenge to irreparable harm; the Court again rejects these arguments. Second, Defendants do not dispute that these alleged injuries are irreparable; rather, they argue that they are simply the legal consequences under the law and thus cannot be injury, but this argument is inapt because it presupposes that Defendants will prevail on the merits of Plaintiffs claims.

The Organizational Plaintiffs are also likely to suffer irreparable injury. Personnel from ICWC, CCIJ, LRCL, and CHIRLA filed declarations attesting to their injuries, and the Court includes some of this detail above. In summary, "their clients are subjected to these harsh policies, and prospective clients are chilled from coming forward to seek relief, thus impacting the organizations' core activities." PI Mot. 39:2-4. These impacts are explained in some detail. Defendants do not dispute that these impacts constitute irreparable injury. Instead, they present a single sentence that "the Organizational Plaintiffs similarly cannot show standing let alone a concrete, imminent injury under their resource-diversion theories." PI Opp'n 32:23-24. As discussed in the standing section earlier, the Court rejects this argument.

For all of the foregoing reasons, the Plaintiffs have shown irreparable harm.

**F. The Balance of Hardships and the Public Interest Weigh In Favor of Granting Preliminary Relief**

The last two *Winter* factors—the balance of the hardships and the public interest—merge when the government is the opposing party. *Nken*, 556 U.S. at 435.

As discussed above, Plaintiffs have established that the 2025 Guidance, the De Facto Revocation Policy, and the Blind Removal Policy are likely to result in the detention and removal of petitioners with pending petitions for victim-based immigration benefits, even if they have been granted deferred action, or without

consideration of whether their petitions present a prima facie case for approval, causing irreparable harm to the Plaintiffs, Class Members, and the Organizational Plaintiffs. And, as discussed, these policies likely violate the APA, the *Accardi* doctrine, the Fifth Amendment right to due process, and the INA. Thus, Plaintiffs have shown substantial hardships. And "[g]enerally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution." *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005). Furthermore, violations of federal law are neither equitable nor in the public's interest. *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013). Accordingly, there is a substantial public interest in preliminary relief forestalling such conduct. *Cf. Nken*, 556 U.S. at 436 ("Of course there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm.") Finally, there is also a public interest in "preserving congressional intent," *East Bay Sanctuary*, 993 F.3d at 678, which, as discussed above, Defendants' policies likely undermine.

The Defendants point out that they and the public have a significant interest in enforcement of immigration laws, and that the executive has substantial discretion in enforcing immigration laws, which also implicates foreign policy objectives. This interest is "weighty." *Landon v. Plasencia*, 459 U.S. 21, 34 (1982*); see also Imm. Defs. I*, 145 F.4th at 994 (there are "harms involved in denying the duly elected branches the policies of their choice"). "[C]ontrol over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature." *Landon*, 459 U.S. at 34. This is inarguable, and, for example, "there is always a public interest in prompt execution of removal orders." *Nken*, 556 U.S. at 436.

However, as discussed above, Defendants have thus far failed to provide a sufficiently-reasoned explanation for their specific change in policy, so it is difficult to assess how preliminary relief would impact such reasons and impinge on specific interests. And even crediting that Defendants and the public have a significant interest

in enforcing immigration law, "[t]he public has a strong interest in having a [government] that conducts itself fairly and according to its stated regulations and policies." *Doe v. Noem*, 778 F. Supp. 3d 1151, 1166 (W.D. Wash. 2025) (quoting *Cooney v. Dalton*, 877 F. Supp. 508, 515 (D. Haw. 1995)).

While the judiciary's role in reviewing the executive's immigration enforcement policies is narrow—"to ensure that executive procedures do not violate principles of due process or 'displace congressional choices of policy'"—this "executive deference [] is closely linked with [a] determination on the substantive validity of the Rule. Essentially, the weight we ascribe to this factor depends on the extent to which we agree that the Rule overrides plain congressional intent." *East Bay Sanctuary*, 993 F.3d at 679. Here, the Court has determined that Defendants' three policies likely violate the APA and in particular thwart clear Congressional intent to protect petitioners for victim-based immigration benefits from immigration enforcement pending the adjudication of their applications. Therefore, while the Defendants' prerogatives in the area of immigration enforcement are generally broad, and they have an interest in acting accordingly, in this case that interest is entitled to little weight because Defendants' policies likely violate the APA and clear Congressional intent.

