UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

- - -

HONORABLE ANDRÉ BIROTTE, JR., DISTRICT JUDGE PRESIDING

| | |
|---|---|
| IMMIGRATION CENTER FOR WOMEN and CHILDREN, et al., Plaintiffs, vs. KRISTI NOEM, SECRETARY of HOMELAND SECURITY in her official capacity, et al., Defendants. | No. CV 25-09848-AB |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

*CLASS CERTIFICATION and MOTION for PRELIMINARY INJUNCTION HEARING [51]*

LOS ANGELES, CALIFORNIA

TUESDAY, FEBRUARY 10, 2026

---

MARIA R. BUSTILLOS
OFFICIAL COURT REPORTER
C.S.R. 12254
UNITED STATES COURTHOUSE
350 WEST 1ST STREET
SUITE 4455
LOS ANGELES, CALIFORNIA 90012
(213) 894-2739

## A P P E A R A N C E S

**ON BEHALF OF THE PLAINTIFFS, IMMIGRATION CENTER FOR WOMEN and CHILDREN, et al.:**

CENTER FOR HUMAN RIGHTS and CONSTITUTIONAL LAW
BY: BARDIS VAKILI, ESQ.
1505 EAST 17TH STREET
SUITE 117
SANTA ANA, CA 92705
(619)483-3490

CENTER FOR HUMAN RIGHTS and CONSTITUTIONAL LAW
BY: SARAH KAHN, ESQ.
1505 EAST 17TH STREET
SUITE 117
SANTA ANA, CA 92705
(415)672-1962

COALITION for HUMANE IMMIGRANT RIGHTS
BY: ADAM REESE, ESQ.
2533 WEST 3RD STREET
SUITE 101
LOS ANGELES, CA 90057
(323)353-1333

PUBLIC COUNSEL
BY: KATHLEEN RIVAS, ESQ.
610 SOUTH ARDMORE AVENUE
LOS ANGELES, CA 92705
(213)385-2977

**A P P E A R A N C E S (CONT'D)**

**ON BEHALF OF THE PLAINTIFFS, IMMIGRATION CENTER FOR WOMEN and CHILDREN, et al.:**

MEXICAN AMERICAN LEGAL DEFENSE and EDUCATIONAL DEFENSE
BY: ERIKA CERVANTES, ESQ.
634 SOUTH SPRING STREET
ELEVENTH FLOOR
LOS ANGELES, CA 90014
(213)629-2512

**A P P E A R A N C E S (CONT'D)**

**ON BEHALF OF THE DEFENDANTS, KRISTI NOEM, SECRETARY of HOMELAND SECURITY in her official capacity, et al.:**

OFFICE OF THE U.S. ATTORNEY
SPECIAL ASSISTANT UNITED STATES ATTORNEY
BY: PUSHKAL MISHRA, ESQ.
300 NORTH LOS ANGELES STREET
SUITE 7516
LOS ANGELES, CA 90012
(714)338-3503

**I N D E X**

PAGE

*CLASS CERTIFICATION and MOTION for PRELIMINARY INJUNCTION HEARING [51]:* *6*

*LOS ANGELES, CALIFORNIA; TUESDAY, FEBRUARY 10, 2026*

*-o0o-*

*(COURT IN SESSION AT 10:04 A.M.)*

*THE COURTROOM DEPUTY: Calling item one, CV 25-09848-AB: Immigration Center for Women and Children, et al. v. Kristi Noem, et al.*

Counsel, please state your appearances.

MR. VAKILI: Good morning, Your Honor.

For the plaintiffs, Bardis Vakili.

MS. KAHN: Good morning, Your Honor. For the plaintiffs --

THE COURT: I'm sorry. Could you bring the microphone just a little closer. I could barely hear you.

MR. VAKILI: Good morning, Your Honor. Bardis Vakili for the plaintiffs.

THE COURT: All right. Good morning.

MS. KAHN: Good morning, Your Honor. Sarah Kahn for the plaintiffs.

THE COURT: Good morning.

MS. CERVANTES: Good morning, Your Honor. Erika Cervantes for the plaintiffs.

THE COURT: Okay. Good morning.

MS. BROWN: Good morning. Rebecca Brown for the plaintiffs.

THE COURT: Okay. Good morning.

MS. RIVAS: Good morning. Kathleen Rivas for the plaintiffs.

THE COURT: All right. Good morning.

Last but not least...

MR. REESE: Good morning, Your Honor. Adam Reese for the plaintiffs.

THE COURT: All right. All by your lonesome on the other side.

MR. MISHRA: Good morning, Your Honor. Pushkal Mishra for the defendants.

THE COURT: All right. Good morning. Thank you for being here. Apologies for running a little late.

I've had a chance to review what I think are the relevant documents. Let me just pull up my notes. And I believe our courtroom deputy provided you with some questions just to give you a sense of what we were thinking about. I ask that those not be distributed or disseminated.

I want to make sure from the plaintiffs' side, did you get a chance -- did you get the documents and have a chance to review them?

MR. VAKILI: Yes, Your Honor, we did. Thank you.

THE COURT: And Mr. Mishra?

MR. MISHRA: Yes, Your Honor.

THE COURT: Okay.

MR. MISHRA: I have one -- one initial request. There's a protective order in place right now, ECF number 24. So I just want to make sure that the courtroom is sealed.

THE COURT: To discuss any of this case?

MR. MISHRA: There are a few facts we cannot discuss and, obviously, the names of the plaintiffs.

THE COURT: Okay. What's -- what's the plaintiffs' position -- I mean, it's going to be -- well, go ahead. What's the plaintiffs' position? Let me start there.

MR. VAKILI: We'd object to that, Your Honor. This is a public courtroom. And this is a very, very public matter.

THE COURT: I guess, Mr. Mishra, I'm trying to -- I'm trying to be sensitive to what you're talking about. But can you give me an example of what you would be concerned about being discussed in public? I mean, we don't have to discuss any of the plaintiffs' names. The policies, I think, are public. I'm just trying get a sense of what you think is sensitive.

MR. MISHRA: I just wanted to flag that,

Your Honor, because there's some facts as to which visa and who applied for that visa, you know and as -- to which the protective order applies. I just want to make sure that we're not on the hook for that.

THE COURT: Okay. Well, look, I think both sides are sensitive to it. And -- and in some ways, I'll leave it up to you ultimately to sort of navigate through it. I don't think -- my questions are not going to be specific as it relates to anyone's visa status. It's more the broader policy questions.

But if I do or say something that encroaches upon it, don't be shy about letting me know so that we don't run afoul of anything. Why don't we try it that way. Okay?

MR. MISHRA: Sounds good, Your Honor.

THE COURT: Okay. Thank you. Just give me one more moment, please.

(Pause in the proceedings.)

THE COURT: Okay. So why don't we get started here.

I guess we'll start with the plaintiff. I want to kind of go in order of the questions. And so I don't know who is drawing the short straw from the plaintiffs' side, but why don't you step to the lectern, and then we can kind of go through it one by one.

MR. VAKILI: That's me, Your Honor.

And -- and we appreciate the Court's questions, and there's certainly details to sort through, but I want to start just by pointing out that distilling this case to its essence, it's actually quite simple. It's a challenge to three policies --

THE COURT: Right.

MR. VAKILI: -- brought by three proposed classes, designed to challenge one for each policy, and for organizations that work day in and day out with the affected population.

And the reason we're here, this case -- the issues in this case occur in a moment in time. There is a significant lag between the moment when noncitizen victims of domestic violence, crime, and trafficking avail themselves of the protections that Congress explicitly wanted them to have in the time USCIS is able to adjudicate those cases.

THE COURT: Okay.

MR. VAKILI: And the question is: What are the -- what's permitted in terms of enforcement during this interim period?

And so we challenge the 2025 guidance -- what we refer to as the 2025 guidance, first. Your Honor, one of your questions was -- and I'm sorry, I don't -- I

can take them in order if you'd prefer.

THE COURT: I mean, we might as -- I mean, yes, because --

MR. VAKILI: Yeah.

THE COURT: -- isn't the first thing standing? I mean, right? I mean, how do the plaintiffs have standing to pursue this on a class-wide basis?

MR. VAKILI: So standing is -- is determined at the time the complaint is filed. So you look at the facts as they exist then. At the time the complaint was filed, each of the plaintiffs was suffering ongoing harm. This isn't about some future thing that was going to happen to them. They were in the process of suffering the harm. Those that were in custody clearly were suffering the harms of these policies.

THE COURT: Okay.

MR. VAKILI: Those -- Camila B., who had been arrested and -- and put into detention for a month, sure, she had been released, but she's still in proceedings. She still checks in with ICE regularly through onerous processes.

THE COURT: But she had to do that beforehand; right?

MR. VAKILI: She did not have to do that beforehand.

THE COURT: Prior to that time, no check-ins at all?

MR. VAKILI: No, because she was in deferred action status, an authorized status in the United States. There's no reason to do that.

THE COURT: And your position is that check-ins would constitute a harm? I mean, I understand that at the time of the filing, the status was different. But now, do we ignore the current state of affairs?

MR. VAKILI: Well, you -- when you're looking at the harm, you look at what the policies have caused. And so yes, we're in a heavier -- in an era of heavier-handed enforcement, certainly. But deferred action status is -- as the -- as the court in *Inland Empire* and many others have said: It is an authorized status to be in this country lawfully during a period of time.

And so there's no -- there's no reason for check-ins. There was never one before, and it's because of these policies that she now has to do it.

THE COURT: Okay.

MR. VAKILI: So that's an ongoing harm.

And she's -- and she's in a proceedings, which -- which remains, which never was the case -- which was not the case before. And --

THE COURT: Someone who is not here in the country under legal authorization, they would potentially have to go through similar proceedings, wouldn't they?

MR. VAKILI: Someone who's in the country without lawful authorization would be exposed to removal proceedings.

THE COURT: Right.

MR. VAKILI: We're not alleging the proceedings are -- themselves are unlawful.

THE COURT: Right.

MR. VAKILI: But they are a sign of the harm. So for standing purposes, someone in that process alleging that those proceedings were unlawful in some way, for the harm, injury-in-fact analysis, I think, would suffice.

Now, on the merits, you might have trouble.

THE COURT: Okay.

MR. VAKILI: But on the -- on the injury-in-fact analysis, it would suffice.

THE COURT: Okay.

MR. VAKILI: And then that takes us to the deported plaintiffs. There's been -- there are three that we allege were removed unlawfully.

THE COURT: Okay.

MR. VAKILI: And importantly there, Your Honor, the injury is not just the moment of deportation. It's every single day of being deported, every single day of being separated from your family.

Lupe A., three miles from here she lived for 20 years. And everyday now she is separated from her U.S. citizen grandchildren, her children, her pets, her church, her life that she built. And so the ongoing harm of deportation is sufficient injury-in-fact.

THE COURT: I get it as to -- but jumping back to some of the other plaintiffs, I mean, I'm assuming the Defense is going to talk about ripeness and mootness, you know, given that some had change in status, some already have suffered the harm.

What's your response to that?

MR. VAKILI: That this is -- this falls within a line of cases, Your Honor, that -- for inherently transitory class actions, that creates an exception to mootness.

The Ninth Circuit -- probably the best case in the Ninth Circuit that goes through this -- this line of cases is *Pitts* v. Terrible Herbst. *Pitts* v. Terrible Herbst also has one of the greater case names out there, but it's the case -- and it goes through the history from *County of Riverside v. McLaughlin* in the Supreme

Court on through a number of cases that talk about how when you bring a class action -- when a plaintiff brings a class action, sure, they bring their own harms, but they have a separate interest, interest in representing the class. And even when the individual harms become moot -- and I'll get to in a moment why none of the -- none of the plaintiffs cases, we don't believe, are moot.

But even if we accept that some aspect of their claims are moot, their claims on behalf of the class are not moot. And the lesson basically from *Terrible Herbst* in this line of cases -- Terrible Herbst is H-E-R-B-S-T -- is that even if the harm is on -- no longer ongoing to the plaintiff, it's ongoing as to the class. It's capable of repetition and evading review as to the class if it's a transitory kind of claim.

Is it the kind of claim where, as happened here, the Court is unable to rule on class certification before there is a change of circumstances that might render the plaintiffs' standing moot?

And so that's mootness. And it falls -- this case falls clearly within a line of cases that -- that recognize this exception.

Ripeness is just a different inquiry; right? And in ripeness, you -- it sort of -- it merges with the

injury-in-fact inquiry. The question is whether the harm is speculative.

So here, we have, again, at the time that the complaint was filed, completely ripe cases. It didn't become unripe because of subsequent facts. That is mootness doctrine. Ripeness doctrine is whether you just came to court too soon, and that's just not clearly the case here.

THE COURT: Talk to me about -- you believe that the plaintiffs have standing to pursue prospective -- because you're asking about prospective injunctive relief. I want to focus on that.

MR. VAKILI: Right. Yes, Your Honor.

So prospective injunctive relief still requires the harm that is real and imminent and not speculative. That's sort of the language in most of these cases.

THE COURT: Right.

MR. VAKILI: And here, you can't get anymore imminent than ongoing; right? None of the cases say if you're suffering the harm now, you can't get prospective relief to end that harm as to you and your fellow class members because you're ongoing now.

All those places from *Lyons* to -- I think it's *Hodgers* is the other case they cite. Those folks had suffered a harm; the harm had passed; and now they're

living free; and they wanted to challenge a policy that they were subjected to. And the courts found those cases -- those plaintiffs didn't have a ripeness because they didn't -- they didn't prove -- the record didn't reflect the harm as to them, in particular, was likely to happen -- was likely to happen again. And so that -- that's why that ripeness that comes up in those cases is just not here, Your Honor, because this was not past harms. These were ongoing harms at the time we filed.

THE COURT: Okay. All right.

MR. VAKILI: And, again, I'd suggest, Your Honor, the cases that -- the named plaintiffs' cases aren't --

THE COURT REPORTER: Slow down, please. Say it again.

MR. VAKILI: The names -- I apologize.

THE COURT: You can raise the lectern a little higher. There's a button to your left.

MR. VAKILI: Oh, wow. Technology. Thank you for that.

So we'd also not concede that the individual plaintiffs' claims are moot, even though -- and -- and mootness, once you have standing, is really the burden on the defendants to prove. And they didn't submit any evidence. Now, we're not going to contest things that

we know to be true, certainly.

Paulo C. got out through a habeas petition, not because ICE changed its policy that they can't detain him pursuant to his deferred action status. He still has to check in, also. He still is in removal proceedings. They're still treating him like his deferred status action doesn't mean anything. And so -- and that's true of Ms. -- of Camila B. and others.

So we wouldn't necessarily concede that -- that their harms are -- are not ongoing. So we believe that because this is an inherently class -- transitory class that we have standing on that -- that plaintiffs have standing.

THE COURT: And I don't know if this is in your lane or not, but I'm also curious. CHIRLA is -- they assert -- CHIRLA is not just relying on organizational standing, but associational standing? I'm just curious as to why. Was that just a strategic thing?

MR. VAKILI: To be candid, Your Honor, that is an in-the-alternative kind of argument. If -- if -- if the Court says that they have organizational standing, there are differences -- we can get into the weeds of the doctrine here -- between remedying the harms of an organization themselves and remedying the harms as a third-party stand-in for their members. There are

differences.

There's a practical matter, given the request for relief here. The relief that we're requesting would work for them either way --

THE COURT: Okay.

MR. VAKILI: -- either way.

THE COURT: Okay. All right.

Okay. Can we just jump to the APA claims now?

MR. VAKILI: Yes.

THE COURT: Talk to me. You know, how does the De Facto Revocation Policy, the Blind Removal Policy -- are they policies, guidelines? I mean, I know we're talking about semantics here, but I want to get your perspective on this.

MR. VAKILI: Yeah, I think you've hit the nail right on the head. It's an important question.

These are legal positions that are adopted by the Government. In the -- over the course of the case, we'll prove it, I think, beyond a shadow of a doubt through discovery, but already at the preliminary stage, there's enough indicators -- and I'll start with the deferred action De Facto Revocation Policy -- that ICE behaves in a way that they think deferred action --

THE COURT: Doesn't exist.

MR. VAKILI: -- issued by USCIS, pursuant to

these programs, doesn't mean anything as to them. It doesn't matter. They can --

THE COURT: You know, I thought I read something that suggested that -- that suggests -- that one might argue ICE can consider it, but it's not -- it's not -- it doesn't have the weight that it once had.

So does that -- and if that's accurate, is it -- isn't that contrary to what you just stated, that it doesn't exist? They're saying it exists; it just doesn't have the weight that it once had.

MR. VAKILI: Their position, Your Honor, is that they can -- they have the authority to detain and deport regardless of deferred action, not that it's -- not that it --

THE COURT: Discretionary.

MR. VAKILI: Yeah. So this appears in a couple places. In footnote 1 of the 2025 guidance, it says -- it says, "ICE." There's a lot of acronyms --

THE COURT: Right.

MR. VAKILI: -- in the immigration law, Your Honor. It talks about OPLA, the Office of Primary [sic] Legal Advisor. That's ICE. ICE may determine in the totality of the circumstances that deferred action should be revoked.

THE COURT: Right.

MR. VAKILI: Deferred action, pursuant to these programs, is in USCIS's sole, sole authority. That's in regulations. That's in USCIS policy. ICE just does not have the authority it asserts in that footnote.

It shows up in the briefing. They say specifically -- the Government says specifically deferred action is not an obstacle to enforcement. So when you're asking, "Is it a policy?" that's the evidence of a policy.

And I'll go a little further because the APA, when it defines what's agency action, we have the benefit of the APA, which defines everything -- virtually everything. And the APA defines "agency action." It includes the -- all or part of a rule or policy.

And then it goes and defines what "a rule" is. And a rule -- so this is in 5 U.S.C. 551 -- so I'll start again, 5 U.S.C. 551(13). "'Agency action' includes the whole or part of an agency rule, order, license, sanction, or the equivalent or denial thereof." That is an agency action.

Well, what's a rule? 551(4), "The whole or part of an agency statement of general or particular applicability." So here, we have general agency statements.

I left out one important place this policy shows up, in the dozens of differed action habeas matters that we cited where they -- where ICE asserts authority to continue to detain. So we have statements of policy.

Sanction is also defined. 551(10), "The whole or part of an agency prohibition, requirement, limitation, or other condition affecting the freedom of a person."

And so this is agency action. And if it is an agency action in this context, it is enough to be a policy to challenge.

And there are a number of cases, Your Honor, in the APA context that make clear that a policy does not have to be written. Unwritten policies may be challenged. We cite a few of them.

THE COURT: Yeah, you did. Right. Okay.

MR. VAKILI: And so this is a policy. And the same is true -- and I think one of your questions to the defendants hits this on the head -- regarding the 1227(D)(i) policy, the Blind Removal Policy.

The memo itself says we -- basically says ICE is not required to get prima facie determinations when someone requests a stay. The whole theory of that -- of our claim there is the 1227(D)(i) must be interpreted --

is properly interpreted to require that prima facie determination anytime someone with a U or T visa requests a stay.

And so by asserting that it is not required every time, that's a policy. That is a statement of their legal position, and that's enough to be a policy and an agency action that can be challenged under the APA.

THE COURT: So let me ask you this scenario: Let's say ICE encountered someone with deferred action. Okay. And let's say for whatever reason they have some reason for removal, okay, or to revoke that deferred action. Are you saying that ICE could not do that? It's prohibited from it? Or could you -- you -- and if so, could USCIS do it, or are they prohibited from it, as well? I know it is a multilayered question.

MR. VAKILI: So let me give you a multilayered answer. So let's start -- let's start from first principles. Because -- and this comes from *Regents* -- the Supreme Court case in *Regents*, R-E-G-E-N-T-S, and the *Inland Empire* case that was heard in this district a few years ago and is ongoing -- and that case is on appeal in the Ninth Circuit.

Deferred action is an the affirmative benefit. It is not just, in these contexts, a statement that we

won't enforce against you until later. It confers lawful authority to stay in this country for a period of time.

THE COURT: But it can be revoked.

MR. VAKILI: It can be revoked. So there are USCIS policy -- and this sort of starts to bleed into your Accardi doctrine question. USCIS policy says it is in our sole discretion.

THE COURT: Okay.

MR. VAKILI: We may revoke it. There are criteria for how you got it in the first place.

THE COURT: I'm sorry to interrupt you. But your position is: ICE can't do it, only USCIS?

MR. VAKILI: ICE can't revoke deferred action pursuant to these programs, only USCIS.

THE COURT: But if USCIS revokes it, ICE can enforce.

MR. VAKILI: Then ICE -- then the person becomes situated like anyone else in this country. Then ICE can enforce it.

THE COURT: Right.

MR. VAKILI: So what we're suggesting is prior to any enforcement action, a revocation has to happen.

Now, you brought up a hypothetical, and I will just -- I will point out that it is a hypothetical.

There is nothing in the record to suggest --

THE COURT: Right.

MR. VAKILI: -- that the enforcement is happening against people who have done something --

THE COURT: Right.

MR. VAKILI: -- to revoke their deferred action. We'll deal with that when it comes. We have a Fourth Amendment claim in the complaint --

THE COURT: That might address that.

MR. VAKILI: That's right. If there is probable cause to believe the person is in violation and is somehow too dangerous or too much of a flight risk to get a warrant and go through the process in the meantime, then yes. Can they engage in a brief detention, take the person into custody? Sure.

THE COURT: But that's not what you're talking about?

MR. VAKILI: No. And that's not what's at issue here, and that is not what is in the record.

THE COURT: Fair enough.

MR. VAKILI: And even then, Your Honor, due process would still require, rather than the pre-deprivation hearing, a post-deprivation hearing, something, some process.

THE COURT: Right. I'm sorry. I get TROs

every couple of days.

MR. VAKILI: I imagine. Yep.

So -- so this really is why the Accardi doctrine -- to get to that question -- is in there.

THE COURT: Okay. We'll get into that in a moment. I want to give Mr. Mishra a chance to sort of -- to respond to what's been said. So we're going be to a little bit of a tennis match here.

MR. VAKILI: Okay.

THE COURT: So, Mr. Mishra, if you would, step to the lectern. Upon what we've discussed thus far -- but, you know, the next couple of questions we have are directed toward you about the guidance, is it guidance, is it a policy, things of that nature. So the floor is yours.

MR. MISHRA: Thank you, Your Honor. Plaintiffs say that deferred action, both under the U visa and T visa programs, is a formal authorization to remain lawfully in the U.S. for a set period of time. They just said that, but it is also in the face of their complaint. And they say that the very premise of deferred action is that DHS will take no action to proceed against them.

THE COURT: Are you saying that is inaccurate?

MR. MISHRA: Yes, we're saying that -- that

defense is just real as the alleged De Facto Revocation Policy or Blind Removal Policy. The implementation of the U and T visa, it directly says that all you get with this deferred action is a lower priority on enforcement.

THE COURT: So your view is that it's not a -- in other words, it is not an out right shield. Someone with a U or T visa could be removed by ICE regardless of that status?

MR. MISHRA: Your Honor, yes. And it's not a status. A status comes after the U visa and T visas are approved, and that may happen even post removal. There is a process for people to come back into the country once their U visas and T visas are approved. But it is a two-track system.

THE COURT: So I guess at a 30,000 foot level, what's the purpose of the U or the T visa then?

MR. MISHRA: It allows them to have a lawful status. But, again, the full action is not revoking the U visa or the T visa. Those applications remain active and pending. All it does is that it contemplates a two-track system in which USCIS can continue to adjudicate the visas while -- and this is explicit regulation saying that the USCIS regulation simply implementing that these two visas they -- it says that ICE must proceed to --

THE COURT: So ICE can jump in regardless?

MR. MISHRA: Absolutely.

THE COURT: But -- now you may not be able to answer this, but that hasn't been the practice for -- to the extent, I agree with you. And I'm not sure I'm there yet, but to the extent, I agree with you. Will you acknowledge that that has not been the practice over the last -- what? -- 10, 20 years?

MR. MISHRA: Your Honor, you don't have to take my word for it. Plaintiffs' class certification reply brief on page 2 and page 3 does say that. It still does happen, but it is rare. That's all. So it is not that it forecloses any immigration proceedings, and as we have argued in our brief, lawful consequences under the law is not the harm they can allege under any shield, deferred program or not.

THE COURT: Okay.

MR. MISHRA: And, again, the definition of "lowered priority" that I am pointing to comes from the regulation that implements these two visa schemes. And that matches exactly that which the Supreme Court has articulated in *Reno*, the 1999 case about Section 1252(g) in which the Supreme Court, relying on a treaties, said that this was a commendable exercise in administrative discretion.

THE COURT: Can we jump back for a second? I just want make sure -- I may be confused on this. You're saying -- I think you said earlier when someone has deferred action, it just means they're a lower priority; right? Is that --

MR. MISHRA: Yes, sir.

THE COURT: But can someone who has a deferred -- has a deferred action, can that -- doesn't that deferred action have to be revoked before ICE can then institute removal proceedings?

MR. MISHRA: Your Honor, if you are equating the deferred action to, for example, DACA program or the TPS program, then revocation -- then the use of the word "revocation" makes sense. But in this case, deferred action, the way that regulations have defined it or use it, all it means is a lower priority of enforcement. There is no revocation. All it means is procedural safeguard.

And I might point to one example that is very concrete and at issue here, even in the immigration proceedings, the regulations implementing the U visa and T visa contemplate that the immigration judge at the immigration court are the BIA may actually see deferred action and terminate the proceedings. And those are 8 CFR 1003.18 and .1. Those two regulations is, in

fact, what plaintiff Merlos used to get her proceedings to be terminated.

So there are safety valves that these regulations implementing the visa schemes contemplate, and you can use that. It comes with the territory. But it doesn't mean these -- deferred action is not the U visa and T visa program. Those programs still continue, even if someone has been removed, as I said before.

THE COURT: Okay.

MR. MISHRA: All it does is basically a set of rights that go with the deferred program, and you're at lower priority of enforcement. But enforcement can still happen, and legal consequences can flow from that. But even if you leave the country, you still have a good pathway to come back and be lawfully admitted. And that is what U visa and T visas guarantee you.

May I go back to the *Reno* case that I was alluding to?

THE COURT: Yes.

