UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

* * *

| | |
|---|---|
| IMMIGRATION CENTER FOR WOMEN AND CHILDREN,<br><br>Plaintiff,<br><br>v.<br><br>MARKWAYNE MULLIN, *in his official capacity as Secretary of Homeland Security*, et. al.,<br><br>Defendants. | Case No. 25-cv-9848 |

**DECLARATION OF ACTING DEPUTY ASSISTANT DIRECTOR SAM OLSON**

I, Sam Olson, declare the following under 28 U.S.C. § 1746, and state that under the penalty of perjury the following is true and correct to the best of my knowledge and belief:

1. I am employed by the Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) as the (Acting) Deputy Assistant Director for the Eastern Operations Division. I have held this position since May 17, 2026.

2. I have been employed by ICE since July 2006. Since that time, I have held several positions with ICE: Immigration Enforcement Agent (2006-2007); Deportation Officer (2007-2016) with experience in all aspects of the identification, arrest, case management, and removal of

aliens present in the United States in violation of law; Supervisory Detention and Deportation Officer (2016-2020) responsible for first-line supervision of Criminal Alien Program (CAP) and fugitive operations teams; Assistant Field Office Director (2020-2021) managing a portfolio of programs that included the fugitive operations teams, criminal alien program, criminal prosecutions, intelligence, special response team, and sub-offices in South Dakota and North Dakota; Deputy Field Office Director (2021-2024) with programmatic oversight over all enforcement and removal operations for the St. Paul Area of Responsibility; and Field Office Director (2024-2025) for ERO Chicago with oversight over all ERO operations within the six-state Chicago Area of Responsibility; and Field Office Director with the St. Paul Field Office (2025-2026).

3. Currently, as the Acting Deputy Assistant Director for the ERO Eastern Operations Division, I oversee the ERO Northeast and Southeast Operations, which includes 11 ERO Field Offices.

4. The statements in this declaration are based on my personal knowledge, reasonable inquiry, and information made available to me in the course of my official duties from information obtained from records, systems, databases, other DHS employees, and/or information portals maintained and relied upon by DHS.

5. This declaration is submitted in support of Defendants' Motion to Stay the Preliminary Injunction issued by the Court in this matter on May 20, 2026.

6. I have reviewed the Preliminary Injunction staying ICE Directive 11005.4, *Interim Guidance on Civil Immigration Enforcement Actions Involving Current or Potential Beneficiaries of Victim-Based Immigration Benefits* (Jan. 30, 2025). The Preliminary Injunction requires ICE to reinstitute the previous guidance set forth in ICE Directive 11005.3, *Using a Victim Centered Approach with Noncitizen Crime Victim*s and ICE Policy Statement 10076.1, *Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs* in favor of *I.C.W.C.* class members. The Preliminary Injunction severely compromises ICE's ability to carry out its immigration enforcement responsibilities nationwide.

**Impact of the Court's May 20, 2026, Order**

7. The Court's Preliminary Injunction frustrates and impedes ICE's mission of enforcing immigration laws, preventing terrorism, and combating transnational criminal threats. It is ERO's mission to identify, arrest, and remove aliens who present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally or otherwise undermine the integrity of the United States' immigration laws and border control efforts. ERO manages all logistical aspects of the removal process by identifying, apprehending, and, when appropriate, detaining removable aliens during the course of immigration proceedings and pending physical removal from the United States. When aliens are ordered removed, ERO is responsible for safely repatriating them, or otherwise overseeing their departure from the United States.

8. The Preliminary Injunction creates categories of illegal aliens who cannot be removed, even those with final orders of removal, thus clogging the federal removal process. The Preliminary Injunction also inserts additional process requirements at multiple choke points, arrest, detention, and removal. For instance, the Preliminary Injunction requires ICE to coordinate with USCIS to seek expedited adjudication for all aliens who are detained in ICE custody and are known to have pending T/U/VAWA petitions and/or applications or otherwise satisfy the Court that the statutory inquiry was done. Previously, under ICE Directive 11005.4, the decision to request expedited adjudication from USCIS was left to the ICE officer or agent's discretion. USCIS's published processing times for T Nonimmigrant Status are currently at 31.5 months, while processing times for U Nonimmigrant Status are currently at 19.5 months. Currently, there are approximately 194,000 pending VAWA self-petitions, 68,000 pending T nonimmigrant status applications and derivatives, and 421,000 pending U nonimmigrant status petitions and derivatives, resulting in over 683,000 potential class members. Given known USCIS backlogs with adjudicating U and T petitions and/or applications, the Deferred Action Class and Stay of Removal Class represent a long-duration operational constraint of people with final orders of removal whom ICE cannot remove. The result is a continually growing population of aliens who may be subject to final orders of removal that ICE cannot remove for potentially multi-year periods until USCIS can complete adjudication of the underlying petitions and/or applications.

9. The Court's Preliminary Injunction imposes significant and undue burden on ICE resources nationwide amid surging enforcement needs. For instance, the Preliminary Injunction requires ERO officers to affirmatively screen for pending T/U/VAWA petitions and/or applications of aliens before exercising any type of civil immigration enforcement action. This necessitates the additional step of ERO officers checking USCIS databases and liaising with USCIS personnel for verification of pending T/U/VAWA petitions and/or applications. However, the internal agency structures, chains of command, and processes that were available when ICE Directive 11005.3 was previously in effect have since been allocated elsewhere in the ERO operational systems or simply no longer exist. For instance, the Victim Centered Approach (VCA) Tracker, which was the tool that streamlined the approval process for civil immigration enforcement action conducted under ICE Directive 11005.3, was decommissioned following the January 2025 issuance of ICE Directive 11005.4. In other words, the Court's Preliminary Injunction essentially requires the agency to reinstate and enforce a former ICE policy in a vacuum. Because the Preliminary Injunction applies nationwide, this screening obligation attaches to every alien encounter in every ERO Field Office—not only to identified class members. Thus, officers must run these additional checks before any arrest, detention, or removal decision, slowing ERO's enforcement operations as a whole at a time of surging enforcement demand. ERO conducts thousands of civil immigration enforcement actions each month. Rebuilding the screening and approval infrastructure that existed under ICE Directive 11005.3 is a substantial undertaking, and, in the interim, ERO officers must perform these functions manually.