Having considered the interests on both sides and the weight to which each is due in this case, the Court concludes that the balance of the hardships and the public interest weigh heavily in favor of granting Plaintiffs preliminary relief.

Plaintiffs have therefore satisfied all four of the *Winter* factors as to all eight claims upon which they seek preliminary relief. The Court therefore **GRANTS** Plaintffs' Motion for Preliminary Injunction. However, the Court **DENIES** the Motion insofar as it seeks Proposed Orders ¶¶ 6, 9, and 11 because, as discussed in Section II(B)(4) above, such relief appears barred by § 1252(f)(1).

**G. The Court Waives Bond**

Fed. R. Civ. P. 65(c) provides that the court "may issue a preliminary injunction

or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Despite this mandatory phrasing, "Rule 65(c) invests the district court with discretion as to the amount of security required, *if any.*" *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). A court may dispense with a bond altogether "when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Id.* (quoting *Jorgensen*, 320 F.3d at 919). Courts have also waived security where requiring a bond "would have a negative impact on plaintiff's constitutional rights, as well as the constitutional rights of other members of the public." *Baca v. Moreno Valley Unified Sch. Dist.*, 936 F. Supp. 719, 738 (C.D. Cal. 1996).

Defendants urge the Court to "require Plaintiffs to post a bond commensurate with the scope of any injunction." PI Opp'n 34:26-27. Defendants do not propose an amount, nor do they tie the request to any "costs and damages" they would sustain in the event they should not have been enjoined. The Court concludes that the relief it is granting creates no likely risk of costs and damages to Defendants. By contrast, requiring a bond would serve no protective purpose and would deter individuals from seeking to vindicate their rights. Therefore, the Court **<u>WAIVES</u>** the bond requirement.

### H. Kind and Scope of Relief

The Court now addresses the kind and scope of relief it will grant.

First, as discussed above, the Court is not convinced that the injunctive relief that Plaintiffs seek in Proposed Orders ¶¶ 6, 9, and 11 survives § 1252(f)(1), so it will not enter those Orders.

Next, the Court considers whether to enjoin Defendants from preventing the re-entry of already-removed Plaintiffs Lupe A. (Prop. Order ¶ 5), and Carmen F. and Ms. Ruano (Prop. Order ¶ 8). These Plaintiffs were deported despite being in deferred action status (Lupe A.), or after Defendants denied their stay requests without first

91

seeking a prima facie determination (Carmen F., Ms. Ruano). As discussed above, such actions are likely unlawful. Requiring Defendants to permit them to re-enter would partially return them to the status quo before these violations and allow them to avail themselves of the procedures to which they are entitled. *See, e.g., Mendez v. Immigr. & Naturalization Serv.*, 563 F.2d 956 (9th Cir. 1977) (government was ordered to admit into the United States a noncitizen who had been deported without first receiving due process of law, to permit the noncitizen "to pursue any administrative and judicial remedies to which he is lawfully entitled.") Defendants have not argued otherwise. The Court will therefore grant the injunctive relief requested in Proposed Order ¶¶ 5 and 8.

Finally, the Court considers the scope of the APA stays it will enter. Section 705 of the APA authorizes "a reviewing court" to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. The Court has found that Plaintiffs satisfy the test for an APA stay pending resolution of this case as to all three policies in issue—the 2025 Guidance (Counts 1, 2), the De Facto Revocation Policy (Count 3), and the Blind Removal Policy (Count 9). Counts 1 and 2 were brought by all of the Plaintiffs and all three of the Classes. Count 3 was brought by Lupe A., Camila B., Paulo C., Mrs. Merlos, the Deferred Action Class, and the Organizational Plaintiffs. And Count 9 was brought by all of the Plaintiffs and the Stay of Removal Class. Plaintiffs' Proposed Order proposes language staying the three policies without specifying a scope—either relative to the parties or to a geographical area. *See* Prop. Order ¶¶ 1, 3, 7.