MR. MISHRA: Because the deferred action, the definition there matches what we have in the U visa and the T visa. And it matters because the case also came around the time when the scheme was implemented by Congress. So *Reno* says, "Section 1252(g) seems clearly designed to give some measure of protection -- again,

some measure of protection nor deferred action decisions" -- which is at issue here, ICE saying no deferred action at times. I'll continue with the Court.

"Some measure of protection nor deferred action decisions and similar discretionary determinations, providing that if they're reviewable at all, they at least will not be made the basis for separate grounds of judicial intervention outside this streamlined process that Congress has designed."

Your Honor, that streamlined process is the immigration proceeding for each plaintiff. I know plaintiffs disagree. They characterize as a fallacy the fact that immigration court provides sufficient process, and that's in their BIA reply at page 2. They also say the docket there moves extremely slowly, complaint paragraph 151.

They go so far as to say there are no process as to these two programs over there, which is, as I said, there are two regulations considering the safety valves for the plaintiffs over there. And that's at BIA reply page 14. BIA reply, the reply for the preliminary injunction motion at page 14.

To be sure, all these complaints could still be brought there, just not here. And our point is that this case law saying that if they're not successful

there, they can take it to the BIA and to the Ninth Circuit after that.

THE COURT: Hold on one second. I want to make sure I understand. What do you mean when you say ICE -- my notes, did you say no deferred action decision?

MR. MISHRA: Yeah. That is what the Supreme Court said in *Reno* that even when Executive Branch makes a no deferred action decision or similar discretionary determinations.

THE COURT: But ICE can't make a no deferred action decision, can they?

MR. MISHRA: Sure they can. That is the regulations that implement the U visa and T visa. That is what it says that ICE may continue to proceed against these folks who have applied for the U visa and T visa. And I'm happen to provide the citation for that regulation.

THE COURT: Okay. If you have that citation --

MR. MISHRA: Yes.

THE COURT: Yes, please.

MR. MISHRA: For U visa, it is 8 CFR 214.14(c)(1), subsection little i and little ii. For one -- sorry, for T visa it is 8 CFR 214.204(b)(1), subsection little ii.

Another section covering similar aspects, 8 CFR

214.205(e)(1) through (3).

THE COURT: Okay.

MR. MISHRA: And, Your Honor, I'll jump back to the fact that, again, the lawful -- the premise that they have made that deferred action is no action isn't supported by the scheme that the Congress and the agencies have implemented here. It is a two-track system. And, again, we showed U visa and T visas even for those removed, it is still intact. The program is intact, unlike DACA program and all the other programs.

May I go to the ripeness issue?

THE COURT: Yes, please.

MR. MISHRA: Your Honor, one of the things they said was the inherently transitory exception applies. First of all, I think the complaint on its face says that some of these processes that the immigration court are really slow -- extremely -- they move really slowly -- extremely slowly. So the fact that these processes are not uninherently transitory is not true.

But they rely on *Pitts*, the Ninth Circuit case, and that is distinguishable. Sorry, it's *Pitts*, P-, as in "papa," I-T-T-S. Claims of these types are not inherently transitory given the protracted timeline of immigration proceedings. And that's *Pitts*'s case saying itself, you know. And -- and the meeting concerning

*Pitts* was actually different. There, the defendants were strategically buying off the plaintiffs to move the case. And here, there is no pick off tactic to move the case.

Again, there is a protracted timeline for the immigration proceedings. For example, Camila had -- plaintiff Camila had her last proceedings, I think, July last year, and the next one will be April this year. So there is nothing moving really quickly. This is not an inherently transitory issue here. But more importantly, plaintiffs complain in the brief, at least, that there is a delay on part of defendants to assign counsel to this case.

Again, it indicates the position there was that they were trying to force mootness, just like *Pitts*, but to be sure that the Court had already ordered as of October 30th last year when the class action motion was filed to serve defendants with the unredacted exhibits. Disclosing the identity of the individual plaintiffs and that ECF number 24 at page 4.

That is so this could have been effectuated without defendants assigning counsel to the case. In fact, that is how the complaint was served around that timeframe. Yet, the service of the individual plaintiffs was not completed until December 6th, and

that is shown by ECF number 37 at page 1. And that's less than two weeks before defendants filed --

THE COURT: So what is your -- I'm trying to understand. What's your point ultimately? That there is these delays that -- that are built in the system?

MR. MISHRA: No. The point there was that I think the reply brief at page 5 through 8 was saying -- 5 through 6 was saying that *Pitts* is applicable here because we also -- defendants are also trying to buy off -- or basically they're trying to delay the case so the issues become moot.

THE COURT: Okay.

MR. MISHRA: But that is not the case. They could have served us just like the way they served the complaint.

THE COURT: Okay. I get that, but I don't know how significant that -- I mean, I think the more significant point is, I think, from the plaintiffs' prospective is that in theory -- and we've seen cases, not necessarily this case, but we've seen in many cases ICE can pick up someone and deport them within days. And thereby, one might argue it is moot because they're -- they've been removed literally within 24 to 48 hours; right? I mean that happens doesn't it?

MR. MISHRA: Your Honor, in this case that is

not the issue. Those may happen in the habeas petitions, you know, but here the issue is that whether the benefit of the bargain that these plaintiffs could still have it, you know. And sure enough -- I mean, after they are removed, they can still have it, and they can come back. So because it is a two-track system, on the one track, USCIS can take its time to adjudicate those applications in petitions. But at the same time, ICE can also do its job. And even in this system --

THE COURT: But -- think about that. You're saying USCIS can take its time and while the same time ICE is doing its job, if ICE does its job -- at least based on what I've seen just by -- not only in this case but in all the cases, the TROs that we receive, ICE doing its job can mean they get deported immediately. They could be sent to Adelanto.

So I mean, again, I'm struggling to see what is the point here. Your suggesting that there is all this time, but to the plaintiffs, there are scenarios where by the time or by -- you know, they don't have time because people could be sent off to a foreign land.

MR. MISHRA: Your Honor, and the Ninth Circuit is clear on that, and that is a case we cite in our opposition. Even after going to a foreign land, they can still come back through the U and T visa. Not only

that, they can still -- even after they're removed, they can still reopen their proceedings and come back. So there are multiple tracks to avail of the benefits. Again, the way the deferred action has been defined under this conditional scheme doesn't foreclose all those paths.

THE COURT: And look, this may not be -- I don't know if you know the answer to this -- how many people are coming back, utilizing the process that you just described? That, you know, where they're sent off, and you say they still have an avenue and means by which to return to the country. Is that happening?

MR. MISHRA: Your Honor, I cannot speak to that, but that is the whole point of U visa and T visa. It doesn't matter where you are. You have a path to come back. You know, there is a counselor processing involved, and every administration has put that in place. It is always there, you know, and that is the whole point. They're not taking those away from them.

THE COURT: Okay.

MR. MISHRA: Deferred action, the way it is being defined here is different from any other programs. Here, the underlying program itself, U visa and T visa, is untouched. And should we have an explanation U visa and T visa applications and that is why USCIS is doing

its job in due time. You know, but that doesn't foreclose that they would not have a chance to avail of the benefit of the bargain when they cooperated with law enforcement priorities.

THE COURT: Okay. Let me ask you: What's -- what is ICE's reason for the change in the policy? I mean, you touch upon in it in the papers, but it didn't really -- it just seems like, oh, we're just -- it didn't seem like there was a lot of meat to it. Let me just put it -- because that is probably the most direct way I could say that.

MR. MISHRA: Give me one moment, Your Honor, sorry.

THE COURT: All right.

MR. MISHRA: Your Honor, first of all, defendants maintain that there is no change in policy, at least not something that's a final agency action, just adjustments to internal guidance on how to exercise --

THE COURT: It is a pretty big adjustment, don't you think?

MR. MISHRA: I will address that, Your Honor --

THE COURT: Okay.

MR. MISHRA: -- shortly.

All they're doing is adjusting their internal

guidance on how to exercise prosecutorial discretion.

THE COURT: Again, I have to ask: I thought the 2025 guidance -- I thought -- I don't have all the documents. I thought it said it rescinds prior guidance; right? So it's more -- it's saying what you read before or all this stuff on 2025 and I think 2011, that's gone. That -- that doesn't sound like a -- a slight modification to me.

MR. MISHRA: To be sure, Your Honor, every administration does that when they have these guidance come out. That is the language they used. That it supercedes the prior guidance. For example, when the 2021 VC directive came out, it uses the same language to supercede the 2019 directive.

THE COURT: And in those -- and are you suggesting that in those other instances it's not a -- a change -- it's been deemed not a change in policy?

MR. MISHRA: Your Honor, that was not the issue essentially.

THE COURT: Okay.

MR. MISHRA: Again, it was internal guidance on how prosecutorial discretion is to be exercised.

THE COURT: No. I get that. Look, I understand administrations have the right to -- look, in my prior life, attorney generals change guideline

policy, but they were changes. I mean, like when those came out, we -- the prosecutors were not allowed to -- you know, the Ashcroft Memo is the one that comes up to mind. You had to charge every readily provable offense. That was a change. Are you saying that is not the case here?

MR. MISHRA: Let's look at the evidence, Your Honor. I think the answer is that is not the case, but under the 2021 directive, ICE coordinated with USCIS to seek expedited adjudication of the immigration applications and petitions.

THE COURT: But that's been rescinded?

MR. MISHRA: To be sure, that was only when necessary and appropriate.

THE COURT: But it's been rescinded, right, according to this new -- whatever you want to call it?

MR. MISHRA: Sure. Now, look at the new language. It says ICE officers can still exercise the same discretion but just on a case by case determination. So, yes, the language has changed, but look, necessary and appropriate versus a case-by-case determination. There, under the prior guidance it was ICE agents and officers doing it. Now, it's more so the OPLA, the counsel for ICE folks, they're doing it on a case-by-case basis.

So it is just shifting the internal priorities -- not priorities maybe, just shifting how the prosecutor discretion is exercising internally, but comparable language. But even if you assume that it changed just because we use the word "superceded," this is not a new paradigm, Your Honor.

Under the 2019 policy, 11005.2, that also -- ICE did not routinely request adjudications from USCIS, which also implies it wasn't a case-by-case basis. I mean, to the extent plaintiffs have framed that as a policy challenge, the Ninth Circuit is clear that even such alleged policies and practices, challenges must be challenged to the PFR process -- the change of review process.

Our point is that -- and that is a *J.E.F.M.* Ninth Circuit case from 2016, which we cite at the bottom of page 19 of our opposition brief -- BIA opposition brief and first two lines of page 20 of our opposition brief.

And even *Reno*, the Supreme Court case I cited earlier, it's even more explicit. It says that, as I said before, you have to take these similar discretionary determinations not outside the streamline process that Congress has designed.

So our point is that complain all you want, but

take it to the right channel. Don't create additional avenues by saying it is a new policy, and it has affected something that is within the discretion of the agency and not reviewable under the APA.

THE COURT: Okay.

MR. MISHRA: And if I may add a few more things?

I think you also asked us the reasons for those changes and any evidence if we can point to some?

THE COURT: Right.

MR. MISHRA: One aspect is that the revised language under the 2025 guidance brought this internal guidance closer to the applicable rules and regulations.

THE COURT: Say that one more time.

MR. MISHRA: It brought the guidance closer to the applicable rules and regulations. Under the 2021 directive, it almost seemed like you -- it used the word "refrain" from enforcement. But that is not what the regulations underlying the T visa and U visa say. They say you can concurrently do it. You can enforce the laws.

THE COURT: I guess the part I'm struggling with is that at a practical level -- and please correct me if I'm wrong. My understanding was the purpose of these visas was in part to encourage or ensure that

people that were the victims of crime, witnesses to crimes, would come forward for -- you know, come forward and not be worried or have to be concerned about their immigration status at a minimum while the proceedings were pending because the society has decided is important for victims and witnesses regardless of their status to come forward and report and, you know, if necessary testify in cases.

It sounds like now you're saying that's not -- that is no longer important; right?

MR. MISHRA: No, no, Your Honor. That remains important, but those are the policy considerations underlying the statutory scheme. What made it in the language of the statute and the regulations is that you'll get the benefit of the bargain. You will have lawful admission in due time when the U visa and T visa will be approved. And the deferred action --

THE COURT: But in theory under this new -- whatever you want to call it, while a case is pending, or even -- yeah, someone -- ICE could remove someone?

MR. MISHRA: Absolutely.

THE COURT: And then they would have to apply, and say, hey, I'd like to come back so I can be a witness in this case. And someone would make a decision whether that can happen?

MR. MISHRA: No, Your Honor. Even the -- please recall the case-by-case determination that I talked about. If there is a pending investigation, what happens under the case-by-case determination now and under the necessary and appropriate determination before is exactly that evaluation.

If there is an ongoing investigation, before the ICE agents could assess that, now OPLA assesses that on a case-by-case basis and makes sure that that is availed of. But, again, at the end of the day, these folks, if their U visa and T visas are approved, they have a legal pathway. They have lawful status at that point.

I think the issue right now is the deferred action, which is a separate construct altogether from the visa. And under the deferred action, all they have under the regulation, which could be the final agency action, is a battle of track of enforcement and adjudication of the visas -- of visa applications.

What I was going to say was that now that the revised language under the 2025 guidance has brought the guidance closer to the applicable rules and regulations, which Executive Order 14159 mandated it required ICE to apply all lawful means to make sure faithful execution of immigration laws.

THE COURT: No, I get that. Okay. I mean, I understand. Let me hear from the plaintiffs. I just want to get a response because -- and you'll get a chance to come back. I promise.

MR. MISHRA: Okay.

THE COURT: So again, Mr. Vakili, if you've drawn the short straw again, you've heard a lot there. They're saying it's not a policy. I'd be curious to your response. And to the extent I agree with you that it is a policy, are you saying that this policy's contrary to a specific law? Or Congress's overall scheme? What is it?

MR. VAKILI: Your Honor, it's not the short straw to help explain this stuff. It's my pleasure.

So let's be very specific about what was rescinded and the rights -- the protections that were lost. The 2021 policy, you're absolutely correct was rescinded immediately. There is something in the briefing about how it is maybe we'll come back to this policy. It was rescinded immediately under one of the *Biden v. Texas* cases we cite. That's enough we cite. That's enough. You're exactly right, Your Honor. It is binding on ICE. They cannot ignore that. What does the 2021 policy do? "Absent exceptional circumstances, ICE will refrain from enforcement." That is a big deal.

That's at docket 31-8 at 60. It is an exhibit to the Cervantes declaration.

That's not all. Absent exceptional circumstances, ICE will defer enforcement decisions until a negative determination is made at an interim level on the petitions. It gives USCIS a chance to do the thing that Congress wanted them to do. Under the new policy, it sets up this morbid kind of race between ICE and USCIS where if ICE can get the folks out before USCIS can act, then that's fair game.

THE COURT: I mean, you heard the Government say basically they're not different. This is just sort of these -- a parallel process; right? I mean, what is your response?

MR. VAKILI: That they're completely different that the 2021 policy basically allows for USCIS to adjudicate on an interim basis.

THE COURT: On a case-by-case basis?

MR. VAKILI: On -- right. So it says "absent aggravating circumstances." It makes a presumption -- basically a presumption that we won't enforce against someone with a pending petition till ICE can determine whether they're at least prima facie eligible. Why? Because Congress -- I mean, this is all throughout the briefs. We can go through some of it.

Congress was explicit down to the titles of the provisions, down to the congressional records, the statements that the sponsors made. These are protections against removal. That is the title of the provision that creates the T visa, "Protection from removal."

1227(D) is ask called "Relief for certain victims pending action on petitions." Congress is trying to provide relief. One of the sponsors said, "We are trying not to send them back to their home countries." Another sponsor said, "ICE does not have the authority to override USCIS. There is a specially trained unit in USCIS trained in victims of domestic violence, trafficking these kinds of things to adjudicate."

That is who we want adjudicated. This is replete in the record, Your Honor. And this is no half measure. This is the trafficking victim -- the law we're talking about is the Victim of Trafficking and Violence Protection Act of 2000 that created these provisions. 95 to zero in the senate. 371 to one in the house. You can't get that bipartisanship today on a bill stating the sky is blue, Your Honor.

So this is robust protections by nearly unanimous Congress being very serious about the public

safety matter of encouraging non-citizens to come forward without fear of immigration consequences.

THE COURT: But the Government is saying in essence not much will change. What's your response?

MR. VAKILI: The record at this stage of the proceedings certainly says otherwise. We have dozens and dozens of people in deferred action being detained, being tried to remove, denying plaintiffs here. All enforced the organization declaration say things have changed.

The experts in the field from Christina Vallez all say things have changed. Dan Logan, who is a former border enforcement attorney with the U.S. Attorney General's office, has a declaration that says, "Deferred action used to be religiously observed." And so where we say, yes, in rare situations that enforcement used to happen against people with deferred action. Yes, exactly in the way we talked about before, Your Honor. They would have it revoked first.

THE COURT: And what's your response to the Government's position that this deferred action -- I think the words he used, "It lowers the enforcement priority. And even if they are removed, they can still pursue their U or T visa applications from abroad"?

MR. VAKILI: So with the T visa, it is

completely false. T visa requires presence in the United States to be approved. That's 8 CFR 214.207. Even though U visa applicants may one day be approved, tens of years from now, that's not --

THE COURT: But it can happen; right?

MR. VAKILI: It can happen. But --

THE COURT: But you're saying it is practically ineffective?

MR. VAKILI: It is practically ineffective, and the harm is not just -- we're not talking about the harm of I'm not eligible for the visa. That's of course the harm -- there is a whole lot of harms happening here. The harm is the deportation, the separation from your family. All the things that people are actually scared of when they come forward to report to the police are these things. Am I going to lose my house? Am I going to lose my job? Are my kids going to have to live in a country they don't know?

And these are things that are happening. Lupe A. was deported from deferred action in two days. Camila B., it took a month of detention and separation from her family to get out. Jackie Merlos, six -- five or six months of detention, separation from her kids. Her kids had to go live with a family for six months while she sorted out immigration court.

And that brings an important point, Your Honor. The Government consistently says immigration court is the place to sort this out. Immigration courts, again, they're -- the Ninth Circuit has been clear. The regulations are clear. Immigration courts have no authority over U visa petitions and T visa petitions. The interim benefits, the Ninth Circuit acknowledges this in the *Lee* case that we cite. And so there is no authority.

Did -- did Jackie eventually get her proceedings terminated? Sure, after six months of detention. And she -- and she's -- the point isn't that she is in proceedings. The -- the analysis of the inherently transitory exception offered by the Government is completely off. What's -- you measure inherently transitory by the time from the complaint is filed until the time class certification can be adjudicated, not the time the Court can sort it out in immigration court. The immigration court can sort it out. And if that is really where that is supposed to happen, we're not even in inherently transitory territory.

They're not moot. Nothing is moot. She's in court, if that's their position. So they can't have their cake and eat it, too, here. It's got to be one or

the other.

THE COURT: So I mean, the short answer to my question is basically you think these policies violate at a minimum Congress's scheme by virtue of the quotes that you cited from the -- the -- Senator or congressional record?

MR. VAKILI: Right. And so a couple of cases, Your Honor, in the Ninth Circuit one of the *East Bay Sanctuary* cases, 993 F.3d 640, talks about contrary to law analysis under the APA can occur when the rule conflicts with Congress's intent. *Planned Parenthood* is another of the cases, 946 F.3d 1100, again, talking about forwarding Congress's intent.

THE COURT: Okay. Fair enough. In the interest of time, I want to move on.

MR. VAKILI: Sure.

THE COURT: The Blind Removal Policy, that seems to give a little more discretion, but your position is it violates 1227(D)(i). Walk me through that, if you can.

MR. VAKILI: Yeah. So this is a straight up -- this is for a case a lot of complications. This is a sort simple statutory analysis, maybe not to resolve for the Court but pretty square issue. How do you read 1227(D)(i)? It says, "If the petitioner has a prima

facie case, the agency may stay the removal." So the question then is can the agency decide on the removal, decide on a stay request without knowing first whether the petitioner is prima facie eligible?

We read that case, as did Judge Sykes in the *Jiminez* case that we cite, to create a mandatory prerequisite, not a discretionary prerequisite, a mandatory prerequisite. Congress wouldn't have created this if they were just going to allow ICE to just deny stays without knowing; right? That is why it is a Blind Removal Policy, to deny stays without knowing whether they're eligible. And, again, that provision is called protection from removal pending -- not quoting it exactly right -- but pending adjudication.

There is a case out of the Sixth Circuit we, cite, *Barrios Garcia,* 25 F.4th 430, construes a different provision regarding U visa as a similar if then. And it goes through a little bit of the analysis. It goes through Supreme Court doctrine and says you've got to read this to require the determination first so that you can make an informed decision whether to grant a stay.

I'm clear-eyed, as all of us are, as everyone in this room is, that even with that determination, ICE in this administration will likely deny the majority of

the stays when it can. However, for the T visa petitioners by regulation, it all -- a prima facie determination automatically stays a removal order, automatic. And that regulation is on the books. And so this is not a an empty exercise to require.

THE COURT: And with respect to the Blind Removal Policy, you are -- you -- you claim -- well, you reference it in claims 8 and 9, the INA claim and the APA claim. I'm just curious, what is the rationale for making the allegation that -- you know, in those two different claims?

MR. VAKILI: It another one of those fallback provisions, Your Honor.

THE COURT: Oh, okay.

MR. VAKILI: So claimant says that they're acting ultra vires of the statute, and there's pretty good case law. One of the make the road U.S.A. cases, there's a few of them that say if an agency is acting ultra vires of the statute, you don't need the APA to sue. We put the ninth claim in there because --

THE COURT: Belts and suspenders.

MR. VAKILI: Yeah, a court might say otherwise, and then it is a policy. Right. If the Court agrees that there is an -- that the agency is acting ultra vires here, and we don't have to go through is there an

agency action, is it final, none of that stuff.

THE COURT: And for you, I ask what is the difference, if any, between deferred action and stay of removal?

MR. VAKILI: A point in time. So deferred action -- well, a couple of things. No. I take that back. So deferred action, one, means it can happen at any time during the course of the case. I think that's -- it is in one of the cases, either *Regents* or *Reno*. It can happen anytime during the case. So it doesn't have to have a final removal order in place to get every deferred action. Deferred action under these programs -- deferred action can be given in a number of scenarios.

Differed action under these programs is offered for four years. It's not indefinite. It is not until we change our mind. It is four solid years. And it offers authorization for work also. You can get a work permit. So there is real benefits that a stay maybe doesn't -- that at least that I'm not aware of that a stay will get you. A stay only becomes relevant when there is an actual final removal order. And so that's the difference.

THE COURT: Okay. Let's talk about due process, okay. You know, the argument is Camila B.,

Ms. Merlos, they've been released. They say that means their due process rights were not violated. They went through the process, and they got a -- you know, what they were requesting ultimately. Your response?

MR. VAKILI: That deferred action, so that is for the deferred action class. Deferred action is an affirmative benefit, a lot in the *Inland Empire* case we cite. It creates these things I just described, eligibility for a work permit, for T visa folks, like more -- there is -- there is -- there is Government funding that is available and, like, the ability to stay in a country for a plain period of time.

So there is serious reliance interest that require -- it is enough -- it creates this property interest that requires due process before it can be taken away. What that due process looks like depends on the deprivation the Government is seeking to impose in the *Inland Empire* cases notice -- like a notice of intent to revoke and an opportunity to respond was enough because detention -- that was -- the -- it was the initiation of removal proceedings, not detention that was at issue.

And, again, just to like come back to another important point, this -- and I've been doing this a long time. It is not unique here. It is all the time. This

conflation of detention authority and authority to have an immigration court process, they're not the same thing. They're distinct.

There is an immigration court docket hundreds of thousands of people deep, years and years long, and putting someone in that process doesn't implicate the kind of liberty interest that might require a hearing. But it does revoke for the -- for lack of a better word, deferred action maybe require, like, a paper process. When you start taking away people's liberty, a more robust process is required.

THE COURT: All right. Thank you.

Let me shift over, if I could, to Mr. Mishra. I have a couple of questions for you if I could. And we'll start with this due process claim because, you know, I read the papers. And you're going to say, look, they got provided a hearing and other processes, and so the due process rights weren't violated.

But I guess the question is: Is that enough? I thought the whole purpose was -- you know, as recited by counsel, like, to avoid those things from happening. Or am I wrong on that?

MR. MISHRA: Your Honor, that seems to be the case in the immigration proceedings when we apply this three-part test, even their -- in this case, even

if you're assuming the deferred action is like the DACA program, it's not the U visa that is comparable to the DACA program, but let's say the deferred action is comparable to DACA program, even in that case, the Ninth Circuit has spoken clearly that the due process and -- does not mandate procedures that reduce the risk of erroneous deprivation to zero. It is a flexible concept. And it varies with a particular situation.

THE COURT: But, again, I guess, as it relates, it varies with the particular situation. If the particular situation was for many years if you had deferred action, basically, no one would -- you know, I don't want to say you -- people -- you would not be subject to what's been going on recently. Isn't that a significant factor to be considered?

MR. MISHRA: To be sure, Your Honor, the allegation is it happened rarely in the past.

THE COURT: Right.

MR. MISHRA: Now it is heavy-handed. That's in their BIA reply at page 10. Sorry.

THE COURT: Right. And you're saying that's -- that is -- is your response "so what"?

MR. MISHRA: So no. So the point is that it was never foreclosed that there would be no enforcement. There was enforcement going on before too. And --

THE COURT: But it was rare.

MR. MISHRA: It was just rare, at least according to the allegation.

THE COURT: Right.

MR. MISHRA: And what we are saying is that the due process is here, even if we assume for one second that there is a pre-deprivation hearing required, because there was some vested property right, the -- there are two other factors in the calculus, and especially given the significant interest that the Government has in enforcing the immigration laws, it ultimately hinges on the second factor, which is the risk of erroneous deprivation.

So it comes down to how much process, what process did they have in the immigration proceedings. And the *Diaz v. Garland* case we cite in our opposition brief, that basically talks about that. It says that it upheld -- it found that the due process was satisfied even where pre-deprivation hearing was not provided because the risk of erroneous deprivation was relatively small due to procedural safeguards in the immigration court.

And applying that *Diaz* case last month, a Court here -- and this is *Aguilar v. Semaia,* number 26-23, Westlaw cite 2026 Westlaw 166906, and was decided

January 16th, 2026. It applied *Rodriguez* -- sorry, *Diaz v. Garland* and found the exact same thing, that due process was satisfied even though after the proceedings in the immigration court, the person had a bond hearing, and he was not released after that.