10. Further, the Preliminary Injunction's requirement to consider victim status as an affirmative positive discretionary factor under ICE Directive 11005.3 demands that ICE seek supervisory approval at any point in time when ICE seeks to take civil immigration enforcement action against those who are covered as class members under the Preliminary Injunction, adding another step to the process for ICE officers and agents. The Preliminary Injunction moreover requires ICE to consider claims of pending T/U/VAWA petitions and/or applications as positive discretionary factors, regardless of whether such claims are false, verifiable, or being used as delay tactics by aliens. Due to this, whenever someone is considered covered under ICE Directive

11005.3, ERO must seek approval for a civil immigration enforcement action from various officials in the chain of command, ultimately requiring high-level approval. This creates a significant burden for ERO both in regards to time and resources, as each individual alien's case must go through various levels of review before final approval occurs. Routing routine, time-sensitive enforcement decisions through this additional supervisory-approval layer creates bottlenecks throughout ERO's operations. And because ERO officers may not be able to immediately verify an alien's claimed petition at the initial point of encounter, an alien could assert an unverified or fabricated claim of a pending VAWA petition and/or application to delay enforcement—an incentive for false claims that the Preliminary Injunction helps create.

11. The Preliminary Injunction's screening and forbearance requirements also impair ICE's ability to act promptly to protect public safety. Because the Preliminary Injunction requires ERO officers to screen for, and to weigh as a positive discretionary factor, information suggesting that an alien has a pending T/U/VAWA petition and/or application before taking any civil immigration enforcement action—including an alien who is subject to a final order of removal or who presents public-safety concerns—this may invoke an unverified or even unfounded T/U/VAWA petition and/or application to forestall arrest, detention, or removal. Because USCIS adjudication of these petitions currently takes years, ICE may be unable during that period to detain or remove aliens it would otherwise take into custody. Aliens who remain at large in the interim may abscond before any removal can occur.

12. The Preliminary Injunction has caused significant confusion because the reinstated ICE Directive 11005.3 comprises guidance for groups of aliens outside the recognized class members. For instance, the Preliminary Injunction specifically identifies those with pending T/U/VAWA petitions as class members but does not carve out other categories of aliens identified in ICE Directive 11005.3, such as T/U/VAWA beneficiaries, applicants for or beneficiaries of Special Immigrant Juvenile (SIJ) benefits, and applicants for or beneficiaries of Continued Presence. Because the Preliminary Injunction did not contemplate these other categories of aliens discussed under ICE Directive 11005.3, it is unclear if the Court meant to provide relief for these non-party categories as well. Because the Preliminary Injunction requires ERO officers to apply

ICE Directive 11005.3 without knowing whether the Court intended its protections to reach these additional categories, ERO officers face a choice between overapplying forbearance to aliens outside the identified classes or risking a violation of the Preliminary Injunction—either of which disrupts ICE's enforcement operations.

13. The Preliminary Injunction has also caused further confusion as it provides that in addition to named Plaintiffs and the recognized classes, the Preliminary Injunction must be applied in favor of the Organizational Plaintiffs' current and future clients. However, the Organizational Plaintiffs' current and future clients have never been identified to ICE. In addition, the Complaint (ECF No. 1) provides that the Organizational Plaintiffs consist of alien members, only some of which have pending T/U/VAWA petitions and/or applications. As such, it is unclear whether the Preliminary Injunction meant to provide relief for all Organizational Plaintiffs' current and future clients, regardless of whether such clients had pending T/U/VAWA petitions and/or applications. And because ICE cannot identify who the Organizational Plaintiffs' current and future clients are, ERO officers have no way to determine at the point of an alien's encounter whether the given alien is within the Preliminary Injunction's protection or not, compounding the risk that ICE's lawful enforcement actions will later be second-guessed as violations.

14. The Preliminary Injunction does not specifically mandate immediate release of class members, but it does require ICE to consider discretionary release under ICE Directive 11005.3. As discussed above, the internal agency structures, chains of command, and processes that were available when ICE Directive 11005.3 was previously in effect no longer exist. When ICE Directive 11005.3 was previously in effect, ERO field offices had delegated authority to release aliens based on their discretionary review. Presently, however, discretionary release is permitted on an individual basis only after obtaining appropriate high-level supervisory approval from ICE Headquarters. In other words, obtaining the necessary approvals for each class member's discretionary release is a lengthy process that follows a strict chain of command. Because that approval must be obtained for each alien individually, and through ICE Headquarters, applying the Preliminary Injunction across a class of this size is not workable within ordinary operational timeframes and diverts ICE's resources from other enforcement priorities.

Executed on this 26th day of June 2026.

SAMUEL J OLSON
Digitally signed by SAMUEL J OLSON
Date: 2026.06.26 15:17:14 -05'00'

Samuel Olson
Acting Deputy Assistant Director
Eastern Operations Division – Field Operations
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security