Unfortunately, in their initial briefing, neither side squarely addressed what the scope of any APA stay should be. Defendants only argued that an APA stay was barred by § 1252(f)(1), an argument that the Court has rejected. Defendants did not address what the scope of a stay should be if the Court entered one. Plaintiffs' February 4, 2026, Notice of Supplemental Authority (Dkt. No. 50) brought to the

Court's attention *National TPS Alliance v. Noem*, 166 F.4th 739 (9th Cir. Jan. 28, 2026) ("*NTPSA III*"). In the Notice, Plaintiffs briefly explain that *NTPSA III* upheld the district court's grant of a nationwide vacatur under the APA.

In *NTPSA III*, the Circuit considered the Government's argument that the district court abused its discretion by granting, under the APA, "'universal vacatur extending to non-parties.'" *NTPSA III*, 166 F.4th at 767. The Circuit "acknowledge[d] that there are difficult and unanswered questions related to the limits of APA relief under [*Trump v. CASA, Inc.,* 606 U.S. 831 (2025)]." *Id.* Just a few months before *NTPSA III*, in *NTPSA I*, the Circuit addressed, on interlocutory appeal, the appropriate scope of the district court's APA *stay* of agency action. *See National TPS Alliance v. Noem*, 150 F.4th 1000, 1027 (9th Cir. Aug. 29, 2025) ("*NTPSA I*"). *Immigrant Defenders* is also instructive. *Imm. Defs. I*, 145 F.4th 972 at 995-996.

Together, *NTPSA I* and *NTPSA III*[23], along with *Immigrant Defenders*, yield the following parameters for determining the appropriate scope of a stay under the APA. First, preliminary relief "'must be narrowly tailored to remedy the specific harm shown.'" *NTPSA I*, 150 F.4th at 1027 (citing *East Bay Sanctuary*, 934 F.3d at 1029). Second, the Supreme Court's "'complete-relief principle for crafting injunctive relief' [discussed in *CASA*] [] 'provide[s] some useful guidance for crafting interim equitable relief' in the APA context." *NTPSA I*, 150 F.4th at 1028 (citing *Imm. Defs. I*, 145 F.4th at 995–96). The complete relief principle provides that "courts generally 'may

---

[23] In between *NTPSA I* and *NTPSA III*, the Circuit did issue *National TPS Alliance v. Noem*, 163 F.4th 1152 (9th Cir. Sept. 17, 2025) ("*NTPSA II*"). *NTPSA II* denied the Government's emergency motion for an immediate administrative stay and stay pending its appeal of the district court's final judgment entering a nationwide APA vacatur of the Government's action. In *NTPSA II,* the Circuit addressed the scope of the vacatur only summarily by reference to its decision in *NTPSA I. See NTPSA II*, 163 F.4th at 1162 (rejecting Government's argument that nationwide set-aside was overbroad because "[a]s we have already explained [in *NTPSA I*], it is impossible to structure relief on an individual basis or to impose any relief short of nationwide set asides under APA § 706" of the agency's actions). Therefore, *NTPSA II* does not itself provide any additional guidance on the scope question.

administer complete relief between the parties'" but that insofar as "party-specific injunctions sometimes 'advantag[e] nonparties,' [] they do so only incidentally." *CASA*, 606 U.S. at 851 (cleaned up). Correspondingly, the complete relief principle does not authorize the court to grant "complete relief to everyone potentially affected by an allegedly unlawful act," but instead authorizes it to grant "complete relief *to the plaintiffs before the court*." *NTPSA I*, 150 F.4th at 1028 (citing *CASA*, 606 U.S. at 852) (emphasis in original). Third, a nationwide § 705 stay is appropriate only where a narrower stay would not remediate the irreparable harm to the plaintiffs or "is not a workable solution under the [applicable] statute." *See Garro Pinchi v. Noem*, 813 F. Supp. 3d 973, 1039 (N.D. Cal. 2025) (explaining reasoning of *NTPSA I*).