But even in that case, again, applying this framework because of the second and the third factor, essentially, post-deprivation hearing matters a lot.

THE COURT: What's the name of that case again? The one that -- I think from January -- you said January of this year?

MR. MISHRA: Yes, Your Honor. That is Judge Scarsi in *Aguilar*, A-G-U-I-L-A-R, *v. Semaia*, number 26-00023, and the Westlaw cite is 2026 WL 166906, and it was decided on January 16th.

And, Your Honor, to be sure, there is an additional safeguard at play here given by the regulations that implement the U visa and T visa congressional statute, and I think I referred to that before. 8 CFR 1003.18 -- sorry, 1003.18(d)(1) and 1003.1(m) also allows the immigration court and the BIA to terminate proceedings altogether on account of deferred status. So that is right there the in regulations.

So even though proceedings may have started,

even though the person may have been detained beyond the regular proceedings in the immigration court on account of deferred status on the basis of U visa and T visa, the Court there and the BIA may still terminate proceedings altogether, and that is what happened with plaintiff Merlos.

So in conjunction with the routine immigration proceedings, there are additional procedural safeguards here on account of the visa applications, and that's the benefit the applicants get from -- one of the benefits the applicants get under the scheme that the agencies have implemented: To ensure that if someone who does not have a status yet and erroneously put into the proceedings without a pre-deprivation hearing, they still have adequate procedural safeguards. So the risk of erroneous deprivation is relatively low.

And to be sure, Your Honor, what we just heard was that there was a statutory claim under 1227(D) and 1252(b)(9) speaks directly to that. Whether it is the constitutional claim or a statutory -- statutory claim, that still goes to the Ninth Circuit through the PFR process. And the *J.E.F.M.* case we cited, that says that even if you crafted, like, the policies or practices challenge, even then, it goes to the Ninth Circuit through the process.

One more thing they said was that there is a protection from removal. Sure, there is a protection from removal but after you get the visas approved. It is not after you get the deferred status that you get protection from removal.

THE COURT: Practically, isn't that what was happening?

MR. MISHRA: Your Honor, what I mean to say is that once they get the visas approved when they apply for -- they were to get back into the country through the consular processing and they come back --

THE COURT: Oh, you mean after they've been deported?

MR. MISHRA: Yeah. Once they get the lawful status in due time, after that, they cannot be removed because now they have lawful status at that point.

THE COURT: What is your response -- you heard Mr. Vakili talk about the fact that -- he cited numerous policy makers saying the whole purpose was to not have them go back to their respective countries, was to stay here pending those hearings.

But what you're suggesting is, well, they can go back and apply, and if everything works out, they can then come back? I mean, that seems inconsistent with what the stated intent of this was.

MR. MISHRA: Your Honor, we can look at the conditional intent, but to be sure, practically, what matters is what's in the statute and the regulations and what -- ultimately, that is what harmonizes the agreement between both parties and how it basically is effectuated. And here, what we have is a two-track process where it expressly contemplates enforcement but, at the same time, adjudication.

THE COURT: Do you acknowledge that this process, however you want to describe it, has been applied differently now than it has in the past?

MR. MISHRA: I understand that the allegation is it -- that now there is more enforcement, it is heavy-handed, but that is my second point: That part takes direct issue with the detention commencement of proceedings, adjudication of the proceedings, and removal, and that, Your Honor, is basically *Heckler* territory. They're saying that -- *Heckler* territory -- what they're saying is that before the enforcement was here, now the enforcement is heavy-handed, and the cause of that is with policy change.

But essentially, what it boils down to is that the cause of that is -- they say this on the BIA reply at page 10. There were certain protective measures back in 2021. Now those protective measures are gone, and

that is exactly the point. Now the Government, if it is not taking those protective measures, we can't force it to. This is committed to agency's discretion by law, and it is un- -- this is absolutely *Heckler* territory. The Supreme Court spoke to that. This is -- *Heckler*, H-E-C-K-L-E-R. And such exercises of prosecutorial discretion are committed to agency discretion by law.

THE COURT: But even when -- even when you're -- even given that discretion, are we to ignore any practical impact of that change? I mean, I guess what I'm trying to think -- in real-life terms, victim, witness, whatever, says, "I don't want to be involved in this," and they're told, like, look, we can help with respect to your, you know, immigration status with this, this, and this. "Okay. I will assist." And then one day, nope, that no longer applies. Like, we're to just ignore that?

MR. MISHRA: Your Honor, that is not what the agency is doing. Agency is taking all of that into consideration under its case-by-case evaluation. And again, that is committed to the agency's discretion.

And to be sure, as one practical example, Your Honor asked me about an example of -- of what justified any shift in priorities. You know, why are we doing more of these now? So what happened is in 2021,

the VCA directive came about, and then ICE releases the facts -- a fact sheet after a couple years of doing what they were doing. In that fact sheet, ICE -- ICE criticizes the -- the very first directive in this area, which was the 10005.1 that was released in 2009. I think that's --

THE COURT: I'm sorry. The fact sheet, is that -- where is that in the record?

MR. MISHRA: Your Honor, that is not in the record, but you asked me for an example. You can take a judicial notice of that, and I have a printed copy.

THE COURT: You are saying that is part of the reason why this directive or whatever you want to call it was enacted, because of some information contained in a fact sheet that demonstrated sort of the errors or the -- the weaknesses in the prior policies?

MR. MISHRA: Your Honor, that is -- we're still in the pleading stage, so I still don't have access to evidence, you know, but the point is that this is one of the things that is out there in the public. You know, ICE released this, you know, after two years of the prior directive, and it says expressly that the very first directive constrained the prosecutorial discretion. And what happened is the prima facie determination became overly burdensome on both ICE and

USCIS.

And even though -- that fact should say that the prima facie determination wasn't a lot, but it became a lot. And one of the reasons for that was it said there was an exponential increase in U visa applications, and this is two years down the line after the prior directive was implemented.

THE COURT: So you're saying that's the reason why this policy changed, because there was exponential increase in the amount of U visas?

MR. MISHRA: Your Honor, I don't have the certified administrative record. But what I am saying is this administration had previously experienced that 2019 directive under which there was no prima facie determination, so it had some institutional memory of that, how it works out.

And then obviously, these fact sheets and I'm sure, like, a lot of other things that are out there in the agency's records, these basically informs the agency's discretion on how to adjust, how to basically determine whether to prosecute or not, and how many to prosecute or what not, basically that case-to-case -- case-by-case evaluation.

THE COURT: And -- and I guess I'm trying to -- I'm trying to understand the argument. Are you saying

or suggesting that at the end of the day, this is just prosecutorial discretion, and then it is not subject to any APA review or...

MR. MISHRA: Absolutely, Your Honor, we're saying that.

THE COURT: Okay. Okay. All right. I know -- we've got a little bit more time, and I want to ask a couple more questions of the plaintiff, if I could. And, Mr. Mishra, I'll have you come back again. Okay?

MR. MISHRA: Sounds good. Thank you, Your Honor.

THE COURT: I think, based on the theme of this morning, the Accardi doctrine, is that more of a belt-and-suspenders sort of argument?

MR. VAKILI: Yes, Your Honor. Though, really, the -- it is probably the clearest source for argument that USCIS has to adjudicate a deferred action revocation because it is there in the USCIS policy manual that it is USCIS's sole unreviewable discretion. ICE has no business here. It is in the --

THE COURT: Does the Accardi claim provide a different kind of relief or...

MR. VAKILI: No. So the Accardi claim would -- the relief in an Accardi claim is "comply with your policies." So comply -- so where the USCIS policy

manual says --

THE COURT: This is our discretion and sole --

MR. VAKILI: This is our discretion. Here are the standards for getting deferred action. Here are the standards for revoking it. The relief under the Accardi claim is "do that, do that."

Now, yes, because absent detention, like what USCIS normally does, a notice of intent to revoke and then a -- and then a -- sort of a written brief in response, absent detention, I would -- we would suggest that that comports with due process. So there is overlap.

THE COURT: Okay.

MR. VAKILI: But then when you start talking about detention, we think more is required, and -- and the policy manual doesn't really go into that, unsurprisingly, because USCIS doesn't contemplate these folks being detained.

THE COURT: Okay.

MR. VAKILI: I know you have questions. Could I respond really, really briefly to a couple of things?

THE COURT: When lawyers say "briefly," it usually doesn't pan out that way, but go ahead.

MR. VAKILI: I've got six bullet points, Your Honor. I hope I'll do them quick.

THE COURT: Six didn't sound brief, but go ahead.

MR. VAKILI: The *J.E.F.M* case that we've heard about --

THE COURT: Wait. One more time.

MR. VAKILI: The *J.E.F.M* case that we've heard about is a Ninth Circuit case. A child alleged -- the challenge was to the lack of appointment of counsel --

THE COURT: Uh-huh.

MR. VAKILI: -- in immigration proceedings for children. The allegation was that that harmed their ability to make their case in removal proceedings. And that's why the Ninth Circuit said it has to be brought through the removal proceedings. You're alleging that the removal proceedings are unfair, and so that is why 1252(b)(9) applies.

That is just not the case here. We're not saying the removal proceedings within the proceedings themselves are unfair; it is the initiation of those proceedings that causes a harm.

Detention, on the other hand, is not something that's in the -- is not reviewable in removal proceedings. It is a separate matter altogether. There are cases that get into that. *Jennings*, *Gonzalez v. ICE*, 975 F.3d 788, legality of detention is

collateral to removal proceedings. And things that are collateral don't come in under (b)(9).

Similar, there are cases that talk about the stay of blind removal, stays of removal. That doesn't fall under (b)(9) because it comes -- stays of removal come after removal proceedings. The *Ibarra-Perez* case we cite goes into that.

So (b)(9) is just not something that funnels, which is what (b)(9) does, cases that can be reviewed the removal process. It doesn't funnel these claims because these claims can't be.

Yes, the agency has discretion. I'm moving on -- trying to, Your Honor. The whole point of the APA is that discretion can't be abused. So that is -- Congress has spoken there.

The reliance interest you talk about, Your Honor, *Regents*, again, the Supreme Court has been very, very clear about what these programatic deferred action grants do versus the one-offs. This is a programatic deferred action program. So *Regents* really controls there.

And then last two points: The -- if they want to allege and prove that enforcement is basically the same now, great, we'll have a -- we'll have a -- we'll enjoy depositions and discovery, and we'll come back at

summary judgment.

At this preliminary stage, what should the Court do while this case proceeds? The record is replete with heavy-handed enforcement and experts in the field saying this is -- this is new and unheard of.

THE COURT: But you heard the Government say "so what"? I mean, fine. It's -- it's heavy-handed now. It didn't go from, to use the youngster's terms, zero to 100. I mean, there was enforcement early on. It is just now at a higher rate. So what?

MR. VAKILI: So that's a change at minimum that needs to be explained. Under *Regents* --

THE COURT: Okay. But they say there is a fact sheet to show that, you know, the amount of U visas have increased exponentially. We are focused in our priorities, and so this is what we want to do.

MR. VAKILI: And I hope this -- this will prove that I was brief. This is the last point, and this is my last one.

THE COURT: Okay.

MR. VAKILI: One, that is a -- that fact sheet, I haven't seen it. It's not in the record. That's a post hoc -- you're not allowed to do post hoc rationales in APA review. If it comes in, in discovery, great, we'll address it. I'll -- we'll depose somebody on it.

It will be fine. So no post hoc rationale is in APA review.

The other thing is the burdensome -- burdensome argument actually doesn't make any sense. Congress wants these petitions approved. Yes, the programs are wildly successful. More people applied than they anticipated, and so it takes longer. That takes USCIS resources. Deporting people and detaining people also takes a ton of resources. The Ninth Circuit has been clear about this in cases like *Hernandez*.

And so what the whole policies did was take these resource concerns and the policy -- the congressional purpose and say, okay, we're not going to invest the resources into deporting and detaining and enforcing. Resource saved there. We're going to let USCIS adjudicate in their own time. Resource saved there.

If they want to have a heavy-handed -- I'm not going to write their policy for them. If they want to have a heavy-handed enforcement policy, okay, I mean, justify it -- they haven't done that in a way that is not arbitrary or capricious -- and comply with Congress's mandate to at least have those applications prima facie adjudicated before you enforce. That is how you do it, and that is just not what is happening.

THE COURT: All right. Let's talk about, I guess, arguably, what I think is a very meaty issue here: scope.

Okay. Look, this is not your first time at the rodeo. You -- and you know, *National TPS versus Noem*. You know, there is a lot of hesitancy and concern about -- nationwide. So what are we talking about here? What would -- what would be the scope, for example, in the APA claim?

MR. VAKILI: So -- so yes. And, look, the Supreme Court decision in the *CASA* case sort of has everyone wondering which way the wind is blowing. So let me put that case in perspective.

That was an individual case on behalf of one person trying to, basically for the whole nation, enjoin a policy that -- that people born in this country are not U.S. citizens if they're born -- I wouldn't be a United States citizen under that problem.

So -- and the Court said let's be careful with nation -- you're helping people that aren't before the Court. They were specific that that nationwided injunction phenomenon for individuals was a workaround for class actions, and they said basically Congress has a thing for nationwide injunctions. It is called the class action. You go through the Rule 23 analysis. It

is simple. So that just doesn't apply here. We're proceeding post *CASA* in the way that *CASA* -- that the Supreme Court anticipated.

THE COURT: Look, I understand where you're coming from. But do you think it was clear that it was -- that we don't want individual cases to -- to cause a nationwide injunction, but we want -- but class actions can?

MR. VAKILI: Well, so -- so what they -- what I think the case really is about is remedying the harm of the parties that is before the Court.

THE COURT: Right.

MR. VAKILI: And the class is a part -- a certified class is a party before the Court. And so the way we've crafted these classes, Your Honor, the remedies we're seeking -- the injunctive remedies we're seeking, there is many, actually. Most of the remedies we're seeking are 705 remedies.

The injunctive remedy, for instance, against the Blind Removal Policy is limited to the parties before the Court. It wouldn't apply to me. I -- I'm not going to be removed, as far as I know, not yet. We're not there in this administration yet.

And so it is carefully crafted. The Government, they didn't the move to --

THE COURT: Hold on. Before -- in your view, what would be the scope of any APA stay here?

MR. VAKILI: So the APAs is different than the -- so an APA merely -- sometimes courts call it "postpone." That is what is in the statute. Sometimes they will say "vacate pending ultimate resolution of the issues." And so what it -- what the -- all you can -- for the memo, for the 2025 guidance, the Court can set aside -- well, ultimately, it is -- at the ultimate stage, it is set aside. For now, it has postponed the effective date of that memo, put it on pause.

THE COURT: But that is nationwide?

MR. VAKILI: And nation- -- well, that is what APA relief contemplates.

THE COURT: Okay.

MR. VAKILI: So there are cases that talk about why APA relief is a -- it is a postponement of a policy.

THE COURT: No, I understand that. I just want to make sure -- I want to hear it from the horse's mouth that that is your position because courts have struggled with this, I think, in part because of all of the legal discussion/debate about nationwide -- you know, one lowly judge in Los Angeles thinking he rules the world, you know.

MR. VAKILI: Yep.

THE COURT: Or that is the criticism.

You know, and so I just -- but your position would be because it is a policy, that that would be the net effect of it?

MR. VAKILI: And so the pristine legal -- I do think the proper reading of the APA is that, and I think the D.C. Circuit over and over again goes through this. I do have a cite for you, I think. It is *Make the Road New York v. Noem*.

THE COURT: Maco, M-A-C-O?

MR. VAKILI: *Make the Road* --

THE COURT: Oh, *Make the Road*.

MR. VAKILI: *Make the Road New York v. Noem*. It is a Westlaw cite. It is 2025 WL 3563313. It's -- it's -- it is relevant in what it does, but it is also relevant in the review of Supreme Court and D.C. Circuit, which does a lot of APA work, law on this issue. So that is the proper reading of the APA, in our view.

Now, in the *Olvera* case, the District Court of Massachusetts case that also addressed those policies, that district judge, probably for the reasons you're alluding to, said we're just going to set it aside -- I'm just going to set this aside regarding the plaintiffs.

If that's what the Court wants to do, set it aside for the class, because that is the plaintiffs, if then -- okay. We -- I don't think that is the way to read the APA, but we represent the plaintiffs and the class. Our duty is to them. If that is what the Court wants to do, we're not going to bicker a whole lot with that.

THE COURT: Now, let's shift over to the injunction for a second.

Okay. You're asking for, I think, in order number 11, a class-wide injunction. And what I'm struggling with is whether or not 1252 forecloses that class-wide relief.

MR. VAKILI: So let's look at the three injunctions we're seeking because they're different.

THE COURT: Right.

MR. VAKILI: We'll forego -- I think, you know, you write proposed orders trying to protect as best you can.

THE COURT: Right.

MR. VAKILI: If the Court sets -- regarding the 2025 guidance, if the Court sets it aside under 705, a separate injunction enjoining the Government from applying it is not necessary. It's been set aside, and so we -- we'll withdraw that one, the injunctive relief

there.

The injunction on the Blind Removal Policy isn't impacted by 1252(f)(1). So this is the injunction that would say: "You have to read 1227(D)(i) to require prima facie determinations." That is basically what we'd ask.

Well, you have to read 1252(f)(1) very carefully. And with the Ninth Circuit's ruling in *Galvez v. Jaddou*, J-A-D-D-O-U, we cite it. I think it is *Galvez v. Jaddou*, which is basically binding at this point. It is 1252(f)(1). This is very -- it gets in the weeds, but 1252(f)(1) says essentially, "You can't have a class-wide injunction that restrains or enjoins the operation of a certain set of statutes as amended by IIRAIRA," the 1996 law that really up changed the immigration laws.

And in *Galvez v. Jaddou*, the Ninth Circuit looked at the TVPRA, which is the law that created the issue in *Galvez*, same law that created 1227(D)(i). And the Ninth Circuit said it postdates IIRAIRA, I-I-R-A-I-R-A. It postdates IIRAIRA and therefore is not part of the INA as amended by IIRAIRA. It postdates -- so 1252(f) just doesn't apply to that. So you really got to pull apart the statutes.

THE COURT: Okay.

MR. VAKILI: That is the Blind Removal Policy.

THE COURT: Okay.

MR. VAKILI: Okay. The deferred action, the -- the De Facto Revocation Policy, I hope the Court has heard enough to know that we are aware of 1252(f)(1). We didn't write you an order that was going to violate it. So we were very careful not to ask the Court to issue class wide preliminary injunction that orders people to be released or that requires hearings. We think those are required by the law.

That is probably going to have to come at some declaratory judgment stage of the proceedings because declaratory judgments are allowed by 1252(f)(1). What we are asking for is an injunction that says if they're going to revoke deferred action, that some process is necessary.

THE COURT: Okay.

MR. VAKILI: Deferred action doesn't fall within these statutes, the 12 -- the statutes at issue in 1252(f)(1). It is the regulations that talk about deferred action are in 214. That's 1184 of the INA. 1184 is not within there. The arrest authority in the INA is 1157. That is not within the statutes covered by 1252(f)(1).

THE COURT: And I'm just trying to follow

along. I'm kind of scanning through the order.

MR. VAKILI: Yeah.

THE COURT: Is this -- are you talking about section -- I said PI order number 6, that defendants are enjoined from revoking deferred action status of organizational plaintiffs, clients, and members who are in valid deferred action status without providing notice, et cetera, et cetera. Is that what you are referring to?

MR. VAKILI: That is number 6, Your Honor, yes. And our -- what -- what it is an over generalized portion of number 11 where we say, "Enjoined from applying the de facto revocation policy." So I guess I'm trying to put a little more meat on that one for Your Honor.

THE COURT: Okay.

MR. VAKILI: Rather than that language an injunction that said, "Defendants are enjoined from revoking deferred action without a process that comports with due process or under the Accardi doctrine under USCIS policy."

THE COURT: Okay.

MR. VAKILI: That kind of injunction doesn't -- at best it is collateral to the statutes that are covered by 1252(f)(1) and the *Al Otro Lado* case from the

Ninth Circuit. It came out last fall. It is very clear that things that are collateral to those statutes don't fall within (f)(1) because they're -- you're not enjoining the operation of those statutes. They're somehow impacted is not material to the (f)(1) analysis.

THE COURT: Okay. To your last series of questions, I want to make sure I understand sort of what causes of action you believe that the specific orders relate to or correspond to.

MR. VAKILI: Yes, sorry.

So PI order number 2, which cause of action does this injunctive relief correspond to? We -- we withdrew -- just as I said, so we're withdrawing that one.

THE COURT: Right.

MR. VAKILI: PI order number 5 is the return of Lupe A.

THE COURT: Right.

MR. VAKILI: So that's her fifth claim. That is the fifth claim, revocation of deferred action without due process. They deported her without revoking.

Relief number 8, that is for the return of Ms. Ruano and Carmen F.

THE COURT: So if I were to -- if I were to

grant this, it would be basically ordering the Government to find and return them back to the U.S.?

MR. VAKILI: I think, actually, we would be -- would be authorized to ask for that. The Supreme Court in *Abrego Garcia* basically said the District Court of Maryland was within their rights to order them to bring him back. But we haven't even asked that. We've just asked them to get out of the way if they come back.

THE COURT: Say that again.

MR. VAKILI: To get out of the way if they do come back. So if these individuals come to the border that -- we're asking the Government -- we're asking you to say to the Government: "Let them come back. Let them occupy the legal position they had before this controversy started."

There is a lot of immigration -- there is a lot of consequences for leaving the country and coming back. So we'd ask that none of those apply; right? So allow them to return, occupy the legal position they occupied before, which is sort of what 705 relief is meant to do and what preliminary injunctive relief is meant to do. So restores the status quo ante for them.

THE COURT: And what about 6 and 9?

MR. VAKILI: 6 and 9. So 6 --

THE COURT: Let's talk a little bit about 6.

MR. VAKILI: Yeah. So 6 is enjoin the revocation of -- of -- of the deferred action without due process for the plaintiffs. That is the fifth claim for relief.

And 9 is -- is similar for the -- for the Blind Removal Policy, enjoining the -- enjoy the deciding of stays of removal without doing a prima facie adjudication.

THE COURT: Okay.

MR. VAKILI: And just so the Court feels like it is on solid ground with ordering someone from outside the country to come back, not just the Supreme Court, but the Ninth Circuit over and over again has done this. *Walter* -- we cite *Walter v. Reno.* That is in the '90s. We cite *Mendez v. INS.* That's the '70s. *Singh v. Waters*, 1996. *Salgado Diaz v. Gonzalez*, 395 F.3d 1158, that is the Ninth Circuit saying in 2005 -- basically saying if someone is removed unlawfully, the remedy is to being them back.

THE COURT: Okay. Thank you.

MR. VAKILI: Thank you, Your Honor.

THE COURT: All right. Mr. Mishra, I want to give you the chance to respond before we wrap things up.

MR. MISHRA: Your Honor, plaintiffs rely on the collateral effect rule in *Al Otro*. To that, I just want

to respond that here injunction would directly affect arrest proceedings and removal. So the collateral effect rule doesn't apply.

In terms of 1252(f)(1) not applying to 1227(D), it's not just that statute which plaintiffs propose injunction covers. It is also 1226, the detention statute, and 1231, removal.

But in any case, we can look at the language of 1252(f)(1), and we can see how *Galvez* got it wrong. In statutory construction, a nonrestrictive or descriptive clause usually settled by commas provide additional information. It doesn't -- it is not essential to identifying what precedes it.

And that is where *Galvez* got it wrong. It said, "Jurisdiction stripping provision of Section 242(f)(1) after INA applies to certain injunctions that enforce or restrain certain provisions of the INA as mortified by the IIRAIRA." As it said it, the error is right there on the face of it. It says, "As mortified by the IIRAIRA," without commas. But that is not what we have in 1252(f)(1). We have the commas. And what the Court did in *Galvez* was it removed the commas to give effect to the statute, essentially, rewriting the statute.

That is not just the only problem. There is

this ongoing amendment principle. Under that, a reference to a specific part or subchapter of an act includes all subsequent amendments to that section unless Congress explicitly states otherwise.

Here, the phrase "as amended by" -- basically, IIRAIRA was intended to notify the new enforcement regime and basically the shift from deportation to removal rather than freeze the jurisdiction stripping provision to a certain 996 version of the code because Congress specifically placed Section 1227(d) inside part 4. It intentionally subjected that provision to the existing rules governing that part including the Section 1252(f)(1) bottom class-wide injunctions.

But there is more context to that. 1252(f)(1) was enacted in 996 against a well-established equitable baseline that the Supreme Court has been articulating for years before that. And that rule was also not solely just to focus on injunctive relief. Supreme Court has many times before that has said wherever prosecutorial discretion is involved, federal courts may not issue declaratory or injunctive relief.

That directly interferes with the enforcement of statutes except as to the particular plaintiffs before the Court. One of the cases we cite in our opposition is the *Duran* case, but even before that,

*Duran* relied on *Samuels v. Mackell.* And that's 401 U.S. 66, and that's a 1971 Supreme Court case. There, the Supreme Court had said, "The practical effect of the two forms of relief will be virtually identical." And because of that, it said there is a basic policy against federal interference with such enforcement mechanisms.

And then a few years later in a 1982 case, *Grace Brethren Church* with the cite 457 U.S. at 408, the Supreme Court again spoke on the issue in the context of Tax Injunction Act. 28 U.S.C. 1341 said that, "The district courts shall not enjoin, suspend, or restrain tax collection. The Supreme Court said there is little practical difference between injunctive and declaratory relief because declaratory relief would suspend or restrain tax collision.

And that is exactly the argument we have made also about 1251(f)(1), that even if you set aside the injunctive part, the other part of it still operates to constrain or restrain the Government's application of 1221 through 1232.

THE COURT: So are you -- so -- so you're saying that if I were to rule in the plaintiffs' favor, it should only be limited to who -- the individual named plaintiffs because they filed a class action; right? And that suggests its broader; isn't it?

MR. MISHRA: She asked for a very broad injunction that would run up right against *CASA*, you know. But what we're saying is that -- I know you asked me what is appropriate scope of any stay. If I were to assume that a stay were to issue, we -- we can only issue one against the named plaintiff Camila because she is the only individual plaintiff resident in this district. And she -- that's -- that would be like the only real case that plaintiffs refer to. That is the closest I can think of, of what could be appropriate.