Staying the policies only as to the Individual Plaintiffs and the clients of the Organizational Plaintiffs would appear to provide complete relief as to these parties without reaching non-parties. However, the APA claims are also brought on behalf of the three classes, so the complete-relief principle counsels in favor of staying the policies as to the respective classes as well. The Court notes that the classes are not geographically limited: they encompass all persons who match the parameters regardless of their location. Therefore, in order to grant complete relief to the classes, because the classes are nationwide, the stays should also be nationwide. Therefore, the Court's APA stays will apply to the named Plaintiffs, to the Organizational Plaintiff's current and future clients, and to the classes who bring the corresponding claims, without a geographical limitation.[24] This is necessary to afford complete preliminary relief between all of the parties.

---

[24] The Court recognizes that staying the policies as to the Individual Plaintiffs and as to the current and future clients of the Organizational Plaintiffs is redundant to staying the policies as to the classes nationwide because all of the Individual Plaintiffs and the clients of the Organizational Plaintiffs are members of the classes. However, the Court finds it appropriate to be this specific in the event any portion of this Order is stayed.

## V.   CONCLUSION

The Court **GRANTS** Plaintiffs' Motion for Class Certification (Dkt. No. 23) and **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' Motion for Preliminary Injunction (Dkt. No. 31), and **ORDERS** as follows.

The Court **PRELIMINARILY CERTIFIES** the following classes:

1. **Pending Petition Class**: All individuals with pending principal or derivative U visa petitions, T visa petitions, or VAWA self-petitions who ICE detains or seeks to detain for civil immigration enforcement.

2. **Deferred Action Class**: All individuals to whom USCIS has granted deferred action based on a pending U or T visa petition and who, during the authorized period of deferred action, ICE detains, seeks to detain, or removed without providing notice and an opportunity to be heard regarding potential revocation of their deferred action status.

3. **Stay of Removal Class**: All individuals with a pending U or T visa petition who, since January 30, 2025, have been, are, or will be detained by ICE and who request or requested a stay of a final removal order prior to enforcement of that removal order.

The Court **APPOINTS** the following class representatives:

1. Plaintiffs Lupe A., Camila B., Paulo C., Kenia J. Merlos, Luna E., Carmen F., Yessenia Ruano, and Daniel H. as the **Pending Petition Class** representatives.

2. Lupe A., Camila B., Paulo C., and Ms. Merlos as the **Deferred Action Class** representatives.

3. Carmen F. and Yessenia Ruano as the **Stay of Removal Class** representatives.

The Court **APPOINTS** the Center for Human Rights and Constitutional Law, Public Counsel, La Raza Centro Legal, and the Coalition for Humane Immigrant

Rights as class counsel for the three classes.

As to the Motion for Preliminary Injunction, the Court **ORDERS**:

1. Pursuant to 5 U.S.C. § 705, the Court hereby **STAYS** the 2025 Guidance, including its rescission of prior policies. This stay applies in favor of All Individual Plaintiffs, the current and future clients of the Organizational Plaintiffs, and the members of all three Classes.

2. Pursuant to 5 U.S.C. § 705, the Court hereby **STAYS** the De Facto Revocation Policy, under which ICE does not honor grants of deferred action conferred by USCIS to individuals with pending petitions for U or T visas. This stay applies in favor of Lupe A., Camila B., Paulo C., Kenia J. Merlos, the current and future clients of the Organizational Plaintiffs, and the members of the Deferred Action Class.

3. Pursuant to 5 U.S.C. § 705, the Court hereby **STAYS** the Blind Removal Policy. This stay applies in favor of All Individual Plaintiffs, the current and future clients of the Organizational Plaintiffs, and the members of the Stay of Removal Class.

4. Defendants are preliminarily **ENJOINED** from preventing the re-entry of Lupe A. to the United States in the same immigration status she had prior to her detention and removal.

5. Defendants are preliminarily **ENJOINED** from preventing the re-entry of Carmen F. and Yessenia Ruano to the United States in the same immigration status they had prior to their forced expulsion from the United States, and are further **ENJOINED** from removing Carmen F. and Yessenia Ruano without a prima facie determination regarding their eligibility regarding the visas for which they applied.

Insofar as Plaintiffs' Motion for Preliminary Injunction seeks preliminary relief other than what expressly ordered above, it is **<u>DENIED</u>**.

**IT IS SO ORDERED.**

Dated: May 20, 2026

_____
HON. ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT JUDGE