But, again, our position is that even any stay or set aside all of that would be foreclosed by the Supreme Court cases I have cited and 1251. And even last year when *CASA* was decided, even in that opinion, even though it dealt with injunctive relief only, even there, the Court started with *Duran* case saying the same thing. Neither declaratory relief not injunctive relief, we have said, can directly interfere with the enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs.

So our point is that our argument is that even a set aside would not be appropriate and even a declaratory relief would not work here.

THE COURT: Okay. All right. Anything else you want to argue before we wrap things up? We've been

at this for a little more than an hour and 30 minutes. Anything else that we haven't talked about?

I think I've gotten all my questions answered, but I just want to make sure. Is there anything you think I need to focus on as I'm trying to make a decision in this case?

MR. MISHRA: No, Your Honor. You have covered it all.

THE COURT: All right. And I'm sorry, Mr. Vakili. Have I been butchering your name the whole time?

MR. VAKILI: My dad would say "Vakili." But I would never --

THE COURT: Vakili, all right. My name has been butchered my whole life, so I'm sensitive.

So, Mr. Vakili, anything else that we didn't discuss that you think I need to know?

MR. VAKILI: To state the obvious, if only Your Honor could tell the Ninth Circuit they were wrong. I have Supreme Court cases I'd like to present with you, as well. So it just doesn't matter.

THE COURT: Okay.

MR. VAKILI: And they haven't moved to change venue properly because venue is proper here. We have two named plaintiffs who live here within ten miles of

here and two organizations whose headquarters is here.

THE COURT: Okay.

MR. VAKILI: One of which represents thousands and thousands of U visa petitioners.

THE COURT: Well, look, thank you both for the time. I appreciate it, and I appreciate you answering the questions. To state the obvious, this will take a little bit of time. Although I know it is time-sensitive, but I'm going to take the matter under -- oh, I'm sorry.

Did we not discuss the VAWA, the victims, and the -- I don't know if I got that question. I'm just looking at my notes here.

MR. VAKILI: We did not, Your Honor.

THE COURT: Because there are no VAWA petitioners; correct?

MR. VAKILI: Right.

THE COURT: So with respect to standing?

MR. VAKILI: So if -- I know judges don't like when advocates reframe their questions. I do not think it is a standing question.

THE COURT: Okay.

MR. VAKILI: Standing is determined whether there is an injury, in fact, that is fairly traceable and assists all the non-factors. This is really a

Rule 23 question, are VAWA applicants properly within the pending petition class? And they are; right. Typicality doesn't require. So numerosity is not impacted. Commonality is not really impacted. Commonality asks whether there are common questions. They don't all have to be common.

So what matters most is the *Wal-Mart v. Dukes*, the seminal certification case. What matters class certification is not the raising of common questions even in droves but the capacity of a class-wide to generate common answers to drive the resolution of the litigation.

The memo we're challenging with that class lumps this group of folks together.

THE COURT: Lumps them with whom?

MR. VAKILI: Lumps -- it treats VAWA applicants, U visa applicants, T visa applicants --

THE COURT: All the same.

MR. VAKILI: -- all the same as beneficiaries or am applicants for victim-based benefits.

THE COURT: Okay. So it is under sort of a victims-based benefits umbrella, if you will.

MR. VAKILI: That's right. So we're only seeking to set aside the policy. And there is no reason that VAWA applicant would have to present and represent

the interest there. Imagine a challenge to racial discrimination against it based on Latino heritage. You wouldn't need a representative from every country that is predominately Latino; right? You would just need someone who can raise the issues.

THE COURT: All right.

MR. VAKILI: So it is not necessary to have someone with every fact pattern.

THE COURT: All right. At least now I understand the position. Okay.

Anything else that we may have neglected this morning?

MR. VAKILI: I'm just going through your questions, Your Honor. That's really what we want to address, and I'm not seeing anything. So nothing further from the plaintiffs.

THE COURT: Mr. Mishra?

MR. MISHRA: Your Honor, just one last request: Our response to the complaint is due in 14 days from now -- today. But if this determination for the pending motions will take some time, is it possible to move the deadline two weeks from whenever the pending motions are decided?

THE COURT: Any objection from the plaintiff?

MR. VAKILI: No objection to that, Your Honor,

but we reserve the right to maybe seek expedited pre-answer discovery should the need arise.

THE COURT: We'll fight that fight if -- when we need to. Okay. So that's fine. I mean, no objection from the plaintiffs. So if -- just in the interest of belt and suspenders, just file a stipulation to that effect, and this way, it will be on docket so there is no disputes going forward.

Okay. Well, thank you all. I appreciate the time. We'll take the matter under submission until the Court issues its ruling on these motions. All right. Thank you.

MR. MISHRA: Thank you, Your Honor.

MR. VAKILI: Thank you.

(Whereupon, proceeding adjourned.)

\- - -

# C E R T I F I C A T E

IMMIGRATION CENTER FOR WOMEN :
and CHILDREN, et al. : No. CV 25-09848-AB
vs. :
KRISTI NOEM, SECRETARY of :
HOMELAND SECURITY in her :
official capacity, et al. :

I, MARIA BUSTILLOS, OFFICIAL COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

__________/S/______________ //___

MARIA R. BUSTILLOS DATE
OFFICIAL REPORTER

## '

**'70s** [1] - 82:15
**'90s** [1] - 82:14
**'agency** [1] - 21:18

## /

**/S** [1] - 92:23

## 1

**1** [3] - 20:17, 29:25, 35:1
**10** [5] - 1:20, 6:1, 28:8, 57:20, 62:24
**100** [1] - 70:9
**10005.1** [1] - 64:5
**1003.1(m** [1] - 59:21
**1003.18** [2] - 29:25, 59:20
**1003.18(d)(1** [1] - 59:20
**101** [1] - 2:15
**10:04** [1] - 6:3
**11** [2] - 76:11, 79:12
**1100** [1] - 51:12
**11005.2** [1] - 41:7
**1157** [1] - 78:23
**1158** [1] - 82:16
**117** [2] - 2:6, 2:11
**1184** [2] - 78:21, 78:22
**12** [1] - 78:19
**1221** [1] - 85:20
**12254** [1] - 1:23
**1226** [1] - 83:6
**1227(D** [3] - 47:7, 60:18, 83:4
**1227(d** [1] - 84:10
**1227(D)(i** [4] - 22:21, 22:25, 51:25, 77:4
**1227(D)(i)** [2] - 51:19, 77:19
**1231** [1] - 83:7
**1232** [1] - 85:20
**1251** [1] - 86:13
**1251(f)(1** [1] - 85:17
**1252** [1] - 76:12
**1252(b)(9** [2] - 60:19, 68:16
**1252(f** [1] - 77:23
**1252(f)(1** [7] - 77:7, 77:12, 79:25, 83:4, 83:9, 84:13, 84:14
**1252(f)(1)** [7] - 77:3, 77:11, 78:5, 78:13, 78:20, 78:24, 83:21
**1252(g** [2] - 28:22, 30:24
**1341** [1] - 85:10
**14** [3] - 31:21, 31:22, 90:19
**14159** [1] - 44:23
**1505** [2] - 2:6, 2:10
**151** [1] - 31:16
**166906** [2] - 58:25, 59:14
**16th** [2] - 59:1, 59:15
**17TH** [2] - 2:6, 2:10
**19** [1] - 41:17
**1971** [1] - 85:2
**1982** [1] - 85:7
**1996** [2] - 77:15, 82:16
**1999** [1] - 28:22
**1ST** [1] - 1:24

## 2

**2** [3] - 28:11, 31:14, 80:11
**20** [3] - 14:6, 28:8, 41:18
**2000** [1] - 47:20
**2005** [1] - 82:17
**2009** [1] - 64:5
**2011** [1] - 39:6
**2016** [1] - 41:16
**2019** [3] - 39:14, 41:7, 65:14
**2021** [8] - 39:13, 40:9, 42:16, 45:17, 45:24, 46:16, 62:25, 63:25
**2025** [10] - 10:23, 10:24, 20:17, 39:3, 39:6, 42:12, 44:21, 74:8, 75:14, 76:22
**2026** [5] - 1:20, 6:1, 58:25, 59:1, 59:14
**213** [1] - 1:25
**213)385-2977** [1] - 2:20
**213)629-2512** [1] - 3:8
**214** [1] - 78:21
**214.14(c)(1** [1] - 32:22
**214.204(b)(1** [1] - 32:23
**214.205(e)(1** [1] - 33:1
**214.207** [1] - 49:2
**23** [2] - 72:25, 89:1
**24** [3] - 8:6, 34:20, 35:23
**242(f)(1** [1] - 83:16
**25** [1] - 52:16
**25-09848-AB** [3] - 1:10, 6:5, 92:5
**2533** [1] - 2:15
**26-00023** [1] - 59:14
**26-23** [1] - 58:24
**28** [2] - 85:10, 92:14

## 3

**3** [1] - 28:11
**3)** [1] - 33:1
**30** [1] - 87:1
**30,000** [1] - 27:15
**300** [1] - 4:6
**30th** [1] - 34:17
**31-8** [1] - 46:1
**323)353-1333** [1] - 2:16
**350** [1] - 1:24
**3563313** [1] - 75:14
**37** [1] - 35:1
**371** [1] - 47:21
**395** [1] - 82:16
**3RD** [1] - 2:15

## 4

**4** [2] - 34:20, 84:11
**401** [1] - 85:1
**408** [1] - 85:8
**415)672-1962** [1] - 2:12
**430** [1] - 52:16
**4455** [1] - 1:24
**457** [1] - 85:8
**48** [1] - 35:24

## 5

**5** [5] - 21:17, 21:18, 35:7, 35:8, 80:16
**51** [2] - 1:18, 5:3
**551** [1] - 21:17
**551(10** [1] - 22:6
**551(13)** [1] - 21:18
**551(4** [1] - 21:22

## 6

**6** [9] - 5:3, 35:8, 79:4, 79:10, 81:23, 81:24, 81:25, 82:1
**60** [1] - 46:1
**610** [1] - 2:19
**619)483-3490** [1] - 2:7
**634** [1] - 3:6
**640** [1] - 51:9
**66** [1] - 85:2
**6th** [1] - 34:25

## 7

**705** [3] - 73:18, 76:22, 81:20
**714)338-3503** [1] - 4:7
**7516** [1] - 4:6
**753** [1] - 92:13
**788** [1] - 68:25

## 8

**8** [9] - 29:25, 32:21, 32:23, 32:25, 35:7, 49:2, 53:8, 59:20, 80:23
**894-2739** [1] - 1:25

## 9

**9** [4] - 53:8, 81:23, 81:24, 82:5
**90012** [2] - 1:25, 4:7
**90014** [1] - 3:7
**90057** [1] - 2:16
**92705** [3] - 2:7, 2:11, 2:19
**946** [1] - 51:12
**95** [1] - 47:21
**975** [1] - 68:25
**993** [1] - 51:9
**996** [2] - 84:9, 84:15

## A

**A.M** [1] - 6:3
**ability** [2] - 55:11, 68:12
**able** [2] - 10:17, 28:3
**ABOVE** [1] - 92:16
**ABOVE-ENTITLED** [1] - 92:16
**Abrego** [1] - 81:5
**abroad** [1] - 48:24
**absent** [5] - 45:24, 46:3, 46:19, 67:7, 67:10
**absolutely** [5] - 28:2, 43:21, 45:17, 63:4, 66:4
**abused** [1] - 69:14
**Accardi** [8] - 24:7, 26:3, 66:13, 66:21, 66:23, 66:24, 67:5, 79:20
**accept** [1] - 15:9
**access** [1] - 64:18
**according** [2] - 40:16, 58:3
**account** [3] - 59:22, 60:2, 60:9
**accurate** [1] - 20:7
**acknowledge** [2] - 28:7, 62:9
**acknowledges** [1] - 50:7
**acronyms** [1] - 20:18
**Act** [2] - 47:20, 85:10
**act** [2] - 46:10, 84:2
**acting** [3] - 53:16, 53:18, 53:24
**action** [92] - 12:4, 12:14, 15:2, 15:3, 18:4, 18:7, 19:22, 19:23, 20:13, 20:24, 21:1, 21:7, 21:11, 21:14, 21:21, 22:2, 22:10, 22:11, 23:7, 23:10, 23:13, 23:24, 24:14, 24:23, 25:7, 26:17, 26:22, 27:4, 27:18, 29:4, 29:8, 29:9, 29:12, 29:15, 29:24, 30:6, 30:20, 31:1, 31:3, 31:4, 32:5, 32:8, 32:11, 33:5, 34:17, 37:4, 37:21, 38:17, 43:17, 44:15, 44:16, 44:18, 47:8, 48:7, 48:15, 48:17, 48:21, 49:20, 54:1, 54:3, 54:6, 54:7, 54:12, 54:13, 54:15, 55:5, 55:6, 56:9, 57:1, 57:3, 57:12, 66:17, 67:4, 69:18, 69:20, 72:25, 78:3, 78:15, 78:18, 78:21, 79:5, 79:7, 79:19, 80:8, 80:11, 80:20, 82:2, 85:24
**action'** [1] - 21:18
**actions** [3] - 14:18, 72:23, 73:8
**active** [1] - 27:19
**actual** [1] - 54:22
**ADAM** [1] - 2:14
**Adam** [1] - 7:7
**add** [1] - 42:6
**additional** [4] - 42:1, 59:17, 60:8, 83:11
**address** [4] - 25:9, 38:22, 70:25, 90:15
**addressed** [1] - 75:21
**Adelanto** [1] - 36:16
**adequate** [1] - 60:15
**adjourned** [1] - 91:15
**adjudicate** [7] - 10:18, 27:22, 36:7, 46:17, 47:15, 66:17, 71:16
**adjudicated** [3] - 47:16, 50:18, 71:24
**adjudication** [6] - 40:10, 44:19, 52:14, 62:8, 62:16, 82:8
**adjudications** [1] - 41:8
**adjust** [1] - 65:20
**adjusting** [1] - 38:25
**adjustment** [1] - 38:20
**adjustments** [1] - 38:18
**administration** [5] - 37:17, 39:10, 52:25, 65:13, 73:23
**administrations** [1] - 39:24
**administrative** [2] - 28:24, 65:12
**admission** [1] - 43:16
**admitted** [1] - 30:15
**adopted** [1] - 19:17
**Advisor** [1] - 20:22
**advocates** [1] - 88:20
**affairs** [1] - 12:9
**affect** [1] - 83:1
**affected** [2] - 10:11, 42:3

**affiliating** [1] - 22:8
**afoul** [1] - 9:13
**agencies** [2] - 33:7, 60:11
**agency** [22] - 21:11, 21:13, 21:19, 21:21, 21:23, 21:24, 22:7, 22:10, 22:11, 23:7, 38:17, 42:4, 44:17, 52:1, 52:2, 53:18, 53:24, 54:1, 63:7, 63:19, 69:12
**agency's** [4] - 63:3, 63:21, 65:19, 65:20
**agents** [2] - 40:23, 44:8
**aggravating** [1] - 46:20
**ago** [1] - 23:22
**agree** [3] - 28:5, 28:6, 45:9
**agreement** [1] - 62:5
**agrees** [1] - 53:23
**Aguilar** [2] - 58:24, 59:13
**AGUILAR** [1] - 59:13
**ahead** [3] - 8:13, 67:23, 68:2
**Al** [2] - 79:25, 82:25
**al** [9] - 1:7, 1:13, 2:5, 3:5, 4:5, 6:6, 92:5, 92:9
**allegation** [5] - 53:10, 57:17, 58:3, 62:12, 68:11
**allege** [3] - 13:24, 28:15, 69:23
**alleged** [3] - 27:1, 41:12, 68:7
**alleging** [3] - 13:9, 13:14, 68:14
**allow** [2] - 52:9, 81:18
**allowed** [3] - 40:2, 70:23, 78:13
**allows** [3] - 27:17, 46:16, 59:21
**alluding** [2] - 30:18, 75:23
**almost** [1] - 42:17
**alternative** [1] - 18:20
**altogether** [4] - 44:15, 59:22, 60:5, 68:23
**amended** [3] - 77:14, 77:22, 84:5
**Amendment** [1] - 25:8
**amendment** [1] - 84:1
**amendments** [1] - 84:3
**AMERICAN** [1] - 3:4
**amount** [2] - 65:10, 70:14
**ANA** [2] - 2:7, 2:11
**analysis** [8] - 13:15, 13:20, 50:13, 51:10, 51:23, 52:18, 72:25, 80:5
**AND** [3] - 92:11, 92:14, 92:16
**AND/OR** [1] - 92:20
**ANDRÉ** [1] - 1:5
**Angeles** [1] - 74:23
**ANGELES** [8] - 1:19, 1:25, 2:16, 2:19, 3:7, 4:6, 4:7, 6:1
**answer** [6] - 23:18, 28:4, 37:8, 40:8, 51:2, 91:2
**answered** [1] - 87:3
**answering** [1] - 88:6
**answers** [1] - 89:11
**ante** [1] - 81:22
**anticipated** [2] - 71:7, 73:3
**ANY** [1] - 92:19
**anytime** [2] - 23:2, 54:10
**APA** [23] - 19:8, 21:10, 21:12, 21:13, 22:14, 23:8, 42:4, 51:10, 53:9, 53:19, 66:3, 69:13, 70:24, 71:1, 72:9, 74:2, 74:4, 74:14, 74:17, 75:6, 75:17, 75:18, 76:4
**apart** [1] - 77:24
**APAs** [1] - 74:3
**apologies** [1] - 7:13
**apologize** [1] - 17:16
**appeal** [1] - 23:23
**appearances** [1] - 6:7
**applicability** [1] - 21:24
**applicable** [4] - 35:8, 42:13, 42:16, 44:22
**applicant** [1] - 89:25
**applicants** [8] - 49:3, 60:10, 60:11, 89:1, 89:17, 89:20
**application** [1] - 85:19
**applications** [9] - 27:19, 36:8, 37:25, 40:11, 44:19, 48:24, 60:9, 65:6, 71:23
**applied** [5] - 9:2, 32:15, 59:1, 62:11, 71:6
**applies** [5] - 9:3, 33:14, 63:16, 68:16, 83:16
**apply** [10] - 43:22, 44:24, 56:24, 61:9, 61:23, 73:1, 73:21, 77:23, 81:18, 83:3
**applying** [5] - 58:23, 59:6, 76:24, 79:13, 83:4
**appointment** [1] - 68:8
**appreciate** [4] - 10:2, 88:6, 91:9
**appropriate** [6] - 40:14, 40:21, 44:5, 86:4, 86:10, 86:22
**approved** [9] - 27:11, 27:13, 43:17, 44:11, 49:2, 49:3, 61:3, 61:9, 71:5
**April** [1] - 34:8
**arbitrary** [1] - 71:22
**ARDMORE** [1] - 2:19
**ARE** [1] - 92:20
**area** [1] - 64:4
**arguably** [1] - 72:2
**argue** [3] - 20:5, 35:22, 86:25
**argued** [1] - 28:14
**argument** [8] - 18:20, 54:25, 65:25, 66:14, 66:16, 71:4, 85:16, 86:21
**arise** [1] - 91:2
**arrest** [2] - 78:22, 83:2
**arrested** [1] - 11:18
**articulated** [1] - 28:22
**articulating** [1] - 84:16
**Ashcroft** [1] - 40:3
**aside** [11] - 74:9, 74:10, 75:23, 75:24, 76:2, 76:22, 76:24, 85:17, 86:12, 86:22, 89:24
**aspect** [2] - 15:9, 42:11
**aspects** [1] - 32:25
**assert** [1] - 18:16
**asserting** [1] - 23:4
**asserts** [2] - 21:4, 22:3
**assess** [1] - 44:8
**assesses** [1] - 44:8
**assign** [1] - 34:12
**assigning** [1] - 34:22
**assist** [1] - 63:15
**ASSISTANT** [1] - 4:4
**assists** [1] - 88:25
**associational** [1] - 18:17
**assume** [3] - 41:4, 58:6, 86:5
**assuming** [2] - 14:11, 57:1
**AT** [1] - 6:3
**Attorney** [1] - 48:13
**attorney** [2] - 39:25, 48:13
**ATTORNEY** [2] - 4:4, 4:5
**authority** [11] - 20:12, 21:2, 21:4, 22:4, 24:2, 47:12, 50:6, 50:9, 56:1, 78:22
**authorization** [4] - 13:2, 13:6, 26:18, 54:18
**authorized** [3] - 12:4, 12:15, 81:4
**automatic** [1] - 53:4
**automatically** [1] - 53:3
**avail** [3] - 10:16, 37:3, 38:2
**available** [1] - 55:11
**availed** [1] - 44:10
**AVENUE** [1] - 2:19
**avenue** [1] - 37:11
**avenues** [1] - 42:2
**avoid** [1] - 56:21
**aware** [2] - 54:20, 78:5


## B


**b)(9** [3] - 69:5, 69:8, 69:9
**b)(9)** [1] - 69:2
**Bardis** [2] - 6:9, 6:16
**BARDIS** [1] - 2:5
**barely** [1] - 6:13
**bargain** [3] - 36:3, 38:3, 43:15
**Barrios** [1] - 52:16
**based** [5] - 36:13, 66:12, 89:20, 89:22, 90:2
**baseline** [1] - 84:16
**basic** [1] - 85:5
**basis** [8] - 11:7, 31:7, 40:25, 41:9, 44:9, 46:17, 46:18, 60:3
**battle** [1] - 44:18
**Bay** [1] - 51:8
**became** [2] - 64:25, 65:4
**become** [3] - 15:5, 16:5, 35:11
**becomes** [2] - 24:19, 54:21
**beforehand** [2] - 11:22, 11:25
**BEHALF** [3] - 2:4, 3:4, 4:3
**behalf** [2] - 15:10, 72:14
**behaves** [1] - 19:23
**belt** [2] - 66:14, 91:6
**belt-and-suspenders** [1] - 66:14
**belts** [1] - 53:21
**beneficiaries** [1] - 89:19
**benefit** [7] - 21:12, 23:24, 36:3, 38:3, 43:15, 55:7, 60:10
**benefits** [6] - 37:3, 50:7, 54:19, 60:10, 89:20, 89:22
**best** [3] - 14:20, 76:18, 79:24
**better** [1] - 56:8
**between** [6] - 10:14, 18:23, 46:8, 54:3, 62:5, 85:13
**beyond** [2] - 19:19, 60:1
**BIA** [10] - 29:23, 31:14, 31:20, 31:21, 32:1, 41:17, 57:20, 59:21, 60:4, 62:23
**bicker** [1] - 76:6
**Biden** [1] - 45:21
**big** [2] - 38:20, 45:25
**bill** [1] - 47:23
**binding** [2] - 45:23, 77:10
**bipartisanship** [1] - 47:22
**BIROTTE** [1] - 1:5
**bit** [5] - 26:8, 52:18, 66:7, 81:25, 88:8
**bleed** [1] - 24:6
**Blind** [10] - 19:11, 22:21, 27:2, 51:17, 52:10, 53:6, 73:20, 77:2, 78:1, 82:5
**blind** [1] - 69:4
**blowing** [1] - 72:12
**blue** [1] - 47:23
**boils** [1] - 62:22
**bond** [1] - 59:4
**books** [1] - 53:4
**border** [2] - 48:13, 81:11
**born** [2] - 72:16, 72:17
**bottom** [2] - 41:17, 84:13
**Branch** [1] - 32:8
**Brethren** [1] - 85:8
**brief** [12] - 25:14, 28:11, 28:14, 34:11, 35:7, 41:17, 41:18, 41:19, 58:17, 67:9, 68:1, 70:18
**briefing** [2] - 21:5, 45:19
**briefly** [2] - 67:21, 67:22
**briefs** [1] - 46:25
**bring** [4] - 6:12, 15:2, 15:3, 81:6
**brings** [2] - 15:2, 50:1
**broad** [1] - 86:1
**broader** [2] - 9:10, 85:25
**brought** [7] - 10:8, 24:24, 31:24, 42:12, 42:15, 44:21, 68:13
**BROWN** [1] - 6:24
**Brown** [1] - 6:24
**built** [2] - 14:8, 35:5
**bullet** [1] - 67:24
**burden** [1] - 17:23
**burdensome** [3] - 64:25, 71:3
**business** [1] - 66:20
**BUSTILLOS** [3] - 1:22, 92:11, 92:24
**butchered** [1] - 87:15
**butchering** [1] - 87:10
**button** [1] - 17:18

**buy** [1] - 35:9
**buying** [1] - 34:2
**BY** [6] - 2:5, 2:10, 2:14, 2:18, 3:6, 4:5

## C

**C.S.R** [1] - 1:23
**CA** [6] - 2:7, 2:11, 2:16, 2:19, 3:7, 4:7
**cake** [1] - 50:25
**calculus** [1] - 58:9
**CALIFORNIA** [5] - 1:2, 1:19, 1:25, 6:1, 92:13
**Camila** [7] - 11:17, 18:8, 34:6, 34:7, 49:21, 54:25, 86:6
**candid** [1] - 18:19
**cannot** [4] - 8:9, 37:13, 45:23, 61:15
**capable** [1] - 15:15
**capacity** [4] - 1:13, 4:5, 89:10, 92:9
**capricious** [1] - 71:22
**careful** [2] - 72:19, 78:7
**carefully** [2] - 73:24, 77:8
**Carmen** [1] - 80:24
**CASA** [5] - 72:11, 73:2, 86:2, 86:14
**case** [101] - 8:8, 10:5, 10:12, 10:13, 12:25, 14:20, 14:23, 14:24, 15:22, 16:8, 16:24, 19:18, 23:20, 23:21, 23:22, 28:22, 29:14, 30:17, 30:22, 31:25, 33:20, 33:24, 34:3, 34:4, 34:13, 34:22, 35:10, 35:13, 35:20, 35:25, 36:13, 36:23, 40:5, 40:8, 40:19, 40:21, 40:25, 41:9, 41:16, 41:20, 43:19, 43:24, 44:2, 44:4, 44:9, 46:18, 50:8, 51:22, 52:1, 52:5, 52:6, 52:15, 53:17, 54:8, 54:10, 55:7, 56:24, 56:25, 57:4, 58:16, 58:23, 59:6, 59:9, 60:22, 63:20, 65:22, 65:23, 68:3, 68:6, 68:7, 68:12, 68:17, 69:6, 70:3, 72:11, 72:13, 72:14, 73:10, 75:20, 75:21, 79:25, 83:8, 84:25, 85:2, 85:7, 86:9, 86:16, 87:6, 89:8
**case-by-case** [9] - 40:21, 40:25, 41:9, 44:2, 44:4, 44:9, 46:18, 63:20, 65:23
**case-to-case** [1] - 65:22
**cases** [35] - 10:18, 14:17, 14:22, 15:1, 15:7, 15:12, 15:22, 16:4, 16:16, 16:19, 17:3, 17:7, 17:12, 17:13, 22:13, 35:19, 35:20, 36:14, 43:8, 45:21, 51:7, 51:9, 51:12, 53:17, 54:9, 55:18, 68:24, 69:3, 69:9, 71:10, 73:6, 74:16, 84:24, 86:13, 87:20
**caused** [1] - 12:11
**causes** [2] - 68:20, 80:8
**Center** [1] - 6:5
**CENTER** [6] - 1:7, 2:4, 2:9, 3:4, 92:4
**CENTRAL** [2] - 1:2, 92:12
**certain** [6] - 47:7, 62:24, 77:14, 83:16, 83:17, 84:9
**certainly** [4] - 10:3, 12:13, 18:1, 48:6
**certification** [5] - 15:18, 28:10, 50:17, 89:8, 89:9
**CERTIFICATION** [2] - 1:18, 5:3
**certified** [2] - 65:12, 73:14
**CERTIFY** [1] - 92:13
**CERVANTES** [2] - 3:6, 6:21
**Cervantes** [2] - 6:22, 46:2
**cetera** [2] - 79:8
**CFR** [6] - 29:25, 32:21, 32:23, 32:25, 49:2, 59:20
**challenge** [9] - 10:6, 10:9, 10:23, 17:1, 22:12, 41:11, 60:24, 68:8, 90:1
**challenged** [3] - 22:16, 23:7, 41:13
**challenges** [1] - 41:12
**challenging** [1] - 89:13
**chance** [8] - 7:15, 7:22, 7:23, 26:6, 38:2, 45:4, 46:6, 82:23
**change** [15] - 14:13, 15:19, 38:6, 38:16, 39:17, 39:25, 40:5, 41:13, 48:4, 54:17, 62:21, 63:10, 70:11, 87:23
**changed** [7] - 18:3, 40:20, 41:5, 48:10, 48:12, 65:9, 77:15
**changes** [2] - 40:1, 42:9
**channel** [1] - 42:1
**characterize** [1] - 31:12
**charge** [1] - 40:4
**CHARGED** [1] - 92:19
**check** [4] - 12:1, 12:6, 12:19, 18:5
**check-ins** [3] - 12:1, 12:6, 12:19
**checks** [1] - 11:20
**child** [1] - 68:7
**CHILDREN** [4] - 1:7, 2:5, 3:5, 92:5
**children** [2] - 14:7, 68:11
**Children** [1] - 6:6
**CHIRLA** [2] - 18:15, 18:16
**Christina** [1] - 48:11
**Church** [1] - 85:8
**church** [1] - 14:8
**CIRCUIT** [1] - 92:19
**Circuit** [26] - 14:20, 14:21, 23:23, 32:2, 33:20, 36:22, 41:11, 41:16, 50:4, 50:7, 51:8, 52:15, 57:5, 60:21, 60:24, 68:7, 68:13, 71:9, 75:7, 75:17, 77:17, 77:20, 80:1, 82:13, 82:17, 87:19
**Circuit's** [1] - 77:8
**circumstances** [5] - 15:19, 20:23, 45:24, 46:4, 46:20
**citation** [2] - 32:16, 32:18
**cite** [21] - 16:24, 22:16, 36:23, 41:16, 45:21, 50:8, 52:6, 52:16, 55:8, 58:16, 58:25, 59:14, 69:7, 75:8, 75:14, 77:9, 82:14, 82:15, 84:24, 85:8
**cited** [6] - 22:3, 41:20, 51:5, 60:22, 61:18, 86:13
**citizen** [2] - 14:7, 72:18
**citizens** [2] - 48:1, 72:17
**claim** [20] - 15:16, 15:17, 22:25, 25:8, 53:7, 53:8, 53:9, 53:20, 56:15, 60:18, 60:20, 66:21, 66:23, 66:24, 67:6, 72:9, 80:19, 80:20, 82:3
**claimant** [1] - 53:15
**claims** [9] - 15:10, 17:22, 19:8, 33:22, 53:8, 53:11, 69:10, 69:11
**class** [33] - 11:7, 14:18, 15:2, 15:3, 15:5, 15:10, 15:15, 15:16, 15:18, 16:21, 18:11, 28:10, 34:17, 50:17, 55:6, 72:23, 72:25, 73:7, 73:13, 73:14, 76:2, 76:5, 76:11, 76:13, 77:13, 78:8, 84:13, 85:24, 89:2, 89:8, 89:10, 89:13
**CLASS** [2] - 1:18, 5:3
**class-wide** [6] - 11:7, 76:11, 76:13, 77:13, 84:13, 89:10
**classes** [2] - 10:9, 73:15
**clause** [1] - 83:11
**clear** [10] - 22:14, 36:23, 41:11, 50:4, 50:5, 52:23, 69:18, 71:10, 73:5, 80:1
**clear-eyed** [1] - 52:23
**clearest** [1] - 66:16
**clearly** [5] - 11:14, 15:22, 16:7, 30:24, 57:5
**clients** [1] - 79:6
**closer** [4] - 6:13, 42:13, 42:15, 44:22
**closest** [1] - 86:10
**COALITION** [1] - 2:13
**CODE** [1] - 92:14
**code** [1] - 84:9
**collateral** [6] - 69:1, 69:2, 79:24, 80:2, 82:25, 83:2
**collection** [1] - 85:12
**collision** [1] - 85:15
**coming** [3] - 37:9, 73:5, 81:17
**commas** [4] - 83:11, 83:20, 83:21, 83:23
**commencement** [1] - 62:15
**commendable** [1] - 28:24
**committed** [3] - 63:3, 63:7, 63:21
**common** [4] - 89:5, 89:6, 89:9, 89:11
**commonality** [2] - 89:4, 89:5
**comparable** [3] - 41:4, 57:2, 57:4
**complain** [2] - 34:11, 41:25
**complaint** [11] - 11:9, 11:10, 16:4, 25:8, 26:21, 31:15, 33:15, 34:23, 35:15, 50:16, 90:19
**complaints** [1] - 31:23
**completed** [1] - 34:25
**completely** [4] - 16:4, 46:15, 49:1, 50:15
**complications** [1] - 51:22
**comply** [3] - 66:24, 66:25, 71:22
**comports** [2] - 67:11, 79:19
**concede** [2] - 17:21, 18:9
**concept** [1] - 57:8
**concern** [1] - 72:6
**concerned** [2] - 8:21, 43:3
**concerning** [1] - 33:25
**concerns** [1] - 71:12
**concrete** [1] - 29:20
**concurrently** [1] - 42:20
**condition** [1] - 22:8
**conditional** [2] - 37:5, 62:2
**CONFERENCE** [2] - 92:18, 92:21
**confers** [1] - 24:1
**conflation** [1] - 56:1
**conflicts** [1] - 51:11
**CONFORMANCE** [2] - 92:17, 92:20
**confused** [1] - 29:2
**Congress** [16] - 10:16, 30:24, 31:9, 33:6, 41:24, 46:7, 46:24, 47:1, 47:8, 47:25, 52:8, 69:15, 71:4, 72:23, 84:4, 84:10
**Congress's** [5] - 45:11, 51:4, 51:11, 51:13, 71:23
**congressional** [4] - 47:2, 51:6, 59:19, 71:13
**conjunction** [1] - 60:7
**consequences** [4] - 28:14, 30:13, 48:2, 81:17
**consider** [1] - 20:5
**consideration** [1] - 63:20
**considerations** [1] - 43:12
**considered** [1] - 57:15
**considering** [1] - 31:19
**consistently** [1] - 50:2
**constitute** [1] - 12:7
**constitutional** [1] - 60:20
**CONSTITUTIONAL** [2] - 2:5, 2:9
**constrain** [1] - 85:19
**constrained** [1] - 64:23
**construct** [1] - 44:15

**construction** [1] - 83:10
**construes** [1] - 52:16
**consular** [1] - 61:11
**CONT'D** [2] - 3:1, 4:1
**contained** [1] - 64:14
**contemplate** [3] - 29:22, 30:4, 67:17
**contemplates** [3] - 27:20, 62:7, 74:14
**contest** [1] - 17:25
**contested** [1] - 86:19
**context** [4] - 22:11, 22:14, 84:14, 85:9
**contexts** [1] - 23:25
**continue** [5] - 22:4, 27:21, 30:7, 31:3, 32:14
**contrary** [3] - 20:8, 45:11, 51:9
**controls** [1] - 69:20
**controversy** [1] - 81:15
**cooperated** [1] - 38:3
**coordinated** [1] - 40:9
**copy** [1] - 64:11
**correct** [3] - 42:23, 45:17, 88:16
**CORRECT** [1] - 92:15
**correspond** [2] - 80:9, 80:12
**COUNSEL** [1] - 2:18
**counsel** [6] - 6:7, 34:12, 34:22, 40:24, 56:21, 68:8
**counselor** [1] - 37:16
**countries** [2] - 47:11, 61:20
**country** [15] - 12:16, 13:2, 13:5, 24:2, 24:19, 27:12, 30:14, 37:12, 49:18, 55:12, 61:10, 72:16, 81:17, 82:12, 90:3
**County** [1] - 14:25
**couple** [9] - 20:16, 26:1, 26:12, 51:7, 54:6, 56:14, 64:2, 66:8, 67:21
**course** [3] - 19:18, 49:11, 54:8
**COURT** [197] - 1:1, 1:22, 6:3, 6:12, 6:17, 6:20, 6:23, 7:1, 7:4, 7:8, 7:12, 8:1, 8:3, 8:8, 8:11, 8:18, 9:5, 9:16, 9:19, 10:7, 10:19, 11:2, 11:5, 11:16, 11:22, 12:1, 12:6, 12:21, 13:1, 13:8, 13:11, 13:18, 13:21, 13:25, 14:10, 16:9, 16:17, 17:10, 17:14, 17:17, 18:14, 19:5, 19:7, 19:10, 19:24, 20:3, 20:15, 20:19, 20:25, 22:17, 23:9, 24:4, 24:9, 24:12, 24:16, 24:21, 25:2, 25:5, 25:9, 25:16, 25:20, 25:25, 26:5, 26:10, 26:24, 27:5, 27:15, 28:1, 28:3, 28:17, 29:1, 29:7, 30:9, 30:19, 32:3, 32:10, 32:18, 32:20, 33:2, 33:12, 35:3, 35:12, 35:16, 36:10, 37:7, 37:20, 38:5, 38:14, 38:20, 38:23, 39:2, 39:15, 39:20, 39:23, 40:12, 40:15, 42:5, 42:10, 42:14, 42:22, 43:18, 43:22, 45:1, 45:6, 46:11, 46:18, 48:3, 48:20, 49:5, 49:7, 51:2, 51:14, 51:17, 53:6, 53:14, 53:21, 54:2, 54:24, 56:12, 57:9, 57:18, 57:21, 58:1, 58:4, 59:9, 61:6, 61:12, 61:17, 62:9, 63:8, 64:7, 64:12, 65:8, 65:24, 66:6, 66:12, 66:21, 67:2, 67:13, 67:19, 67:22, 68:1, 68:5, 68:9, 70:6, 70:13, 70:20, 72:1, 73:4, 73:12, 74:1, 74:12, 74:15, 74:18, 75:1, 75:10, 75:12, 76:8, 76:16, 76:20, 77:25, 78:2, 78:17, 78:25, 79:3, 79:16, 79:22, 80:6, 80:15, 80:18, 80:25, 81:9, 81:23, 81:25, 82:9, 82:20, 82:22, 85:21, 86:24, 87:9, 87:14, 87:22, 88:2, 88:5, 88:15, 88:18, 88:22, 89:15, 89:18, 89:21, 90:6, 90:9, 90:17, 90:24, 91:3, 92:11, 92:12
**Court** [51] - 15:1, 15:18, 18:21, 23:20, 28:21, 28:23, 31:3, 32:7, 34:16, 41:20, 50:18, 51:24, 52:19, 53:23, 58:23, 60:4, 63:5, 69:17, 70:3, 72:11, 72:19, 72:21, 73:3, 73:11, 73:14, 73:21, 74:8, 75:16, 75:20, 76:1, 76:5, 76:21, 76:22, 78:4, 78:7, 81:4, 81:5, 82:10, 82:12, 83:22, 84:16, 84:19, 84:24, 85:2, 85:3, 85:9, 85:12, 86:13, 86:16, 87:20, 91:11
**court** [17] - 12:14, 16:7, 29:23, 31:13, 33:16, 49:25, 50:2, 50:19, 50:24, 53:22, 56:2, 56:4, 58:22, 59:4, 59:21, 60:2
**Court's** [1] - 10:2
**COURTHOUSE** [1] - 1:23
**courtroom** [3] - 7:17, 8:7, 8:16
**COURTROOM** [1] - 6:4
**courts** [7] - 17:2, 50:3, 50:5, 74:4, 74:20, 84:21, 85:11
**covered** [3] - 78:23, 79:25, 87:7
**covering** [1] - 32:25
**covers** [1] - 83:6
**crafted** [3] - 60:23, 73:15, 73:24
**create** [2] - 42:1, 52:6
**created** [4] - 47:20, 52:8, 77:18, 77:19
**creates** [4] - 14:18, 47:5, 55:8, 55:14
**crime** [2] - 10:15, 43:1
**crimes** [1] - 43:2
**criteria** [1] - 24:11
**criticism** [1] - 75:1
**criticizes** [1] - 64:4
**curious** [4] - 18:15, 18:17, 45:8, 53:9
**current** [1] - 12:9
**custody** [2] - 11:14, 25:15
**CV** [3] - 1:10, 6:5, 92:5

## D

**D.C** [2] - 75:7, 75:16
**DACA** [5] - 29:12, 33:10, 57:1, 57:3, 57:4
**dad** [1] - 87:12
**Dan** [1] - 48:12
**dangerous** [1] - 25:12
**date** [1] - 74:11
**DATE** [1] - 92:24
**days** [4] - 26:1, 35:21, 49:20, 90:19
**de** [1] - 79:13
**De** [4] - 19:11, 19:22, 27:1, 78:4
**deadline** [1] - 90:22
**deal** [2] - 25:7, 45:25
**dealt** [1] - 86:15
**December** [1] - 34:25
**decide** [2] - 52:2, 52:3
**decided** [5] - 43:5, 58:25, 59:15, 86:14, 90:23
**deciding** [1] - 82:6
**decision** [7] - 32:5, 32:8, 32:11, 43:24, 52:21, 72:11, 87:6
**decisions** [3] - 31:2, 31:5, 46:4
**declaration** [3] - 46:2, 48:9, 48:14
**declaratory** [7] - 78:12, 78:13, 84:21, 85:13, 85:14, 86:17, 86:23
**deemed** [1] - 39:17
**deep** [1] - 56:5
**defendants** [11] - 7:11, 17:24, 22:20, 34:1, 34:12, 34:18, 34:22, 35:2, 35:9, 38:16, 79:4
**Defendants** [2] - 1:14, 79:18
**DEFENDANTS** [1] - 4:3
**Defense** [1] - 14:12
**DEFENSE** [2] - 3:5, 3:5
**defense** [1] - 27:1
**defer** [1] - 46:4
**deferred** [74] - 12:3, 12:13, 18:4, 18:7, 19:22, 19:23, 20:13, 20:24, 21:1, 21:7, 23:10, 23:12, 23:24, 24:14, 25:6, 26:17, 26:22, 27:4, 28:16, 29:4, 29:8, 29:9, 29:12, 29:14, 29:23, 30:6, 30:11, 30:20, 31:1, 31:3, 31:4, 32:5, 32:8, 32:10, 33:5, 37:4, 37:21, 43:17, 44:14, 44:16, 48:7, 48:17, 48:21, 49:20, 54:3, 54:5, 54:7, 54:12, 54:13, 55:5, 55:6, 56:9, 57:1, 57:3, 57:12, 59:23, 60:3, 61:4, 66:17, 67:4, 69:18, 69:20, 78:3, 78:15, 78:18, 78:21, 79:5, 79:7, 79:19, 80:20, 82:2
**Deferred** [1] - 48:14
**defined** [4] - 22:6, 29:15, 37:4, 37:22
**defines** [4] - 21:11, 21:12, 21:13, 21:16
**definition** [2] - 28:18, 30:21
**delay** [2] - 34:12, 35:10
**delays** [1] - 35:5
**demonstrated** [1] - 64:15
**denial** [1] - 21:20
**deny** [3] - 52:9, 52:11, 52:25
**denying** [1] - 48:8
**deport** [2] - 20:13, 35:21
**deportation** [4] - 14:2, 14:9, 49:13, 84:7
**deported** [6] - 13:23, 14:3, 36:15, 49:20, 61:13, 80:21
**deporting** [2] - 71:8, 71:14
**depose** [1] - 70:25
**DEPOSIT** [1] - 92:20
**depositions** [1] - 69:25
**deprivation** [11] - 25:23, 55:17, 57:7, 58:7, 58:13, 58:19, 58:20, 59:8, 60:14, 60:16
**deputy** [1] - 7:17
**DEPUTY** [1] - 6:4
**describe** [1] - 62:10
**described** [2] - 37:10, 55:8
**descriptive** [1] - 83:10
**designed** [4] - 10:9, 30:25, 31:9, 41:24
**details** [1] - 10:3
**detain** [3] - 18:3, 20:12, 22:4
**detained** [3] - 48:7, 60:1, 67:18
**detaining** [2] - 71:8, 71:14
**detention** [15] - 11:18, 25:15, 49:21, 49:23, 50:12, 55:20, 55:21, 56:1, 62:15, 67:7, 67:10, 67:15, 68:21, 68:25, 83:6
**determination** [14] - 23:2, 40:20, 40:22, 44:2, 44:4, 44:5, 46:5, 52:20, 52:24, 53:3, 64:25, 65:3, 65:15, 90:20
**determinations** [5] - 22:23, 31:5, 32:9, 41:23, 77:5
**determine** [3] - 20:23, 46:22, 65:21
**determined** [2] - 11:8, 88:23
**DHS** [1] - 26:22
**Diaz** [4] - 58:16, 58:23, 59:1, 82:16
**differed** [2] - 22:2, 54:15
**difference** [3] - 54:3, 54:23, 85:13
**differences** [2] - 18:22, 19:1
**different** [11] - 12:8, 15:24, 34:1, 37:22, 46:12, 46:15, 52:17,

53:11, 66:22, 74:3, 76:15
**differently** [1] - 62:11
**direct** [2] - 38:10, 62:15
**directed** [1] - 26:13
**directive** [11] - 39:13, 39:14, 40:9, 42:17, 64:1, 64:4, 64:13, 64:22, 64:23, 65:7, 65:14
**directly** [5] - 27:3, 60:19, 83:1, 84:22, 86:18
**disagree** [1] - 31:12
**disclosing** [1] - 34:19
**discovery** [4] - 19:20, 69:25, 70:24, 91:2
**discretion** [22] - 24:8, 28:25, 39:1, 39:22, 40:19, 41:3, 42:3, 51:18, 63:3, 63:7, 63:9, 63:21, 64:24, 65:20, 66:2, 66:19, 67:2, 67:3, 69:12, 69:14, 84:20
**discretionary** [5] - 20:15, 31:5, 32:9, 41:23, 52:7
**discrimination** [1] - 90:2
**discuss** [5] - 8:8, 8:10, 8:22, 87:17, 88:11
**discussed** [2] - 8:21, 26:11
**discussion/debate** [1] - 74:22
**disputes** [1] - 91:8
**disseminated** [1] - 7:20
**distilling** [1] - 10:4
**distinct** [1] - 56:3
**distinguishable** [1] - 33:21
**distributed** [1] - 7:19
**District** [2] - 75:20, 81:5
**DISTRICT** [5] - 1:1, 1:2, 1:5, 92:12
**district** [4] - 23:21, 75:22, 85:11, 86:8
**DIVISION** [1] - 1:3
**DO** [1] - 92:13
**docket** [4] - 31:15, 46:1, 56:4, 91:7
**doctrine** [8] - 16:6, 18:23, 24:7, 26:4, 52:19, 66:13, 79:20
**documents** [3] - 7:16, 7:22, 39:4
**domestic** [2] - 10:15, 47:13
**done** [3] - 25:4, 71:21, 82:13
**doubt** [1] - 19:19
**down** [6] - 17:14, 47:1, 47:2, 58:14, 62:22, 65:6
**dozens** [3] - 22:2, 48:6, 48:7
**drawing** [1] - 9:23
**drawn** [1] - 45:7
**drive** [1] - 89:11
**droves** [1] - 89:10
**due** [20] - 25:21, 38:1, 43:16, 54:24, 55:2, 55:15, 55:16, 56:15, 56:18, 57:5, 58:6, 58:18, 58:21, 59:2, 61:15, 67:11, 79:20, 80:21, 82:3, 90:19
**Dukes** [1] - 89:7
**Duran** [3] - 84:25, 85:1, 86:16
**during** [4] - 10:21, 12:16, 54:8, 54:10
**duty** [1] - 76:5

## E

**early** [1] - 70:9
**East** [1] - 51:8
**EAST** [2] - 2:6, 2:10
**eat** [1] - 50:25
**ECF** [3] - 8:5, 34:20, 35:1
**EDUCATIONAL** [1] - 3:5
**effect** [6] - 75:4, 82:25, 83:3, 83:23, 85:3, 91:7
**effective** [1] - 74:11
**effectuated** [2] - 34:21, 62:6
**either** [3] - 19:4, 19:6, 54:9
**ELEVENTH** [1] - 3:7
**eligibility** [1] - 55:9
**eligible** [4] - 46:23, 49:11, 52:4, 52:12
**Empire** [4] - 12:15, 23:21, 55:7, 55:18
**empty** [1] - 53:5
**enacted** [2] - 64:14, 84:15
**encountered** [1] - 23:10
**encourage** [1] - 42:25
**encouraging** [1] - 48:1
**encroaches** [1] - 9:11
**end** [3] - 16:21, 44:10, 66:1
**enforce** [7] - 24:1, 24:17, 24:20, 42:20, 46:21, 71:24, 83:17
**enforced** [1] - 48:9
**enforcement** [31] - 10:21, 12:13, 21:7, 24:23, 25:3, 27:4, 29:16, 30:12, 38:4, 42:18, 44:18, 45:25, 46:4, 48:13, 48:16, 48:22, 57:24, 57:25, 62:7, 62:13, 62:19, 62:20, 69:23, 70:4, 70:9, 71:20, 84:6, 84:22, 85:6, 86:19
**enforcing** [2] - 58:11, 71:15
**engage** [1] - 25:14
**enjoin** [3] - 72:15, 82:1, 85:11
**enjoined** [2] - 79:5, 79:18
**Enjoined** [1] - 79:12
**enjoining** [3] - 76:23, 80:4, 82:6
**enjoins** [1] - 77:13
**enjoy** [2] - 69:25, 82:6
**ensure** [2] - 42:25, 60:12
**ENTITLED** [1] - 92:16
**equating** [1] - 29:11
**equitable** [1] - 84:15
**equivalent** [1] - 21:20
**era** [1] - 12:12
**erika** [1] - 6:22
**ERIKA** [1] - 3:6
**erroneous** [4] - 57:7, 58:13, 58:20, 60:16
**erroneously** [1] - 60:13
**error** [1] - 83:19
**errors** [1] - 64:15
**especially** [1] - 58:10
**ESQ** [6] - 2:5, 2:10, 2:14, 2:18, 3:6, 4:5
**essence** [2] - 10:5, 48:4
**essential** [1] - 83:12
**essentially** [5] - 39:19, 59:8, 62:22, 77:12, 83:23
**established** [1] - 84:15
**et** [11] - 1:7, 1:13, 2:5, 3:5, 4:5, 6:6, 79:8, 92:5, 92:9
**evading** [1] - 15:15
**evaluation** [3] - 44:6, 63:20, 65:23
**eventually** [1] - 50:10
**everyday** [1] - 14:6
**evidence** [5] - 17:25, 21:9, 40:7, 42:9, 64:19
**exact** [1] - 59:2
**exactly** [7] - 28:21, 44:6, 45:22, 48:18, 52:14, 63:1, 85:16
**example** [9] - 8:20, 29:12, 29:19, 34:6, 39:12, 63:22, 63:23, 64:10, 72:8
**except** [2] - 84:23, 86:19
**exception** [4] - 14:18, 15:23, 33:14, 50:14
**exceptional** [2] - 45:24, 46:3
**execution** [1] - 44:24
**Executive** [2] - 32:8, 44:23
**exercise** [5] - 28:24, 38:19, 39:1, 40:18, 53:5
**exercised** [1] - 39:22
**exercises** [1] - 63:6
**exercising** [1] - 41:3
**exhibit** [1] - 46:1
**exhibits** [1] - 34:18
**exist** [3] - 11:10, 19:24, 20:9
**existing** [1] - 84:12
**exists** [1] - 20:9
**expedited** [2] - 40:10, 91:1
**experienced** [1] - 65:13
**experts** [2] - 48:11, 70:4
**explain** [1] - 45:14
**explained** [1] - 70:12
**explanation** [1] - 37:24
**explicit** [3] - 27:22, 41:21, 47:1
**explicitly** [2] - 10:17, 84:4
**exponential** [2] - 65:5, 65:9
**exponentially** [1] - 70:15
**exposed** [1] - 13:6
**expressly** [2] - 62:7, 64:22
**extent** [4] - 28:5, 28:6, 41:10, 45:9
**extremely** [3] - 31:15, 33:17, 33:18
**eyed** [1] - 52:23

## F

**f)(1** [2] - 80:3, 80:5
**F.3d** [4] - 51:9, 51:12, 68:25, 82:16
**F.4th** [1] - 52:16
**face** [3] - 26:20, 33:15, 83:19
**facie** [12] - 22:23, 23:1, 46:23, 52:1, 52:4, 53:2, 64:24, 65:3, 65:14, 71:24, 77:5, 82:7
**fact** [20] - 13:15, 13:20, 14:9, 16:1, 30:1, 31:13, 33:4, 33:18, 34:23, 61:18, 64:2, 64:3, 64:7, 64:15, 65:2, 65:17, 70:13, 70:21, 88:24, 90:8
**facto** [1] - 79:13
**Facto** [4] - 19:11, 19:22, 27:1, 78:4
**factor** [3] - 57:15, 58:12, 59:7
**factors** [2] - 58:9, 88:25
**facts** [5] - 8:9, 9:1, 11:10, 16:5, 64:2
**fair** [3] - 25:20, 46:10, 51:14
**fairly** [1] - 88:24
**faithful** [1] - 44:24
**fall** [4] - 69:5, 78:18, 80:1, 80:3
**fallacy** [1] - 31:12
**fallback** [1] - 53:12
**falls** [3] - 14:16, 15:21, 15:22
**false** [1] - 49:1
**family** [4] - 14:4, 49:14, 49:22, 49:24
**far** [3] - 26:11, 31:17, 73:22
**favor** [1] - 85:22
**fear** [1] - 48:2
**FEBRUARY** [2] - 1:20, 6:1
**federal** [3] - 84:20, 85:6, 86:20
**FEE** [1] - 92:19
**FEES** [1] - 92:19
**fellow** [1] - 16:21
**few** [6] - 8:9, 22:16, 23:22, 42:6, 53:18, 85:7
**field** [2] - 48:11, 70:5
**fifth** [3] - 80:19, 80:20, 82:3
**fight** [2] - 91:3
**file** [1] - 91:6
**filed** [8] - 11:9, 11:11, 16:4, 17:9, 34:18, 35:2, 50:17, 85:24
**filing** [1] - 12:8
**final** [5] - 38:17, 44:17, 54:1, 54:11, 54:22
**fine** [3] - 70:7, 71:1, 91:4
**first** [13] - 10:24, 11:5, 23:18, 24:11, 33:15, 38:15, 41:18, 48:19, 52:3, 52:20, 64:4, 64:23, 72:4
**five** [1] - 49:22
**flag** [1] - 8:25
**flexible** [1] - 57:7
**flight** [1] - 25:12
**FLOOR** [1] - 3:7
**floor** [1] - 26:14
**flow** [1] - 30:13
**focus** [3] - 16:12, 84:18, 87:5

**focused** [1] - 70:15
**folks** [8] - 16:24, 32:15, 40:24, 44:11, 46:9, 55:9, 67:18, 89:14
**follow** [1] - 78:25
**foot** [1] - 27:15
**footnote** [2] - 20:17, 21:4
**FOR** [9] - 1:7, 2:4, 2:9, 3:4, 92:4, 92:11, 92:12, 92:19
**force** [2] - 34:15, 63:2
**foreclose** [2] - 37:5, 38:2
**foreclosed** [2] - 57:24, 86:12
**forecloses** [2] - 28:13, 76:12
**forego** [1] - 76:17
**FOREGOING** [1] - 92:14
**foreign** [2] - 36:21, 36:24
**formal** [1] - 26:18
**FORMAT** [1] - 92:17
**former** [1] - 48:12
**forms** [1] - 85:4
**forward** [6] - 43:2, 43:7, 48:2, 49:15, 91:8
**forwarding** [1] - 51:13
**four** [2] - 54:16, 54:17
**Fourth** [1] - 25:8
**framed** [1] - 41:10
**framework** [1] - 59:7
**free** [1] - 17:1
**freedom** [1] - 22:8
**freeze** [1] - 84:8
**full** [1] - 27:18
**funding** [1] - 55:11
**funnel** [1] - 69:10
**funnels** [1] - 69:8
**future** [1] - 11:12

**G**

**Galvez** [7] - 77:9, 77:10, 77:17, 77:19, 83:9, 83:14, 83:22
**game** [1] - 46:10
**Garcia** [2] - 52:16, 81:5
**Garland** [2] - 58:16, 59:2
**general** [2] - 21:23, 21:24
**General's** [1] - 48:14
**generalized** [1] - 79:11
**generals** [1] - 39:25
**generate** [1] - 89:11
**given** [7] - 14:13, 19:2, 33:23, 54:13, 58:10, 59:17, 63:9
**Gonzalez** [2] - 68:25, 82:16
**governing** [1] - 84:12
**Government** [16] - 19:18, 21:6, 46:11, 48:3, 50:2, 50:15, 55:10, 55:17, 58:11, 63:1, 70:6, 73:25, 76:23, 81:2, 81:12, 81:13
**Government's** [2] - 48:21, 85:19
**Grace** [1] - 85:8
**grandchildren** [1] - 14:7
**grant** [2] - 52:21, 81:1
**grants** [1] - 69:19
**great** [2] - 69:24, 70:24
**greater** [1] - 14:23
**ground** [1] - 82:11
**grounds** [1] - 31:7
**group** [1] - 89:14
**guarantee** [1] - 30:16
**guess** [10] - 8:18, 9:21, 27:15, 42:22, 56:19, 57:9, 63:10, 65:24, 72:2, 79:13
**guidance** [20] - 10:23, 10:24, 20:17, 26:13, 38:18, 39:1, 39:3, 39:5, 39:10, 39:12, 39:21, 40:22, 42:12, 42:13, 42:15, 44:21, 44:22, 74:8, 76:22
**guideline** [1] - 39:25
**guidelines** [1] - 19:12

**H**

**H-E-C-K-L-E-R** [1] - 63:6
**habeas** [3] - 18:2, 22:2, 36:1
**half** [1] - 47:17
**hand** [1] - 68:21
**handed** [8] - 12:13, 57:19, 62:14, 62:20, 70:4, 70:7, 71:18, 71:20
**harm** [24] - 11:12, 11:14, 12:7, 12:11, 12:22, 13:12, 13:15, 14:9, 14:14, 15:13, 16:2, 16:15, 16:20, 16:21, 16:25, 17:5, 28:15, 49:10, 49:12, 49:13, 68:20, 73:10
**harmed** [1] - 68:11
**harmonizes** [1] - 62:4
**harms** [9] - 11:15, 15:3, 15:5, 17:9, 18:10, 18:23, 18:24, 49:12
**head** [2] - 19:16, 22:20
**headquarters** [1] - 88:1
**hear** [3] - 6:13, 45:2, 74:19
**heard** [9] - 23:21, 45:7, 46:11, 60:17, 61:17, 68:3, 68:6, 70:6, 78:5
**HEARING** [2] - 1:18, 5:3
**hearing** [9] - 25:23, 56:7, 56:17, 58:7, 58:19, 59:4, 59:8, 60:14
**hearings** [2] - 61:21, 78:9
**heavier** [2] - 12:12, 12:13
**heavier-handed** [1] - 12:13
**heavy** [7] - 57:19, 62:14, 62:20, 70:4, 70:7, 71:18, 71:20
**heavy-handed** [7] - 57:19, 62:14, 62:20, 70:4, 70:7, 71:18, 71:20
**Heckler** [4] - 62:17, 62:18, 63:4, 63:5
**HELD** [1] - 92:16
**help** [2] - 45:14, 63:13
**helping** [1] - 72:20
**Herbst** [4] - 14:22, 14:23, 15:11, 15:12
**HERBST** [1] - 15:13
**HEREBY** [1] - 92:13
**heritage** [1] - 90:2
**Hernandez** [1] - 71:10
**hesitancy** [1] - 72:6
**higher** [2] - 17:18, 70:10
**hinges** [1] - 58:12
**history** [1] - 14:24
**hit** [1] - 19:15
**hits** [1] - 22:20
**hoc** [3] - 70:23, 71:1
**Hodgers** [1] - 16:24
**hold** [2] - 32:3, 74:1
**home** [1] - 47:10
**HOMELAND** [3] - 1:13, 4:4, 92:8
**Honor** [82] - 6:8, 6:10, 6:15, 6:18, 6:21, 7:6, 7:10, 7:24, 8:2, 8:15, 9:1, 9:15, 10:1, 10:24, 14:1, 14:17, 16:13, 17:8, 17:12, 18:19, 20:11, 20:21, 22:13, 25:21, 26:16, 27:9, 28:9, 29:11, 31:10, 33:3, 33:13, 35:25, 36:22, 37:13, 38:12, 38:15, 38:22, 39:9, 39:18, 40:8, 41:6, 43:11, 44:1, 45:13, 45:22, 47:17, 47:23, 48:18, 50:1, 51:8, 53:13, 56:23, 57:16, 59:12, 59:16, 60:17, 61:8, 62:1, 62:17, 63:18, 63:23, 64:9, 64:17, 65:11, 66:4, 66:11, 66:15, 67:25, 69:13, 69:17, 73:15, 79:10, 79:15, 82:21, 82:24, 87:7, 87:19, 88:14, 90:14, 90:18, 90:25, 91:13
**HONORABLE** [1] - 1:5
**hook** [1] - 9:4
**hope** [3] - 67:25, 70:17, 78:4
**horse's** [1] - 74:19
**hour** [1] - 87:1
**hours** [1] - 35:24
**house** [2] - 47:22, 49:16
**HUMAN** [2] - 2:4, 2:9
**HUMANE** [1] - 2:13
**hundreds** [1] - 56:4
**hypothetical** [2] - 24:24, 24:25

**I**

**I-I-R-A-I-R-A** [1] - 77:21
**I-T-T-S** [1] - 33:22
**Ibarra** [1] - 69:6
**Ibarra-Perez** [1] - 69:6
**ICE** [54] - 11:20, 18:3, 19:22, 20:5, 20:18, 20:22, 21:3, 22:3, 22:22, 23:10, 23:13, 24:13, 24:14, 24:16, 24:18, 24:20, 27:7, 27:25, 28:1, 29:9, 31:2, 32:4, 32:10, 32:14, 35:21, 36:9, 36:12, 36:14, 40:9, 40:18, 40:23, 40:24, 41:8, 43:20, 44:8, 44:23, 45:23, 45:24, 46:4, 46:9, 46:22, 47:11, 52:9, 52:24, 64:1, 64:3, 64:21, 64:25, 66:20, 68:25
**ICE's** [1] - 38:6
**identical** [1] - 85:4
**identifying** [1] - 83:13
**identity** [1] - 34:19
**ignore** [4] - 12:9, 45:23, 63:9, 63:17
**ii** [2] - 32:22, 32:24
**IIRAIRA** [7] - 77:15, 77:20, 77:21, 77:22, 83:18, 83:20, 84:6
**imagine** [2] - 26:2, 90:1
**immediately** [3] - 36:15, 45:18, 45:20
**IMMIGRANT** [1] - 2:14
**IMMIGRATION** [4] - 1:7, 2:4, 3:4, 92:4
**Immigration** [1] - 6:5
**immigration** [34] - 20:20, 28:13, 29:20, 29:22, 29:23, 31:11, 31:13, 33:16, 33:24, 34:6, 40:10, 43:4, 44:25, 48:2, 49:25, 50:2, 50:3, 50:5, 50:19, 56:2, 56:4, 56:24, 58:11, 58:15, 58:21, 59:4, 59:21, 60:2, 60:7, 63:14, 68:10, 77:16, 81:16
**imminent** [2] - 16:15, 16:19
**impact** [1] - 63:10
**impacted** [4] - 77:3, 80:5, 89:4
**implement** [2] - 32:13, 59:18
**implementation** [1] - 27:2
**implemented** [4] - 30:23, 33:7, 60:12, 65:7
**implementing** [3] - 27:24, 29:21, 30:4
**implements** [1] - 28:20
**implicate** [1] - 56:6
**implies** [1] - 41:9
**important** [7] - 19:16, 22:1, 43:6, 43:10, 43:12, 50:1, 55:24
**importantly** [2] - 14:1, 34:10
**impose** [1] - 55:17
**IN** [5] - 6:3, 92:11, 92:16, 92:17, 92:20
**in-the-alternative** [1] - 18:20
**INA** [6] - 53:8, 77:22, 78:21, 78:23, 83:16, 83:18
**inaccurate** [1] - 26:24
**includes** [3] - 21:14, 21:19, 84:3
**including** [1] - 84:12
**inconsistent** [1] - 61:24
**increase** [2] - 65:5, 65:10
**increased** [1] - 70:15
**indefinite** [1] - 54:16
**indicates** [1] - 34:14
**indicators** [1] - 19:21
**individual** [8] - 15:5, 17:21, 34:19, 34:24, 72:14, 73:6, 85:23, 86:7
**individuals** [2] - 72:22, 81:11
**ineffective** [2] - 49:8,

49:9
**information** [2] - 64:14, 83:12
**informed** [1] - 52:21
**informs** [1] - 65:19
**inherently** [8] - 14:17, 18:11, 33:14, 33:23, 34:10, 50:14, 50:16, 50:21
**initial** [1] - 8:4
**initiation** [2] - 55:21, 68:19
**injunction** [16] - 31:22, 72:22, 73:7, 76:9, 76:11, 76:23, 77:2, 77:3, 77:13, 78:8, 78:14, 79:18, 79:23, 83:1, 83:6, 86:2
**INJUNCTION** [2] - 1:18, 5:3
**Injunction** [1] - 85:10
**injunctions** [4] - 72:24, 76:15, 83:17, 84:13
**injunctive** [13] - 16:12, 16:14, 73:16, 73:19, 76:25, 80:12, 81:21, 84:18, 84:21, 85:13, 85:18, 86:15, 86:17
**injury** [6] - 13:15, 13:20, 14:2, 14:9, 16:1, 88:24
**injury-in-fact** [4] - 13:15, 13:20, 14:9, 16:1
**Inland** [4] - 12:14, 23:21, 55:7, 55:18
**inquiry** [2] - 15:24, 16:1
**INS** [1] - 82:15
**inside** [1] - 84:10
**instance** [1] - 73:19
**instances** [1] - 39:16
**institute** [1] - 29:10
**institutional** [1] - 65:15
**intact** [2] - 33:9, 33:10
**intended** [1] - 84:6
**intent** [6] - 51:11, 51:13, 55:19, 61:25, 62:2, 67:8
**intentionally** [1] - 84:11
**interest** [10] - 15:4, 51:15, 55:13, 55:15, 56:7, 58:10, 69:16, 90:1, 91:6
**interfere** [1] - 86:18
**interference** [1] - 85:6
**interferes** [1] - 84:22
**interim** [4] - 10:22, 46:5, 46:17, 50:7
**internal** [5] - 38:18, 38:25, 39:21, 41:1, 42:12
**internally** [1] - 41:3
**interpreted** [2] - 22:25, 23:1
**interrupt** [1] - 24:12
**intervention** [1] - 31:8
**invest** [1] - 71:14
**investigation** [2] - 44:3, 44:7
**involved** [3] - 37:17, 63:12, 84:20
**IS** [2] - 92:14, 92:17
**issue** [21] - 25:19, 29:20, 31:2, 33:11, 34:10, 36:1, 36:2, 39:18, 44:14, 51:24, 55:22, 62:15, 72:2, 75:18, 77:19, 78:8, 78:19, 84:21, 85:9, 86:5, 86:6
**issued** [1] - 19:25
**issues** [5] - 10:13, 35:11, 74:7, 90:5, 91:11
**item** [1] - 6:4
**itself** [3] - 22:22, 33:25, 37:23

**J**

**J.E.F.M** [4] - 41:15, 60:22, 68:3, 68:6
**Jackie** [2] - 49:22, 50:10
**Jaddou** [3] - 77:9, 77:10, 77:17
**JADDOU** [1] - 77:9
**January** [4] - 59:1, 59:10, 59:15
**Jennings** [1] - 68:24
**Jiminez** [1] - 52:6
**job** [6] - 36:9, 36:12, 36:15, 38:1, 49:17
**JR** [1] - 1:5
**judge** [3] - 29:22, 74:23, 75:22
**Judge** [2] - 52:5, 59:12
**JUDGE** [1] - 1:5
**judges** [1] - 88:19
**judgment** [2] - 70:1, 78:12
**judgments** [1] - 78:13
**JUDICIAL** [2] - 92:18, 92:21
**judicial** [2] - 31:8, 64:11
**July** [1] - 34:7
**jump** [4] - 19:8, 28:1, 29:1, 33:3
**jumping** [1] - 14:10
**Jurisdiction** [1] - 83:15
**jurisdiction** [1] - 84:8
**justified** [1] - 63:24
**justify** [1] - 71:21

**K**

**KAHN** [3] - 2:10, 6:10, 6:18
**Kahn** [1] - 6:19
**KATHLEEN** [1] - 2:18
**Kathleen** [1] - 7:2
**kids** [3] - 49:17, 49:23, 49:24
**kind** [10] - 9:22, 9:25, 15:16, 15:17, 18:20, 46:8, 56:7, 66:22, 79:1, 79:23
**kinds** [1] - 47:14
**knowing** [3] - 52:3, 52:10, 52:11
**KRISTI** [3] - 1:12, 4:4, 92:7
**Kristi** [1] - 6:6

**L**

**lack** [2] - 56:8, 68:8
**Lado** [1] - 79:25
**lag** [1] - 10:14
**land** [2] - 36:21, 36:24
**lane** [1] - 18:15
**language** [11] - 16:16, 39:11, 39:13, 40:18, 40:20, 41:4, 42:12, 43:14, 44:21, 79:17, 83:8
**last** [13] - 7:5, 28:8, 34:7, 34:8, 34:17, 58:23, 69:22, 70:18, 70:19, 80:1, 80:6, 86:14, 90:18
**late** [1] - 7:14
**Latino** [2] - 90:2, 90:4
**LAW** [2] - 2:5, 2:9
**law** [15] - 20:20, 28:15, 31:25, 38:3, 45:11, 47:18, 51:10, 53:17, 63:3, 63:7, 75:17, 77:15, 77:18, 77:19, 78:10
**lawful** [10] - 13:6, 24:2, 27:17, 28:14, 33:4, 43:16, 44:12, 44:24, 61:14, 61:16
**lawfully** [3] - 12:16, 26:19, 30:15
**laws** [4] - 42:21, 44:25, 58:11, 77:16
**lawyers** [1] - 67:22
**least** [9] - 31:7, 34:11, 36:12, 38:17, 46:23, 54:20, 58:2, 71:23, 90:9
**least..** [1] - 7:5
**leave** [2] - 9:7, 30:14
**leaving** [1] - 81:17
**lectern** [3] - 9:24, 17:17, 26:11
**Lee** [1] - 50:8
**left** [2] - 17:18, 22:1
**LEGAL** [1] - 3:4
**Legal** [1] - 20:22
**legal** [9] - 13:2, 19:17, 23:6, 30:13, 44:12, 74:21, 75:5, 81:14, 81:19
**legality** [1] - 68:25
**less** [1] - 35:2
**LESS** [1] - 92:19
**lesson** [1] - 15:11
**letting** [1] - 9:12
**level** [3] - 27:15, 42:23, 46:6
**liberty** [2] - 56:7, 56:10
**license** [1] - 21:20
**life** [4] - 14:8, 39:25, 63:11, 87:15
**likely** [3] - 17:5, 17:6, 52:25
**limitation** [1] - 22:8
**limited** [2] - 73:20, 85:23
**line** [5] - 14:17, 14:21, 15:12, 15:22, 65:6
**lines** [1] - 41:18
**literally** [1] - 35:23
**litigation** [1] - 89:12
**live** [3] - 49:17, 49:24, 87:25
**lived** [1] - 14:5
**living** [1] - 17:1
**Logan** [1] - 48:12
**lonesome** [1] - 7:8
**look** [18] - 9:5, 11:9, 12:11, 37:7, 39:23, 39:24, 40:7, 40:17, 40:21, 56:16, 62:1, 63:13, 72:4, 72:10, 73:4, 76:14, 83:8, 88:5
**looked** [1] - 77:18
**looking** [2] - 12:10, 88:13
**looks** [1] - 55:16
**LOS** [8] - 1:19, 1:25, 2:16, 2:19, 3:7, 4:6, 4:7, 6:1
**Los** [1] - 74:23
**lose** [2] - 49:16, 49:17
**lost** [1] - 45:17
**low** [1] - 60:16
**lower** [4] - 27:4, 29:4, 29:16, 30:12
**lowered** [1] - 28:19
**lowers** [1] - 48:22
**lowly** [1] - 74:23
**lumps** [3] - 89:14, 89:15, 89:16
**Lupe** [3] - 14:5, 49:20, 80:17
**Lyons** [1] - 16:23

**M**

**Mackell** [1] - 85:1
**Maco** [1] - 75:10
**MACO** [1] - 75:10
**maintain** [1] - 38:16
**majority** [1] - 52:25
**makers** [1] - 61:19
**mandate** [2] - 57:6, 71:23
**mandated** [1] - 44:23
**mandatory** [2] - 52:6, 52:8
**manual** [3] - 66:19, 67:1, 67:16
**MARIA** [3] - 1:22, 92:11, 92:24
**Mart** [1] - 89:7
**Maryland** [1] - 81:6
**Massachusetts** [1] - 75:21
**match** [1] - 26:8
**matches** [2] - 28:21, 30:21
**material** [1] - 80:5
**MATTER** [1] - 92:16
**matter** [9] - 8:17, 19:2, 20:2, 37:15, 48:1, 68:23, 87:21, 88:9, 91:10
**matters** [6] - 22:3, 30:22, 59:8, 62:3, 89:7, 89:8
**McLaughlin** [1] - 14:25
**mean** [34] - 8:12, 8:21, 11:2, 11:6, 12:7, 14:11, 18:7, 19:12, 20:1, 30:6, 32:4, 35:17, 35:24, 36:4, 36:15, 36:17, 38:7, 40:1, 41:10, 45:1, 46:11, 46:13, 46:24, 51:2, 61:8, 61:12, 61:24, 63:10, 70:7, 70:9, 71:20, 91:4
**means** [7] - 29:4, 29:16, 29:17, 37:11, 44:24, 54:7, 55:1
**meant** [2] - 81:20, 81:21
**meantime** [1] - 25:14
**measure** [5] - 30:25, 31:1, 31:4, 47:18, 50:15
**measures** [3] - 62:24, 62:25, 63:2
**meat** [2] - 38:9, 79:14
**meaty** [1] - 72:2
**mechanisms** [1] - 85:6
**meeting** [1] - 33:25
**members** [3] - 16:22, 18:25, 79:6
**Memo** [1] - 40:3

**memo** [4] - 22:22, 74:8, 74:11, 89:13
**memory** [1] - 65:15
**Mendez** [1] - 82:15
**merely** [1] - 74:4
**merges** [1] - 15:25
**merits** [1] - 13:17
**Merlos** [4] - 30:1, 49:22, 55:1, 60:6
**MEXICAN** [1] - 3:4
**microphone** [1] - 6:13
**might** [9] - 11:2, 13:17, 15:19, 20:5, 25:9, 29:19, 35:22, 53:22, 56:7
**miles** [2] - 14:5, 87:25
**mind** [2] - 40:4, 54:17
**minimum** [3] - 43:4, 51:4, 70:11
**minutes** [1] - 87:1
**MISHRA** [69] - 4:5, 7:10, 8:2, 8:4, 8:9, 8:25, 9:15, 26:16, 26:25, 27:9, 27:17, 28:2, 28:9, 28:18, 29:6, 29:11, 30:10, 30:20, 32:6, 32:12, 32:19, 32:21, 33:3, 33:13, 35:6, 35:13, 35:25, 36:22, 37:13, 37:21, 38:12, 38:15, 38:22, 38:24, 39:9, 39:18, 39:21, 40:7, 40:13, 40:17, 42:6, 42:11, 42:15, 43:11, 43:21, 44:1, 45:5, 56:23, 57:16, 57:19, 57:23, 58:2, 58:5, 59:12, 61:8, 61:14, 62:1, 62:12, 63:18, 64:9, 64:17, 65:11, 66:4, 66:10, 82:24, 86:1, 87:7, 90:18, 91:13
**Mishra** [9] - 7:11, 8:1, 8:18, 26:6, 26:10, 56:13, 66:9, 82:22, 90:17
**modification** [1] - 39:8
**moment** [7] - 9:17, 10:13, 10:14, 14:2, 15:6, 26:6, 38:12
**month** [3] - 11:18, 49:21, 58:23
**months** [3] - 49:23, 49:24, 50:11
**moot** [10] - 15:6, 15:8, 15:10, 15:11, 15:20, 17:22, 35:11, 35:22, 50:23
**mootness** [6] - 14:13, 14:19, 15:21, 16:6, 17:23, 34:15
**morbid** [1] - 46:8
**morning** [17] - 6:8, 6:10, 6:15, 6:17, 6:18, 6:20, 6:21, 6:23, 6:24, 7:1, 7:2, 7:4, 7:6, 7:10, 7:12, 66:13, 90:12
**mortified** [2] - 83:18, 83:20
**most** [4] - 16:16, 38:10, 73:17, 89:7
**motion** [2] - 31:22, 34:17
**MOTION** [2] - 1:18, 5:3
**motions** [3] - 90:21, 90:22, 91:11
**mouth** [1] - 74:19
**move** [6] - 33:17, 34:2, 34:3, 51:15, 73:25, 90:21
**moved** [1] - 87:23
**moves** [1] - 31:15
**moving** [2] - 34:9, 69:12
**MR** [189] - 6:8, 6:15, 7:6, 7:10, 7:24, 8:2, 8:4, 8:9, 8:15, 8:25, 9:15, 10:1, 10:8, 10:20, 11:4, 11:8, 11:17, 11:24, 12:3, 12:10, 12:22, 13:5, 13:9, 13:12, 13:19, 13:22, 14:1, 14:16, 16:13, 16:18, 17:11, 17:16, 17:19, 18:19, 19:6, 19:9, 19:15, 19:25, 20:11, 20:16, 20:20, 21:1, 22:18, 23:17, 24:5, 24:10, 24:14, 24:18, 24:22, 25:3, 25:6, 25:10, 25:18, 25:21, 26:2, 26:9, 26:16, 26:25, 27:9, 27:17, 28:2, 28:9, 28:18, 29:6, 29:11, 30:10, 30:20, 32:6, 32:12, 32:19, 32:21, 33:3, 33:13, 35:6, 35:13, 35:25, 36:22, 37:13, 37:21, 38:12, 38:15, 38:22, 38:24, 39:9, 39:18, 39:21, 40:7, 40:13, 40:17, 42:6, 42:11, 42:15, 43:11, 43:21, 44:1, 45:5, 45:13, 46:15, 46:19, 48:5, 48:25, 49:6, 49:9, 51:7, 51:16, 51:21, 53:12, 53:15, 53:22, 54:5, 55:5, 56:23, 57:16, 57:19, 57:23, 58:2, 58:5, 59:12, 61:8, 61:14, 62:1, 62:12, 63:18, 64:9, 64:17, 65:11, 66:4, 66:10, 66:15, 66:23, 67:3, 67:14, 67:20, 67:24, 68:3, 68:6, 68:10, 70:11, 70:17, 70:21, 72:10, 73:9, 73:13, 74:3, 74:13, 74:16, 74:25, 75:5, 75:11, 75:13, 76:14, 76:17, 76:21, 78:1, 78:3, 78:18, 79:2, 79:10, 79:17, 79:23, 80:10, 80:16, 80:19, 81:3, 81:10, 81:24, 82:1, 82:10, 82:21, 82:24, 86:1, 87:7, 87:12, 87:18, 87:23, 88:3, 88:14, 88:17, 88:19, 88:23, 89:16, 89:19, 89:23, 90:7, 90:13, 90:18, 90:25, 91:13, 91:14
**MS** [5] - 6:10, 6:18, 6:21, 6:24, 7:2
**multilayered** [2] - 23:16, 23:17
**multiple** [1] - 37:3
**must** [3] - 22:25, 27:25, 41:12


## N


**nail** [1] - 19:15
**name** [3] - 59:9, 87:10, 87:14
**named** [4] - 17:12, 85:23, 86:6, 87:25
**names** [4] - 8:10, 8:22, 14:23, 17:16
**nation** [3] - 72:15, 72:20, 74:13
**National** [1] - 72:5
**nationwide** [5] - 72:7, 72:24, 73:7, 74:12, 74:22
**nationwided** [1] - 72:21
**nature** [1] - 26:14
**navigate** [1] - 9:7
**nearly** [1] - 47:24
**necessarily** [2] - 18:9, 35:20
**necessary** [7] - 40:14, 40:21, 43:8, 44:5, 76:24, 78:16, 90:7
**need** [7] - 53:19, 87:5, 87:17, 90:3, 90:4, 91:2, 91:4
**needs** [1] - 70:12
**negative** [1] - 46:5
**neglected** [1] - 90:11
**net** [1] - 75:4
**never** [4] - 12:19, 12:24, 57:24, 87:13
**New** [2] - 75:9, 75:13
**new** [8] - 40:16, 40:17, 41:6, 42:2, 43:18, 46:8, 70:5, 84:6
**next** [2] - 26:12, 34:8
**ninth** [1] - 53:20
**Ninth** [24] - 14:20, 14:21, 23:23, 32:2, 33:20, 36:22, 41:11, 41:16, 50:4, 50:7, 51:8, 57:5, 60:21, 60:24, 68:7, 68:13, 71:9, 77:8, 77:17, 77:20, 80:1, 82:13, 82:17, 87:19
**NOEM** [3] - 1:12, 4:4, 92:7
**Noem** [4] - 6:6, 72:5, 75:9, 75:13
**non** [2] - 48:1, 88:25
**non-citizens** [1] - 48:1
**non-factors** [1] - 88:25
**noncitizen** [1] - 10:14
**none** [5] - 15:6, 15:7, 16:19, 54:1, 81:18
**nonrestrictive** [1] - 83:10
**normally** [1] - 67:8
**NORTH** [1] - 4:6
**notes** [3] - 7:16, 32:5, 88:13
**Nothing** [1] - 50:23
**nothing** [3] - 25:1, 34:9, 90:15
**notice** [5] - 55:18, 64:11, 67:8, 79:8
**notify** [1] - 84:6
**number** [15] - 8:6, 15:1, 22:13, 34:20, 35:1, 54:13, 58:24, 59:13, 76:11, 79:4, 79:10, 79:12, 80:11, 80:16, 80:23
**numerosity** [1] - 89:3
**numerous** [1] - 61:18


## O


**object** [1] - 8:15
**objection** [3] - 90:24, 90:25, 91:5
**observed** [1] - 48:15
**obstacle** [1] - 21:7
**obvious** [2] - 87:18, 88:7
**obviously** [2] - 8:10, 65:17
**occupied** [1] - 81:19
**occupy** [2] - 81:14, 81:19
**occur** [2] - 10:13, 51:10
**October** [1] - 34:17
**OF** [12] - 1:2, 1:17, 2:4, 3:4, 4:3, 4:4, 92:12, 92:15, 92:18, 92:21
**offense** [1] - 40:4
**offered** [2] - 50:14, 54:15
**offers** [1] - 54:18
**OFFICE** [1] - 4:4
**Office** [1] - 20:21
**office** [1] - 48:14
**officers** [2] - 40:18, 40:23
**official** [3] - 1:13, 4:5, 92:9
**OFFICIAL** [3] - 1:22, 92:11, 92:24
**offs** [1] - 69:19
**Olvera** [1] - 75:20
**ON** [3] - 2:4, 3:4, 4:3
**once** [6] - 17:23, 20:6, 20:10, 27:13, 61:9, 61:14
**one** [56] - 6:4, 8:4, 9:16, 9:25, 10:9, 10:25, 12:19, 14:23, 20:5, 22:1, 22:19, 29:19, 32:3, 32:23, 33:13, 34:8, 35:22, 36:7, 38:12, 40:3, 42:11, 42:14, 45:20, 47:9, 47:21, 49:3, 50:25, 51:8, 53:12, 53:17, 54:7, 54:9, 57:12, 58:6, 59:10, 60:10, 61:1, 63:15, 63:22, 64:19, 65:4, 68:5, 69:19, 70:19, 70:21, 72:14, 74:22, 76:25, 79:14, 80:14, 84:24, 86:6, 88:3, 90:18
**one-offs** [1] - 69:19
**onerous** [1] - 11:21
**ongoing** [12] - 11:11, 12:22, 14:8, 15:14, 16:19, 16:22, 17:9, 18:10, 23:22, 44:7, 84:1
**operates** [1] - 85:18
**operation** [2] - 77:14, 80:4
**opinion** [1] - 86:14
**OPLA** [3] - 20:21, 40:24, 44:8
**opportunity** [1] - 55:19
**opposition** [6] - 36:24, 41:17, 41:18, 41:19, 58:16, 84:25
**or..** [2] - 66:3, 66:22
**order** [15] - 8:5, 9:3, 9:22, 11:1, 21:19, 53:3, 54:11, 54:22, 76:10, 78:6, 79:1, 79:4, 80:11, 80:16, 81:6
**Order** [1] - 44:23
**ordered** [1] - 34:16
**ordering** [2] - 81:1, 82:11
**orders** [3] - 76:18,

78:8, 80:8
**ordinances** [1] - 86:19
**organization** [2] - 18:24, 48:9
**organizational** [3] - 18:16, 18:21, 79:6
**organizations** [2] - 10:10, 88:1
**otherwise** [3] - 48:6, 53:22, 84:4
**Otro** [2] - 79:25, 82:25
**outside** [3] - 31:8, 41:23, 82:11
**overall** [1] - 45:11
**overlap** [1] - 67:12
**overly** [1] - 64:25
**override** [1] - 47:12
**own** [2] - 15:3, 71:16

## P

**page** [12] - 28:11, 31:14, 31:21, 31:22, 34:20, 35:1, 35:7, 41:17, 41:18, 57:20, 62:24
**PAGE** [2] - 5:2, 92:17
**pan** [1] - 67:23
**papa** [1] - 33:22
**paper** [1] - 56:9
**papers** [2] - 38:7, 56:16
**paradigm** [1] - 41:6
**paragraph** [1] - 31:16
**parallel** [1] - 46:13
**Parenthood** [1] - 51:11
**part** [18] - 21:14, 21:19, 21:23, 22:7, 34:12, 42:22, 42:25, 56:25, 62:14, 64:12, 73:13, 74:21, 77:22, 84:2, 84:11, 84:12, 85:18
**particular** [7] - 17:5, 21:23, 57:8, 57:10, 57:11, 84:23, 86:20
**parties** [3] - 62:5, 73:11, 73:20
**party** [2] - 18:25, 73:14
**passed** [1] - 16:25
**past** [3] - 17:8, 57:17, 62:11
**path** [1] - 37:15
**paths** [1] - 37:6
**pathway** [2] - 30:15, 44:12
**pattern** [1] - 90:8
**Paulo** [1] - 18:2
**Pause** [1] - 9:18
**pause** [1] - 74:11
**pending** [13] - 27:20, 43:5, 43:19, 44:3, 46:22, 47:8, 52:13, 52:14, 61:21, 74:6, 89:2, 90:20, 90:22
**people** [16] - 25:4, 27:12, 36:21, 37:9, 43:1, 48:7, 48:17, 49:14, 56:5, 57:13, 71:6, 71:8, 72:16, 72:20, 78:9
**people's** [1] - 56:10
**Perez** [1] - 69:6
**period** [5] - 10:22, 12:16, 24:2, 26:19, 55:12
**permit** [2] - 54:19, 55:9
**permitted** [1] - 10:21
**person** [7] - 22:9, 24:18, 25:11, 25:15, 59:4, 60:1, 72:15
**perspective** [2] - 19:14, 72:13
**petition** [3] - 18:2, 46:22, 89:2
**petitioner** [2] - 51:25, 52:4
**petitioners** [3] - 53:2, 88:4, 88:16
**petitions** [8] - 36:2, 36:8, 40:11, 46:6, 47:8, 50:6, 71:5
**pets** [1] - 14:7
**PFR** [2] - 41:13, 60:21
**phenomenon** [1] - 72:22
**phrase** [1] - 84:5
**PI** [3] - 79:4, 80:11, 80:16
**pick** [2] - 34:3, 35:21
**Pitts** [7] - 14:22, 33:20, 33:21, 34:1, 34:15, 35:8
**Pitts's** [1] - 33:24
**place** [6] - 8:5, 22:1, 24:11, 37:18, 50:3, 54:11
**placed** [1] - 84:10
**places** [2] - 16:23, 20:17
**plain** [1] - 55:12
**plaintiff** [11] - 9:21, 15:2, 15:14, 30:1, 31:11, 34:7, 60:6, 66:8, 86:6, 86:7, 90:24
**PLAINTIFFS** [2] - 2:4, 3:4
**Plaintiffs** [1] - 1:8
**plaintiffs** [43] - 6:9, 6:11, 6:16, 6:19, 6:22, 6:25, 7:3, 7:7, 8:10, 11:6, 11:11, 13:23, 14:11, 15:7, 16:10, 17:3, 18:12, 26:16, 31:12, 31:20, 34:2, 34:11, 34:19, 34:25, 36:3, 36:19, 41:10, 45:2, 48:8, 75:25, 76:2, 76:4, 79:6, 82:3, 82:24, 83:5, 84:23, 85:24, 86:9, 86:20, 87:25, 90:16, 91:5
**plaintiffs'** [11] - 7:21, 8:12, 8:13, 8:22, 9:23, 15:20, 17:12, 17:22, 28:10, 35:18, 85:22
**planned** [1] - 51:11
**play** [1] - 59:17
**pleading** [1] - 64:18
**pleasure** [1] - 45:14
**point** [26] - 24:25, 29:19, 31:24, 35:4, 35:6, 35:18, 36:18, 37:14, 37:19, 41:15, 41:25, 42:9, 44:13, 50:1, 50:12, 54:5, 55:24, 57:23, 61:16, 62:14, 63:1, 64:19, 69:13, 70:18, 77:11, 86:21
**pointing** [2] - 10:4, 28:19
**points** [2] - 67:24, 69:22
**police** [1] - 49:15
**policies** [14] - 8:23, 10:6, 11:15, 12:11, 12:20, 19:12, 22:15, 41:12, 51:3, 60:23, 64:16, 66:25, 71:11, 75:21
**Policy** [14] - 19:11, 19:22, 22:21, 27:2, 51:17, 52:11, 53:7, 73:20, 77:2, 78:1, 78:4, 82:6
**policy** [51] - 9:10, 10:9, 17:1, 18:3, 21:3, 21:8, 21:9, 21:15, 22:1, 22:5, 22:12, 22:14, 22:18, 22:21, 23:5, 23:6, 24:6, 24:7, 26:14, 38:6, 38:16, 39:17, 40:1, 41:7, 41:11, 42:2, 43:12, 45:8, 45:10, 45:17, 45:20, 45:24, 46:8, 46:16, 53:23, 61:19, 62:21, 65:9, 66:18, 66:25, 67:16, 71:12, 71:19, 71:20, 72:16, 74:17, 75:3, 79:13, 79:21, 85:5, 89:24
**policy's** [1] - 45:10
**population** [1] - 10:11
**portion** [1] - 79:12
**position** [16] - 8:12, 8:13, 12:6, 20:11, 23:6, 24:13, 34:14, 48:21, 50:24, 51:19, 74:20, 75:2, 81:14, 81:19, 86:11, 90:10
**positions** [1] - 19:17
**possible** [1] - 90:21
**post** [7] - 25:23, 27:11, 59:8, 70:23, 71:1, 73:2
**post-deprivation** [2] - 25:23, 59:8
**postdates** [3] - 77:20, 77:21, 77:23
**postpone** [1] - 74:5
**postponed** [1] - 74:10
**postponement** [1] - 74:17
**potentially** [1] - 13:3
**practical** [6] - 19:2, 42:23, 63:10, 63:22, 85:3, 85:13
**practically** [4] - 49:7, 49:9, 61:6, 62:2
**practice** [2] - 28:4, 28:7
**practices** [2] - 41:12, 60:23
**pre** [5] - 25:23, 58:7, 58:19, 60:14, 91:2
**pre-answer** [1] - 91:2
**pre-deprivation** [4] - 25:23, 58:7, 58:19, 60:14
**precedes** [1] - 83:13
**predominately** [1] - 90:4
**prefer** [1] - 11:1
**preliminary** [5] - 19:20, 31:21, 70:2, 78:8, 81:21
**PRELIMINARY** [2] - 1:18, 5:3
**premise** [2] - 26:21, 33:4
**prerequisite** [3] - 52:7, 52:8
**presence** [1] - 49:1
**present** [2] - 87:20, 89:25
**PRESIDING** [1] - 1:5
**presumption** [2] - 46:20, 46:21
**pretty** [3] - 38:20, 51:24, 53:16
**previously** [1] - 65:13
**prima** [12] - 22:23, 23:1, 46:23, 51:25, 52:4, 53:2, 64:24, 65:3, 65:14, 71:24, 77:5, 82:7
**Primary** [1] - 20:22
**principle** [1] - 84:1
**principles** [1] - 23:19
**printed** [1] - 64:11
**priorities** [5] - 38:4, 41:2, 63:24, 70:16
**priority** [6] - 27:4, 28:19, 29:5, 29:16, 30:12, 48:23
**pristine** [1] - 75:5
**probable** [1] - 25:11
**problem** [2] - 72:18, 83:25
**procedural** [4] - 29:17, 58:21, 60:8, 60:15
**procedures** [1] - 57:6
**proceed** [3] - 26:23, 27:25, 32:14
**proceeding** [3] - 31:11, 73:2, 91:15
**proceedings** [45] - 9:18, 11:20, 12:23, 13:3, 13:7, 13:9, 13:14, 18:6, 28:13, 29:10, 29:21, 29:24, 30:1, 33:24, 34:6, 34:7, 37:2, 43:4, 48:6, 50:11, 50:13, 55:21, 56:24, 58:15, 59:3, 59:22, 59:25, 60:2, 60:5, 60:8, 60:14, 62:16, 68:10, 68:12, 68:14, 68:15, 68:18, 68:20, 68:23, 69:1, 69:6, 78:12, 83:2
**PROCEEDINGS** [2] - 1:17, 92:16
**proceeds** [1] - 70:3
**process** [43] - 11:13, 13:13, 25:13, 25:22, 25:24, 27:12, 31:8, 31:10, 31:13, 31:17, 37:9, 41:13, 41:14, 41:24, 46:13, 54:25, 55:2, 55:3, 55:15, 55:16, 56:2, 56:6, 56:9, 56:11, 56:15, 56:18, 57:5, 58:6, 58:14, 58:15, 58:18, 59:3, 60:22, 60:25, 62:7, 62:10, 67:11, 69:10, 78:15, 79:19, 79:20, 80:21, 82:3
**processes** [4] - 11:21, 33:16, 33:19, 56:17
**processing** [2] - 37:16, 61:11
**program** [12] - 28:16, 29:12, 29:13, 30:7, 30:11, 33:9, 33:10, 37:23, 57:2, 57:3, 57:4, 69:20
**programatic** [2] - 69:18, 69:19
**programs** [11] - 20:1, 21:2, 24:15, 26:18, 30:7, 31:18, 33:10, 37:22, 54:13, 54:15, 71:5
**prohibited** [2] - 23:14, 23:15
**prohibition** [1] - 22:7

promise [1] - 45:4
proper [3] - 75:6, 75:18, 87:24
properly [3] - 23:1, 87:24, 89:1
property [2] - 55:14, 58:8
propose [1] - 83:5
proposed [2] - 10:8, 76:18
prosecute [2] - 65:21, 65:22
prosecutor [1] - 41:3
prosecutorial [6] - 39:1, 39:22, 63:6, 64:23, 66:2, 84:20
prosecutors [1] - 40:2
prospective [5] - 16:11, 16:14, 16:20, 35:19
protect [1] - 76:18
protection [7] - 30:25, 31:1, 31:4, 52:13, 61:2, 61:5
Protection [2] - 47:5, 47:20
protections [4] - 10:16, 45:16, 47:4, 47:24
protective [5] - 8:5, 9:3, 62:24, 62:25, 63:2
protracted [2] - 33:23, 34:5
provable [1] - 40:4
prove [5] - 17:4, 17:24, 19:19, 69:23, 70:17
provide [4] - 32:16, 47:9, 66:21, 83:11
provided [3] - 7:17, 56:17, 58:19
provides [1] - 31:13
providing [2] - 31:6, 79:7
provision [6] - 47:5, 52:12, 52:17, 83:15, 84:9, 84:11
provisions [4] - 47:2, 47:21, 53:13, 83:17
PUBLIC [1] - 2:18
public [6] - 8:16, 8:17, 8:21, 8:23, 47:25, 64:20
pull [2] - 7:16, 77:24
purpose [5] - 27:16, 42:24, 56:20, 61:19, 71:13
purposes [1] - 13:13
pursuant [4] - 18:4, 19:25, 21:1, 24:15
PURSUANT [1] - 92:13
pursue [3] - 11:7, 16:10, 48:24
PUSHKAL [1] - 4:5
Pushkal [1] - 7:11
put [8] - 11:18, 37:17, 38:10, 53:20, 60:13, 72:13, 74:11, 79:14
putting [1] - 56:6

## Q

questions [18] - 7:18, 9:8, 9:10, 9:22, 10:2, 10:25, 22:19, 26:12, 56:14, 66:8, 67:20, 80:7, 87:3, 88:7, 88:20, 89:5, 89:9, 90:14
quick [1] - 67:25
quickly [1] - 34:9
quite [1] - 10:5
quo [1] - 81:22
quotes [1] - 51:4
quoting [1] - 52:13

## R

race [1] - 46:8
racial [1] - 90:1
raise [2] - 17:17, 90:5
raising [1] - 89:9
rare [4] - 28:12, 48:16, 58:1, 58:2
rarely [1] - 57:17
rate [1] - 70:10
rather [3] - 25:22, 79:17, 84:8
rationale [2] - 53:9, 71:1
rationales [1] - 70:23
read [9] - 20:3, 39:6, 51:24, 52:5, 52:20, 56:16, 76:4, 77:4, 77:7
readily [1] - 40:4
reading [2] - 75:6, 75:18
real [5] - 16:15, 27:1, 54:19, 63:11, 86:9
real-life [1] - 63:11
really [18] - 17:23, 26:3, 33:17, 34:9, 38:8, 50:20, 66:15, 67:16, 67:21, 69:20, 73:10, 77:15, 77:24, 88:25, 89:4, 90:14
reason [9] - 10:12, 12:5, 12:18, 23:11, 23:12, 38:6, 64:13, 65:8, 89:24
reasons [3] - 42:8, 65:4, 75:22
Rebecca [1] - 6:24
receive [1] - 36:14
recently [1] - 57:14
recited [1] - 56:20
recognize [1] - 15:23
record [11] - 17:4, 25:1, 25:19, 47:17, 48:5, 51:6, 64:8, 64:10, 65:12, 70:3, 70:22
records [2] - 47:2, 65:19
reduce [1] - 57:6
REDUCTION [1] - 92:20
REESE [2] - 2:14, 7:6
Reese [1] - 7:7
refer [2] - 10:24, 86:9
reference [2] - 53:8, 84:2
referred [1] - 59:19
referring [1] - 79:9
reflect [1] - 17:5
refrain [2] - 42:18, 45:25
reframe [1] - 88:20
regarding [4] - 22:20, 52:17, 75:24, 76:21
regardless [4] - 20:13, 27:7, 28:1, 43:6
Regents [6] - 23:19, 23:20, 54:9, 69:17, 69:20, 70:12
REGENTS [1] - 23:20
regime [1] - 84:7
regular [1] - 60:2
regularly [1] - 11:20
regulation [7] - 27:23, 28:20, 32:17, 44:17, 53:2, 53:4
regulations [17] - 21:3, 29:15, 29:21, 29:25, 30:4, 31:19, 32:13, 42:13, 42:16, 42:19, 43:14, 44:22, 50:5, 59:18, 59:24, 62:3, 78:20
REGULATIONS [2] - 92:17, 92:21
relate [1] - 80:9
relates [2] - 9:9, 57:9
relatively [2] - 58:20, 60:16
released [6] - 11:19, 55:1, 59:5, 64:5, 64:21, 78:9
releases [1] - 64:1
relevant [4] - 7:16, 54:21, 75:15, 75:16
reliance [2] - 55:13, 69:16
relied [1] - 85:1
relief [27] - 16:12, 16:14, 16:21, 19:3, 47:9, 66:22, 66:24, 67:5, 74:14, 74:17, 76:13, 76:25, 80:12, 80:23, 81:20, 81:21, 82:4, 84:18, 84:21, 85:4, 85:14, 86:15, 86:17, 86:18, 86:23
Relief [1] - 47:7
religiously [1] - 48:15
rely [2] - 33:20, 82:24
relying [2] - 18:16, 28:23
remain [2] - 26:18, 27:19
remains [2] - 12:24, 43:11
remedies [4] - 73:16, 73:17, 73:18
remedy [2] - 73:19, 82:18
remedying [3] - 18:23, 18:24, 73:10
removal [34] - 13:6, 18:5, 23:12, 27:11, 29:10, 47:4, 47:6, 52:1, 52:2, 52:13, 53:3, 54:4, 54:11, 54:22, 55:21, 61:2, 61:3, 61:5, 62:17, 68:12, 68:14, 68:15, 68:18, 68:22, 69:1, 69:4, 69:5, 69:6, 69:10, 82:7, 83:2, 83:7, 84:8
Removal [10] - 19:11, 22:21, 27:2, 51:17, 52:11, 53:7, 73:20, 77:2, 78:1, 82:6
remove [2] - 43:20, 48:8
removed [12] - 13:24, 27:7, 30:8, 33:9, 35:23, 36:5, 37:1, 48:23, 61:15, 73:22, 82:18, 83:22
render [1] - 15:20
Reno [7] - 28:22, 30:17, 30:24, 32:7, 41:20, 54:10, 82:14
reopen [1] - 37:2
repetition [1] - 15:15
replete [2] - 47:17, 70:4
reply [8] - 28:10, 31:14, 31:21, 35:7, 57:20, 62:23
report [2] - 43:7, 49:15
REPORTED [1] - 92:15
REPORTER [4] - 1:22, 17:14, 92:11, 92:24
REPORTER'S [1] - 1:17
represent [2] - 76:4, 89:25
representative [1] - 90:3
representing [1] - 15:4
represents [1] - 88:3
request [5] - 8:4, 19:2, 41:8, 52:3, 90:18
requesting [2] - 19:3, 55:4
requests [2] - 22:24, 23:3
require [9] - 23:1, 25:22, 52:20, 53:5, 55:14, 56:7, 56:9, 77:4, 89:3
required [7] - 22:23, 23:4, 44:23, 56:11, 58:7, 67:15, 78:10
requirement [1] - 22:7
requires [4] - 16:14, 49:1, 55:15, 78:9
rescinded [5] - 40:12, 40:15, 45:16, 45:18, 45:20
rescinds [1] - 39:4
reserve [1] - 91:1
resident [1] - 86:7
resolution [2] - 74:6, 89:11
resolve [1] - 51:23
resource [3] - 71:12, 71:15, 71:16
resources [3] - 71:8, 71:9, 71:14
respect [4] - 53:6, 63:14, 86:20, 88:18
respective [1] - 61:20
respond [5] - 26:7, 55:19, 67:21, 82:23, 83:1
response [11] - 14:15, 45:3, 45:9, 46:14, 48:4, 48:20, 55:4, 57:22, 61:17, 67:10, 90:19
restores [1] - 81:22
restrain [4] - 83:17, 85:11, 85:15, 85:19
restrains [1] - 77:13
return [5] - 37:12, 80:16, 80:23, 81:2, 81:19
review [8] - 7:15, 7:23, 15:15, 41:13, 66:3, 70:24, 71:2, 75:16
reviewable [3] - 31:6, 42:4, 68:22
reviewed [1] - 69:9
revised [2] - 42:11, 44:21
revocation [8] - 24:23, 29:13, 29:14, 29:17, 66:18, 79:13, 80:20, 82:2
Revocation [4] - 19:11, 19:22, 27:1, 78:4
revoke [8] - 23:12, 24:10, 24:14, 25:6, 55:19, 56:8, 67:8, 78:15
revoked [5] - 20:24, 24:4, 24:5, 29:9, 48:19

**revokes** [1] - 24:16
**revoking** [5] - 27:18, 67:5, 79:5, 79:19, 80:22
**rewriting** [1] - 83:24
**RIGHTS** [3] - 2:4, 2:9, 2:14
**rights** [5] - 30:11, 45:16, 55:2, 56:18, 81:6
**ripe** [1] - 16:4
**ripeness** [7] - 14:12, 15:24, 15:25, 16:6, 17:3, 17:7, 33:11
**risk** [5] - 25:12, 57:6, 58:13, 58:20, 60:15
**Rivas** [1] - 7:2
**RIVAS** [2] - 2:18, 7:2
**Riverside** [1] - 14:25
**Road** [4] - 75:8, 75:11, 75:12, 75:13
**road** [1] - 53:17
**robust** [2] - 47:24, 56:11
**rodeo** [1] - 72:5
**Rodriguez** [1] - 59:1
**room** [1] - 52:24
**routine** [1] - 60:7
**routinely** [1] - 41:8
**Ruano** [1] - 80:24
**Rule** [2] - 72:25, 89:1
**rule** [11] - 15:18, 21:14, 21:16, 21:17, 21:19, 21:22, 51:10, 82:25, 83:3, 84:17, 85:22
**rules** [5] - 42:13, 42:16, 44:22, 74:23, 84:12
**ruling** [2] - 77:8, 91:11
**run** [2] - 9:13, 86:2
**running** [1] - 7:13

## S

**safeguard** [2] - 29:18, 59:17
**safeguards** [3] - 58:21, 60:8, 60:15
**safety** [3] - 30:3, 31:19, 48:1
**Salgado** [1] - 82:16
**Samuels** [1] - 85:1
**sanction** [2] - 21:20, 22:6
**Sanctuary** [1] - 51:9
**SANTA** [2] - 2:7, 2:11
**Sarah** [1] - 6:19
**SARAH** [1] - 2:10
**satisfied** [2] - 58:18, 59:3
**saved** [2] - 71:15, 71:16
**scanning** [1] - 79:1
**scared** [1] - 49:14
**Scarsi** [1] - 59:13
**scenario** [1] - 23:9
**scenarios** [2] - 36:19, 54:14
**scheme** [7] - 30:23, 33:6, 37:5, 43:13, 45:12, 51:4, 60:11
**schemes** [2] - 28:20, 30:4
**scope** [4] - 72:3, 72:8, 74:2, 86:4
**sealed** [1] - 8:7
**second** [7] - 29:1, 32:3, 58:6, 58:12, 59:7, 62:14, 76:9
**SECRETARY** [3] - 1:12, 4:4, 92:7
**section** [3] - 32:25, 79:4, 84:3
**SECTION** [1] - 92:13
**Section** [5] - 28:22, 30:24, 83:16, 84:10, 84:13
**SECURITY** [3] - 1:13, 4:4, 92:8
**see** [3] - 29:23, 36:17, 83:9
**seeing** [1] - 90:15
**seek** [2] - 40:10, 91:1
**seeking** [6] - 55:17, 73:16, 73:17, 73:18, 76:15, 89:24
**seem** [1] - 38:9
**Semaia** [2] - 58:24, 59:13
**semantics** [1] - 19:13
**seminal** [1] - 89:8
**senate** [1] - 47:21
**Senator** [1] - 51:5
**send** [1] - 47:10
**sense** [4] - 7:18, 8:24, 29:14, 71:4
**sensitive** [5] - 8:19, 8:24, 9:6, 87:15, 88:9
**sent** [3] - 36:16, 36:21, 37:10
**separate** [5] - 15:4, 31:7, 44:15, 68:23, 76:23
**separated** [2] - 14:4, 14:6
**separation** [3] - 49:13, 49:21, 49:23
**series** [1] - 80:6
**serious** [2] - 47:25, 55:13
**serve** [1] - 34:18
**served** [3] - 34:23, 35:14
**service** [1] - 34:24
**SESSION** [1] - 6:3
**set** [13] - 26:19, 30:10, 74:8, 74:10, 75:23, 75:24, 76:1, 76:24, 77:14, 85:17, 86:12, 86:22, 89:24
**sets** [3] - 46:8, 76:21, 76:22
**settled** [1] - 83:11
**shadow** [1] - 19:19
**shall** [1] - 85:11
**sheet** [6] - 64:2, 64:3, 64:7, 64:15, 70:14, 70:21
**sheets** [1] - 65:17
**shield** [2] - 27:6, 28:15
**shift** [4] - 56:13, 63:24, 76:8, 84:7
**shifting** [2] - 41:1, 41:2
**short** [4] - 9:23, 45:7, 45:13, 51:2
**shortly** [1] - 38:24
**show** [1] - 70:14
**showed** [1] - 33:8
**shown** [1] - 35:1
**shows** [2] - 21:5, 22:2
**shy** [1] - 9:12
**sic** [1] - 20:22
**side** [3] - 7:9, 7:21, 9:24
**sides** [1] - 9:6
**sign** [1] - 13:12
**significant** [5] - 10:14, 35:17, 35:18, 57:15, 58:10
**similar** [8] - 13:3, 31:5, 32:9, 32:25, 41:22, 52:17, 69:3, 82:5
**simple** [3] - 10:5, 51:23, 73:1
**simply** [1] - 27:23
**Singh** [1] - 82:15
**single** [2] - 14:3
**situated** [1] - 24:19
**situation** [3] - 57:8, 57:10, 57:11
**situations** [1] - 48:16
**six** [6] - 49:22, 49:23, 49:24, 50:11, 67:24, 68:1
**Sixth** [1] - 52:15
**sky** [1] - 47:23
**slight** [1] - 39:8
**slow** [2] - 17:14, 33:17
**slowly** [3] - 31:15, 33:18
**small** [1] - 58:21
**society** [1] - 43:5
**sole** [5] - 21:2, 24:8, 66:19, 67:2
**solely** [1] - 84:18
**solid** [2] - 54:17, 82:11
**someone** [21] - 13:1, 13:5, 13:13, 22:24, 23:2, 23:10, 27:6, 29:3, 29:7, 30:8, 35:21, 43:20, 43:24, 46:22, 56:6, 60:12, 82:11, 82:18, 90:5, 90:8
**sometimes** [2] - 74:4, 74:5
**soon** [1] - 16:7
**sorry** [14] - 6:12, 10:25, 24:12, 25:25, 32:23, 33:21, 38:13, 57:20, 59:1, 59:20, 64:7, 80:10, 87:9, 88:10
**sort** [18] - 9:7, 10:3, 15:25, 16:16, 24:6, 26:6, 46:12, 50:3, 50:18, 50:19, 51:23, 64:15, 66:14, 67:9, 72:11, 80:7, 81:20, 89:21
**sorted** [1] - 49:25
**sound** [2] - 39:7, 68:1
**sounds** [3] - 9:15, 43:9, 66:10
**source** [1] - 66:16
**SOUTH** [2] - 2:19, 3:6
**speaks** [1] - 60:19
**SPECIAL** [1] - 4:4
**specially** [1] - 47:12
**specific** [6] - 9:9, 45:11, 45:15, 72:21, 80:8, 84:2
**specifically** [3] - 21:6, 84:10
**speculative** [2] - 16:2, 16:15
**spoken** [2] - 57:5, 69:15
**sponsor** [1] - 47:11
**sponsors** [2] - 47:3, 47:9
**SPRING** [1] - 3:6
**square** [1] - 51:24
**stage** [6] - 19:20, 48:5, 64:18, 70:2, 74:10, 78:12
**stand** [1] - 18:25
**stand-in** [1] - 18:25
**standards** [2] - 67:4, 67:5
**standing** [15] - 11:5, 11:7, 11:8, 13:13, 15:20, 16:10, 17:23, 18:12, 18:13, 18:17, 18:21, 88:18, 88:21, 88:23
**start** [10] - 8:14, 9:21, 10:4, 19:21, 21:18, 23:18, 56:10, 56:15, 67:14
**started** [4] - 9:19, 59:25, 81:15, 86:16
**starts** [1] - 24:6
**state** [4] - 6:7, 12:9, 87:18, 88:7
**statement** [3] - 21:23, 23:5, 23:25
**statements** [3] - 21:25, 22:4, 47:3
**STATES** [7] - 1:1, 1:23, 4:5, 92:12, 92:14, 92:18, 92:21
**states** [1] - 84:4
**States** [3] - 12:5, 49:2, 72:18
**stating** [1] - 47:23
**status** [26] - 9:9, 12:4, 12:8, 12:14, 12:16, 14:14, 18:4, 18:7, 27:8, 27:10, 27:18, 43:4, 43:7, 44:12, 59:23, 60:3, 60:13, 61:4, 61:15, 61:16, 63:14, 79:5, 79:7, 81:22
**statute** [10] - 43:14, 53:16, 53:19, 59:19, 62:3, 74:5, 83:5, 83:7, 83:23, 83:24
**statutes** [10] - 77:14, 77:24, 78:19, 78:23, 79:24, 80:2, 80:4, 84:23, 86:19
**statutory** [6] - 43:13, 51:23, 60:18, 60:20, 83:10
**stay** [17] - 22:24, 23:3, 24:2, 52:1, 52:3, 52:22, 54:3, 54:19, 54:21, 55:11, 61:20, 69:4, 74:2, 86:4, 86:5, 86:11
**stays** [7] - 52:10, 52:11, 53:1, 53:3, 69:4, 69:5, 82:7
**STENOGRAPHICALLY** [1] - 92:15
**step** [2] - 9:24, 26:10
**still** [27] - 11:19, 11:20, 16:14, 18:4, 18:5, 18:6, 25:22, 28:11, 30:7, 30:13, 30:14, 31:23, 33:9, 36:4, 36:5, 36:25, 37:1, 37:2, 37:11, 40:18, 48:23, 60:4, 60:15, 60:21, 64:17, 64:18, 85:18
**stipulation** [1] - 91:6
**straight** [1] - 51:21
**strategic** [1] - 18:18
**strategically** [1] - 34:2
**straw** [3] - 9:23, 45:7, 45:14
**streamline** [1] - 41:23
**streamlined** [2] - 31:8, 31:10
**STREET** [6] - 1:24, 2:6, 2:10, 2:15, 3:6, 4:6
**stripping** [2] - 83:15, 84:8
**struggled** [1] - 74:20

**struggling** [3] - 36:17, 42:22, 76:12
**stuff** [3] - 39:6, 45:14, 54:1
**subchapter** [1] - 84:2
**subject** [2] - 57:14, 66:2
**subjected** [2] - 17:2, 84:11
**submission** [1] - 91:10
**submit** [1] - 17:24
**subsection** [2] - 32:22, 32:24
**subsequent** [2] - 16:5, 84:3
**successful** [2] - 31:25, 71:6
**sue** [1] - 53:20
**suffered** [2] - 14:14, 16:25
**suffering** [4] - 11:11, 11:14, 11:15, 16:20
**suffice** [2] - 13:16, 13:20
**sufficient** [2] - 14:9, 31:13
**suggest** [3] - 17:11, 25:1, 67:10
**suggested** [1] - 20:4
**suggesting** [5] - 24:22, 36:18, 39:16, 61:22, 66:1
**suggests** [2] - 20:4, 85:25
**SUITE** [5] - 1:24, 2:6, 2:11, 2:15, 4:6
**summary** [1] - 70:1
**supercede** [1] - 39:14
**superceded** [1] - 41:5
**supercedes** [1] - 39:12
**supported** [1] - 33:6
**supposed** [1] - 50:20
**Supreme** [22] - 14:25, 23:20, 28:21, 28:23, 32:7, 41:20, 52:19, 63:5, 69:17, 72:11, 73:3, 75:16, 81:4, 82:12, 84:16, 84:19, 85:2, 85:3, 85:9, 85:12, 86:13, 87:20
**suspend** [2] - 85:11, 85:14
**suspenders** [3] - 53:21, 66:14, 91:6
**Sykes** [1] - 52:5
**system** [6] - 27:14, 27:21, 33:8, 35:5, 36:6, 36:9

**T**

**tactic** [1] - 34:3
**talks** [3] - 20:21, 51:9, 58:17
**Tax** [1] - 85:10
**tax** [2] - 85:12, 85:15
**Technology** [1] - 17:19
**ten** [1] - 87:25
**tennis** [1] - 26:8
**tens** [1] - 49:4
**terminate** [3] - 29:24, 59:22, 60:4
**terminated** [2] - 30:2, 50:11
**terms** [4] - 10:21, 63:11, 70:8, 83:4
**Terrible** [4] - 14:22, 15:11, 15:12
**territory** [5] - 30:5, 50:22, 62:18, 63:4
**test** [1] - 56:25
**testify** [1] - 43:8
**Texas** [1] - 45:21
**THAT** [2] - 92:13, 92:16
**THE** [209] - 2:4, 3:4, 4:3, 4:4, 6:4, 6:12, 6:17, 6:20, 6:23, 7:1, 7:4, 7:8, 7:12, 8:1, 8:3, 8:8, 8:11, 8:18, 9:5, 9:16, 9:19, 10:7, 10:19, 11:2, 11:5, 11:16, 11:22, 12:1, 12:6, 12:21, 13:1, 13:8, 13:11, 13:18, 13:21, 13:25, 14:10, 16:9, 16:17, 17:10, 17:14, 17:17, 18:14, 19:5, 19:7, 19:10, 19:24, 20:3, 20:15, 20:19, 20:25, 22:17, 23:9, 24:4, 24:9, 24:12, 24:16, 24:21, 25:2, 25:5, 25:9, 25:16, 25:20, 25:25, 26:5, 26:10, 26:24, 27:5, 27:15, 28:1, 28:3, 28:17, 29:1, 29:7, 30:9, 30:19, 32:3, 32:10, 32:18, 32:20, 33:2, 33:12, 35:3, 35:12, 35:16, 36:10, 37:7, 37:20, 38:5, 38:14, 38:20, 38:23, 39:2, 39:15, 39:20, 39:23, 40:12, 40:15, 42:5, 42:10, 42:14, 42:22, 43:18, 43:22, 45:1, 45:6, 46:11, 46:18, 48:3, 48:20, 49:5, 49:7, 51:2, 51:14, 51:17, 53:6, 53:14, 53:21, 54:2, 54:24, 56:12, 57:9, 57:18, 57:21, 58:1, 58:4, 59:9, 61:6, 61:12, 61:17, 62:9, 63:8, 64:7, 64:12, 65:8, 65:24, 66:6, 66:12, 66:21, 67:2, 67:13, 67:19, 67:22, 68:1, 68:5, 68:9, 70:6, 70:13, 70:20, 72:1, 73:4, 73:12, 74:1, 74:12, 74:15, 74:18, 75:1, 75:10, 75:12, 76:8, 76:16, 76:20, 77:25, 78:2, 78:17, 78:25, 79:3, 79:16, 79:22, 80:6, 80:15, 80:18, 80:25, 81:9, 81:23, 81:25, 82:9, 82:20, 82:22, 85:21, 86:24, 87:9, 87:14, 87:22, 88:2, 88:5, 88:15, 88:18, 88:22, 89:15, 89:18, 89:21, 90:6, 90:9, 90:17, 90:24, 91:3, 92:11, 92:12, 92:14, 92:15, 92:16, 92:17, 92:18, 92:20, 92:21
**theme** [1] - 66:12
**themselves** [4] - 10:16, 13:10, 18:24, 68:19
**theory** [3] - 22:24, 35:19, 43:18
**thereby** [1] - 35:22
**therefore** [1] - 77:21
**thereof** [1] - 21:20
**they've** [3] - 35:23, 55:1, 61:12
**thinking** [2] - 7:19, 74:23
**third** [2] - 18:25, 59:7
**third-party** [1] - 18:25
**THIS** [1] - 92:19
**thousands** [3] - 56:5, 88:3, 88:4
**three** [6] - 10:6, 10:8, 13:23, 14:5, 56:25, 76:14
**three-part** [1] - 56:25
**throughout** [1] - 46:24
**time-sensitive** [1] - 88:9
**timeframe** [1] - 34:24
**timeline** [2] - 33:23, 34:5
**TITLE** [1] - 92:14
**title** [1] - 47:4
**titles** [1] - 47:1
**TO** [1] - 92:13
**today** [2] - 47:22, 90:20
**together** [1] - 89:14
**ton** [1] - 71:9
**took** [1] - 49:21
**totality** [1] - 20:23
**touch** [1] - 38:7
**toward** [1] - 26:13
**TPS** [2] - 29:13, 72:5
**traceable** [1] - 88:24
**track** [7] - 27:14, 27:21, 33:7, 36:6, 36:7, 44:18, 62:6
**tracks** [1] - 37:3
**Trafficking** [1] - 47:19
**trafficking** [3] - 10:15, 47:14, 47:18
**trained** [2] - 47:13
**TRANSCRIPT** [4] - 1:17, 92:15, 92:17, 92:19
**transitory** [10] - 14:18, 15:16, 18:11, 33:14, 33:19, 33:23, 34:10, 50:14, 50:16, 50:21
**treaties** [1] - 28:23
**treating** [1] - 18:6
**treats** [1] - 89:16
**tried** [1] - 48:8
**TROs** [2] - 25:25, 36:14
**trouble** [1] - 13:17
**true** [4] - 18:1, 18:8, 22:19, 33:19
**TRUE** [1] - 92:14
**try** [1] - 9:13
**trying** [18] - 8:18, 8:19, 8:23, 34:15, 35:3, 35:9, 35:10, 47:9, 47:10, 63:11, 65:24, 65:25, 69:13, 72:15, 76:18, 78:25, 79:14, 87:5
**TUESDAY** [2] - 1:20, 6:1
**TVPRA** [1] - 77:18
**two** [22] - 27:14, 27:21, 27:24, 28:20, 29:25, 31:18, 31:19, 33:7, 35:2, 36:6, 41:18, 49:20, 53:10, 58:9, 62:6, 64:21, 65:6, 69:22, 85:3, 87:25, 88:1, 90:22
**two-track** [5] - 27:14, 27:21, 33:7, 36:6, 62:6
**types** [1] - 33:22
**typicality** [1] - 89:3

**U**

**U.S** [8] - 4:4, 14:7, 26:19, 48:13, 72:17, 81:2, 85:1, 85:8
**U.S.A** [1] - 53:17
**U.S.C** [3] - 21:17, 21:18, 85:10
**ultimate** [2] - 74:6, 74:9
**ultimately** [6] - 9:7, 35:4, 55:4, 58:12, 62:4, 74:9
**ultra** [3] - 53:16, 53:19, 53:24
**umbrella** [1] - 89:22
**unable** [1] - 15:18
**unanimous** [1] - 47:25
**under** [39] - 13:2, 23:7, 26:17, 28:14, 28:15, 37:5, 40:9, 40:22, 41:7, 42:4, 42:12, 42:16, 43:18, 44:4, 44:5, 44:16, 44:17, 44:21, 45:20, 46:7, 51:10, 54:12, 54:15, 60:11, 60:18, 63:20, 65:14, 67:5, 69:2, 69:5, 70:12, 72:18, 76:22, 79:20, 84:1, 88:10, 89:21, 91:10
**underlying** [3] - 37:23, 42:19, 43:13
**unfair** [2] - 68:15, 68:19
**unheard** [1] - 70:5
**uninherently** [1] - 33:19
**unique** [1] - 55:25
**unit** [1] - 47:13
**United** [3] - 12:5, 49:2, 72:18
**UNITED** [7] - 1:1, 1:23, 4:4, 92:12, 92:14, 92:18, 92:21
**unlawful** [2] - 13:10, 13:14
**unlawfully** [2] - 13:24, 82:18
**unless** [1] - 84:4
**unlike** [1] - 33:10
**unredacted** [1] - 34:18
**unreviewable** [1] - 66:19
**unripe** [1] - 16:5
**unsurprisingly** [1] - 67:17
**untouched** [1] - 37:24
**unwritten** [1] - 22:15
**up** [14] - 7:16, 9:7, 17:7, 21:5, 22:2, 24:24, 35:21, 40:3, 46:8, 51:21, 77:15, 82:23, 86:2, 86:25
**upheld** [1] - 58:18
**USCIS** [31] - 10:17, 19:25, 21:3, 23:15, 24:6, 24:7, 24:13, 24:15, 24:16, 27:21, 27:23, 36:7, 36:11, 37:25, 40:9, 41:8, 46:6, 46:9, 46:10, 46:16, 47:12, 47:13, 65:1, 66:17, 66:18, 66:25, 67:8, 67:17, 71:7, 71:16, 79:21
**USCIS's** [2] - 21:2, 66:19
**uses** [1] - 39:13
**utilizing** [1] - 37:9

## V

**vacate** [1] - 74:6
**Vakili** [8] - 6:9, 6:16, 45:6, 61:18, 87:10, 87:12, 87:14, 87:16
**VAKILI** [121] - 2:5, 6:8, 6:15, 7:24, 8:15, 10:1, 10:8, 10:20, 11:4, 11:8, 11:17, 11:24, 12:3, 12:10, 12:22, 13:5, 13:9, 13:12, 13:19, 13:22, 14:1, 14:16, 16:13, 16:18, 17:11, 17:16, 17:19, 18:19, 19:6, 19:9, 19:15, 19:25, 20:11, 20:16, 20:20, 21:1, 22:18, 23:17, 24:5, 24:10, 24:14, 24:18, 24:22, 25:3, 25:6, 25:10, 25:18, 25:21, 26:2, 26:9, 45:13, 46:15, 46:19, 48:5, 48:25, 49:6, 49:9, 51:7, 51:16, 51:21, 53:12, 53:15, 53:22, 54:5, 55:5, 66:15, 66:23, 67:3, 67:14, 67:20, 67:24, 68:3, 68:6, 68:10, 70:11, 70:17, 70:21, 72:10, 73:9, 73:13, 74:3, 74:13, 74:16, 74:25, 75:5, 75:11, 75:13, 76:14, 76:17, 76:21, 78:1, 78:3, 78:18, 79:2, 79:10, 79:17, 79:23, 80:10, 80:16, 80:19, 81:3, 81:10, 81:24, 82:1, 82:10, 82:21, 87:12, 87:18, 87:23, 88:3, 88:14, 88:17, 88:19, 88:23, 89:16, 89:19, 89:23, 90:7, 90:13, 90:25, 91:14
**valid** [1] - 79:7
**Vallez** [1] - 48:11
**valves** [2] - 30:3, 31:20
**varies** [2] - 57:8, 57:10
**VAWA** [5] - 88:11, 88:15, 89:1, 89:16, 89:25
**VC** [1] - 39:13
**VCA** [1] - 64:1
**venue** [2] - 87:24
**version** [1] - 84:9
**versus** [3] - 40:21, 69:19, 72:5
**vested** [1] - 58:8
**victim** [3] - 47:18, 63:11, 89:20
**Victim** [1] - 47:19
**victim-based** [1] - 89:20
**victims** [7] - 10:15, 43:1, 43:6, 47:8, 47:13, 88:11, 89:22
**victims-based** [1] - 89:22
**view** [3] - 27:5, 74:1, 75:19
**violate** [2] - 51:3, 78:6
**violated** [2] - 55:2, 56:18
**violates** [1] - 51:19
**violation** [1] - 25:11
**violence** [2] - 10:15, 47:14
**Violence** [1] - 47:20
**vires** [3] - 53:16, 53:19, 53:25
**virtually** [2] - 21:13, 85:4
**virtue** [1] - 51:4
**visa** [63] - 9:1, 9:2, 9:9, 23:2, 26:17, 26:18, 27:3, 27:7, 27:10, 27:16, 27:19, 28:20, 29:21, 29:22, 30:4, 30:7, 30:16, 30:21, 30:22, 32:13, 32:15, 32:21, 32:23, 33:8, 36:25, 37:14, 37:23, 37:24, 37:25, 42:19, 43:16, 44:11, 44:16, 44:19, 47:5, 48:24, 48:25, 49:1, 49:3, 49:11, 50:6, 52:17, 53:1, 55:9, 57:2, 59:18, 60:3, 60:9, 65:5, 88:4, 89:17
**visas** [14] - 27:10, 27:13, 27:22, 27:24, 30:16, 33:8, 42:25, 44:11, 44:19, 61:3, 61:9, 65:10, 70:14
**vs** [2] - 1:10, 92:6

## W

**wait** [1] - 68:5
**Wal** [1] - 89:7
**Wal-Mart** [1] - 89:7
**walk** [1] - 51:19
**Walter** [2] - 82:14
**wants** [3] - 71:5, 76:1, 76:6
**warrant** [1] - 25:13
**Waters** [1] - 82:16
**ways** [1] - 9:6
**weaknesses** [1] - 64:16
**weeds** [2] - 18:22, 77:12
**weeks** [2] - 35:2, 90:22
**weight** [2] - 20:6, 20:10
**well-established** [1] - 84:15
**WEST** [2] - 1:24, 2:15
**WESTERN** [1] - 1:3
**Westlaw** [4] - 58:25, 59:14, 75:14
**whole** [15] - 21:19, 21:22, 22:6, 22:24, 37:14, 37:19, 49:12, 56:20, 61:19, 69:13, 71:11, 72:15, 76:6, 87:10, 87:15
**wide** [7] - 11:7, 76:11, 76:13, 77:13, 78:8, 84:13, 89:10
**wildly** [1] - 71:6
**wind** [1] - 72:12
**WITH** [2] - 92:17, 92:20
**withdraw** [1] - 76:25
**withdrawing** [1] - 80:13
**withdrew** [1] - 80:13
**witness** [2] - 43:24, 63:12
**witnesses** [2] - 43:1, 43:6
**WL** [2] - 59:14, 75:14
**Women** [1] - 6:5
**WOMEN** [4] - 1:7, 2:4, 3:4, 92:4
**wondering** [1] - 72:12
**word** [5] - 28:10, 29:13, 41:5, 42:17, 56:8
**words** [2] - 27:6, 48:22
**workaround** [1] - 72:22
**works** [2] - 61:23, 65:16
**world** [1] - 74:23
**worried** [1] - 43:3
**wow** [1] - 17:19
**wrap** [2] - 82:23, 86:25
**write** [3] - 71:19, 76:18, 78:6
**written** [2] - 22:15, 67:9

## Y

**year** [5] - 34:8, 34:17, 59:11, 86:14
**years** [14] - 14:6, 23:22, 28:8, 49:4, 54:16, 54:17, 56:5, 57:11, 64:2, 64:21, 65:6, 84:17, 85:7
**York** [2] - 75:9, 75:13
**youngster's** [1] - 70:8

## Z

**zero** [3] - 47:21, 57:7, 70:9